IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CRABAR/GBF, INC, <br><br> Plaintiff and Counterclaim Defendant, <br><br> vs. <br><br> MARK WRIGHT AND WRIGHT PRINTING CO., <br><br> Defendants and Counterclaimant. | 8:16-CV-537 <br><br> MEMORANDUM AND ORDER |

    This dispute involves the purchase of a custom printing business located in Omaha, Nebraska. The plaintiff, Crabar/GBF, Inc., bought the business from the defendants, Mark Wright and Wright Printing Co.—but now, Crabar is suing them for allegedly breaching various contractual obligations by reentering the custom printing business and using assets previously sold to Crabar. Wright and Wright Printing have counterclaimed, arguing that Crabar, too, breached various contractual obligations.

    This matter is before the Court on the parties' cross-motions for partial summary judgment (filing 56; filing 75), and Crabar's motion to dismiss (filing 65) Wright and Wright Printing's counterclaim. For the reasons set forth below, the Court will grant Wright Printing's partial motion for summary judgment (filing 75) with respect to § 5 of the Purchase Agreement, and deny Crabar's partial motion for summary judgment (filing 56). The Court will also grant Crabar's motion to dismiss (filing 65) Wright and Wright Printing's counterclaim.

## BACKGROUND

Mark Wright is the president and CEO of Wright Printing, a Nebraska corporation specializing in designing and manufacturing custom printed pocket folders. Filing 45 at 2. Crabar is in the business of producing printed business materials for commercial vendors. Filing 45 at 2. In September 2013, Wright Printing sold its custom printing business to Crabar for approximately $15 million. Filing 45 at 48-90. And in effectuating that sale, the parties entered into a series of agreements, two of which are particularly important for purposes of this suit: the Asset Purchase Agreement ("the Purchase Agreement") and the Release Agreement. *See* Filing 45 at 48-100; filing 45 at 93-100.

Under the Purchase Agreement, Crabar acquired the assets of three custom printing entities: (1) "Folder Express," (2) "Progress Music," and (3) "Progress Publications" (collectively, the "custom printing business"), all of which were previously owned and operated by Wright Printing. Filing 45 at 3-5; *see also* filing 45 at 48-90. As part of the Purchase Agreement, Wright Printing also promised that it would not, at any time, use the tradenames, domain names, and other intellectual property associated with its custom printing business. Filing 45 at 63. Nor would it use or disclose any confidential information involving the "manufacturing processes, methods of operation, products, financial data, sources of supply and customers." Filing 45 at 64.

In addition to acquiring various assets under the Purchase Agreement, the parties agreed that Crabar would enter into a lease with 11616 I Street, LLC—a limited liability company managed by Wright. Filing 45 at 12. The lease allowed Crabar to operate the custom printing business out of the same Omaha facility that it had occupied prior to the acquisition. Filing 45 at 12.

But in the spring of 2015, tensions between the parties began to rise. Around this time, Wright notified Crabar that 11616 I Street, LLC, would not renew Crabar's lease, and that the property must be vacated by September 30, 2015. Wright offered to extend Crabar's lease to December 30, 2015 to give Crabar enough time to find an alternative location, but on two conditions: (1) that Crabar release and return $1.1 million held in escrow as security for legal claims arising under the terms of the Purchase Agreement, and (2) that Crabar release Wright Printing from all representations and warranties under the Purchase Agreement. Filing 45 at 16. Crabar agreed to those terms, and on June 25, 2015, Crabar released the escrow funds and the parties executed the second agreement at issue in this case—the Release Agreement. Filing 45 at 93-100.

The Release Agreement, in essence, extinguished nearly[1] all existing rights, and obligations, of the parties under the Purchase Agreement. *See* filing 45 at 93-100. Indeed, the agreement explicitly terminated "all indemnification and other obligations of performance for which [the parties are] otherwise responsible under the Purchase Agreement[.]" Filing 45 at 94. And it released all causes of action and claims for relief arising under the Purchase Agreement. Filing 45 at 95. It also included a non-disparagement provision which prohibited the parties from making negative, derogatory, or disparaging comments about one another. Filing 45 at 96-97.

It is against that backdrop that this litigation ensued. Once the lease ended—and Crabar vacated the Omaha facility—on December 30, 2015, Wright Printing began using the building to re-launch two custom printing businesses: "Pocket Folders Fast" and "Bandfolder Press." This re-

---

[1] The Court acknowledges that the Release Agreement specifically preserves the rights, and obligations, found in §§ 7.1-7.4 of the Purchase Agreement. Filing 45 at 94-95.

launch, Crabar alleges, violates several of Crabar's contractual, common law, and statutorily protected rights.

