IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CRABAR/GBF, INC,

              Plaintiff,

vs.

MARK WRIGHT, et al.,

              Defendants.

8:16-CV-537

MEMORANDUM AND ORDER

This dispute involves the purchase of a custom printing business located in Omaha, Nebraska. The plaintiff, Crabar/GBF, Inc., bought the business from the defendants, Mark Wright and Wright Printing Co., in autumn 2013. Now, Crabar is suing Wright and Wright Printing for allegedly breaching various contractual obligations by reentering the custom printing business and using assets previously sold to Crabar. Crabar is also suing Wright Printing's now CEO, Mardra Sikora, and two Wright Printing employees, Jamie Fredrickson and Alexandra Kohlhaas, for their part in various alleged wrongdoings associated with the Wright Printing re-launch. *See* filing 224.

This matter is before the Court on Crabar's motion to set aside the Court's previous Memorandum and Order (filing 244) dismissing its breach of contract claim against Wright Printing, and two motions to dismiss filed by the defendants (filing 226 and filing 228). For the reasons set forth below, the Court will grant Crabar's motion to set aside, and grant in part and deny in part the defendants motions to dismiss.

## I. BACKGROUND

The facts of this case are set forth in detail in the Court's prior Memorandum and Order. Briefly summarized, the corporate parties in this case, Crabar and Wright Printing, are both in the custom printing business. Filing 224 at 3. Mark Wright is the president of Wright Printing. Filing 224 at 23. Mardra Sikora is Wright's daughter and now CEO of Wright Printing, and Jamie Fredrickson and Alexandra Kohlhaas are former Crabar employees who now work for Wright Printing. Flng 224 at 3, 23.

In September 2013, Wright Printing sold its custom printing business to Crabar for approximately $15 million. Filing 45 at 48-90. In effectuating that sale, the parties entered into a series of agreements, two of which are particularly important for purpose of this suit: the Asset Purchase Agreement ("the Purchase Agreement") and the Release Agreement. *See* Filing 45 at 48-100; filing 45 at 93-100.

Under the Purchase Agreement, Crabar acquired the assets of three custom printing entities: (1) "Folder Express," (2) "Progress Music," and (3) "Progress Publications" (collectively, the "custom printing business"), all of which were previously owned and operated by Wright Printing. Filing 45 at 3-5; *see also* filing 45 at 48-90. As part of the Purchase Agreement, Wright Printing also promised that it would not, at any time, use the tradenames, domain names, and other intellectual property associated with its custom printing business. Filing 45 at 63. Nor would it use or disclose any confidential information involving the "manufacturing processes, methods of operation, products, financial data, sources of supply and customers." Filing 45 at 64.

In addition to acquiring various assets under the Purchase Agreement, the parties agreed that Crabar would enter into a lease with 11616 I Street, LLC—a limited liability company managed by Wright. Filing 45 at 12. The

lease allowed Crabar to operate the custom printing business out of the same Omaha facility in which Wright Printing had operated it before the acquisition. Filing 45 at 12.

But in the spring of 2015, tensions between the parties began to rise. Around this time, Wright notified Crabar that 11616 I Street, LLC, would not renew Crabar's lease, and that Crabar would need to vacate the property by September 30, 2015. Wright offered to extend Crabar's lease to December 30, 2015 to give Crabar enough time to find an alternative location, but on two conditions: (1) that Crabar release and return $1.1 million held in escrow as security for legal claims arising under the terms of the Purchase Agreement, and (2) that Crabar release Wright Printing from all representations and warranties under the Purchase Agreement. Filing 45 at 16. Crabar agreed to those terms, and on June 25, 2015, Crabar released the escrow funds and the parties executed the second agreement at issue in this case—the Release Agreement. Filing 45 at 93-100.

The Release Agreement, in essence, extinguished nearly[1] all existing rights and obligations of the parties under the Purchase Agreement. *See* filing 45 at 93-100. Indeed, the Release Agreement explicitly terminated "all indemnification and other obligations of performance for which [the parties are] otherwise responsible under the Purchase Agreement[.]" Filing 45 at 94. And it released all causes of action and claims for relief arising under the Purchase Agreement. Filing 45 at 95. It also included a non-disparagement provision which prohibited the parties from making negative, derogatory, or disparaging comments about one another. Filing 45 at 96-97.

---

[1] The Release Agreement did specifically preserve the rights and obligations found in §§ 7.1-7.4 of the Purchase Agreement. Filing 45 at 94-95.

It is against that backdrop that this litigation ensued. Once the lease ended—and Crabar vacated the Omaha facility—on December 30, 2015, Wright Printing began using the building to re-launch two custom printing businesses: "Pocket Folders Fast" and "Bandfolder Press." This re-launch, Crabar alleges, violates several of Crabar's contractual, common law, and statutorily protected rights.

## II. PROCEDURAL HISTORY

The procedural history of this case is somewhat unique, so it bears explanation. In December 2016, Crabar filed its initial complaint (filing 1) against Wright and Wright Printing only. That complaint was amended in May 2017—adding a single breach of contract cause of action. *Compare* filing 1 at 1-100 *with* filing 45 at 1-100. Shortly after Crabar filed its amended complaint, the parties filed cross-motions for partial summary judgment on Crabar's first claim for relief, breach of the Purchase Agreement. Filing 56 at 1. Crabar also moved to dismiss Wright and Wright Printing's counterclaim. The Court granted Wright and Wright Printing's motion for partial summary judgment as to §§ 5.1 (c) and (e) under the Purchase Agreement and dismissed Wright and Wright Printing's counterclaim. *See* filing 137 at 16.

After the Court's March 16, 2019 Memorandum and Order, a series of discovery disputes arose and revealed information previously unknown to Crabar. Based on this new evidence, Crabar moved for leave to file a second amended complaint, which was granted by the Magistrate Judge. Filing 223 at 3. Crabar's second amended complaint added three additional defendants—Sikora, Fredrickson, and Kohlhaas—and a series of additional claims.