Specifically, Crabar's amended complaint asserts nine theories of recovery: (1) breach of contract, *i.e.* the Purchase Agreement, against Wright Printing only; (2) misappropriation of trade secrets in violation of Neb. Rev. Stat. § 87-504; (3) tortious interference with business relationships; (4) federal trademark infringement in violation of 15 U.S.C. § 1114(1) (against Wright Printing only); (5) federal unfair competition in violation of 15 U.S.C. § 1125(a) (against Wright Printing only); (6) unfair completion (against Wright Printing only); (7) violation of the Nebraska Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-302 (against Wright Printing only); (8) fraud; and (9) breach of contract, *i.e.* the Release Agreement. Wright and Wright Printing have asserted a counterclaim alleging that Crabar breached the non-disparagement provision of the Release Agreement.

Crabar has moved to dismiss the counterclaim, and the parties have filed cross-motions for partial summary judgment on Crabar's first claim for relief—breach of the Purchase Agreement. Those motions will be denied in part, and granted in part, as set forth below.

## STANDARD OF REVIEW

### RULE 12(B)(6)

A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

4

555 (2007). For the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.*

And to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal,* 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief. *Id.* at 679.

Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* The facts alleged must raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the plaintiff's claim. *See Twombly,* 550 U.S. at 545. The court must assume the truth of the plaintiff's factual allegations, and a well-pleaded complaint may proceed, even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. *Id.* at 556.

When deciding a motion to dismiss under Rule 12(b)(6), the Court is normally limited to considering the facts alleged in the complaint. If the Court considers matters outside the pleadings, the motion to dismiss must be converted to one for summary judgment. Fed. R. Civ. P. 12(d). However, the Court may consider exhibits attached to the complaint and materials that are necessarily embraced by the pleadings without converting the motion. *Mattes v. ABC Plastics, Inc.,* 323 F.3d 695, 697 n.4 (8th Cir. 2003). Documents necessarily embraced by the pleadings include those whose contents are

alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading. *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012). The Court may also take notice of public records. *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007).

RULE 56(A)

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken

6

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Torgerson, 643 F.3d at 1042.

Rule 56 also allows the Court to grant summary judgment as to some issues but not as to others. *See* Fed. R. Civ. P. 56(a). Upon doing so, the Court may "enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute," and thereby treat such a fact "as established in the case." Fed. R. Civ. P. 56(g).

DISCUSSION

I. CRABAR'S BREACH OF CONTRACT CLAIM

As briefly mentioned above, the parties have filed cross-motions for partial summary judgment as to Crabar's breach of contract claim—which the parties agree is governed by Delaware law. *See generally* filing 58; filing 76. That claim is premised on §§ 5.1 (c) and (e) of the Purchase Agreement.[2] Those provisions, generally speaking, contain restrictive covenants prohibiting Wright Printing from utilizing the "Names, Domain Names, any derivations thereof and all other Intellectual Property currently used in the [custom printing] Business" and from using, or disclosing, any "Confidential Information" it acquired while working in the custom printing business. Filing 45 at 63-64. "Confidential Information" is further defined in the Purchase Agreement as "(i) all trade secrets as defined under applicable statute or common law, and (ii) other confidential information of or about [Wright Printing], including, without limitation, any such information

---

[2] The Court acknowledges that Crabar's sur-reply may be broadly construed as implicating § 7 of the Purchase Agreement. *See* generally filing 130. But because neither Crabar nor Wright Printing moved for partial summary judgment on that provision, it is not addressed in this Memorandum and Order.

7

regarding the business of [Wright Printing], its manufacturing processes, methods of operations, products, financial data, sources of supply and customers." Filing 45 at 64. According to Crabar, Wright Printing breached §§ 5.1(c) and (e) by using its trademarks, trade secrets, and product specifications in its operation of Pocket Folders Fast and Bandfolder Press. *See generally* filing 58 at 32-58.