Specifically, Crabar's second amended complaint now asserts fourteen theories of recovery: (1) breach of contract (against Wright Printing only); (2) misappropriation of trade secrets in violation of Neb. Rev. Stat. § 87-504; (3)

tortious interference with business relationships; (4) federal trademark infringement in violation of 15 U.S.C. § 1114(1) (against Wright Printing only); (5) federal unfair competition in violation of 15 U.S.C. § 1125(a) (against Wright Printing only); (6) unfair competition (against Wright Printing only); (7) violation of the Nebraska Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-302 (against Wright Printing only); (8) fraud (against Wright and Wright Printing only); (9) breach of contract (against Wright and Wright Printing only); (10) Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*; (11) misappropriation of trade secrets in violation of 18 U.S.C. § 1836 *et seq.*; (12) breach of the implied covenant of good faith and fair dealing (against Wright Printing only); (13) breach of contract (against Kohlhaas only); (14) breach of contract (against Fredrickson only).

At this stage of the proceedings, there are various motions pending before the Court—some relating to the Court's prior Memorandum and Order dismissing Crabar's claim alleging that Wright and Wright Printing breached the Purchase Agreement, *see* filing 242 at 1-3, and others seeking to dismiss various claims under Crabar's second amended complaint. More specifically, Fredrickson and Kohlhaas have filed a motion to dismiss Crabar's breach of contract claims against them arising under a Confidentiality Agreement signed by both employees. Filing 226 at 1-3. And Fredrickson and Kohlhaas also join the remaining defendants in their collective motion to dismiss the following claims: (1) fraud, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, (4) violation of the Computer Fraud and Abuse Act, (5) tortious interference with business relationships, and (6) breach of the federal Defend Trade Secrets Act. Filing 228 at 3-4.

## III. DISCUSSION

### 1. CRABAR'S MOTION TO SET ASIDE

First, Crabar moves the Court to set aside its previous order (filing 137) granting partial summary judgment to Wright Printing and dismissing Crabar's breach of contract claim. In essence, Crabar is asking the Court to reconsider whether partial summary judgment is appropriate. *See* Fed. R. Civ. P. 54(d) (any order that adjudicates fewer than all the claims does not end the action as to any of the claims and may be revised at any time before the entry of a judgment adjudicating all the claims).

### (a) Standard of Review

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are for the trier of fact. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of

the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the trier of fact could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

Rule 56 also allows the Court to grant summary judgment as to some issues but not as to others. *See* Fed. R. Civ. P. 56(a). Upon doing so, the Court may "enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute," and thereby treat such a fact "as established in the case." Fed. R. Civ. P. 56(g).

### (b) Discussion

In its March 16, 2018 Memorandum and Order the Court dismissed Crabar's breach of contract claim. Filing 137 at 7-12. That claim was based on §§ 5.1 (c) and (e) of the Purchase Agreement. Generally speaking, those provisions contain restrictive covenants prohibiting Wright Printing from utilizing the "Names, Domain Names, any derivations thereof and all other Intellectual Property currently used in the [custom printing] Business" and from using, or disclosing, any "Confidential Information" it acquired while working in the custom printing business. Filing 45 at 63-64. "Confidential Information" is further defined in the Purchase Agreement as "(i) all trade secrets as defined under applicable statute or common law, and (ii) other confidential information of or about [Wright Printing], including, without limitation, any such information regarding the business of [Wright Printing], its manufacturing processes, methods of operations, products, financial data, sources of supply and customers." Filing 45 at 64. According to Crabar, Wright

Printing breached §§ 5.1(c) and (e) by using its trademarks, trade secrets, and product specifications in its operation of Pocket Folders Fast and Bandfolder Press. *See generally* filing 58 at 32-58.

But the dispositive issue before the Court was not actually whether Wright Printing's actions violated §§ 5.1(c) and (e) of the Purchase Agreement. Rather, the parties' dispute turns on the legal significance of the parties' subsequent agreement: the Release Agreement. That agreement generally released Wright Printing from obligations imposed under the Purchase Agreement, including the those imposed under §§ 5.1(c) and (e). Filing 45 at 70-71. More specifically, § 2(c) states in relevant part:

> In addition, except as otherwise provided in this Agreement, all indemnification and other obligations of performance for which [Wright Printing] is otherwise responsible under the Purchase Agreement from and after the date hereof, and Purchaser's rights to seek any recourse or remedy in relation thereto are hereby immediately terminated and cancelled by the parties and of no further force and effect.

Filing 45 at 94. And because the language of the Release Agreement undisputedly released Wright Printing from its existing obligations under the Purchase Agreement, in Wright Printing's view, the Release Agreement precluded Crabar's allegations under the Purchase Agreement as a matter of law.

In opposition to Wright Printing's motion, Crabar generally took issue with Wright Printing's reading of the phrase "obligations of performance." In particular, Crabar suggested that the language of § 2(c) only released Wright

Printing from some of its obligations of performance under the Purchase Agreement. That is, in Crabar's view, §2(e) terminated *affirmative* obligations (*i.e.* shall indemnify), but not *restrictive* obligations (*i.e.* shall not use confidential information) under the Purchase Agreement. Filing 87 at 21-22.

Crabar also briefly suggested that Wright Printing induced Crabar into executing the Release Agreement by falsely representing that Wright intended to sell "the building and cease being a landlord because he wanted to 'close out and slow down.'" Filing 87 at 5. That is, in Crabar's view, it agreed to release and return $1.1 million held in escrow as security for legal claims arising under the terms of the Purchase Agreement, and release Wright Printing from all representations and warranties under the Purchase Agreement, only because Wright Printing represented that it wanted out of the custom printing business entirely. Filing 45 at 16. Crabar suggested that in reality, however, Wright Printing was actually preparing to re-launch its competing printing business while negotiating the terms of the Release Agreement.[2]

The Court was not, at that time, persuaded by Crabar's arguments. Particularly with respect to Crabar's latter contention, the Court suggested that there was little, if any, evidence in the record to support Crabar's vague assertion that Wright Printing was secretly preparing to re-launch its custom printing business. *See* filing 137 at 9 n.3. In fact, the only evidence Crabar