But the dispositive issue before the Court is not actually whether Wright Printing's actions violated §§ 5.1(c) and (e) of the Purchase Agreement. Rather, the parties' dispute turns on the legal significance of the parties' subsequent agreement: the Release Agreement. In other words, Wright Printing claims that in executing the Release Agreement, the parties effectively terminated all obligations of performance, including those found in §§ 5.1(c) and (e), and released all legal claims Crabar may have previously pursued under the Purchase Agreement. *See* filing 76 at 27. And because Crabar's breach of contract claim is based on the Purchase Agreement which, according to Wright Printing, is no longer operative, Wright Printing urges dismissal of Crabar's breach of contract claim as a matter of law.

To support its argument, Wright Printing points to two provisions of the Release Agreement—§§ 2(c) and 6. Wright Printing claims that § 2(c) generally terminates the duties imposed under §§ 5.1 (c) and (e) by discharging all obligations of performance under the Purchase Agreement. Filing 45 at 94. In the alternative, Wright Printing points to § 6 of the Release Agreement which, it claims, releases the parties from all causes of action or claims for relief arising out of a breach of the Purchase Agreement. Filing 45 at 95.

Wright Printing's latter contention is easily disposed of, so the Court will begin there. Specifically, Wright Printing claims § 6 is necessarily broad

enough to insulate it from *any* future liability arising out of obligations imposed by the Purchase Agreement. Indeed, § 6 "forever discharges [Wright Printing] . . . from any and all manners of actions, causes of action, claims for relief, in law or in equity . . . of any nature whatsoever, known or unknown, fixed or contingent . . . based on the Purchase Agreement and rights, obligations, [and] covenants and indemnities arising thereunder[.]" Filing 45 at 95. And on its face, that language is, at least arguably, broad enough to encompass future claims, or causes of action.

Crabar does not dispute the breadth of § 6. Rather, as Crabar correctly points out, there are some circumstances where "dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract." *Salamone v. Gorman*, 106 A.3d 354, 370 (Del. 2014). And this is one of those instances. Indeed, Delaware courts have repeatedly held that parties cannot bar, or release, claims that have not accrued as of the date of execution. *See UniSuper Ltd. v. News Corp.*, 898 A.2d 344, 348 (Del. Ch. 2006); *see also Pineda v. Steinberg*, 2008 WL 4817088, at *2 (Del. Super. Ct. Oct. 29, 2008). And here, Wright Printing attempts to use § 6 to do exactly that. After all, the parties do not dispute that the Release Agreement was executed on June 25, 2015, but that Crabar's contract claim did not accrue until Wright Printing began marketing and preparing to launch its competing printing businesses in January 2016.[3] *See Certainteed Corp. v.*

---

[3] The Court acknowledges that despite the fact that Crabar has, repeatedly, admitted that Wright Printing did not begin to launch its competing printing business until January 2016, *see* filing 45 at 20; filing 58 at 4-5; it has also suggested that Wright Printing began "preparing" to launch "Pocket Folders Fast" prior to 2016. Filing 16 at 53. Specifically, Crabar claims that Mardra Sikora, Mark Wright's daughter, purchased the domain name www.pocketfoldersfast.com in August, 2014. Filing 58 at 16. But even assuming these allegations are true, as Wright Printing correctly points out, Crabar has not provided the

9

*Celotex Corp.*, 2005 WL 217032, at *7 (Del. Ch. Jan. 24, 2005) (breach of contract claim accrues at the time the breach occurs). So, although § 6 could be construed as releasing Wright Printing from liability under these circumstances, the Court cannot enforce the provision to the extent that it bars future causes of action in violation of public policy. *See UniSuper Ltd.*, 898 A.2d at 348. Accordingly, Wright Printing's partial motion for summary judgment on these grounds will be denied.

That leaves Wright Printing's remaining argument: that § 2(c) of the Release Agreement effectively terminates, and discharges, the parties remaining obligations under the Purchase Agreement. That is, Wright Printing argues that, under the plain language of §2(c), the Purchase Agreement is no longer enforceable.

As previously mentioned, § 2(c) states in relevant part:

> In addition, except as otherwise provided in this Agreement, all indemnification and other obligations of performance for which [Wright Printing] is otherwise responsible under the Purchase Agreement from and after the date hereof, and Purchaser's rights to seek any recourse or remedy in relation thereto are hereby immediately terminated and cancelled by the parties and of no further force and effect.

Filing 45 at 94.

---

Court with any, much less significant, evidence, showing how, or why, Sikora is bound to the terms of the Purchase Agreement. Indeed, Sikora was not employed at Wright Printing at the time of the acquisition, nor was she associated with the custom printing industry—much less Wright Printing—when she purchased the domain name in August 2014. *See* filing 73-3 at 2-3.