---

[2] The Court acknowledges Wright Printing's contention that Crabar did not really advance a theory of fraudulent inducement in the previous round of briefing. Filing 248 at 6. Even if that were true, the Court could still reconsider its grant of summary judgment based on newly discovered evidence. *Arnold v. ADT Sec. Servs., Inc.*, 627 F.3d 716, 721 (8th Cir. 2010) (internal citations omitted). And more fundamentally, a district court has broad discretion to reconsider an order "at any time prior to the entry of judgment." *K.C.1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1017 (8th Cir. 2007); Rule 54(b).

could point to in support of its allegation that Wright Printing began preparing to launch "Pocket Folders Fast" prior to 2016, was based on the conduct of Wright's daughter, Mardra Sikora. More specifically, Crabar claimed that Sikora purchased the domain name www.pocketfoldersfast.com in August, 2014 which, if believed by the trier of fact, would support an inference that Wright Printing must have secretly been plotting to re-enter the printing business once it was released from its obligations under the Purchase Agreement. Filing 58 at 16.

But the problem with that argument was twofold. To begin with, Sikora was not even a part of this litigation—nor was she a party to the Purchase Agreement or Release Agreement. More fundamentally, Sikora made several representations to the Court suggesting that when she purchased the domain name in August 2014 she was neither employed by Wright Printing, nor was she associated with the custom printing business—much less connected to Wright Printing. Filing 73-3 at 1-2. Instead, Sikora explained that from 2011 until January 2016, she was operating as a full-time author, speaker, and advocate. Filing 73-3 at 2. She also testified that when she purchased the domain name pocketfoldersfast.com she was "trying to learn more about website search engine optimization and studying Google Adwords." Filing 73-3 at 2. Most importantly, Sikora claimed that when she purchased the domain name she "had no intention of launching a custom folder printing business, and [] had not spoken to [her] father, Defendant Mark Wright, about running the domain purchase." Filing 73-3 at 2.

Simply put, there was no evidence that would allow a reasonable fact finder to impute the conduct of Sikora to Wright or Wright Printing. And absent the evidence of the domain name purchase, Crabar could not support its contention that Wright and Wright Printing were—despite their

representations to Crabar—already planning to re-enter the printing business. Based on the record before it, the Court concluded that Crabar's evidence was too attenuated to create a genuine dispute of material fact on the validity of the Release Agreement.

But that was then. Today, the evidence suggests a much different story. After numerous discovery disputes and a series of motions to compel, *see* filing 191; filing 195, Crabar received information that contradicts Sikora's sworn affidavit. The record evidence now shows that at the time Sikora acquired the www.pocketfoldersfast.com domain name, contrary to her previous assertions, she was on Wright Printing's payroll. *See* filing 244-5 at 1. In fact, she wasn't just employed at Wright Printing—she was a part-owner of it. Filing 244-15 at 5. And the evidence also suggests that Wright did, in fact, know that Sikora had purchased the domain name www.pocketfoldersfast.com well before Sikora submitted her affidavit suggesting otherwise. Filing 244-10 at 1. More specifically, on January 28, 2015, Wright sent Sikora an email with the subject line "Pocket folders now?" Filing 244-10 at 1. Sikora responded saying "pocketfoldersfast.com" is "what we've got for now." Filing 244-10 at 1.

That evidence not only connects Sikora to Wright Printing, but it also calls into question Wright's and Sikora's motives in the months before the parties' executed the Release Agreement. Indeed, in the same January 28 email that Sikora sent with the domain name she had purchased, Wright attached comprehensive sales data from the business it had previously sold to Crabar. Filing 244-10 at 1. Wright instructed Sikora to "look at FE tab" (*i.e.*, the Folder Express tab). Filing 244-10 at 1; DEF076396. The Folder Express tab included order quantities, pricing, paper type, and revenue for Wright Printing's 2012 folder business—information Wright and Sikora might find valuable if Wright Printing was planning to relaunch its folder business.

DEF076396. Then, in March 2015, Wright sent an email to Tom Garland, owner of Quad—the entity that Wright sold its remaining packing business to—informing Garland that Quad would obtain four entities, but that Wright would retain Wright Printing Co., Boxes-in-a-click, and Pocket Folders Fast. Filing 244-11 at 1. During previous discussions, Wright also made it clear that the assets to Pocket Folders Fast were excluded from Quad's purchase agreement. And by June, Wright represented to Wells Fargo that Wright Printing projected sales revenue from the entity Pocket Folders Now. *See* DEF080363.

Simply put, the evidence now before the Court challenges Sikora's and Wright's previous statements with respect to their intentions in the months prior to the execution of the Release Agreement. That factual dispute forms the basis for the question now before the Court: whether the Release Agreement is void or voidable, and consequently, whether Crabar's breach of contract claim should stand dismissed. *See Gonzalez v. Union Pac. R.R. Co.,* 803 N.W.2d 424, 435 (Neb. 2011).

Generally speaking, a release agreement should not be upheld if fraud, deceit, oppression, or unconscionable advantage is connected with the transaction. *Id.* There are two separate and distinct forms of fraud—fraud in the execution and fraud in the inducement. As the Nebraska Supreme Court has explained,

> *[f]raud in the execution* goes to the very existence of the contract, such as where a [contract] is misread to the [party], or where one paper is surreptitiously substituted for another, or where a party is tricked into signing an instrument he or she did not mean to execute. In such cases, . . . there was no meeting of the

minds, . . . in other words, it is not a question of a contract voidable for fraud, but of no contract at all. *Fraud in the inducement*, by contrast, goes to the means used to induce a party to enter into a contract. In such cases, the party knows the character of the instrument and intends to execute it, but the contract may be voidable if the party's consent was obtained by false representations—for instance, as to the nature and value of the consideration, or other material matters.

*Cullinane v. Beverly Enters.-Nebraska, Inc.*, 912 N.W.2d 774, 792 (Neb. 2018) (internal citation omitted)(emphasis added).