The parties' dispute turns on the Court's interpretation of the phrase "obligations of performance." That is, according to Wright Printing, "obligations of performance" necessarily includes *all* obligations under the Purchase Agreement. Crabar, however, reads that phrase as only terminating *some* obligations. Filing 87 at 21-22. In other words, Crabar claims that §2(e) terminates *affirmative* obligations (*i.e.* shall indemnify), but not *restrictive* obligations (*i.e.* shall not use confidential information) under the Purchase Agreement.

But the Court does not find Crabar's interpretation of §2(c) persuasive. Indeed, Crabar has provided the Court with no authority to suggest that the words "obligations of performance" are, in similar circumstances, understood as only encompassing affirmative duties to act. To the contrary, courts have repeatedly construed performance obligations as encompassing *both* affirmative and restrictive requirements. *See Medek v. Medek*, 2009 WL 2005365, at *12 (Del. Ch. July 1, 2009) (discharging the defendant from her "obligation to perform" which included her obligation not to compete with the plaintiff); *see also USA Commercial Mortg. Co.*, 2007 WL 2571947, at *14 (D. Nev. Aug. 29, 2007) (finding that an outstanding performance obligation includes a duty to refrain from taking certain actions); *Long John Silver's, Inc. v. Washington Franchise, Inc.*, 1980 WL 30249, at *3 (E.D. Va. June 24, 1980) (finding that the defendant breached its "obligation to perform" under the agreement by using and adopting trade secrets it was prohibited from acquiring).

More fundamentally, though, Crabar's interpretation violates generally held principles of contract interpretation. Indeed, Crabar's narrow construction of §2(c) would render § 2(e) superfluous. *See Osborn ex rel.*

11

*Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010). Section 2(e) states, in relevant part:

> Notwithstanding the foregoing amendment [§§ 2(a)-(d)], it is expressly agreed that the foregoing amendment shall not limit or otherwise amend the terms of the Restrictive Covenants Applicable to Seller [Wright Printing] and Affiliates under Section 7.1 of the Purchase Agreement or the Restrictive Covenants Applicable to Purchaser [Crabar] and affiliates under Section 7.2 of the Purchase Agreement or the related remedies permitted for breach thereof. . . .

Filing 45 at 94. And as Wright Printing correctly points out, had § 2(c) terminated only the *affirmative* obligations, leaving intact all *restrictive* obligations, then § 2(e) would have no practical purpose. As noted above, § 2(e) preserves three specific *restrictive* covenants—*i.e.*, the covenant not to compete, the covenant not to solicit employees and customers, and the covenant not to disclose. *See* filing 45 at 70-71.

Stated another way, the parties intentionally preserved three *restrictive* covenants knowing that the others were released pursuant to § 2(c). So, to be given effect, § 2(e) must be construed, at the very least, as an implicit acknowledgment that § 2(c) terminates *both affirmative* and *restrictive* obligations of performance. And because Crabar's breach of contract claim stems from obligations imposed under the Purchase Agreement, which were expressly terminated by § 2(c) of the Release Agreement, the Court will dismiss that claim as a matter of law.

## II. WRIGHT PRINTING'S COUNTERCLAIM

As briefly mentioned above, Crabar has also moved to dismiss Mark Wright and Wright Printing's (collectively, the counterclaimants) breach of contract counterclaim. The counterclaimants allege that Crabar violated § 9 of the Release Agreement, which prohibits the parties from making any statements that "might reasonably be construed to be derogatory or critical of, or negative . . . or [would] malign, harm, disparage, defame, or damage" the reputation of the counterclaimants' custom printing business. Filing 45 at 96-97. Specifically, the counterclaim contains allegations involving two general categories of statements allegedly made by Crabar—those about "its landlord's unwillingness to renew [Crabar's] lease" agreement, and those concerning the counterclaimants' previous "mismanagement" of the printing business. Filing 49 at 32-33.

In response, Crabar raises two arguments to support why, in its view, the counterclaim must be dismissed. First, Crabar contends that no plausible inference of disparagement can be found from Crabar's comments about its landlord. In other words, Crabar argues that, to state a plausible claim, the counterclaimants must allege facts and statements that could reasonably be construed as having an adverse effect on the counterclaimants' custom printing reputation. *See* filing 66 at 4. And because the counterclaimants have not alleged how or why such statements are disparaging, the countercomplaint necessarily fails. And second, Crabar claims that its comments about the counterclaimants' purported "mismanagement" lacks any meaningful factual allegations needed to state a claim for relief. *See* filing 66 at 7-9. That is, the counterclaimants' complaint is "so vague and wanting in basic details" that it lacks any plausibility. Filing 79 at 7.