In this case, Crabar contends that it was fraudulently induced into executing the Release Agreement based on Wright's misrepresentations. That means, in Crabar's view, the Release Agreement is voidable as a matter of law. But according to Wright Printing, even if Wright did misrepresent its intentions, Crabar's motion to set aside the Court's earlier Memorandum and Order still fail. That is true, Wright Printing suggests, because before an agreement can be voidable, Crabar must tender back the consideration (*i.e.*, the $20,000 escrow funds) it received under that agreement. *See* filing 248 at 3. And because Crabar has not tendered its consideration, Wright Printing suggests that the Release Agreement cannot be voidable, and Crabar's motion necessarily fails. Filing 248 at 3.

The Court is not persuaded by the defendants' contentions. While it is true that before a settlement or release may be voidable, the general rule is that the consideration should be tendered or returned as a condition precedent to maintaining an action on the original claim, there are several exceptions to that rule. *Gonzalez*, 803 N.W.2d at 424. Particularly relevant, "where the

underlying action is for money damages against which the value of the consideration could be set off against a recovery," the tender-back rule does not apply. *Id.* That is, when the consideration "is merely money paid, the amount of which can be credited in partial cancellation of the injured party's claim," it would be inequitable to require the injured party to tender back the consideration. *Id.*; *Vavricka v. Mid–Continent Co.*, 8 N.W.2d 674 (Neb. 1943); *Collins v. Hughes & Riddle*, 278 N.W. 888, 894 (Neb. 1938); *Aron v. Mid–Continent Co.*, 8 N.W.2d 682 (Neb. 1943); *Fox v. State*, 88 N.W. 176 (Neb. 1901); *see Hogue v. Southern R. Co.*, 390 U.S. 516 (1968).

That is precisely what happened in this case. Here, the consideration Crabar received was the release (or payment) of $20,000 in escrow in exchange for an extended lease and release from the Purchase Agreement. *See* filing 244 at 4. That amount could be easily set off against recovery if Crabar were to succeed on any of its claims. *See Gonzalez*, 803 N.W.2d at 424. Accordingly, the Court concludes that Crabar is not required, as a matter of law, to tender-back consideration before pursuing its theory that Wright and Wright Printing fraudulently induced it into executing the Release Agreement. *See id.*

That brings the Court to the remaining question before it: whether a reasonable fact finder could determine that Crabar was induced into executing the Release Agreement by Wright's fraudulent misrepresentations. *Cullinane*, 912 N.W.2d at 792. A fraudulent misrepresentation claim requires a plaintiff to establish the following elements: (1) A representation was made; (2) the representation was false; (3) when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) the representation was made with the intention that the plaintiff should rely on it; (5) the plaintiff did so rely on it; and (6) the plaintiff suffered damage as a result. *Id.*; *deNourie & Yost Homes, LLC v. Frost*, 854 N.W.2d 298,

312 (Neb. 2014); *Cao v. Nguyen*, 607 N.W.2d 528 (Neb. 2000). Fraudulent misrepresentations may consist of half-truths calculated to deceive and a representation might also be fraudulent even if it is literally true, but intended to create an impression that is substantially false. *Cullinane*, 912 N.W.2d at 792.

Based on the evidence, the Court concludes that a reasonable trier of fact could find that Wright represented to Crabar that he intended to sell the building and completely retire from the printing business, that Wright Printing actually intended to keep the building for purposes of re-launching its printing business, that when Wright made those representations, he knew that he intended to re-launch the printing business, that Wright's representation was made so that Crabar would be more inclined to release Wright Printing from its obligations under the Purchase Agreement, and that Crabar suffered damage as a result. *See id.* ; *deNourie & Yost Homes, LLC*, 854 N.W.2d at 312. And if the trier of fact was to conclude that Wright fraudulently induced Crabar into execution of the Release Agreement, that agreement would be voidable. The implication of that would be that the Purchase Agreement obligations remain in effect. *See Gonzalez*, 803 N.W.2d at 435. So, the Court will grant Crabar's motion to vacate, and Crabar's breach of contract claim will no longer stand dismissed.

## 2. MOTIONS TO DISMISS

Each of the five defendants have moved to dismiss some of Crabar's claims in the second amended complaint. Specifically, Fredrickson and Kohlhaas move to dismiss Crabar's breach of contract claims against them. Those claims are based on an Acknowledgement of Information Security and Confidentiality Agreement signed by Fredrickson and Kohlhaas in consideration for their employment. *See* filing 224-6; filing 224-9. The other

defendants move to collectively dismiss Crabar's (1) fraud, (2) breach of the covenant not to compete, (3) breach of the implied covenant of good faith and fair dealing, (4) tortious interference, (5) deceptive trade practices, and (6) computer fraud claims.

Because Fredrickson's and Kohlhaas' motions raise similar issues of law and fact, the Court will consider that motion together. Then, the Court will turn to the remaining motion to dismiss joined by all five defendants.

(a) Standard of Review

A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.*

And to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal,* 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief. *Id.* at 679.

Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* The facts alleged must raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the plaintiff's claim. *See Twombly*, 550 U.S. at 545. The court must assume the truth of the plaintiff's factual allegations, and a well-pleaded complaint may proceed, even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. *Id.* at 556.

When deciding a motion to dismiss under Rule 12(b)(6), the Court is normally limited to considering the facts alleged in the complaint. If the Court considers matters outside the pleadings, the motion to dismiss must be converted to one for summary judgment. Fed. R. Civ. P. 12(d). However, the Court may consider exhibits attached to the complaint and materials that are necessarily embraced by the pleadings without converting the motion. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003). Documents necessarily embraced by the pleadings include those whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading. *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012).

(b) Fredrickson and Kohlhaas

Fredrickson and Kohlhaas move to dismiss two breach of contract claims, styled as Counts XIII (against Kohlhaas) and XIV (against Fredrickson) of Crabar's operative complaint. Filing 227 at 15. As briefly noted above, those claims are based on an Acknowledgement of Information Security and Confidentiality Agreement signed by all Crabar employees, including Fredrickson and Kohlhaas, and governed by Nebraska law. Filing 224-8 at 1. That agreement prohibited Crabar employees from disclosing Crabar's trade

secrets or other confidential information. Filing 224-8 at 1. More specifically, Fredrickson and Kohlhaas agreed not to "directly or indirectly for any person, corporation or entity during or after termination of my employment . . . disclose to, or make use of [Crabar's] Trade Secrets or other confidential or proprietary information." Filing 224-8 at 1. They also agreed that upon termination of their employment, to immediately return all documentation and information belonging to Crabar. Filing 224-8 at 1.