The Court will first address Crabar's arguments concerning its statement pertaining to "its landlord" before moving on to the statements of "mismanagement." Generally speaking, Crabar claims that the statement it made concerning its landlord's decision not to renew its lease is true, and as such, cannot be disparaging as a matter of law. *See* filing 66 at 5. Crabar also contends that even assuming the statement was not true, under no circumstances could it be construed as "derogatory, negative, or critical" of the counterclaimants or their custom printing business. *See* filing 45 at 96.

Crabar's former argument, however, appears to confuse contract and defamation jurisprudence. Indeed, as the counterclaimants correctly point out, the language of the non-disparagement clause prohibits "*any* remark, comment, message, information, declaration, communication or other statement of *any* kind" which harms, disparages, defames, or damages the reputation of the parties—not only *false* statements. Filing 45 at 96. And while falsity may be required to state a claim for defamation, it has no bearing on whether Wright Printing violated its contractual obligations under the Release Agreement. *See Khushaim v. Tullow Inc.*, 2016 WL 3594752, at \*3 (Del. Super. Ct. June 27, 2016).

Even so, the counterclaim still fails to state a claim for which relief can be granted. To plausibly state a breach of contract claim, the pleading must allege: (1) the existence of a contract; (2) that the contract was breached; and (3) damages suffered as a result of the breach. *Khushaim,* 2016 WL 3594752, at \*3. That is, the statement made must "be derogatory, or critical, or negative toward . . . disparage, defame, or damage" the counterclaimants to be in violation of § 9 of the Release Agreement. Filing 45 at 96. But under no set of facts could Crabar's statement that "its landlord refused to renew its lease" plausibly demonstrate a breach of § 9. *See* filing 45 at 32*; see also* filing

14

45 at 96. That statement is not "derogatory, critical or negative toward" the counterclaimants' custom printing business. Filing 45 at 96. At the very most, that statement *might* plausibly support an inference of disparagement if the counterclaimants were in the business of property management, or real estate—but it is, in no way, disparaging of Wright or Wright Printing's custom printing business.[4] So, the counterclaim's allegations, however true, could not amount to a breach of the Release Agreement and thus, fail to state a claim for which relief can be granted. *See Twombly*, 550 U.S. at 558; *Iqbal*, 556 U.S. at 678.

And the counterclaimants' "mismanagement" allegations fare no better. While the counterclaim alleges that Crabar "published false or misleading statements blaming its inefficiencies, failures to meet deadlines, failures to timely meet orders, and customer service deficiencies on Wright or Wright Printing," the counterclaim it is completely devoid of any facts to support this statement. *See* filing 49 at 33. Even liberally construed, the "mismanagement" allegations are too vague and conclusory to state a claim for relief. *See Iqbal,* 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). Accordingly, the Court will grant Crabar's motion to dismiss the counterclaim in its entirety.

---

[4] The Court acknowledges the counterclaimants' contention that because Wright is a member of 11616 I Street, LLC, the non-disparagement provision necessarily applies. *See* filing 45 at 96. But as Crabar correctly points out, 11616 I Street, LLC is an entirely separate legal entity with no association to the custom printing business. Filing 66 at 4. So, the non-disparagement agreement, cannot, and does not, apply.

III. MOTION FOR SANCTIONS

As a final matter, Wright Printing has moved for sanctions under Federal Rule of Civil Procedure 11, arguing that Crabar's original assertion of its breach of contract claim was "objectively unreasonable" given the language of existence of the Release Agreement. *See* filing 76 at 54. But Wright Printing's request for sanctions is without merit, and as such, the Court declines to order Rule 11(c) sanctions in this case.

IT IS ORDERED:

1. Crabar's motion for partial summary judgment (filing 56) as to § 5.1 (c) is denied.

2. Wright and Wright Printing's motion for partial summary judgment (filing 75) as to §§ 5.1 (c) and (e) is granted.

3. Crabar's motion to dismiss (filing 65) Wright Printing's counterclaim is granted.

4. Wright and Wright Printing's counterclaim is dismissed.

Dated this 16th day of March, 2017.

BY THE COURT:

John M. Gerrard
United States District Judge