According to Crabar, however, Fredrickson and Kohlhaas breached those obligations by giving Wright Printing Crabar's confidential information in violation of that agreement. In particular, Crabar alleges that Kohlhaas downloaded several electronic files including an Excel spreadsheet entitled "FE_ExistingDie_Inquiries.xls". Filing 224 at 49. Fredrickson, for her part, allegedly gave Crabar the confidential documents downloaded by Kohlhaas. Filing 224 at 50. And based on this conduct, Crabar contends that both Fredrickson and Kohlhaas violated the terms of the parties' Confidentiality Agreement. *See* filing 224 at 49-50.

But Fredrickson and Kohlhaas argue that the Confidentiality Agreement is not a binding agreement. That argument, however, is not based on the language of the Confidentiality Agreement itself, but rather, an entirely separate document—Crabar's Employee Handbook. Filing 225-2 at 1. That handbook states that Crabar's "policies are mere guidelines that do not create contractual obligations." Filing 240 at 2. Fredrickson and Kohlhaas read that language as nullifying the Confidentiality Agreement because the Confidentiality Agreement is based on compliance with two Crabar policies: (1) Information and Security Policy and (2) Confidentiality. *See* filing 224-9 at 1.

The Court is not persuaded. At this stage of the proceedings, there is nothing to suggest that the existence of the Employee Handbook somehow

means that the Confidentiality Agreement signed by Fredrickson and Kohlhaas is no longer binding. So, the question before the Court is whether Crabar has adequately pled a breach of contract claim under the Confidentiality Agreement.

In order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty. *Henriksen v. Gleason*, 643 N.W.2d 652, 658 (Neb. 2002). "[T]he burden of proving the existence of an employment contract and all the facts essential to the cause of action is upon the person who asserts the contract." *Blinn v. Beatrice Cmty. Hosp. & Health Ctr., Inc.*, 708 N.W.2d 235, 245 (Neb. 2006). The language which forms the basis of an alleged contract, whether oral or written, must constitute an offer definite in form which is communicated to the employee, and the offer must be accepted and consideration furnished for its enforceability. *Id.*

Here, Crabar has pled the existence of a binding agreement. More specifically, Crabar alleges that on the date that Kohlhaas and Fredrickson accepted employment at Crabar, in consideration for that employment, Kohlhaas and Fredrickson agreed to abide by Crabar's security policy and were prohibited from disclosing any of Crabar's trade secrets or proprietary information. Filing 224 at 49-50; filing 224-6; filing 224-9. Kohlhaas breached that agreement, Crabar contends, when she downloaded confidential information to unfairly compete against Crabar. Filing 224 at 49. Fredrickson, for her part, allegedly gave Wright Printing, Wright, and Sikora access to confidential information in violation of the Confidentiality Agreement. And those allegations, if true, would support Crabar's breach of contract claim. *See id.*

Even so, Fredrickson and Kohlhaas still contend that the Confidentiality Agreement is unenforceable as a matter of law. Filing 227 at 10. In particular, Fredrickson and Kohlhaas allege that the Confidentiality Agreement imposes impermissibly broad post-employment restrictive covenants. That is true, Fredrickson and Kohlhaas contend, because under the Confidentiality Agreement, they could not "directly or indirectly . . . during or after the termination of [their] employment . . . disclose [], or make use of the Company's Trade Secrets or other confidential or proprietary information." Filing 224-8 at 1. The Confidentiality Agreement further explains the type of confidential or proprietary information that might be protected under the terms of the agreement, including, among other things, Crabar's operational methods, pricing policies, technical processes, manufacturing methods, technical processes, systems documentation, and other information that is not readily ascertainable by independent investigation. Filing 224-8 at 1.

Fredrickson and Kohlhaas take particular issue with the Confidentiality Agreement's restriction on the disclosure of "any other information disclosed, either orally or in writing . . . while in the employ of the Company that is not known or readily ascertainable by independent investigation . . . ." Filing 224-8 at 1. That restriction, Fredrickson and Kohlhaas contend, is so broad that it must be construed as prohibiting them from "using, at any time and for any reason, any nonconfidential and nonproprietary information disclosed by a coworker or even any information disclosed by a neighbor who has no affiliation to Crabar." Filing 227 at 14. In other words, Fredrickson and Kohlhaas read the words "any other information disclosed . . . while in the employ of the Company" literally, as prohibiting Fredrickson and Kohlhaas from disclosing *any* information they learned while they were employed by Crabar.

But that construction of the agreement defies general principles of contract interpretation. "Fragmenting a contract . . . out of context, and then applying a literal interpretation to the isolated words and phrases thus separated is not permissible." *Simpson v. Simpson*, 232 N.W.2d 132, 137 (Neb. 1975). Instead, an agreement is subject to the general rule of construction that the entire instrument must be considered as a whole. *See Westbrook v. Masonic Manor*, 178 N.W.2d 280, 281 (1970); Restatement Second of Contracts § 228. And when considering the entire Confidentiality Agreement as a whole, and in particular, the provision describing trade secrets—rather than a single sentence plucked in isolation—it is clear that the language prohibits Fredrickson and Kohlhaas only from disclosing confidential or proprietary information they obtained while working at Crabar. *See* filing 224-8 at 1. In other words, the restriction does not prohibit Fredrickson and Kohlhaas from disclosing all information they obtained during the time period they worked for Crabar, but rather, *confidential* information that they learned by virtue of their employment at Crabar. *See* filing 224-8 at 1.

With that understanding in mind, the Court must decide whether, as a matter of law, that restriction is an overly restrictive covenant. (The Court assumes, without deciding, that a restriction on the use of confidential information is a "restraint on trade," as Fredrickson and Kohlhaas insist— Crabar does not argue otherwise. *See* filing 237 at 7-8.) In determining whether a particular clause or agreement is overly restrictive, the Court looks to Nebraska's three-part test for determining the provision's validity. *See Gaver v. Schneider's O.K. Tire Co.*, 856 N.W.2d 121, 130 (Neb. 2014). Under that test, a partial restraint on trade is valid if it is (1) not injurious to the public; (2) no greater than reasonably necessary to protect the employer in some legitimate business interest; and (3) not unduly harsh and oppressive on the party against

whom it is asserted. *H & R Block Tax Servs. v. Circle A Enters.*, 693 N.W.2d 548, 553-54 (Neb. 2005)). At issue here is the second requirement: whether Crabar's clause is no greater than is reasonably necessary to protect a legitimate business interest.

The Court concludes that the Confidentiality Agreement is no greater than necessary. Indeed, the Nebraska Supreme Court has concluded that legitimate protectable business interests include employer's goodwill, confidential information, and trade secrets. *Id.* It has been stated:

> Legitimate interests of an employer which may be protected from competition include: the employer's trade secrets which have been communicated to the employee during the course of employment; confidential information communicated by the employer to the employee, but not involving trade secrets, such as information on a unique business method; an employee's special influence over the employer's customers, obtained during the course of employment; contacts developed during the employment; and the employer business's development of goodwill.

*Gaver,* 856 N.W.2d at 130-31. Accordingly, the Court concludes that the Confidentiality Agreement's restriction on the disclosure of trade secrets and other confidential information obtained during the course of employment is not, as a matter of law, overly restrictive. *See Id.* As such, the Court will deny Fredrickson's and Kohlhaas' motion to dismiss on those grounds.

(c) All Defendants

Next, Wright Printing, Wright, and Sikora join Kohlhaas and Fredrickson (collectively, the defendants) in moving to dismiss six of Crabar's

claims. In particular, the defendants move to dismiss Crabar's Fraud, Implied Covenant of Good Faith and Fair Dealing, Breach of Non-Disparagement Covenant, Computer Fraud and Abuse Act, Defend Trade Secrets Act, and Tortious Interference claims. Filing 229 at 4.

### (i) Fraud Claim (Against Wright Printing and Wright)

The defendants contend that Crabar's fraudulent inducement claim must be dismissed. Specifically, the defendants argue that Crabar has failed to plead facts that, even if true, support its contention that Wright fraudulently induced Crabar into executing either the Purchase Agreement or the Release Agreement. See filing 229 at 7. That argument is based on two primary contentions: (1) that the Release Agreement released Wright Printing from any claim that it was fraudulently induced to enter into the Purchase Agreement, *see* filing 229 at 8, and alternatively, (2) even if the Release Agreement is still in play, whatever representations were made by Crabar were neither material nor actually relied on by Crabar. Filing 229 at 8.

With respect to the defendants' former contention, as the Court has already explained above, there is sufficient evidence before the Court to support Crabar's contention that Wright Printing fraudulently induced Crabar into executing the Release Agreement. And if that were true, the Release Agreement would be voidable. So, to the extent that the defendants suggest that the Release Agreement automatically precludes Crabar's fraud claim, that argument is without merit.

That leaves the defendants' alternative contention—that whatever representations were made by Wright were not material, nor can Crabar demonstrate that it actually relied on those statements. As explained above, to state a claim for fraudulent misrepresentation, Crabar must establish the following elements: (1) A representation was made; (2) the representation was

false; (3) when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) the representation was made with the intention that the plaintiff should rely on it; (5) the plaintiff did so rely on it; and (6) the plaintiff suffered damage as a result. *deNourie & Yost Homes, LLC*, 854 N.W.2d at 312.

The Court concludes that Crabar has stated a claim for fraudulent inducement. Assuming Crabar's allegations are true, the operative complaint contends that Wright Printing committed fraud by "falsely representing that they desired to exit the custom folder printing business forever because they saw no future in the business" when Wright Printing's "true intent was to generate funds to pay down crushing debt [Wright Printing] had accumulated and then to reenter the business in direct competition . . . ." Filing 224 at 39. Relying on Wright Printing's representation, Crabar agreed to a short, two-year restrictive covenant and paid Wright Printing for its printing business. Filing 224 at 39. As a result of that conduct, Crabar was damaged. Filing 224 at 39. Those allegations, if true, support Crabar's claim for fraudulent inducement. *deNourie & Yost Homes, LLC*, 854 N.W.2d at 312. Accordingly, Court will deny Wright Printing's motion to dismiss on those grounds.

*(ii) Breach of the Implied Covenant of Good Faith and Fair Dealing as to the Purchase Agreement (Against Wright Printing)*

Next, Crabar contends that Wright Printing breached the implied covenant of good faith and fair dealing with respect to the Purchase Agreement. *See* filing 224 at 48. That claim is based on Crabar's contention that Wright Printing used the confidential assets that it previously sold to Crabar to compete with Crabar in the custom printing business. *See* filing 224 at 48. More specifically, Crabar alleges that Wright Printing's use of "the customer lists and information files, historical customer sales data files,

product cost files and CAD die files to launch and operate its competing presentation folder business selling Crabar's product line . . . frustrates the fruits of [the parties'] bargain." Filing 224 at 48.

As the Court noted in its previous memorandum and order, the parties agree that their breach of contract claim under the Purchase Agreement is governed by Delaware law. Filing 137 at 7. "The implied covenant of good faith and fair dealing is the doctrine by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement." *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 182–83 (Del. Ch. 2014), *aff'd*, No. 399, 2014, 2015 WL 803053 (Del. Feb. 26, 2015). Despite the use of the terms "good faith" and "fair dealing" in its name, the covenant does not actually establish a free-floating requirement that a party act in some morally commendable sense. *Id.* In practice, that means the implied covenant of good faith and fair dealing is narrow: "it cannot be invoked where the contract itself expressly covers the subject at issue." *Id.*

And here, Crabar attempts to do exactly that: invoke the covenant of good faith and fair dealing even though the Purchase Agreement expressly covers the use of confidential information. *Id.* Indeed, the Purchase Agreement prohibited Wright Printing from using "any of the Confidential Information of [Wright Printing] for [Wright Printing's] own purpose or for the benefit of any other person . . . ." Filing 224 at 9-10. The Purchase Agreement defines Confidential Information as "all trade secrets . . . and [] other confidential information of or about [Wright Printing] including without limitation, any information regarding the business of [Wright Printing], its manufacturing processes, methods of production, products, financial data, sources of supply and customers . . . ." Filing 224 at 10.

So, Crabar's allegations with respect to Wright Printing's use of Crabar's confidential and proprietary information, constitute a straightforward breach of contract claim—not an implied covenant of good faith and fair dealing claim. Thus, the Court will grant Wright Printing's motion to dismiss on those grounds.

(iii)  *Breach of the Release Agreement's Non-Disparagement Covenant*

Next, the defendants move to dismiss Crabar's claim that Wright and Wright Printing breached the non-disparagement covenant in the Release Agreement. Filing 229 at 19. Under the Release Agreement, Wright and Wright Printing were prohibited from making any statements

> that might reasonably be construed to be derogatory or critical of, or negative toward, [Crabar] or any of its directors, officers, Affiliates, subsidiaries, employees, agents or representatives (collectively, the "Purchaser Representatives"), or to malign, harm, disparage, defame or damage the reputation or good name of [Crabar], its business or any of the Purchaser Representatives . . .

Filing 224-4 at 4.[3]

Crabar alleges that Wright and Wright Printing breached that agreement in two ways. First, Crabar contends that Wright allegedly told the Omaha World-Herald that he decided to put Wright Printing's Omaha facility on the market only after he learned that Crabar would not renew its lease. Filing 244 at 42. That is, Wright made it seem as though it was Crabar, not Wright Printing, that decided not to renew Crabar's lease. *See* filing 244 at 42.

_____

[3] Wright signed a personal joinder to the Release Agreement. *See* filing 224 at 41.

And second, Crabar alleges that Wright Printing and its employees also falsely communicated to customers that Crabar "unilaterally decided to move out of Omaha, had planned to abandon Omaha all along, had fired all of its employees in Omaha in connection with the move, and that this alleged unilateral decision to abandon Omaha thus cost all of Crabar's employees in Omaha their jobs." Filing 244 at 42. Those actions, Crabar claims, were made to "malign, harm, disparage, defame or damage the reputation or good name" of Crabar and as such, amount to a breach of the Release Agreement. Filing 244 at 42.

Wright and Wright Printing, on the other hand, claim that Crabar's allegations do not support its breach of contract claim. Specifically, they argue that Wright's "second-hand comment in a newspaper article" cannot amount to a breach of the Release Agreement because Wright did not author the article. *See* filing 229 at 20. And with respect to Crabar's latter contention, Wright and Wright Printing argue that there is no evidence Wright actually made any disparaging statements to Crabar's customers or potential customers. *See* filing 229 at 23.

The Court is not convinced. Wright's comment to the Omaha World-Herald, if true, would support Crabar's allegation that Wright made disparaging statements about Crabar. And while Crabar's general allegations that Wright made statements that were "critical of, or negative toward" Crabar or made with an intent to "damage the reputation or good name of [Crabar]. *See* filing 224-4 at 4, are a closer call, the Court will still deny Wright and Wright Printing's motion at the pleading stage of the proceedings with respect to this claim.

### (iv)  CFAA Claim

Next, the defendants collectively argue that Crabar has failed to adequately plead a claim under the Computer Fraud and Abuse Act. *See* 18

U.S.C. § 1030 *et seq*. The CFAA generally subjects a person who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer" to imprisonment, and a fine and civil liability in some circumstances. § 1030(a)(2)(C) and (g). "[T]he term 'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." § 1030(e)(6).

But there is some disagreement about how that definition should be construed. That is, should the "exceed access" language be read narrowly, as the defendants suggest, as applying only when the person who accessed the information had no authorization at all (*i.e.*, a hacker situation)? *See WEC Carolina Energy Sols. LLC v. Miller*, 687 F.3d 199, 207 (4th Cir. 2012); *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012); *see also TripleTree, LLC v. Walcker*, No. 16-609, 2016 WL 2621954, at *3 (D. Minn. May 6, 2016) (collecting cases); *Shamrock Foods Co. v. Gast*, 535 F. Supp. 2d 962 (D. AZ. 2008); *Int'l Ass'n of Machinists & Aero. Workers v. Werner–Matsuda*, 390 F. Supp. 2d 479, 495 (D. Md. 2005). Or should that language be construed more broadly, as Crabar proposes, as applying to any accesser who might have authorized access to a computer, but is limited in the use of that information? *See United States v. Rodriguez*, 628 F.3d 1258 (11th Cir. 2010); *United States v. John*, 597 F.3d 263 (5th Cir. 2010); *Int'l Airport Ctrs., LLC v. Citrin*, 440 F.3d 418 (7th Cir. 2006).

To flesh those distinctions out further: under the narrow interpretation, an employee who is permitted to access only product information on the company's computer, but also accesses customer data, "would 'exceed[] authorized access' if [s]he looks at the customer lists." *Nosal*, 676 F.3d at 863.

But an employee who accesses product information then misuses that information to compete with the company, would not "exceed authorized access" because she was permitted to access that information. In contrast, under the broader understanding of that language, an employee who accesses information with permission but with an improper purpose would exceed access in violation of the CFAA, even if he or she only used information he or she was actually authorized to access. *See id.*

After careful review of both understandings of § 1030(a)(2)(c), the Court concludes that the narrow construction of that provision is most persuasive.[4] More specifically, the Court finds the Ninth Circuit's reasoning in *Nosal* particularly convincing. *Id.* at 863-64. Indeed, as the *Nosal* Court correctly points out, the rule of lenity requires courts to construe criminal statutes, like the CFAA, "narrowly so as to avoid making criminal law in Congress's stead." *Id.*; *United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820). Applying that principle, the language "exceeds authorized access" in the CFAA does not extend to violations of use restrictions. "If Congress wants to incorporate misappropriation liability into the CFAA, it must speak more clearly." *Nosal,* 676 F.3d at 863.

And that conclusion is bolstered by the legislative history of the CFAA, "whose general purpose is to punish hacking—the circumvention of technological access barriers—not misappropriation of trade secrets—a subject Congress has dealt with elsewhere." *Id.*; *see also* H.R. Rep. No. 98-894, at 4 (1984), reprinted in 1984 U.S.C.C.A.N. 3689, 3690. After all, as originally enacted, the CFAA applied to a person who (1) knowingly accessed without authorization or (2) having accessed a computer with authorization, used the

---

[4] The Eighth Circuit has not yet addressed this issue.

opportunity such access provided for purposes to which such authorization did not extend. Pub. L. No. 98-473, § 2102, 98 Stat. 2190, 2190–91 (1984). But, Congress amended the statute by replacing the second method of access with the phrase "exceeds authorized access." *See* Pub. L. No. 99-474, § 2, 100 Stat. 1213, 1213 (1986); *see also TripleTree, LLC*, 2016 WL 2621954, at *4. The reason for that amendment was to "eliminate coverage for authorized access that aims at purposes to which such authorization does not extend." *See* S. Rep. No. 99-432, at 21 (1986); *see also TripleTree, LLC*, 2016 WL 2621954, at *4.

Based on the foregoing, this Court will apply a narrow reading of § 1030(a)(2)(c) and conclude that a user who is otherwise authorized to access information on a protected computer does not act "without authorization" or "exceed[] authorized access" by violating restrictions on the *use* of that information. § 1030(a)(2)(c); *Nosal*, 676 F.3d at 863. Because Crabar's amended complaint fails to allege that Kohlhaas was not authorized to access the product information on Crabar's virtual private network, Crabar's CFAA claim against Kohlhaas necessarily fails. *See* filing 224 at 45-46. To that end, Crabar's allegations against the remaining defendants, Wright, Sikora, Wright Printing and Fredrickson—which are based on Kohlhaas' alleged misuse of information she was authorized to access—also fail as a matter of law. Filing 224 at 46. Accordingly, the Court will grant the defendants' motion to dismiss Crabar's CFAA claim.

*(v) Defend Trade Secrets Act Claim*

Crabar's second amended complaint also contends that the defendants violated the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1832 *et seq*. Filing 224 at 46. According to the defendants, however, Crabar's DTSA claim against Kohlhaas and Fredrickson must be dismissed. To support that contention, the defendants argue that Crabar's operative complaint does not

contain adequate factual allegations from which a reasonable jury could infer that Kohlhaas and Fredrickson misappropriated Crabar's trade secrets.

Generally speaking, "[t]he DTSA creates a cause of action in favor of the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The term "misappropriated" is defined as the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." § 1839(5)(B)(ii)(II).

Here, Crabar contends that Kohlhaas and Fredrickson had substantial access to the company's trade secrets. Because of this access, Kohlhaas and Fredrickson allegedly signed a confidentiality agreement, in which they agreed to hold the company's trade secrets in confidence during and following their employment. Filing 224 at 50. Despite that agreement, Crabar alleges, Kohlhaas and Fredrickson disclosed Crabar's trade secrets to Wright Printing. Filing 224 at 50. According to Crabar, Wright Printing then used and incorporated that information in the development and modification of competing products. Filing 224 at 50. Based on these allegations, which the Court must accept as true, the Court concludes that Crabar has adequately pled a claim that Kohlhaas and Fredrickson "misappropriated" its trade secrets. Accordingly, the defendants' motion to dismiss will be denied.

### (vi) Tortious Interference Claim

Last, the defendants contend that Crabar has failed to state a claim for tortious interference with a business relationship. To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff

must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. *Steinhausen v. HomeServices of Neb., Inc.*, 857 N.W.2d 816, 831 (Neb. 2015). The interference must impact a valid business relationship or expectancy, and the relationship or expectancy interfered with must belong to the party asserting the claim. *Id.*

Although Nebraska law is not fully developed on this point, it is true that proving a business expectancy "valid" will generally require proof that there was a reasonable likelihood or probability of a business relationship. *See, e.g.*, *Lucas v. Monroe Cnty.*, 203 F.3d 964, 978 (6th Cir. 2000) (applying Michigan law); *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 221-22 (Minn. 2014). And this may require proof of a potential relationship with a particular party, or at least a class of parties. *See Infogroup, Inc. v. DatabaseLLC,* 95 F. Supp. 3d 1170, 1196 (D. Neb. 2015); *see also Lucas*, 203 F.3d at 978; *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1191 (11th Cir. 1999) (applying Florida law); *Gieseke*, 844 N.W.2d at 222.

But Crabar's second amended complaint fails to allege the existence of any business relationship that was potentially impacted by Wright Printing's conduct. In fact, Crabar has not identified a single customer relationship that was influenced by Wright Printing, it has not referred the Court to any negotiations that may have been ongoing or potentially interfered with, nor has Crabar pointed to a single account that it actually lost because of Wright Printing's actions. Instead, Crabar rests its tortious interference claim on its contention that the "[d]efendants intentionally interfered with Folder Express', Progress Music's, and Progress Publications' existing and prospective business

relationships with their customers without justification." Filing 224 at 35. Even liberally construed, that allegation is too vague and conclusory to state a claim for relief. *See* Iqbal, 556 U.S. at 678. So, the Court will grant the defendants' motion and dismiss Crabar's tortious interference claim.

## IV. CONCLUSION

In sum, the Court will grant Crabar's motion to set aside the Court's previous Memorandum and Order to the extent that it dismissed Crabar's breach of contract claim under the Purchase Agreement. *See* filing 137 at 8-10. The Court will also grant the defendants' motion to dismiss Crabar's CFAA and tortious interference claims, but the Court will deny the balance of the defendants' motions.

IT IS ORDERED:

1.    Crabar's motion to set aside (filing 242) is granted.

2.    Fredrickson's and Kohlhaas' motion to dismiss (filing 226) is denied.

3.    The defendants' motion to dismiss (filing 228) is granted in part and denied in part as set forth above.

Dated this 26th day of August, 2019

BY THE COURT:

John M. Gerrard
Chief United States District Judge