IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CRABAR/GBF, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 8:16-cv-00537 |
| | ) | |
| vs. | ) | |
| | ) | |
| MARK WRIGHT AND WRIGHT | ) | |
| PRINTING CO., MARDRA SIKORA, | ) | |
| JAMIE FREDRICKSON, and | ) | |
| ALEXANDRA KOHLHAAS, | ) | |
| | ) | |
| Defendants. | ) | |

**THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

CRABAR/GBF, INC., by its undersigned attorneys, alleges the following against

Defendants MARK WRIGHT, WRIGHT PRINTING CO., MARDRA SIKORA, JAMIE

FREDRICKSON and ALEXANDRA KOHLHAAS:

**OVERVIEW**

1.    This case arises from a scheme by Defendants Mark Wright ("Wright") and

Wright Printing Co. ("WPCO") to sell a specialty printing business to Plaintiff Crabar/GBF, Inc.

("Crabar") under the false pretense that they saw no future in the business and, therefore, were

leaving it for good.  In fact, those Defendants' true agenda was to use the proceeds of the sale to

pay down substantial debt they had accumulated over the years, to then disrupt Crabar's

operation of the purchased business by forcing it to relocate from its existing premises (which

Defendant Wright owned through a related company and leased to Crabar), and then to reenter

the business and compete directly against Crabar using the very assets, confidential and trade

secret information, trademarks and intellectual property they sold to Crabar and agreed never to use after the sale.

2.      As the culmination of this scheme, Defendants recently reentered the business, misappropriated customer lists, customer information, sales and product cost data and electronic files they sold to Crabar to duplicate Crabar's product line and target and solicit Crabar's customers.  Defendants Mardra Sikora ("Sikora"), Jamie Fredrickson ("Fredrickson"), and Alexandra Kohlhaas ("Kohlhaas") participated in this misappropriation by stealing and providing Crabar's customer list, customer information and electronic files to Defendants Wright and WPCO.  Defendants Wright and WPCO also obtained a toll-free telephone number that is identical to Crabar's except for the last digit, and operating the new business under a trade name and website domain name that mimics the trade name and trademarks of Crabar's business, which were part of the assets that Crabar purchased from Defendants.  Through this unlawful activity, Defendants have substantially undermined and misappropriated the value of the business they sold to Crabar for $15 million, causing Crabar substantial damage, detailed below.

## **THE PARTIES**

3.      Crabar is a corporation organized under the laws of the State of Delaware.  It is a wholly-owned subsidiary of Ennis, Inc. ("Ennis"), which has its principal place of business in Midlothian, Texas.

4.      Defendant WPCO is a corporation organized under the laws of the State of Nebraska, with its principal place of business in Omaha, Nebraska.

5.      Defendant Wright is a resident and citizen of the State of Nebraska.  Wright is the President and owner of WPCO.

6.      Defendant Sikora is a resident and citizen of the state of Nebraska.  Sikora is CEO of WPCO.

7.      Defendant Kohlhaas is and has been since at least July 1, 2016, an employee of WPCO.  Kohlhaas is, on information and belief, a citizen of Iowa residing in Council Bluffs, Iowa.  Kohlhaas works for WPCO in Omaha, Nebraska.  Kohlhaas is a former employee of Crabar's who resigned from Crabar on May 27, 2016.  Before resigning, Kohlhaas misappropriated electronic files from Crabar in Omaha, Nebraska, and later provided access to, and copies of, certain of those files to the other Defendants for the purpose of enabling Defendant WPCO to unfairly compete with Crabar.

8.      Defendant Fredrickson is and has been since at least July 1, 2016, an employee of WPCO.  Fredrickson is, on information and belief, a citizen and resident of Nebraska.  Prior to July 1, 2016, Fredrickson was a consultant for WPCO, helping WPCO organize and launch its business in competition with Crabar, including by misappropriating and using Crabar's confidential, trade secret spreadsheet listing the specifications of thousands of dies Crabar used to manufacture custom presentation folders.  Fredrickson is a former employee of Crabar's, having resigned from Crabar's employ in 2014.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).  The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the matters in dispute are between citizens of different States.

10.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1121, 18 U.S.C. § 1836(c)  and 28 U.S.C. § 1367 because two of the claims arise under the Lanham Act, 15 U.S.C. §1114, one arises under the Defend Trade Secrets

Act of 2016 ("DTSA"), 18 U.S.C. § 1831 et seq., and the other claims are so related to the Lanham Act and DTSA claims that they form part of the same case or controversy under Article III of the United States Constitution.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2), because the Defendants reside in this District and a substantial part of the events giving rise to Crabar's claims occurred and continue to occur in this District.

12.     The Court has personal jurisdiction over Defendant WPCO because it is incorporated under the laws of the State of Nebraska and its principal place of business is located in the State of Nebraska.

13.     The Court has personal jurisdiction over Defendants Wright, Sikora and Fredrickson because they are residents and citizens of the State of Nebraska.

14.     The Court has personal jurisdiction over defendant Kohlhaas because she entered into a contract with Crabar in this state (described in Count XIII below) and committed tortious acts within this state that also violated federal and state statutes and Crabar's rights thereunder.

## FACTUAL ALLEGATIONS

### WPCO Seeks to Sell Its Custom Folder Business to Ennis

15.     Ennis, Inc. is a leading wholesale manufacturer and supplier of printed business products.  Crabar, a subsidiary of Ennis, was a wholesale manufacturer of business forms in the years leading up to its acquisition of certain of the assets of Defendant WPCO.

16.     In May 2013, an investment banker acting on behalf of Defendants Wright and WPCO approached Ennis about a possible purchase of certain assets of WPCO's custom-printed folder business, which operated under the brand names "Folder Express," "Progress Publications Music" and "Progress Publications" (the "custom folder business").

17.     Wright described Folder Express as being "the cherry of the deal" and the most recognized name in presentation folders.  Folder Express manufactured and supplied a wide variety of custom-printed presentation, multi-media, pocket and other folders, report covers and related products for use by businesses and other commercial end-users.  Its folder styles included two-pocket folders, right pocket folders, reinforced folders, folders with a thicker spine, legal folders, folders with tabs, folders with business card slits, small presentation folders, large presentation folders, document folders, tri-panel presentation folders and keyfolders.

18.     Folder Express customers could choose from a number of different printing and production options, including offset color printing, foil stamping, embossing, lamination, UV coating, other special coatings, and business card slits.  The folders were then printed with specially-requested artwork (including photographs, graphics, images and logos) and copy submitted by the customer, on a layout submitted by the customer and subsequently adjusted by Folder Express employees in order to meet production and printing restrictions and requirements.  Folder Express maintained customer artwork and other artwork files relating to customer orders, prior order specifications and requirements, and customer address, contact and other information in the normal course of operation of its business.

19.     Folder Express marketed and sold its products on a wholesale basis through a nationwide network of thousands of distributors in the print, advertising, marketing, advertising specialties and forms industries.  These distributors were Folder Express' customers.  It was they who placed actual purchase orders with Folder Express, submitted the artwork, requested layouts and provided other order information to Folder Express, and otherwise interfaced and communicated directly with Folder Express in connection with an order.

20.     Folder Express had excellent market penetration.  In the two years prior to Wright's approach to Ennis, Folder Express sold or sent sales kits to nearly 29% of the approximately 54,000 printers and print resellers in business, including over 2,000 sales kits sent out in 2012 to customers who had not contacted Folder Express before.  Not a single customer had over 1% of Folder Express' total sales.

21.     Progress Publications Music ("Progress Music") had a more narrow focus than Folder Express.  It manufactured and supplied music folders to music stores across the country that sold and rented instruments to school band and orchestra programs, including numerous "bandfolder" folder designs.  Its music store customers would choose from a variety of standard music-related artwork but customize the folder to include the store's name.  Progress Music had nearly 96% of the market.

22.     Progress Publications also had a narrow focus, which was on the manufacture and supply of school folders, planners and related items to schools across the country.

23.     Defendants operated Folder Express, Progress Music and Progress Publications out of a 152,000 square foot industrial facility located at 11616 I Street in Omaha, Nebraska.  Wright owned the facility through another one of his companies, 11616 "I" Street LLC (the "Omaha Facility").

24.     In addition to the custom folder business, Defendants also owned a separate business that manufactured packaging products and cartons (the "packaging business").  Defendants' packaging business was not part of the asset acquisition proposed to Ennis.

25.     To facilitate Defendants Wright and WPCO's provision of confidential information and trade secrets to Ennis during the due diligence phase of the potential acquisition of WPCO's custom folder business, Ennis and WPCO entered into a Confidentiality Agreement

dated May 10, 2013 (the "Confidentiality Agreement," attached hereto as Exhibit 1).  The

Confidentiality Agreement provided that, in connection with the acquisition discussions, WPCO

might disclose to Ennis certain "financial records, trade secrets, documents, data and other

confidential information" of WPCO, including customer lists and volumes, marketing strategies,

financial statements, business or financial plans, documents, data, agreements, papers, reports,

compilations, analyses and summaries concerning WPCO and its business operations.  (*Id.* §1).

The parties agreed that all of the above-referenced information "is confidential," "is proprietary

and confidential" and "that [WPCO], its business operations and the [folder presentation

business] Assets could be damaged if any of the information is disclosed to unauthorized third

parties."  (*Id.* §§ 1-2).  WPCO thus demanded, and Ennis agreed, that Ennis would "maintain the

information as proprietary and confidential and take all measures reasonably necessary and

advisable to safeguard and protect it against disclosure…."  (*Id.* § 4).

  26. As part of the due diligence process, representatives of Ennis and Crabar asked

Wright why he wanted to sell his lucrative custom folder business but keep his much less

lucrative packaging business.  Wright responded that that he was carrying a significant amount

of debt and therefore wanted to sell his more lucrative business in order to generate cash to pay

down his outstanding loans; that he no longer wanted to be in the custom folder business; that he

thought the custom folder business was going to decline and thus wanted to get out of it; and that

he instead wanted to focus on growing his packaging business, including by using some of the

proceeds from the sale of his custom folder business.  On information and belief, based on

subsequent events occurring in the 24 months that followed, Wright's actual intent was to sell the

folder business to generate funds to pay down debt of approximately $10,000,000, to thereafter

sell the packaging business, and to use the proceeds of the sale of the packaging business to reenter the folder business in direct competition with Crabar.

### Crabar Purchases Defendants' Custom Folder Business

27.     In reliance on Wright's representations, Ennis, via its Crabar subsidiary, entered into an Asset Purchase and Sale Agreement with WPCO dated September 23, 2013 ("Asset Purchase Agreement").  The executed Asset Purchase Agreement itself, along with Schedule A (List of Defined Terms) and Exhibit D (Trademark Assignment) thereto, are attached hereto as Exhibit 2.  The acquisition closed on September 30, 2013.  Crabar paid $15 million and assumed approximately $494,000 in WPCO trade payables to purchase WPCO's custom folder business.

28.     Of the $15 million purchase price, $1.5 million was to be placed in escrow with Bank of America Merrill Lynch, as security against any breach of contract, covenant or restriction by WPCO, which would give rise to a right of indemnification on Crabar's part under Article 8 of the Asset Purchase Agreement.

29.     As part of the sale, Crabar purchased and acquired, *inter alia*, all right title and interest in (a) certain manufacturing equipment and dies used in the business; (b) all goodwill of the  business; (c) electronic and hard copy files related to the business assets; and (d) all proprietary and confidential information relating to the business operations of Folder Express, Progress Music and Progress Publications.  (See Asset Purchase Agreement sec. 1.1, 1.2).

30.     The proprietary and confidential information Crabar purchased from WPCO included all data, records, files and other documentation related to those businesses and the operation of the same, including but not limited to:  (a) all client and customer lists, telephone numbers and e-mail addresses concerning past, present or prospective clients or customers, and all customer and prospect databases; (b) all customer sales information, sales records,

information regarding customer printing requirements, job files, jackets, job logs, artwork, base

negatives and other information regarding work performed for customers; (c) all sales,

promotional and advertising materials, sales catalogs and sales brochures; (d) all supplier lists

and supplier purchasing records and information; and (e) ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████. (Exhibit 2, §§ 1.2(c), (l)).  Crabar and Defendants agreed that all of this

information constituted "Confidential Information" under the Asset Purchase Agreement.

31.     Defendants agreed after the acquisition, they would not, use, disclose or divulge

any "Confidential Information" of or about WPCO's custom folder business, Folder Express or

Progress Music, including the identities of customers, for their own benefit or purposes or for the

benefit of any other person or entity.  Specifically, Defendants agreed as follows:

> 5.1     **Covenants of Seller.**  Seller hereby covenants and agrees with
> Purchaser as follows:
>
> (e)     **Confidentiality.**  From and after the Closing Date, without
> the prior written consent of Purchaser, Seller shall not, except on behalf of
> Purchaser and except on Seller's behalf in the operation of the Affiliate
> Business [the packaging business], **use any of the Confidential
> Information of Seller for Seller's own purposes or for the benefit of
> any other person, firm, corporation, partnership, organization or any
> other entity, or disclose any Confidential Information to any person,
> firm, corporation partnership or other entity** unless…(ii) such
> Confidential Information is available to the public through no fault of
> Seller, (iii) such Confidential Information becomes available to Seller
> from a third party who is under no confidential or fiduciary obligation to
> either Purchaser or Seller with respect to such Confidential Information, or
> (iv) such Confidential Information is used by Seller in the operation of
> Seller's Affiliate Business [the packaging business] and maintained by
> Seller as Confidential Information subject to the restrictions on disclosure
> which Seller applies to Seller's own Confidential Information.  As used
> herein, the term **"Confidential Information" shall mean (i) all trade**

**secrets as defined under applicable statute or common law, and (ii) other confidential information of or about Seller, including, without limitation, any such information regarding the business of Seller, its manufacturing processes, methods of operation, products, financial data, sources of supply and customers**….(initial emphasis added).

*            *            *

7.1    <u>**Restrictive Covenants Applicable to Seller and Affiliates**</u>. Except in connection with services performed for or on behalf of Purchaser or any of its affiliates, neither Seller, nor Mark Wright or any entity directly or indirectly controlling, controlled by or under common control with Seller (either Mark Wright or any such entity, a "**Seller Affiliate**"), shall, either directly or indirectly, on such Seller's own account or as an independent contractor, employee, consultant, agent, partner, joint venturer, member, owner, officer, director or stockholder of any other person, firm, corporation, partnership, limited liability company, association or other entity, or in any other capacity, in any way:

(d)    <u>**Non-Disclosure**</u>.  At any time **use, for the benefit of Seller or for any other person, firm, corporation, partnership, association or other entity, or divulge or disclose in any manner to any persons, firm, corporation, partnership or other entity, the identity of the customers of Seller or Purchaser (from and after the Closing) or any of their respective affiliates any Confidential Information**. Notwithstanding anything to the contrary contained in this Agreement, the restrictions on the disclosure and use of Confidential Information shall not apply to:

(i)    information or techniques which are or become available to the public other than through disclosure (whether deliberate or inadvertent) by any party in violation of any restrictive covenant or fiduciary duty to which such party is bound;…

(iii)    Confidential Information that is or becomes available to Seller or a Seller Affiliate from a third party who is under no confidential or fiduciary obligation to Purchase or any affiliate of Purchaser with respect to such Confidential Information;

(iv)    the use, but not disclosure to third parties, of Confidential Information in the operation of the Affiliate Business [the packaging business]....

(Exhibit 2, §§ 5.1(e), 7.1(d)) (emphasis added).

32.     Defendant WPCO agreed that the strict limitations on its use of Confidential Information after the acquisition were necessary to protect Crabar in the use and employment of the goodwill respecting the Folder Express, Progress Publications and Progress Music businesses.  (Ex. 2, § 7.3).

33.     In the acquisition, Crabar also purchased any "Intellectual Property" that WPCO owned and used in the custom folder business, including intellectual property pertaining to the business and operations of Folder Express, Progress Music and Progress Publications.  (Exhibit 2, § 1.2(f).  Such Intellectual Property included *inter alia* all unpatented inventions, discoveries, specifications, data, processes, formulae, trade secrets, proprietary technical information or know-how, product names, confidential and technical information, product specifications and confidential business information of WPCO.  (Ex. 2, § 1.2(f) & Definition of "Intellectual Property" in § 1.2).   It thus encompassed proprietary folder dimensions and product names, as well as trade secrets consisting of:  (a) ████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████; (b) confidential and proprietary color formulae that Folder Express offered for its color-coated folder covers; and (c) a confidential and proprietary set of color options that Folder Express offered for its color-coated folder covers.

34.     The "Intellectual Property" that Crabar purchased from WPCO also included various trademarks, trade names, logos, slogans, domain names and toll-free numbers that WPCO owned and used in its custom folder business, including *inter alia*:  (a) the trademark "Folder Express," federal trademark registration no. 2,247,736, registered as incontestable in

2004; (b) the trademark "Think Fast," federal trademark registration no. 2,582,110, registered as

incontestable in 2008; (c) all logos and slogans used in the Folder Express business, which would

include the logo and slogan set forth below (which uses both the "Folder Express" and "Think

Fast" trademarks):



(d) the trade name "Progress Publications Music"; (e) the trademark "Sculptured Pockets,"

federal trademark registration no. 3,614,618, registered as incontestable in 2015 (f) all

derivations of the above-referenced trademarks, trade names, logos and slogans; (g) the domain

names www.folderexpress.com and www.progresspublicationsmusic.com (the "acquired domain

names"); and (h) all toll free and other telephone numbers used by Folder Express, Progress

Music and Progress Publications, including the (800) 365-3377 number used by Progress Music.

(*Id.*; Ex. D to Ex. 2 attached hereto (Trademark Assignment)).

35.     As part of the acquisition, WPCO agreed that neither it nor any affiliate, which, as

defined, includes Wright, would use the trade name and trademark "Folder Express," the

trademark "Think Fast," the slogan "Folders Express THINK FAST," the trademark "Sculptured

Pockets," the trade name "Progress Publications Music," the acquired domain names, any

derivations of such trade names, trademarks, domain names or slogans, or any of the other

"Intellectual Property" it sold to Crabar for any purpose whatsoever after the acquisition.  (Ex. 2,

§ 1.2(f), Definition of Intellectual Property in § 1.2, & § 5.1(c)).

36.     Crabar agreed to offer employment to substantially all of the 96 WPCO employees working in WPCO's Folder Express, Progress Music and Progress Publications businesses.  This included employees who had years of experience working with the machinery and equipment used in those businesses.  This experience uniquely enabled such employees to operate the machinery and equipment in a highly efficient manner and quickly identify and correct problems in the manufacturing process and thereby reduce waste, delay and cost.  For example, most of the machinery is only calibrated to detect certain printing anomalies and only within certain parameters.  In contrast, a very experienced employee can detect a wider variety of problems and much sooner than the machinery, which enables them to intervene sooner to fix the problem.  These employees were very valuable to the Folder Express, Progress Publications, and Progress Music businesses, as such skillsets and abilities cannot be taught but are instead developed through years of experience actually working with the machinery and equipment. Approximately 90 of the WPCO employees (including all of those who worked on the folder machinery and equipment) accepted employment with Crabar and continued working for Folder Express, Progress Music and Progress Publications after the acquisition.

37.     Also as part of the acquisition, Crabar entered into an industrial building lease with Wright for the Omaha Facility (via Wright's 11616 "I" Street LLC entity) in order to continue operating the Folder Express, Progress Music and Progress Publications businesses out of the same facility after the acquisition.  The one-year lease term began on September 30, 2013 with an option to extend for another year.  Crabar invoked the option, thereby extending the lease to September 30, 2015.

38.     In sum, Crabar paid Defendants the agreed-upon consideration of over $15 million for the assets comprising the Folder Express, Progress Music and Progress Publications

businesses, which included the confidential, proprietary and trade secret information and intellectual property of those businesses, and the hard copy and electronic files of the businesses, the right to obtain the experienced employees who collectively ran those businesses, and the right to continue operating those businesses out of the Omaha Facility.

39.    Following the sale, Crabar continued operating the custom folder and music folder businesses it acquired as "Folder Express," "Progress Publications" and "Progress Publications Music."  Folder Express, Progress Publications and Progress Music were successful under Crabar's ownership and continued to maintain good relationships with their thousands of customers throughout the remainder of 2013, all of 2014 and at least the first half of 2015**.**

40.    The continued success of Folder Express, Progress Publications and Progress Music was heavily dependent upon the confidential, proprietary trade secret information and intellectual property that Crabar purchased from WPCO.  Crabar and its employees continued to maintain and develop this information and intellectual property after the acquisition.  Such information includes but is not limited to all of the "Confidential Information" described in both the Confidentiality Agreement and Asset Purchase Agreement.  It encompasses Folder Express, Progress Publications and Progress Music customer lists, including the names, telephone numbers and email addresses of the individual contact at each such customer, customer data, artwork files, job files and logs, custom color formulae, item templates and manufacturing processes.  Significant time and effort were expended, over the course of many years, to develop such information, customer base and customer lists, and Crabar paid WPCO handsomely to acquire the fruits of that time and effort.

41.    All of the above-referenced confidential information and trade secrets derive independent economic value from not being generally known to, and not being readily

ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.  This includes the identity of the thousands of Folder Express distributor-customers throughout the country and their particular needs and proclivities, which are not readily ascertainable by competitors by proper means.

42.     Such confidential information is valuable and important to Crabar, as it enables the company to maintain and expand its Folder Express, Progress Publications and Progress Music customer base, perform at a high-level in the manufacturing and printing processes, satisfactorily and quickly fill customer orders, and thus to continue operating a financially successful custom folder business.

43.     Crabar provided its employees who worked for Folder Express, Progress Publications and Progress Music access to its confidential, proprietary and trade secret information and intellectual property in order to enable those employees to continue successfully performing their jobs on behalf of those businesses.

44.     Crabar has taken reasonable measures to protect its Folder Express, Progress Publications and Progress Music trade secrets, confidential information, proprietary information and intellectual property through its use of policies and internal practices.

45.     For example, as a condition of their continued employment, Crabar required its employees who worked for Folder Express, Progress Publications and Progress Music to maintain the confidentiality of the company's trade secrets and confidential information, including but not limited to customer names, and sources of supplies, types of equipment, materials, methods and processes used in the business, and not to disclose such information to anyone outside the company.  The employees agreed to abide by these restrictions in the Folder Express Employee Handbook ("Employee Handbook") that each of them signed.  The Employee

Handbook instructs employees that they owe a duty of good faith and loyalty to their employer to maintain the confidentiality of such information not only while employed by Crabar but also after they leave Crabar's employ.

46.     The Employee Handbook also prohibits employees from storing company documents on personal home computers, requiring such documents to be stored on business computers only.  The Employee Handbook specifically provides that employees are expected to exhibit the same high level of ethical and business standards when using Crabar's information technology systems as they do with more traditional workplace resources.

### Wright Abruptly Forces Crabar Out of the Omaha Facility and Leverages the Surprise Into a $1.1 Million Payday

47.     In July 2014, Crabar informed Wright that it wanted to discuss options for a longer-term lease at the Omaha Facility so that Folder Express, Progress Music and Progress Publications could continue operating out of the facility after the lease expired on September 30, 2015.  In January 2015, Crabar specifically proposed a two-year lease with three two-year renewal options.  It also advised Wright that it did not need all of the space it was using and thus proposed ceding the more desirable space back to Wright and moving all of its operations into the less desirable space.

48.     By March 10, 2015, the parties appeared to be close to reaching agreement on all terms for a longer-term lease at the Omaha Facility, including on both the lease term and renewal options proposed by Crabar, and on Crabar moving all of its operations into the less desirable space.  Then, without warning two weeks later, Wright abruptly informed Crabar that it intended to sell the Omaha Facility and would not renew the lease.  Two weeks after that, Wright abruptly told Crabar that it needed to vacate the Omaha Facility by September 30, 2015, claiming in

emails sent to Crabar's Michael Magill on May 2, 2015 and May 8, 2015, the "reality" was that he simply wanted to "close out and slow down," "get out" and get the property "off his plate."

49.     Crabar was surprised and confused by Wright's actions and tried to persuade him to renew the lease.  It told Wright that it did not understand why he would want to try to sell an empty building versus a building with an existing tenant that was generating cash flow, which would be of interest to buyers looking to purchase the building as an investment.

50.     Wright admitted in May 2015 that he had exactly such an interested buyer-investor:  a REIT named Stag Industrial.  Crabar responded that, as the goal of a buyer like Stag Industrial is to buy cash flow, Wright's decision to empty the building of tenants was counterproductive and illogical.  Wright told Crabar that if he could get a lessor for 10 years, he would accept such a lease with the intention of selling the building to Stag Industrial, which cast further doubt on Wright's real motives vis-à-vis Crabar given how close he and Crabar were to reaching agreement on a lease with a potential eight-year term.

51.     Due to Wright's abrupt refusal to renew Crabar's lease, Crabar found itself in the spring of 2015 in urgent need of finding and moving its Folder Express, Progress Music and Progress Publications operations into a new industrial facility on short notice.

52.     Capitalizing on the untenable position he had imposed on Crabar, Wright offered, in a May 18, 2015 email to Crabar's Michael Magill, to extend the lease to December 30, 2015 to allow Crabar time to move to another location, but did so on two conditions: first, that Crabar agree to terminate the breach of contract, representation or warranty escrow fund, which at that point contained $1.1 million, and direct the escrow agent, Bank of America Merrill Lynch, to return the funds to WPCO; and (2) that Crabar release WPCO from all representations and warranties under the Asset Purchase Agreement.

53.     In making this proposal, Wright omitted to disclose that:  (a) he was in the process of selling the packaging business he had previously (less than two years earlier) told Plaintiff would be the focus of his business efforts going forward; and (b) he intended to launch a competing business with Crabar using the confidential, proprietary and trade secret information and intellectual property he and WPCO had sold Crabar, using a name that mimicked the trademark and tradename also included in the sale, and obtaining and using a toll-free telephone number that was identical to the toll-free number WPCO sold Crabar except for the last digit (which digit was, itself, the closest digit available to the last digit of the Crabar number.  That Wright had the present intent to launch this business is beyond dispute, as , he had secretly reserved an internet domain name for the to-be-launched company, under the infringing tradename www.pocketfoldersfast.com, more than six months earlier, as described in more detail below.

54.     Notwithstanding that he was preparing to sell his packaging business and launch the competing folder business, Wright falsely represented to Crabar in May 2015, that he had no intention of retaining ownership of the printing facility or of reentering the custom folder printing business in that same facility.  Wright falsely led Crabar to believe that his abrupt decision to sell the building was part and parcel of his decision to retire, telling Crabar's Michael Magill in emails sent on May 2, 2015 and May 18, 2015 that Wright's goal was to "get out" of being a landlord by getting the building "off his plate" because the "reality" was that the time had come for him "to close out and slow down."

55.     In reliance on Wright's representations, Crabar agreed to Wright's conditions, resulting in an extension of the lease to December 31, 2015, termination of the escrow, and the release of $1.1 million in funds to WPCO.

56.     Had Wright disclosed his true intent to launch the competing business, Crabar would not have agreed to Wright's "generous" offer to extend the lease, and would not have agreed to terminate the escrow and release the $1.1 million in funds to WPCO, to Crabar's detriment.

## Crabar is Forced to Relocate its Folder Express Business

57.     Crabar wanted to stay in the Omaha area in order to retain its experienced employees and minimize any disruption to its operations.  Crabar therefore searched for an industrial facility in the area that met its various operational requirements, the most critical of which were 75,000 square feet of space and sufficient electrical power to run the businesses' fabrication, printing and finishing machinery and equipment.  Unfortunately, Crabar could not find a facility in Omaha that met these requirements, and any facility that had adequate space would have required prohibitively costly work to upgrade the electrical power capacity to meet Crabar's needs.

58.     With Omaha not an option, Crabar made the difficult decision in the summer of 2015 to move its Folder Express, Progress Publications and Progress Music operations to an Ennis-owned facility in Columbus, Kansas, which did fully meet the businesses' operational requirements.  Crabar offered all of the employees who worked for Folder Express, Progress Music and Progress Publications the opportunity to move to Columbus, Kansas and continue working for those businesses.  While relocation is difficult for any employee, Crabar reasonably expected that it would be able to retain many of its valued, key employees, who overwhelmingly had worked in the folder printing business for many years.  The fact that none of its competitors had printing plants in or near Omaha added to Crabar's reasonable expectations.

59.     On September 4, 2015, the Omaha World-Herald published an article reporting on Folder Express' relocation to Columbus, Kansas and Wright listing the Omaha Facility for sale. The article reported that Wright "said the decision to put it on the market was made **after** he learned Folder Express would not renew its lease" (emphasis added).  Wright's statement to the media was untrue.  In fact, it was Wright himself who unilaterally decided—over Crabar's objections—not to renew Crabar's lease and to sell the Omaha Facility.  Wright's untrue statement did, however, paint a misleading picture in the community that Crabar had unilaterally decided to abandon Omaha, and that Wright was the victim of that purported unilateral decision, merely reacting to it by listing the property for sale.  Although Plaintiff attempted to set the record straight in the press and with customers, Wright's misstatement that Plaintiff was abandoning Omaha cast Plaintiff in an awful light in the community and industry.

60.     By the end of 2015, Crabar moved its Folder Express, Progress Publications and Progress Music operations to Columbus, Kansas.  Only four employees accepted Crabar's offer and made the move to Columbus.

### Wright, Sikora, and WPCO Start a Competing Custom Folder Business Using the Omaha Facility

61.     Wright never sold the Omaha Facility.  Instead, he and WPCO have been using that facility to operate two new custom folder businesses: "Pocket Folders Fast" and "Bandfolder Press."  Wright and WPCO, along with Sikora as CEO, launched these businesses in 2016 to compete against the Folder Express and Progress Music businesses they sold to Crabar less than three years earlier.

### Wright, Sikora and WPCO Adopt and Infringing Name and Domain Name for the Competing Business

62.     Defendants Wright, Sikora, and WPCO began plotting to launch the competing businesses less than one year after selling Folder Express, Progress Publications and Progress Music to Crabar for $15 million and agreeing not to use any confidential information, trade secrets or intellectual property associated with those businesses.  Specifically, in early August 2014, approximately 10 months after the acquisition closed, Wright and WPCO, through Sikora, purchased the domain name and started the website www.pocketfoldersfast.com, as part of their plan to launch a custom folder business under the trade name "Pocket Folders Fast."  WPCO later purchased the domain name and started the website www.bandfolderpress.com, as part of a plan to launch a competing music folder business under the trade name "Bandfolder Press."

63.     Defendants Wright, Sikora, and WPCO chose to operate their new custom folder business under the trade name "Pocket Folders Fast" and use the domain name www.pocketfoldersfast.com notwithstanding the fact that, just prior to the acquisition, they sent a cease-and-desist letter to another company in which they objected to that company's use of the trade name "Pocket Folders Express" and domain name pocketfoldersexpress.com as infringing the registered trademark "Folder Express."

64.     To wit, in August 2013, attorneys for WPCO wrote to a custom folder company in Duluth, Georgia operating under the name "Pocket Folders Express" and engaged in business directly competitive with, and servicing similar customers as, WPCO.  (*See* Exhibit 3, attached hereto).  In the letter, WPCO asserted that there was a "strong similarity" between the name "Pocket Folders Express" and WPCO's "Folder Express" trademark, and that, when coupled with the fact that the same industry and customers would come into contact with the two companies' products, the other company's use of the name "Pocket Folders Express" created a

"clear" likelihood of confusion.  WPCO asserted that the other company's use of the name "Pocket Folders Express" and domain name pocketfoldersexpress.com therefore "constitute an infringement of [WPCO's] mark, and may additionally constitute unfair competition under applicable state law," and claimed such infringement and other state law violations entitled it to injunctive relief, monetary damages, damages based on the allegedly infringing company's profits, the cost of legal action, and potentially treble damages.

65.     Throughout 2016, Defendants Wright, Sikora, and WPCO worked to launch Pocket Folders Fast and Bandfolder Press and make them operational.  They began actively marketing Bandfolder Press in early 2016 and launched that business in February 2016.  They began actively marketing Pocket Folders Fast in the summer of 2016 and launched that business in August 2016.  WPCO is operating Pocket Folders Fast and Bandfolder Press out of the same Omaha Facility Wright forced Folder Express and Progress Music to vacate, under false pretenses, a few months earlier.   Defendants also used promotional statements on their new website to target their former customers at Folder Express and Progress Music.

66.     Wright's daughter, Defendant Mardra Sikora, holds herself out as the CEO of Pocket Folders Fast, Bandfolder Press and WPCO.  Sikora previously worked for Folder Express, Progress Publications and Progress Music and WPCO in various management, sales, marketing and customer service capacities from 1994 through 2011, and holds herself out as having been the President of WPCO from 2008 through 2011.  On information and belief, Sikora continued working for WPCO after 2011 and before WPCO launched its new business in 2016, including working on a developmental business called "Boxes in a Click" for WPCO throughout 2014 and 2015.  Over the course of her 17 years working for Folder Express, Progress Publications, Progress Music and WPCO, Sikora obtained extensive knowledge of those

businesses' proprietary and confidential information, trade secrets and intellectual property, which Defendants sold to Crabar in 2013 and agreed not to use thereafter for any purpose whatsoever.

67.     WPCO employees have intimate knowledge of the business and operations of Folder Express, Progress Publications and Progress Music.  They had knowledge of and access to, and presently possess knowledge of and/or access to, confidential and proprietary information, trade secrets and intellectual property belonging to Crabar concerning the Folder Express, Progress Publications and Progress Music businesses, including all of the confidential and proprietary information, trade secrets and intellectual property listed in and encompassed by the Asset Purchase Agreement.  This information includes extensive information regarding numerous Folder Express, Progress Publications and Progress Music customers, which was included in the exhibits appended to the Asset Purchase Agreement.  Each Defendant has accessed and used such information in the course of their employment with WPCO in order to operate the Pocket Folders Fast and Bandfolder Press businesses to compete with Crabar and seek to lure away Crabar's Folder Express, Progress Publications and Progress Music customers.

68.     Defendants are using Crabar's confidential and proprietary information, trade secrets, electronic files, customer lists and intellectual property in their operation of Pocket Folders Fast and Bandfolder Press, including but not limited to confidential and proprietary information, trade secrets and intellectual property known to them and in their possession as a result of their prior ownership of and employment by those businesses, and as provided to them by former Crabar employees, including Sikora, Kohlhaas and Fredrickson.

**Wright, Sikora and WPCO Misappropriated and Used Crabar's Customer Lists,
Historical Sales Data Documents and Product Cost Modeling Documents to Unfairly
Compete Against Crabar**

69.     Defendants Wright, Sikora, and WPCO are soliciting customers and potential customers of Crabar's Folder Express, Progress Publications and Progress Music businesses using confidential trade secret records WPCO sold to Crabar.

70.     For example, Defendant Sikora misappropriated a trade secret list of more than 100 key Folder Express customers in 2011 and then used that list in 2016 to target Crabar's customers for WPCO's start-up business Pocket Folders Fast.  This list was one of the assets WPCO sold to Crabar through the Asset Purchase Agreement.

71.     Similarly, in September 2016, Defendants Wright, Sikora, and WPCO used a trade secret list of thousands of Folder Express customers containing detailed contact and sales history information to identify Crabar customers to solicit for the competing Pocket Folders Fast business.  This list was one of the assets WPCO sold to Crabar through the Asset Purchase Agreement.

72.     During at least the period June 2016 through February 2017, Defendants Wright, Sikora and WPCO also used copies of detailed, trade secret product cost-modeling spreadsheets WPCO sold to Crabar to develop cost modeling for Pocket Folders Fast's identical, competing products, with the goal of underpricing Crabar's products.  These spreadsheets were also among the assets WPCO sold to Crabar through the Asset Purchase Agreement.

73.     Defendants used the customer list / sales data: (a) knowing that WPCO sold all right, title and interest to the files and information to Crabar in September 2013; and (b) knowing that the information was subject to the Confidentiality covenant in Section 7.1(d) of the Asset Purchase Agreement.

**Defendants Wright, Sikora and WPCO Misappropriated Crabar's Die-Related Files
to Unfairly Compete Against Crabar**

74.     Pocket Folders Fast is marketing folder styles that are identical to proprietary
folder styles manufactured and sold only by Folder Express, and which were part of the assets
and intellectual property that WPCO sold to Crabar and agreed not to use for any purposes after
the sale.  Specifically, all 25 of the folder styles/specifications offered by Pocket Folders Fast are
identical to those offered by Folder Express, and of those 25 styles, 16 are proprietary to Folder
Express.  No other custom folder printing company offers this array of folder styles and
specifications in its product catalogue.  Pocket Folders Fast is also using Folder Express' product
names for some of those identical products, *e.g.*, VP-1, VP-2, which product names were also
part of the assets and intellectual property that WPCO sold to Crabar and agreed not to use after
the sale.  Defendants' offerings demonstrate that they are targeting Plaintiff's customers (given
that no other manufacturer offers this array of product sizes, and customers are highly resistant to
any change in a folder product) and using Plaintiff's trade secret information regarding cost
minimization to compete against Plaintiff.

75.     Paper stock is cut to the precise dimensions required to manufacture a folder
product using dies that are created according to instructions in Computer Assisted Design
electronic files (the "CAD die files").  The CAD die files were specifically designed to hold the
specifications/engineering drawings for the die-cutting layouts that manufacture dies for use in
the business purchased by Crabar.  Folder Express, Progress Publications and Progress Music
used the dies manufactured pursuant to the CAD die file instructions in its presentation folder
manufacturing machinery to produce its uniquely-sized product line of folders.

76.     WPCO delivered copies of the CAD die files to Crabar as part of the closing of
the Asset Purchase Agreement transaction.

77.     Over time, dies wear out and must be replaced.  Crabar does not own the machinery used to manufacture dies and must contract with a die-making company to create new dies according to the instructions contained in the CAD die files it purchased from Defendants.

78.     Prior to and after the closing of the Asset Purchase Agreement, WPCO owned and operated die-manufacturing equipment.  WPCO continued to manufacture dies for use in its packaging business after the acquisition.

79.     Following the closing of the Asset Purchase Agreement, Crabar contracted with WPCO and other companies to manufacture dies for Crabar's Folder Express, Progress Music, and Progress Publications businesses as needed.  Accordingly, WPCO retained copies of Crabar's CAD die files to manufacture the dies for Crabar.  WPCO manufactured new dies for Crabar on multiple occasions after the closing of the Asset Purchase Agreement.  When ordering dies from a manufacturer other than WPCO, Crabar provided its CAD die files to the manufacturer exclusively for use in manufacturing dies for Crabar's business.

80.     In August 2015, WPCO sold its packaging and die-making business to a third-party, Quad Packaging, Inc. ("Quad").  As part of this sale, WPCO transferred its die-making machinery to Quad, as well as its computer servers, hard drives and electronic files.

81.     Among the electronic files WPCO transferred to Quad were the CAD die files used to create dies for Crabar's Folder Express, Progress Music and Progress Publications businesses.

82.     During 2016, Defendant Wright sought and obtained copies of Crabar's CAD die files from Quad for the purpose of duplicating the Folder Express product line, in order to lure Crabar's customers away from Crabar and to Defendants' Pocket Folders Fast business.

83.     In obtaining Crabar's CAD die files from Quad, Defendants did not disclose to Quad that they (a) had sold all right, title and interest in the CAD die files to Crabar in September 2013; (b) were prohibited from using the CAD die files in any way to Crabar's detriment pursuant to Section 7.1(d) of the APA; and (c) therefore, had no legal right to reclaim possession of the copies of Crabar's CAD die files or use them in a competing presentation folder business.

84.     Defendants have used Crabar's CAD die files to manufacture their competing products to the precise dimensions of certain of Crabar's products from at least August 2016 forward.

85.     Defendants have used Crabar's CAD die files without Crabar's permission and knowing that they are prohibited from doing so by reason of their sale of all right, title and interest in the CAD die files to Crabar and by operation of Section 7.1(d) of the APA.

86.     In late 2015, a Crabar employee, defendant Kohlhaas, without authorization and in direct contravention of Crabar's corporate policy against storing corporate documents on an employee's home computer, downloaded confidential, trade secret Crabar electronic files to an external hard drive storage device (the "Hard Drive").

87.     Among these files was a Microsoft Excel spreadsheet named "Existing_Die_Inquiry.xls."  (the "Die Specification Spreadsheet").

88.     The Die Specification Spreadsheet lists detailed specifications of more than 4,000 custom dies used in Crabar's business.

89.     The Die Specification Spreadsheet Kohlhaas downloaded to the Hard Drive had been updated as of December 2015.

90.     In late 2015 or early 2016, Kohlhaas, without authorization, provided access to Crabar's electronic files on the Hard Drive to defendant Frederickson, who was then an employee or consultant of WPCO.

91.     Pursuant to this unauthorized access, Kohlhaas and/or Frederickson misappropriated certain Crabar files, including the Die Specification Spreadsheet, and provided them to Defendants Wright, Sikora and WPCO for use in the competing presentation folder business they were preparing to launch.

92.     Defendants Wright, Sikora and WPCO, including through their consultants and employees Kohlhaas and Frederickson, used the documents they misappropriated from the Hard Drive, including the Die Specification Spreadsheet, to launch their competing presentation folder business and manufacture identically-sized products to products Crabar offers according to the specifications contained in the CAD Die files and Die Specification Spreadsheet.

93.     All Defendants knew they lacked authorization to misappropriate and use Crabar's electronic files, including the Die Specification Spreadsheet, but did so anyway, intentionally and with impunity.

94.     Crabar takes reasonable steps to maintain the secrecy and confidentiality of the CAD die files and the Die Inquiry Spreadsheet, including by employing a computer system firewall to block outside access to the system, limiting employee access to the CAD die files to employees who have a need to access and use them, requiring that employees create and maintain a secret personal password in order to gain access to Crabar's computer system containing the CAD die files, and screening visitors to its offices and plants to ensure that such visitors are expected by an employee and have business to conduct with the employee.  Crabar also forbids employees from storing corporate documents on their home computers, requiring

that such documents be stored strictly on business computers.  Crabar requires employees to sign acknowledgements that they will abide by this policy and all other policies in the Employee Handbook, including all policies therein designed to maintain and protect the confidentiality of Crabar's business records, confidential and trade secret information.

95.    Distributor-customers care about even the smallest of differences between folder styles, such as pocket height, folder dimensions or color, as they tend not to want to have to explain to their own customers–the end users–why a product has changed.  By improperly obtaining, copying and using Folder Express' CAD die files, Die Specification Spreadsheet and proprietary folder styles, Defendants made it much easier for Pocket Folders Fast to solicit and steal Folder Express' customers.

### WPCO's Trade Name, Trade Dress and Almost Identical Toll-Free Telephone Number are Causing Confusion Among Customers

96.    Defendant WPCO operates the websites www.pocketfoldersfast.com and www.bandfolderpress.com, distributes Pocket Folders Fast and Bandfolder Press catalogs to customers and potential customers across the country, and otherwise markets Pocket Folders Fast and Bandfolder Press, including by advertising in trade publications.

97.    Defendant WPCO is using the trade name "Pocket Folders Fast" throughout its www.pocketfoldersfast.com website, the Pocket Folders Fast catalog and its marketing and advertising materials, in marketing and advertising its products to potential customers.  The name appears on the website and in these materials as "Pocket Folders FAST," with the word "fast" capitalized, just as it is in the "Folder Express THINK FAST" slogan and logo.  Its use of the trade name "Pocket Folders FAST" is likely to cause, and has already caused, confusion among distributor-customers as to the source or sponsorship of goods and services, including confusion as to whether an affiliation, connection or association exists between Pocket Folders

Fast and Folder Express.  This confusion is generated by Defendants' use of the trade name

"Pocket Folders FAST," which pawns off and infringes Crabar's ownership and use of the

registered trademarks "Folder Express" and "Think Fast" in its "Folder Express THINK FAST"

logo and slogan, and of its ownership and use of the registered trademark "Sculptured Pockets"

in its marketing materials.  Defendants Wright and WPCO had previously claimed that a trade

name —"Pocket Folders Express"— bore a "strong similarity" to the trademark "Folder

Express," and that another custom folder company's use of the name "Pocket Folders Express"

would clearly cause a likelihood of confusion with "Folder Express" and therefore was

infringing the "Folder Express" trademark.

98.      Defendant WPCO further sought to confuse Crabar music folder customers that

an affiliation exists between Bandfolder Press and Progress Music by deliberately selecting a

toll-free (844) telephone number for Bandfolder Press—365-3372—that is almost identical to the

Progress Music toll-free (800) number—365-3377 (FOLDERS)—that Defendants Wright and

WPCO sold to Crabar as part of the Asset Purchase Agreement and agreed not to use it for any

purpose whatsoever.  Defendant WPCO's machinations to obtain a toll-free (844) number that

was exactly the same as the Progress Music toll-free number were only thwarted by the fact that

(844) 365-3377 had already been assigned when Defendant WPCO purchased its number on

February 29, 2016.  Defendant WPCO's use of an almost-identical toll-free number is likely to

cause confusion as to whether an affiliation, connection or association exists between Bandfolder

Press and Progress Music.

99.      The likelihood of confusion, and actual confusion, described in the preceding

paragraphs is exacerbated by Defendant WPCO's prior ownership of Folder Express, Progress

Publications and Progress Music, and the fact that Defendants are operating Pocket Folder Fast

and Bandfolder Press out of the same Omaha Facility that used to house Folder Express,

Progress Publications and Progress Music.

100.    Defendant WPCO's knowledge and use of Crabar's confidential, proprietary and

trade secret information and intellectual property gives them an unfair competitive advantage and

allows them to market their products to customers and potential customers of those businesses,

and target their products, pricing and services in such a way as to maximize their ability to lure

such customers away from Crabar.

101.    Defendants have, by their improper conduct as set forth above, been able to put

Folder Express, Progress Music and Progress Publications at a competitive disadvantage and

interfere with their customers and potential customer relationships.

102.    Crabar believes that it has been damaged, and is likely to be damaged, by

Defendants' conduct, including through the loss of customers and of significant sales revenue

and profits.

103.    Crabar has suffered and will continue to suffer irreparable harm if Defendants

continue to use Crabar's customer list information, electronic die-related files, electronic cost

modeling information and proprietary cost-saving information to divert business from and

compete unfairly against Crabar.  Crabar has likewise suffered and will continue to suffer

irreparable harm if Defendants continue to infringe Crabar's trademarks, trade names, domain

name, and toll-free telephone number to divert business from and compete unfairly against

Crabar.

## COUNT I
## Breach Of Contract
### (Against Defendant WPCO)

104.     Crabar realleges paragraphs 1-103 of this Complaint as if fully stated herein.

105.     Crabar and WPCO are parties to the Asset Purchase Agreement dated September 23, 2013.

106.     WPCO agreed in the Asset Purchase Agreement that neither it, nor Wright, nor any WPCO entity affiliate, would use any "Confidential Information" of WPCO, Folder Express or Progress Music for their own purposes or for the benefit of any other person, firm, corporation, partnership, organization or other entity.  WPCO also agreed that neither it, nor Wright, nor any WPCO affiliate would disclose any such "Confidential Information" or the identity of customers of WPCO, Folder Express or Progress Music to any person, firm, corporation, partnership or entity.

107.     WPCO agreed in the Asset Purchase Agreement that neither it, nor Wright, nor any WPCO affiliate, which would include Sikora as purported CEO of WPCO, Pocket Folders Fast and Bandfolder Press, would use the trade names, trademarks, slogans or domain names sold to Crabar, and derivations of such trade names, trademarks, slogans or domain names, or any other Intellectual Property sold to Crabar, for any purpose whatsoever, other than in its performance of acquisition-related agreements or on behalf of Crabar.

108.     WPCO has breached the Agreement by (a) using and disclosing "Confidential Information" of WPCO, Folder Express and Progress Music for its own benefit and for the benefit of Wright, and (b) its own use, Wright's use, and the use by affiliates Sikora, Pocket Folders Fast and Bandfolder Press of derivations of the acquired trade names, trademarks, slogans and domain names, all to compete against Crabar and otherwise for its own purposes.

109.     Crabar has complied with all of its obligations in the Agreement, including but not limited to payment of the $15,000,000 purchase price set forth therein.

110.     As a result of WPCO's breach of the Agreement, Crabar has suffered damage in the form of lost business, business revenues and business opportunities such that it is entitled to damages under Delaware law, which governs the validity, construction and enforceability of the Asset Purchase Agreement.  (Ex. 2, § 10.4).

### COUNT II
### Misappropriation Of Trade Secrets In Violation Of Neb. Rev. Stat. § 87-504
### (Against All Defendants)

111.     Crabar realleges paragraphs 1-103 of this Complaint as if fully stated herein.

112.     Defendants WPCO and Wright, as a result of their former ownership of Folder Express, Progress Publications and Progress Music and through their employment of former Crabar employees, and through their retention after the Asset Purchase Agreement closing of copies of customer lists, customer information, sales data and product cost modeling data and misappropriation of die-related files and documents, acquired, used and currently possess knowledge of Folder Express, Progress Publications and Progress Music confidential information and trade secrets owned by Crabar.

113.     The trade secrets are not generally known to, or ascertainable by proper means by, others and, on that basis, have independent economic value to Crabar.

114.     Crabar has made, and continues to make, reasonable efforts to maintain the secrecy of its Folder Express and Progress Music trade secrets.

115.     Defendants have utilized such trade secrets for their own benefit as a means of persuading customers to transfer business and business opportunities to themselves and to their Pocket Folders Fast and Bandfolder Press businesses.

116.     Defendants have used the Folder Express, Progress Publications and Progress Music trade secrets for their own benefit, without the express or implied consent of Crabar.

117.     At the time they used such trade secrets, Defendants knew or had reason to know that they acquired the trade secrets under circumstances giving rise to a duty to maintain the secrecy or limit the use of such trade secrets, and that the trade secrets were derived from or through persons, including Wright and former Crabar employees, including Sikora, Kohlhaas, and Fredrickson, who owed a duty to Crabar, Folder Express, Progress Publications and/or Progress Music to maintain the secrecy or limit the use of such trade secrets.

118.     Defendants' conduct constitutes misappropriation in violation of Nebraska Revised Statute § 87-504.

119.     As a proximate result of Defendants' conduct, Crabar and its Folder Express, Progress Publications and Progress Music businesses have suffered and will continue to suffer damages, including the loss of customers and revenue from customers.

120.     Crabar is entitled to injunctive relief, its actual losses and damages, and such other damages in excess of $75,000 as permitted by Nebraska Revised Statute § 87-504.

### COUNT III
### Tortious Interference With Business Relationships
**(Against All Defendants)**
**[This claim was previously dismissed by the Court and is included in this Third Amended Complaint to preserve the issue for appeal.]**

121.     Crabar realleges paragraphs 1-103 of this Complaint as if fully stated herein.

122.     Folder Express, Progress Music and Progress Publications have had longstanding business relationships with their customers, including customers formerly serviced by Defendants when Defendants owned those businesses, and by current employees of WPCO who previously worked for those businesses.

123.    Defendants knew of the business relationships between Folder Express, Progress Music, Progress Publications and their customers.

124.    Defendants intentionally interfered with Folder Express', Progress Music's and Progress Publications' existing and prospective business relationships with their customers, without justification.

125.    Defendants' conduct has caused and will continue to cause Crabar and its Folder Express, Progress Publications and Progress Music businesses damage in the form of lost goodwill, customers, business and revenue.

**COUNT IV**
**Federal Trademark Infringement in Violation of 15 U.S.C. § 1114(1) (Lanham Act)**
**(Against Defendant WPCO)**

126.    Crabar realleges paragraphs 1-103 of this Complaint as if fully stated herein.

127.    Crabar owns U.S. federal registration no. 2,247,736 for the trademark "Folder Express," U.S. federal registration no. 2,582,110 for the trademark "Think Fast" and U.S. federal registration no. 3,614,618 for the trademark "Sculptured Pockets." These registrations are in full force and effect and are enforceable.

128.    WPCO's use in commerce of the trade name "Pocket Folders FAST" in connection with custom folder products and services is confusingly similar to Crabar's registered trademarks "Folder Express," "Think Fast" and "Sculptured Pockets, and to the logo "Folder Express THINK FAST" that incorporates two of those trademarks, and is likely to cause confusion, and mistake, and to deceive customers and prospective customers into believing there is an affiliation between WPCO's Pocket Folders Fast and Crabar's Folder Express and that WPCO's goods and services originate from, are affiliated with, or are approved or sponsored by

Crabar and Folder Express.  WPCO's use of the trade name "Pocket Folders Fast" therefore constitutes trademark infringement under 15 U.S.C. § 1114(a).

129.    WPCO committed these acts with knowledge that the name "Pocket Folders Fast" was likely to cause confusion, mistake or to deceive.

130.    WPCO's actions have damaged, and will continue to damage, Crabar's rights, reputation and goodwill and discourage current and potential customers from dealing with Crabar.  Crabar is entitled to injunctive relief against WPCO under 15 U.S.C. § 1116 and recovery of damages from WPCO pursuant to 15 U.S.C. § 1117, including treble the actual damages sustained by Crabar, as well as WPCO's profits from its Pocket Folders Fast business, and the costs of the action together with Crabar's attorney fees.

**COUNT V**
**Federal Unfair Competition in Violation of 15 U.S.C. § 1125(a) (Lanham Act)**
**(Against Defendant WPCO)**

131.    Crabar realleges paragraphs 1-103 of this Complaint as if fully stated herein.

132.    Crabar owns U.S. federal registration no. 2,247,736 for the trademark "Folder Express," U.S. federal registration no. 2,582,110 for the trademark "Think Fast" and U.S. federal registration no. 3,614,618 for the trademark "Sculptured Pockets."  These registrations are in full force and effect and are enforceable.

133.    Defendant WPCO's use in commerce of the trade name "Pocket Folders FAST" in connection with custom folder products and services causes, is confusingly similar to Crabar's registered trademarks "Folder Express," "Think Fast" and "Sculptured Pockets, and to the logo "Folder Express THINK FAST" that incorporates two of those trademarks, and is likely to cause, confusion, and mistake and to deceive customers and prospective customers as to whether (a) Pocket Folders Fast has an affiliation, connection or association with the goods, services or

commercial activities of Folder Express, and (b) Crabar and Folder Express approve, or are the origin or sponsor of, the goods, services or commercial activities of Pocket Folders Fast, in violation of 15 U.S.C. § 1125(a).

134.   WPCO committed these acts with knowledge that the name "Pocket Folders Fast" was likely to cause confusion, mistake or to deceive.

135.   WPCO's actions have damaged, and will continue to damage, Crabar's rights, reputation and goodwill and discourage current and potential customers from dealing with Crabar.  Crabar is entitled to injunctive relief under 15 U.S.C. § 1116 and recovery of damages from WPCO pursuant to 15 U.S.C. § 1117, including treble the actual damages sustained by Crabar, Defendant WPCO's profits from its Pocket Folders Fast business, and the costs of the action, together with Crabar's attorney fees.

**COUNT VI**
**Common Law Unfair Competition**
**(Against Defendant WPCO)**

136.   Crabar realleges paragraphs 1-103 of this Complaint as if fully stated herein.

137.   Crabar owns U.S. federal registration no. 2,247,736 for the trademark "Folder Express," U.S. federal registration no. 2,582,110 for the trademark "Think Fast" and U.S. federal registration no. 3,614,618 for the trademark "Sculptured Pockets."  These registrations are in full force and effect and are enforceable.

138.   WPCO's use in commerce of the trade name "Pocket Folders FAST" in connection with custom folder products and services causes, is confusingly similar to Crabar's registered trademarks "Folder Express," "Think Fast" and "Sculptured Pockets, and to the logo "Folder Express THINK FAST" that incorporates two of those trademarks, causes, and is likely to cause, confusion, and mistake and to deceive customers and prospective customers as to

whether (a) Pocket Folders Fast has any affiliation, connection or association with the goods, services or commercial activities of Folder Express, and (b) Crabar and Folder Express approve, or are the origin or sponsor of, the goods, services or commercial activities of Pocket Folders Fast.

139.    Defendant WPCO committed these acts with knowledge that the name "Pocket Folders Fast" was likely to cause confusion, mistake or to deceive.

140.    Defendant WPCO's actions have damaged, and will continue to damage, Crabar's rights, reputation and goodwill and discourage current and potential customers from dealing with Crabar such that it is entitled to damages under Nebraska law.

**COUNT VII**
**Nebraska Deceptive Trade Practices Act (Neb Rev. Stat. § 87-302)**
**(Against Defendant WPCO)**

141.    Crabar realleges paragraphs 1-103 of this Complaint as if fully stated herein.

142.    WPCO has engaged in deceptive practices and acts by engaging in conduct that causes a likelihood of confusion or of misunderstanding as to whether Pocket Folders Fast goods and services originate from, are affiliated with, or are approved or sponsored by Folder Express and/or Crabar.

143.    WPCO has engaged in deceptive practices and acts by engaging in conduct that causes likelihood of confusion or of misunderstanding as to an affiliation, connection or association between Pocket Folders Fast and Folder Express.

144.    WPCO has willfully engaged in these deceptive practices knowing them to be deceptive.

145.   Crabar is likely to be damaged by WPCO's deceptive trade practices as set forth above and is entitled to temporary and permanent injunctive relief, its costs of suit, attorneys' fees, and such other and further relief as are provided for by law.

**COUNT VIII**
**<u>(Fraud)</u>**
**(Against Defendants WPCO and Wright)**

146.   Crabar realleges paragraphs 1-103 of this Complaint as if fully stated herein.

147.   Defendants WPCO and Wright fraudulently induced Crabar to enter into the Asset Purchase Agreement by:  (a) falsely and misleadingly representing throughout the deal negotiations that they desired to exit the custom folder printing business forever because they saw no future in the business and wanted, instead, to focus on and grow their packaging business; (b) falsely representing in Section 1.1 and 1.2 of the September 2013 draft versions and final executed version of the APA that WPCO was selling and transferring to Crabar "all right and title to and interest in" the Acquired Assets, which included "[a]ll data, records, manuals, and other documentation related to the Acquired Assets and the operation of the business" and specifically included *inter alia* all customer lists, and customer sales information, financial records relating to the custom folder business; (c) falsely representing in Sections 5.1(e) and 7.1(d) of the September 2013 draft versions and final executed version of the APA that they would never use confidential information of the folder business they were selling to Crabar for their own purposes or benefit; and (d) falsely and misleadingly representing in a September 4, 2013 email to Crabar's Michael D. Magill that the operating systems and data of the custom folder business were already "basically separated" from the operating systems and data of Defendants' packaging business.

148.     Defendants WPCO and Wright concealed the material fact known to them that, saved on Wright's laptop, on a server used in WPCO's separate packaging business and on a computer device used by WPCO part-owner Sikora, were hundreds of spreadsheets and other data and confidential information of the custom folder business sold to Crabar, including *inter alia* customer lists, customer order history, cost models, paper pricing files and financial, production and operational Excel spreadsheets and data.  They also concealed their then-present intent and plan to sell the packaging business and to use the unlawfully retained folder business files and confidential information of the folder business to launch a replica competing business once these Defendants' two-year restrictive covenant had expired.

149.     The statements and omissions in paragraph 147-48 above were false and misleading because: (i) WPCO and Wright had and kept hundreds of spreadsheets and other data and confidential information of the custom folder business on their computer devices, (ii) WPCO and Wright intended to and did retain possession of those files after executing the APA; and (iii) these Defendants' true intent was to sell the custom folder business to Crabar in order to generate funds to pay down crushing debt Defendants had accumulated, sell their packaging business and then to reenter the custom folder business in direct competition with Crabar using the unlawfully retained folder business files and confidential information once these Defendants' two-year restrictive covenant had expired.

150.     Having made the various statements to Crabar as described in paragraph 147 above, Defendants Wright and WPCO had a duty to disclose the material facts that they concealed so as to not render the statements they made to Crabar false and misleading.

151.     Defendants Wright and WPCO either knew the statements and omissions set forth in paragraph 147-48 above were false when made or made such statements recklessly without

knowledge of their truth or falsity because:  (a) they knew they retained a possessory interest in multiple spreadsheets containing every detail of the business, including confidential information and trade secrets; (b) a number of the spreadsheets saved to the WPCO packaging business server were created a few days or weeks before they closed the sale of the folder business to Crabar and contained comprehensive trade secret information about the business; (c) they knew the information systems of the WPCO folder business and WPCO packaging business were not "basically separated," as the WPCO packaging business server contained those newly-created folder business spreadsheets and business data; (d) they knew they had the present intention of using those spreadsheets and data and confidential information to launch a corrupt, competing business once the Defendants' two-year restrictive covenant had expired; and (e) the very day WPCO and Wright executed the APA (September 30, 2013) and closed the sale, Wright emailed his investment banker to discuss preparing the packaging business to be sold—the very same business he had told Crabar he wanted to focus on and grow.

152.    Wright and Defendant Sikora, also a part-owner of WPCO and CEO of the corrupt competing business, began planning the launch of their competing folder business just ten months after closing the folder business sale to Crabar, and began using the folder business spreadsheets and confidential information and data they retained after the sale to plan and launch that competing business beginning in late 2014 and continuing in 2015, 2016 and later.  It was on August 6, 2014 that Sikora reserved the domain name pocketfoldersfast.com, after which she and Wright began using the trade secret files and confidential information they unlawfully retained from that business to launch their replica competing business, a few examples of which are set forth in paragraphs 153-54 below.

153.     On December 11, 2014, Wright began working in an Excel file he retained on his laptop titled "Folder Express 2009 - 2012 sales by product.xls".  On January 28, 2015, Wright sent his WPCO co-owner Sikora an email with the subject line "Pocket folders now," attaching a key excel file from his laptop titled "2012 Wright Orders" and containing detailed trade secret production and financial data of the folder business sold to Crabar.  Wright directed Sikora to look at the Folder Express tab in the excel and said he would "sort for the most popular papers".  On repeated occasions in February, March, April and June 2016, Wright and Sikora continued to use that key trade secret document in planning their competing folder business.

154.     In and after May 2016, Wright and Sikora used Progress Music customer order data saved to the WPCO packaging server to identify and solicit customers for their competing music folder business.  Likewise, in June 2016, Sikora used trade secret Folder Express customer list data she kept on her computer to identify and solicit customers for WPCO's competing folder business, and in and after September 2016, Wright used Folder Express customer order data saved to the WPCO packaging server to identify and solicit customers for that same business.  In and after March 2016, Wright and Sikora also used trade secret cost model and pricing files to price their identical competing products and for other reasons.  And in July 2016, they used trade secret files titled *inter alia* "Folder Paper Sizes 2012," "Wright Paper Used 01-01-2013 thru 8-13-13"  and paper pricing and invoice files in launching their competing business.

155.     The material facts that WPCO and Wright concealed from Crabar as referenced in paragraph 148 above were not within Crabar's reasonably diligent attention, observation or judgment.

156.     Crabar believed WPCO and Wright's misrepresentations and omissions as set forth in paragraph 147-48 above.  Defendants WPCO and Wright intended that Crabar rely on

those misrepresentations and omissions.  Crabar did reasonably rely on those misrepresentations, and on that basis, entered into the Asset Purchase Agreement, agreed to a short, two-year restrictive covenant binding Defendants, and paid Defendants $15 million.

157.    Defendants Wright and WPCO later fraudulently induced Crabar to extend the lease of the Omaha Facility from September 30, 2015 to December 31, 2015, to release those Defendants from their representations and warranties, and to release $1.1 million in escrow funds to Defendants by falsely representing that Wright wanted to sell the facility, that he no longer wanted to be a landlord but, instead, wanted "to close out and slow down," "get out" and get the property "off his plate."

158.    In fact, Defendants Wright and WPCO intended to use the Omaha Facility for the competing business they intended to launch using Crabar's confidential, proprietary, trade secret information, and using a tradename that infringed on Crabar's tradename and trademarks. Defendants Wright and WPCO failed to disclose their true intent when making the lease extension proposal to Crabar or, indeed, at any time.

159.    Crabar believed Defendants' false representations that Wright wanted to sell the Omaha Facility in order to cease being a landlord and to "close out and slow down," on which Defendants intended Crabar to rely, and, in reasonable reliance on those false representations and Defendants' omission of their true intent, agreed to the lease extension, released Defendants from their representations and warranties, and agreed to terminate the escrow and release the $1.1 million in escrow funds to Defendants Wright and WPCO.

160.    Those Defendants' fraudulent misrepresentations and omissions were material to Crabar.  Had Crabar known the true facts , it would not have entered into the Asset Purchase Agreement with Defendants; would not have paid Defendants $15 million for the custom folder

business; would not have extended the lease at the Omaha Facility; would not have released

Defendants from their representations and warranties; and would not have agreed to release the

$1.1 million in escrow funds to Defendants.

161.    Defendants Wright and WPCO made the false representations and omissions set

forth above knowing the representations to be false and misleading, or recklessly without

knowledge as to the truth or falsity of such representations.

162.    Defendants Wright and WPCO's fraudulent misrepresentations and omissions

have caused Crabar extensive damages in an amount to be proved at trial, including, but not

limited to, lost revenue and profits due to the disruption of the business it purchased from

WPCO, the $1.1 million in released escrow funds, and the extensive costs of having to relocate

its business from Omaha to Columbus, Kansas.

### COUNT IX
### (Breach of Contact)
### (Against Defendants Wright and WPCO)

163.    Crabar realleges paragraphs 1-103 of this Complaint as if fully stated herein.

164.    Crabar and WPCO are parties to the Release and Waiver Agreement dated June

25, 2015 (the "Release Agreement," attached hereto as Exhibit 4).  Pursuant to the Release

Agreement, Crabar agreed *inter alia* to release to WPCO approximately $1.1 million of purchase

proceeds that still remained in an escrow account as security against any breach of contract,

covenant or restriction by WPCO, which would give rise to a right of indemnification on

Crabar's part under Article 8 of the Asset Purchase Agreement.

165.    The Release Agreement contains a "Non-Disparagement Covenant" that states, in

pertinent part, as follows:

> 9.    **Mutual Non-Disparagement.**  Seller [WPCO], Purchaser [Crabar]
> and Mark Wright, who executes a Joinder to this Agreement to confirm his

consent to the terms of this Section, hereby agree to the following terms (the "Non-Disparagement Covenant"):

a. Each of Seller and Mark Wright agrees that, during the period commencing on the date of this Agreement and continuing for a period of two (2) years (the "Relevant Period"), neither Mark Wright, nor any of the officers of Seller or Affiliates (as defined in the Purchase Agreement) will, and Mark Wright will cause each of such persons not to, directly or indirectly, in any capacity or manner, make, express, transmit speak, write, verbalize or otherwise communicate in any way (or cause, further, assist, solicit, encourage, support or participate in any of the foregoing), any remark, comment, message, information, declaration, communication or other statement of any kind, whether verbal, in writing, electronically transferred or otherwise, that might reasonably be construed to be derogatory or critical of, or negative toward, the Purchaser or any of its directors, officers, Affiliates, subsidiaries, employees, agents or representatives (collectively, the "Purchaser Representatives"), or to malign, harm, disparage, defame or damage the reputation or good name of the Purchaser, its business or any of the Purchaser Representatives; provided the restriction with regard to officers of Seller or Affiliates shall only apply as long as Mark Wright holds a majority of the equity interest in such entities.

166.    On June 25, 2015, Wright executed a Joinder that was attached to and made part of the Release Agreement, and in which he confirmed his agreement with the Non-Disparagement Covenant provisions of the Release Agreement.  (Ex. 4).

167.    In or about early September 2015, in connection with a newspaper article by the Omaha World-Herald concerning Folder Express' relocation to Omaha, Wright told the newspaper that he decided to put the Omaha Facility on the market for sale "after he learned that Folder Express would not renew its lease."  On September 4, 2015, the newspaper published their article and included Wright's statement, which was untrue and misleading

168.    In fact, it was Wright himself who unilaterally decided—over Crabar's objections and entreaties to renew the lease—to terminate lease renewal negotiations, refuse to renew the lease, and to instead list the Omaha Facility for sale.  Wright's statement, however, painted a misleading picture in the community and beyond that Crabar had unilaterally decided not to

renew its lease and to abandon Omaha and its Omaha employees, and that Wright was the victim of that purported unilateral decision, merely reacting to it by listing the property for sale.

169.    On information and belief, after execution of the Release Agreement, Wright, WPCO, and/or officers, employees or affiliates of WPCO, also communicated to Crabar customers that Crabar had unilaterally decided to move out of Omaha, had planned to abandon Omaha all along, had fired all of its employees in Omaha in connection with the move, and that this alleged unilateral decision to abandon Omaha thus cost all of Crabar's employees in Omaha their jobs.

170.    Such statements were untrue and misleading.  Crabar had not planned to abandon Omaha all along.  To the contrary, it was Wright himself who unilaterally decided in the spring of 2015 not to renew Crabar's lease and to instead list the Omaha Facility for sale, over Crabar's objections and entreaties to stay in the Omaha Facility and request that Wright renew and enter into a longer-term lease.  Moreover, after Wright notified Crabar that it needed to vacate the Omaha Facility by the end of September 2015, Crabar made every effort to find another industrial facility in the Omaha area that was available for lease on short notice and that could immediately meet the critical space and electrical power requirements that Crabar needed to run the businesses' fabrication, printing and finishing machinery and equipment.  When it could not find a facility in Omaha that met those requirements, Crabar made the difficult decision to move its Folder Express, Progress Music and Progress Publications operations to an Ennis-owned facility in Columbus Kansas, which did meet the businesses' operational requirements.  Far from firing all of its employees in Omaha, Crabar offered all of the employees who worked for Folder Express, Progress Music and Progress Publications the opportunity to move to Columbus, Kansas and continue working for those businesses.  The statements by Wright and/or officers or

affiliates of WPCO painted a misleading picture that Crabar had unilaterally decided not to renew its lease, to abandon Omaha and to fire and abandon its Omaha employees.

171.     Defendants Wright and WPCO breached the Release Agreement by making statements that might reasonably be construed to be derogatory or critical of, or negative toward, Crabar, and to malign, harm, disparage, defame or damage Crabar's reputation and good name and its Folder Express, Progress Music and Progress Publications businesses.

172.     Crabar has complied with all of its obligations in the Release Agreement, which resulted in the release to WPCO of approximately $1.1 million in funds previously held in escrow.

173.     As a result of Defendants Wright and WPCO's breach of the Release Agreement, Crabar has suffered damage in the form of damage to its reputation, lost business, loss of goodwill, lost business revenues and lost business opportunities.

**COUNT X**
**Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030 et seq.**
**(Against All Defendants)**
**[This claim was previously dismissed by the Court and is included in this Third Amended Complaint to preserve the issue for appeal.]**

174.     Crabar incorporates by reference paragraphs 1 through 103 of this Complaint as if fully restated herein.

175.     In November 2015, Crabar provided a Macintosh Desktop computer (the"Mac Computer") to Defendant Kohlhaas to conduct Crabar business from her home.

176.     The Mac Computer was equipped with virtual private network ("VPN") software, also provided by Crabar, which enabled Kohlhaas to access data stored on Crabar's three servers from a remote location—her home—as needed to conduct Crabar business.

177.     On information and belief, at or about the same time Kohlhaas acquired the Hard Drive, she downloaded thousands of documents from Crabar's servers on the Hard Drive without Crabar's knowledge or authorization.

178.    Kohlhaas kept the Hard Drive containing Crabar's documents at her home, without Crabar's knowledge or authorization.

179.    The Mac Computer Crabar provided Kohlhaas in November 2015 and Hard Drive together and separately constitute a "computer" and "protected computer" as defined by 18 U.S.C. § 1030 (e)(1) and (2)(B), as the Mac Computer and Hard Drive were used, in part, in furtherance of Crabar's business in interstate commerce.

180.    Crabar's computer servers from which Kohlhaas downloaded Crabar's electronic files to the Hard Drive constitutes a "computer" and "protected computer," as Crabar used and uses the servers in interstate commerce.

181.    Kohlhaas was not authorized to download files from Crabar's servers to the Hard Drive she kept at her personal residence.  Crabar's Employee Handbook prohibits such conduct. Kohlhaas intentionally violated this prohibition and knowingly, with intent to defraud Crabar, downloaded Crabar's electronic files to the Hard Drive without authorization.

182.    Kohlhaas was prohibited from providing or allowing any person not employed by Crabar access to Crabar's electronic files, especially Crabar's competitors.  Crabar's Employee Handbook prohibits such conduct both while a person is employed by Crabar and after the person leaves Crabar's employ.  Kohlhaas intentionally violated this prohibition and provided the other Defendants, Crabar's competitors, such access.

183.    Defendants Wright, Sikora, WPCO and Frederickson copied and transferred Crabar's electronic files from the Hard Drive, using those files to unfairly compete with Crabar. Those Defendants knew Kohlhaas lacked authority from Crabar to provide them such access and knew they had no right to copy the files.

184.     Defendants' conduct has caused Crabar damages exceeding $5,000 within a one-year period, including but not limited to forensic computer consultant fees investigating Defendants' conduct.

185.     The Defendants' conduct, individually and collectively, violated 18 U.S.C. § 1030 (a)(2)(c), (4), (5)(B) and § 1030 (b).

186.     Crabar first learned that Kohlhaas possessed the Hard Drive containing its electronic files in May 2017, when Kohlhaas returned the Hard Drive to Crabar in response to a subpoena Crabar served on her seeking documents.

187.     Kohlhaas returned the Hard Drive to Crabar under cover of a letter dated May 15, 2017, in which she stated that she "used [the Hard Drive] to assist Crabar/GBF, Inc. in an efficient manner" and intended to wipe it clean after she left Crabar's employ.  A true and accurate copy of Kohlhaas's May 15, 2017 letter is attached hereto as Exhibit 5.

188.     Crabar first learned that Kohlhaas's May 15, 2017 letter was false and misleading on April 12, 2018, when Defendants' counsel disclosed by e-mail correspondence that Kohlhaas provided the Defendants access to Crabar's files on the Hard Drive and that Defendants had copied and saved at least some of those files to Defendant WPCO's server.

189.     Defendants thereby fraudulently concealed their violations of the Computer Fraud and Abuse Act until April 12, 2018.

## COUNT XI
## Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act of 2016
### (Against All Defendants)

190.     Crabar realleges paragraphs 1 through 103 of this Complaint as if fully stated herein.

191.     Defendant WPCO sold all right, title and interest to trade secret information to Crabar pursuant to the APA, including customer list files, customer information files, sales data files, the CAD die files, product cost files, and ███████████████████████ ███████████████████████.

192.     This trade secret information is all related to the manufacture and sale of presentation folder products to customers nationwide and, hence, used in interstate commerce.

193.     This trade secret information derived economic value from not being generally known to or ascertainable by others, and those others could obtain economic value from the disclosure or use of that information.

194.     Crabar takes and has taken reasonable measures to maintain secrecy of the trade secret information it purchased from Defendant WPCO.

195.     Defendants misappropriated and used Crabar's trade secret information willfully and maliciously to Crabar's detriment and Defendants' economic gain.

196.     Defendants used the trade secret information without Crabar's consent.

197.     At the time of their use of the trade secret information, Defendants knew they were obligated by Section 7.1(d) of the APA and by reason of the fact they sold all right, title and interest in the trade secret information and files to Crabar, not to use that information to Crabar's detriment, or Defendants' benefit.

198.     Defendant's misappropriation and use of Crabar's trade secrets has caused Crabar damages in an amount to be proved at trial.

199.     Crabar lacks an adequate remedy at law to fully redress the harm caused and to be caused by Defendants' misappropriation and use of Crabar's trade secrets.

## COUNT XII
### Breach of the Implied Covenant of Good Faith and Fair Dealing

**(Against Defendant WPCO)**
**[This claim was previously dismissed by the Court and is included in this Third Amended**
**Complaint to preserve the issue for appeal.]**

200.     Crabar incorporates by reference paragraphs 1 through 103 of this Complaint as if
fully restated herein.

201.     As the purchaser of all right, title and interest in the assets listed in the APA,
Crabar had the right to expect, and did reasonably expect, that the seller, Defendant WPCO,
would not later use copies of those assets to compete against the business Crabar purchased and
thereby frustrated and deprived Crabar of the fruit and benefit of its bargain.

202.     Defendant WPCO's use of the customer list and information files, historical
customers sales data files, product cost files and CAD die files to launch and operate its
competing presentation folder business selling identical products to Crabar's product line is
unreasonable, frustrates the fruits of the bargain Crabar reasonably expected and constitutes a
breach of WPCO's implied covenant of good faith and fair dealing.

203.     Defendant WPCO's breach of its covenant of good faith and fair dealing has
caused Crabar damages in an amount to be proved at trial, caused by loss of customers and
revenue to Defendants' competing business.

**COUNT XIII**
**Breach of Contract**
**(Against Defendant Kohlhaas)**

204.     Crabar incorporates by reference paragraphs 1 through 103 of this Complaint as if
fully restated herein.

205.     As part of Crabar's program of protecting its confidential and trade secret
information from competitors, it requires its employees to sign an Acknowledgment of
Information Security and Confidentiality Agreement ("Acknowledgment"), whereby the

employee agrees to abide by the Information Security and Confidentiality Agreement terms then in effect at Crabar.

206.    As consideration for the employee's agreement to abide by those terms, Crabar provides employment or continuing employment to the employee.

207.    Defendant Kohlhaas signed her Acknowledgment on February 10, 2015 in Omaha, Nebraska.  An accurate copy of her signed Acknowledgment is attached hereto as Exhibit 6 and incorporated herein by reference.

208.    The form of Information Security Policy and form of Confidentiality Agreement in use by Crabar as of the date of Kohlhaas' signature are attached hereto as Exhibits 7 and 8. These forms were provided to Kohlhaas for review before she signed the Acknowledgment.

209.    By signing the Acknowledgment, Kohlhaas entered into a contract with Crabar to abode by the terms of Exhibits 7 and 8.

210.    Crabar provided continuing employment to Kohlhaas from February 10, 2015 through May 27, 2016 and otherwise performed its obligations under this contract.

211.    Kohlhaas breached this contract by providing the other Defendants herein access to the Crabar documents Kohlhaas downloaded to the Kohlhaas hard drive, including but not limited to the Excel spreadsheet entitled "FE_Existing Die_Inquiry.xls," and by using those documents to unfairly compete against Crabar.

212.    Kohlhaas' breach has caused Crabar damages in an amount to be proved at trial, including but not limited to considerable computer forensic consulting fees and expenses to investigate the extent of her breach and provision of Crabar documents to the other Defendants, and lost business due to the Defendants' use of those documents.

## COUNT XIV
## Breach of Contract

**(Against Defendant Fredrickson)**

213.    Crabar incorporates by reference paragraphs 1 through 103 and 205 through 206 of this Complaint as if fully restated herein.

214.    Defendant Fredrickson signed her Acknowledgment on September 27, 2013.  An accurate copy of her signed Acknowledgment is attached hereto as Exhibit 9 and incorporated herein by reference.

215.    The form of Information Security Policy and form of Confidentiality Agreement in use by Crabar as of the date of Fredrickson's signature was the same as when Kohlhaas later signed her Acknowledgment -- i.e., the forms attached hereto as Exhibits 7 and 8.  These forms were provided to Fredrickson for review before she signed the Acknowledgment.

216.    By signing the Acknowledgment, Fredrickson entered into a contract with Crabar to abide by the terms of Exhibits 7 and 8.

217.    Crabar provided continuing employment to Fredrickson from September 27, 2013 through October 29, 2014 and otherwise performed its obligations under this contract.

218.    Fredrickson breached this contract by providing Defendants WPCO, Wright and Sikora access to Crabar documents Kohlhaas downloaded to the Kohlhaas hard drive, including but not limited to the Excel spreadsheet entitled "FE_Existing Die_Inquiry.xls," and by using those documents to unfairly compete against Crabar.

219.    Fredrickson's breach has caused Crabar damages in an amount to be proved at trial, including but not limited to considerable computer forensic consulting fees and expenses to investigate the extent of her breach and provision of Crabar documents to the other Defendants, and lost business due to the Defendants' use of those documents.

**<u>REQUEST FOR RELIEF</u>**

Wherefore, Crabar requests the following relief:

1.      Entry of An Order:

(a)     Permanently enjoining Defendants from offering or selling any

presentation folder products that have the same dimensions as like

products sold by Plaintiff;

(b)     Permanently enjoining Defendants and all persons and entities acting in

concert with them, including any officers, employees, agents or

representatives of Defendants WPCO or Wright, from soliciting any of

Crabar's customers or potential customers, marketing to such customers or

potential customers, or accepting orders or business from such customers;

(c)     Permanently enjoining Defendants and all persons and entities acting in

concert with them, including any officers, employees, agents or

representatives of Defendants WPCO or Wright, from any further

misappropriation, use and/or disclosure of confidential information,

proprietary information, trade secrets or intellectual property belonging to

Crabar, including to solicit or continue business relationships with or

orders from Folder Express or Progress Music customers formerly

serviced by Defendants or any employees thereof;

(d)     Permanently enjoining Defendants and all persons and entities acting in

concert with them, including any officers, employees, agents or

representatives of Defendants WPCO or Wright, from:  (i) using the name

"Pocket Folders Fast" in connection with the manufacture, advertising,

promotion, or offering for sale of custom folders or otherwise in the

operation of a custom folder business; (ii) referring to the name "Pocket Folders Fast" as being the former name of any custom folder business operated by Defendants; (iii) using the domain name pocketfoldersfast.com in the operation of a custom folder business; (iv) using any email addresses comprised in part of the name; and (v) using any name, domain name or email address confusing similar to, or derivative of, Plaintiffs' "Folder Express," "Think Fast" and "Sculptured Pockets" registered trademarks or "Folder Express THINK FAST" logo and slogan in connection with the manufacture, advertising, promotion, or offering for sale of custom folders or otherwise in the operation of a custom folder business; and

(e)     Permanently enjoining Defendants and all persons and entities acting in concert with them, including any officers, employees, agents or representatives of Defendants WPCO or Wright, from soliciting or influencing or persuading, or attempting to persuade, individuals who worked for Folder Express or Progress Music before or after the acquisition to work for Pocket Folders Fast or Bandfolder Press;

2.     An award of compensatory damages, in an amount to be determined at trial;

3.     An award of treble damages, in an amount to be determined at trial;

4.     Disgorgement of WPCO's revenues or profits from its Pocket Folders Fast and Bandfolder Press business, in an amount to be determined at trial;

5.     Crabar's costs of suit;

6.     An award of attorneys' fees; and

7.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in Omaha on all issues raised by this Complaint and hereby provides notice to Defendants of such.

Dated:  February 1, 2021.

Respectfully submitted,

CRABAR/GBF, INC., Plaintiff


BY:  /s/ Patrick S. Cooper
      Paul M. Shotkoski #20873
      Patrick S. Cooper #22399
      Sarah  L. McGill #24790
      FRASER STRYKER PC LLO
      409 S. 17th Street
      500 Energy Plaza
      Omaha, Nebraska 68102
      Phone: (402) 341-6000
      Facsimile: (402) 341-8290
      pshotkoski@fraserstryker.com
      pcooper@fraserstryker.com
      smcgill@fraserstryker.com

      and

      Stephen O'Donnell (IL Bar #6193883)
      Elissa L. Isaacs (IL Bar #6207162)
      McCullough P.C.
      208 S. Lasalle Street, Suite 1423
      Chicago, IL 60604
      Phone: (312) –600-0305
      Fax: (312) 600-4425
      sodonnell@mcculloughpc.com
      eisaacs@mcculloughpc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of February, 2021, the undersigned caused the above and foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF System, thereby providing electronic notice of such filing to all counsel of record.


/s/ Patrick S. Cooper

## CONFIDENTIALITY AGREEMENT

THIS CONFIDENTIALITY AGREEMENT (the "**Agreement**") is made and entered into as of this 10th day of May, 2013, by and between WRIGHT PRINTING CO., a Nebraska corporation (hereinafter "**Wright**") and Ennis, Inc., a Texas corporation, and any and all related and affiliated entities and partners thereof (hereinafter collectively referred to as "**Prospect**").

### BACKGROUND INFORMATION

Wright and Prospect are currently discussing a possible transaction, including Prospect's possible purchase of certain assets of Wright (the "**Assets**"). As a result, Wright may make available to Prospect certain confidential information and trade secrets relating to Wright and the Assets. Prospect has agreed to certain restrictions relating to its use of such information and to preserve and maintain the confidentiality of the terms, conditions and other facts associated with its discussions with Wright about the possible purchase of the Assets, and the fact that discussions are occurring between them.

NOW, THEREFORE, Wright and Prospect (the "**Parties**") mutually agree as follows:

**1.    Information.** Wright may disclose and make available for inspection and use by Prospect certain financial records, trade secrets, documents, data and other confidential information relating directly or indirectly to Wright, its business operations and the Assets, including but not limited to, financial statements, business or financial plans or projections, marketing strategies, customer lists and volumes, documents, data, agreements, contracts, papers, reports, compilations, analyses and summaries in written, oral or other form, or other information concerning Wright, its business operations and the Assets (the "**Information**"; and, the term "Information" shall in all events be deemed to include the facts and circumstances that the Parties are discussing or considering in any respect a possible transaction between them). The Information may be in written, oral, electronic or other form, and shall be subject to the treatment described herein whether or not it is expressly labeled or identified in any particular fashion. Prospect acknowledges and agrees that any and all Information relating directly or indirectly to Wright, its business operations and the Assets now or hereafter furnished or made available to Prospect is confidential and that Wright, its business operations and/or the Assets could be damaged if any of the Information is disclosed to unauthorized third parties.

**2.    Ownership of Information and Intellectual Property.** Wright shall retain all right, title and interest in and to the Information it discloses under this Agreement ("**Owning Party**"). Prospect agrees that all Information of any nature disclosed, revealed or made available by Wright under this Agreement, whether or not the Information, or any part thereof, was prepared by Wright or a third party, is proprietary and confidential and subject to the terms of this Agreement. Wright at all times shall exercise reasonable care in providing Information to Prospect but makes no representation, warranty or undertaking as to the accuracy, reliability or completeness of the Information or any part thereof as to any conclusions that may be drawn from such Information.

**3.    Restricted Use of Information.** Prospect agrees that the Information will be used strictly and solely for the purpose of evaluating Prospect's possible acquisition of the Assets and for no other purpose or in any manner whatsoever detrimental to Wright, and that such Information shall be kept strictly confidential by Prospect; provided, however, that (a) any of such Information may be disclosed only to Prospect's employees, representatives and authorized third parties who need to know such Information for the purpose of evaluating

EXHIBIT
**1**

Prospect's possible acquisition of the Assets (it being understood that such employees, representatives and authorized third parties shall be informed by Prospect of the confidential nature of such Information and shall be directed to treat such Information confidentially), and (b) Prospect shall be jointly and severally liable for any breach of this Agreement by its employees, representatives or authorized third parties. Prospect specifically acknowledges and agrees that in no event shall any Information be used in any manner which could be, or could reasonably be expected to be, detrimental to Wright, its business operations, personnel, reputation or prospects or the Assets.

**4.      Non-Disclosure.**   Subject to Paragraph 7, Prospect shall maintain the Information as proprietary and confidential and take all measures reasonably necessary and advisable to safeguard and protect it against disclosure beyond that disclosure permitted herein. Prospect shall not divulge the Information, or any part thereof, to any person or entity whatsoever unless specifically authorized by a representative of Wright, except that Prospect may disclose the Information to Prospect's employees, representatives and authorized third parties involved in reviewing and evaluating the Information exclusively for the purpose stated in Paragraph 3, subject to all the restrictions contained herein.

In addition, without the prior written consent of Wright, Prospect will not reveal or disclose to any associate, employee, customer, supplier, or other person either the fact that discussions or negotiations are taking place concerning a possible transaction with Wright or any of the terms, conditions or other facts associated with their discussions (nonetheless, it is acknowledged that certain executives of Wright are aware of such discussions), including the status thereof.  Prospect further agrees that Prospect will not contact any associates of Wright or any of Wright's employees, clients, customers, suppliers or agents to discuss any aspect of its possible transaction with Wright without first obtaining the prior written consent of Wright.

**5.      Copies of Information.**  Prospect may make copies, excerpts or reproductions of the Information only for its use; however, all such copies, excerpts or reproductions may be used only for the purpose stated in Paragraph 3.

**6.      Return of Information.**  At the sole and exclusive discretion and upon written request of Wright, or upon termination of the discussions by either Wright or Prospect, or upon termination of this Agreement, or upon election of Prospect to return the Information, whichever occurs first, Prospect, and all of its authorized third persons, agents and representatives in possession of any originals, copies, excerpts or reproductions of the Information shall promptly destroy the Information and all originals, copies, excerpts or reproductions thereof unless Wright requests the return of the Information.   In the event Wright requests the return of the Information, Prospect shall cause the persons or entities having possession of the Information or any part thereof, at the sole cost and expense of Prospect, to return to Wright within ten (10) business days of Wright's written request, all of the Information furnished to Prospect (regardless of who provided such information), including any and all copies and reproductions, and Prospect will destroy all notes, abstracts, compilations and excerpts relating thereto, whether in written or electronic form, generated or created by Prospect or its authorized third parties, agents or representatives. In connection herewith, Prospect agrees to provide Wright a written certificate from a senior officer certifying that the Information and all related copies, reproductions, notes, abstracts, compilations and excerpts have been either returned to Wright and/or destroyed in accordance with the terms of this Agreement.

**7.      Exceptions to Confidentiality Obligations.**  Nothing in this Agreement shall affect the right of Prospect to use or disclose the Information or any part thereof which (a) is or

-2-

may hereafter be in the public domain through no breach of this Agreement or any other agreement contemplated herein; (b) is disclosed to either party or the general public by some third party or entity in rightful possession of the Information and such disclosure violates no confidentiality obligations to the other party in such disclosure; (c) is subsequently disclosed to the general public by Wright; or (d) as required by law or in response to legal process including a subpoena duly issued by a court of law or a government agency having jurisdiction or power to compel disclosure. Nothing in this Agreement shall be construed as granting or implying any right to use the Information covered hereby, or as permitting either party hereto, or any authorized third party, to obtain the right to use the Information that may become publicly known through one party's improper act or omission.

8.      **Contacts**.  Wright shall designate those individuals at Wright who Prospect may contact with respect to the discussions contemplated hereby.  Except for designated contact persons, Prospect shall not contact any associate, employee, customer, dealer, supplier, agent or representative of Wright without the prior written consent of Wright.

9.      **Term of Agreement**.  This Agreement shall become effective as of the date first above written and shall remain in effect for a period of three (3) years after the date hereof; provided that in all events the Restricted Use provisions of paragraph 3 and the Non-Disclosure provisions of paragraph 4 shall survive any termination of this Agreement.

10.     **Required Disclosure.**  In the event Prospect or any of its representatives are requested to, or required by, applicable law or regulation or by legal process to disclose any of the Information concerning Wright, Prospect agrees that it will provide Wright with prompt notice of such request(s) or the receipt(s) of legal process so as to enable Wright to seek an appropriate protective order, to consult with Wright about taking steps to resist or narrow the scope of such request, requirement or process, and/or to waive compliance in whole or in part with Prospect's agreement to maintain the confidentiality of the Information.  If and to the extent that after the foregoing notice, in the absence of a protective order or receipt of a waiver under this Agreement, Prospect or its representatives are, in the opinion of its counsel, compelled to disclose Information, Prospect and its representatives may disclose such Information without liability to Wright under this Agreement.

11.     **Other Provisions**.  This Agreement is not assignable by either party to any person or entity whatsoever without the prior written consent of the other party hereto, and any attempted assignment without such prior written consent shall render the assignment null and void.  Subject to the preceding sentence, this Agreement shall be binding upon the successors and assigns of the Parties.  This Agreement contains the entire Agreement and understanding between the Parties as to the subject matter hereof and merges with and supersedes all prior and contemporaneous agreements, commitments, representations, writings and discussions, whether oral or written.  This Agreement may not be superseded, amended or modified except by written agreement signed by the Parties.  Prospect warrants and represents, as to whom the persons or entities it releases the Information pursuant to the terms of this Agreement, that it has sufficient control and authority over all said individuals or entities in whose possession the Information may be placed to assure that the terms, conditions and obligations herein shall be fully complied with and enforced.  In the event that any paragraph or sentence of this Agreement shall be declared invalid, such invalidity shall not thereby affect the remainder of said Agreement.

**12.** **Governing Law.** This Agreement shall be governed by the laws of the state of Nebraska. Prospect hereby (a) agrees that any suit, proceeding or action at law or in equity arising out of or relating to this Agreement ("**Action**") shall be instituted at the option of the party bringing such Action in any state or federal court in the state of Nebraska having subject matter jurisdiction, (b) waives any objection that any party may have now or hereafter to the laying of the venue of any such Action, (c) irrevocably submits to the jurisdiction of any such court in any such Action, and (d) hereby waives any claim or defense of inconvenient forum.

**13.** **Interpretation.** Prospect acknowledges that Prospect and Wright are direct competitors and that the Information provided hereunder may include highly competitive, sensitive and strategic information which Information would not be available to Prospect absent Prospect's execution of this Agreement. Accordingly, it is specifically agreed that the restrictions set forth in this Agreement shall be broadly construed, interpreted and applied to protect the business interests of Wright.

**14.** **Counterparts.** This Agreement may be executed in one or more counterparts and delivered by facsimile or portable document format attached to an email, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day first above written.

Wright Printing Co., a Nebraska corporation

*[signature]*

Name: Mark Wright

Title: President

ENNIS, INC. ,a TEXAS CORPORATION, and its related and affiliated entities and partners

By: *[signature]*

Name: Michael D. Magill

Title: Executive Vice President & Secretary

#499915_1.docx

- 4 -

# ASSET PURCHASE AND SALE AGREEMENT

*between*

## CRABAR/GBF, INC.

*and*

## WRIGHT PRINTING CO.

*Dated as of September 23, 2013*

**Confidential**

**EXHIBIT**

**2**

## ASSET PURCHASE AND SALE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made and entered into as of September 23, 2013, by and between CRABAR/GBF, INC., a Delaware corporation ("**Purchaser**"), and WRIGHT PRINTING CO., a Nebraska corporation ("**Seller**").

## WITNESSETH:

**WHEREAS,** Seller is engaged in the business of printing, manufacturing and distributing business forms, folders and other business products under the names "Folder Express, "Jensen Printing," "Paragon Printing," "Progress Publications" and "Progress Publications Music" (the "**Business**");

**WHEREAS,** Seller is separately engaged in business operations which are not included in the Business, including printing, manufacturing and distributing packaging products, including folding carton, litho-laminated corrugated cartons and related products under the name "Specialty Finishing" (the "**Affiliate Business**"); and

**WHEREAS,** Seller owns certain machinery, equipment, and inventory which are used in connection with the operation of the Business and which are located at a facility located at 11616 I Street, Omaha NE 68137 (the "**Omaha Facility**"); and

**WHEREAS,** Seller desires to sell to Purchaser and Purchaser desires to purchase from Seller, substantially all of the assets of Seller which are used in the Business, but excluding the assets of Seller which are used in the Affiliate Business, all upon the terms and subject to the conditions set forth herein; and

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements of the Parties and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF ASSETS

1.1     **Agreement to Sell and Purchase**. Upon the terms and subject to the conditions set forth herein, and in reliance on the respective representations and warranties of the parties set forth herein, Seller agrees to sell and transfer to Purchaser, and Purchaser agrees to purchase from Seller, for the price and in accordance with the provisions specified in Article 2 below, all right and title to and interest in the Acquired Assets (as defined in Section 1.2 below), free and clear of any and all Liens (as defined on Schedule A; capitalized terms used in this Agreement are defined on Schedule A).  Seller shall have the sole responsibility for the payment of any sales, use, transfer or transaction taxes or other governmental impositions relating to the consummation of the transactions contemplated by this Agreement.

    1.2    **Acquired Assets**.  The term "**Acquired Assets**" consists of the following items of Seller's assets, rights, claims and goodwill and none other:

    (a)    all machinery, equipment, dies, fixtures, office equipment, office machines, computers, Proprietary Software, whether proprietary or licensed, monitors, printers, networking equipment, furniture and furnishings which are listed on Schedule 1.2(a) hereto (collectively, the "**Machinery and Equipment**"), and all manufacturer's and suppliers' warranties or guarantees with respect thereto;

    (b)    all inventories of Seller which are listed on Schedule 1.2b) (collectively, the "**Inventory"**);

    (c)    those Accounts Receivable which are listed on Schedule 1.2c) ("**Qualifying Accounts Receivable**");

    (d)    the Customer Orders (as defined in Section 5.5 below);

    (e)    All data, records, files, manuals, and other documentation related to the Acquired Assets and the operation of the Business, whether in electronic form or otherwise, including: (i) any and all customer lists, customer and prospect databases, customer sales information, information regarding customer printing requirements, job files, jackets, artwork, base negatives, job logs and other similar information regarding printing work performed for customers of the Business; (ii) all client, customer and supplier lists, telephone numbers and electronic mail addresses with respect to past, present or prospective clients, customers and suppliers of the Business; (iii) all of Seller's books, records and data regarding the Machinery and Equipment, including service and warranty records, the Inventory (including purchases thereof), the Qualifying Accounts Receivable, the Intangible Property and the Assumed Liabilities of the Business; (iv) sales promotion materials, public relations and advertising material, and other similar documents and records used in the Business; (v) all accounting and tax books, ledgers and records and other financial records relating to the Business and the Acquired Assets; (vi) all sales and credit records, catalogs and brochures relating to the Business, purchasing records and records relating to suppliers; and (vii) subject to applicable Law, copies of all personnel records of all Persons who immediately prior to the Closing Date were Employees (whether part or full time) of the Business;

    (f)    any Intellectual Property owned by Seller and used in the Business, which are: (1) all rights of Seller to the names Folder Express, Progress Publications, Progress Publications Music, Jensen Printing and Paragon Printing (each, a "**Name**"), and all derivations thereof, (2) all other trade names, trademarks, including Folder Express, logos and slogans, and all derivations thereof, (3) all toll free and all other telephone numbers, including (800) 322-1064, (800) 365-3377, (800) 214-0748 and (402) 334-0788 used by Seller in the conduct of the Business, (4) any domain names used by Seller in the conduct of the Business, including the following domain names:  www.folderexpress.com, www.progresspublications.com,    www.specialprint.com,    www.folderportal.com, www.progresspublicationsmusic.com,              www.foldersdirect.com, www.paragonomaha.com,    www.1800folders.com,    www.bullyeducation.com,

www.bullyfolder.com, www.bullyfolders.com , www.charactereducationfolder.com , and www.substituteteacherfolder.com (the "**Domain Names**"), and (5) the email account rights associated with email addresses used only in connection with the Business (collectively, the "**Intangible Property**");

(g)   all licenses and permits issued to Seller with respect to the Business, to the extent the same are assignable, and those Contracts which are identified on Schedule 1.2(g) as the "**Assigned Contracts**," which will include Seller's rights to use U.S. Post Office Boxes that have been identified to customers or suppliers with respect to the Business;

(h)   all claims (contractual or otherwise), recoveries, credit rights, refunds, rebates, causes of action, counterclaims, rights to offset or other rights Seller may have with respect to, arising out of or relating to any of the Assumed Liabilities or any of the Acquired Assets;

(i)   the equipment lease related to the Fuji J press;

(j)   all deposits and the prepaid assets listed on Schedule 1.2(j);

(k)   A $20,000 credit to the Purchaser representing a portion of the Sales Tax Receivable reported on the Business' August 31, 2013 Balance Sheet;

(l)   All goodwill incident to the Business, including the value of the Names associated with the Business which are transferred to Purchaser hereunder and the value of good customer relations; and

(m)   all other tangible Assets not otherwise included in Sections 1.2(a) through (l) above which are located at the Omaha Facility and are owned and used, or held for use, or previously used, in the Business.

"**Intellectual Property**" as used herein shall mean the domestic and foreign property and rights, if any:  (a) Internet domain names, including the Domain Names, (b) issued patents, pending patent applications (including provisional, continuation, continuation-in-part and divisional applications), and unfiled patent applications, (c) trademarks, trademark registrations, pending trademark registration applications, trade dress, copyrights, copyright registrations, pending copyright registration applications, license agreements, rights acquired through litigation, logos, business and product names, the Name and all derivations thereof and all other trade names and slogans owned by Seller and which are presently used in the Business; (d) moral rights; (e) unpatented inventions, discoveries, specifications, data, processes, formulae, trade secrets, proprietary technical information or know-how, industrial models, confidential and technical information, manufacturing, engineering and technical drawings, product specifications and confidential business information; (f) intellectual property rights similar to any of the foregoing; and (g) copies and tangible embodiments thereof (in whatever form or medium, including electronic media).  As used herein, the term "**Identified Intellectual Property**" shall mean the following specific items of Intellectual Property and no other: (1) the Names; (2) the Domain Names; (3) any Proprietary Software; and (4) the trademark for Folder Express which was regis-

3

tered with the United States Patent and Trademark Office on May 25, 1999 under Registration No. 2247736.

    1.3    **Excluded Assets**. The term "**Excluded Assets**" shall mean the following:

    (a)    all corporate minute books, stock records and corporate seals of Seller; provided, however, that Purchaser shall have access to such books and records as is reasonably necessary after the Closing during regular business hours and upon reasonable notice (with the right to make copies, extracts or compilations thereof);

    (b)    all corporate income tax returns and other tax returns of Seller and work papers, records and documents related thereto, and any rights to refunds; *provided, however*, that Seller will deliver copies thereof to Purchaser following the Closing;

    (c)    Seller's cash and Seller's checking accounts, investments, and rights to refunds and claims for refunds;

    (d)    all accounts receivable and notes receivable from employees and from Mark Wright, personally;

    (e)    all leasehold improvements made to the Omaha Facility;

    (f)    all of Seller's prepaid assets which are not listed on Schedule 1.2(j), including insurance policies on Mark Wright and on any employees of the Business who will not be hired by Purchaser, together with the cash surrender value associated with such life insurance policies;

    (g)    all "Other Receivables" and the Sales Tax Receivable (less the $20,000 credited to the Purchaser) reported on the Business' August 31, 2013 Balance Sheet;

    (h)    Seller's assets and properties which are used in the Affiliate Business and which are not located at the Omaha Facility; and

    (i)    the assets set forth on Schedule 1.3(i) hereto.

    1.4    **Assumed Liabilities**. Subject to Section 1.5 below, as of the Closing, Purchaser will assume and agree to pay, perform and discharge when due: (i) the trade accounts payable of Seller which are listed and described on Schedule 1.4(i) hereto, which will not include Mark Wright's First National Bank Visa card, T. Wright's credit cards, or other credit card charges or other liabilities that are personal in nature, and credit card charges for the following terminated sales personnel: John Ross, Joel Rich, Dave Jensen and cJames Backens and (ii) payroll expenses of Seller which are listed and described on Schedule 1.4(ii) (collectively, the "**Assumed Liabilities**"), subject to the qualification that the amount of payroll expenses to be included in the Assumed Liabilities or listed on Schedule 1.4 (the "**Assumed Payroll Liabilities**") shall not exceed the lesser of: (y) the value shown for the Assumed Liabilities on the ledger of Seller as of the date of the closing balance sheet for Seller and (z) One Hundred Thousand Dollars ($100,000.00). Such Assumed Payroll Liabilities shall be paid to Seller, in cash on or before October 4, 2013, to the extent Seller has actually paid such liability at or before such date. The

4

document attached to this Agreement as Schedule 1.4 as of the date of this Agreement shall be based on the August 31, 2013 Most Recent Fiscal Month End statement for the Business. Following delivery to Purchaser of Seller's month end financial statement for the Business for the period ending September 30, 2013, Seller and Purchaser will update Schedule 1.4 to include all Assumed Liabilities and Assumed Payroll Liabilities as of September 30, 2013, which updated Schedule 1.4 shall set forth the final trade accounts payable which are included in the Assumed Liabilities.

      1.5     **Retained Liabilities**. Except for the Assumed Liabilities, Purchaser shall not assume, or take subject to, or in any manner be responsible for, any liabilities or obligations of Seller of any kind whatsoever, all of which Seller shall remain responsible for. Purchaser shall not assume, and Seller shall pay, perform, and discharge when due and remain exclusively liable for the following (the "**Retained Liabilities**"):

      (a)     any Liability of Seller that is not an Assumed Liability;

      (b)     funded debt and capital obligations of Seller;

      (c)     except with respect to the Assumed Payroll Liabilities, any liabilities related to employment, including wages, salaries, withholding taxes, unemployment taxes, bonuses, severance payments, vacation pay, sick pay or any other payroll, employment or labor cost or expense incurred by Seller related to the Business for periods prior to the Closing ("**Retained Payroll Liabilities**");

      (d)     any Liability of Seller with respect to the Excluded Assets;

      (e)     any Liability of Seller, its Affiliates or ERISA Affiliates under the Benefit Plans related to the Business for periods prior to the Closing;

      (f)     any Liability of Seller for claims covered by Seller's insurance policies arising out of any act or omission occurring or state of facts existing prior to the Closing, including without limitation, workers' compensation (including Claims made in respect of any period during which Seller was a self-insurer), general liability, fire and property insurance policies, and any Liability of Seller for premiums which may be due or are payable under any such insurance policy;

      (g)     any Liability under any employment, severance, retention or termination agreement with any employee of Seller or any of its Affiliates for periods prior to the Closing;

      (h)     any Liability for periods of employment prior to the Closing arising out of or relating to any employee grievance whether or not the affected employees are hired by Purchaser;

      (i)     any Liability related to the Business arising out of any Claims pending as of the Closing;

(j)     any Liability related to the Business arising out of any Claims commenced after the Closing and to the extent arising out of, or relating to, any occurrence or event happening prior to the Closing; and

(k)     any Liability arising out of or resulting from Seller's non-compliance with any Law related to the Business for periods prior to the Closing.

1.6     **Closing**.  The consummation of the purchase and sale of the Acquired Assets and the payment of the Purchase Price (the "**Closing**") shall take place at the offices of Purchaser no later than 12:00 noon., local time, on September 30, 2013 (the "**Closing Date**"), and the Closing shall be effective as of midnight on the Closing Date.

## ARTICLE 2

## CONSIDERATION AND PAYMENT TERMS

2.1     **Purchase Price**.

(a)     On the Closing Date, Purchaser shall pay to Seller Fifteen Million Dollars ($15,000,000) (the "**Purchase Price**"), less the Escrow Amount, by wire transfer of immediately available funds into an account designated by Seller.

(b)     On the Closing Date, Purchaser shall pay into escrow a portion of the Purchase Price, consisting of One Million Five Hundred Thousand Dollars ($1,500,000) (the "**Escrow Amount**") to be held to satisfy any claims for indemnification pursuant to Article VIII.  Any payment required to be made by Seller with respect to Article VIII shall be paid exclusively from the Escrow Amount, except as expressly provided in Article VIII. The Escrow Amount shall be held and distributed pursuant to the terms of the Escrow Agreement in substantially the form attached hereto as Exhibit A ("**Escrow Agreement**") which shall be entered into at Closing with Bank of America Merrill Lynch ("**Escrow Agent**").

2.2     **Payment of Closing Costs**.  The following items and costs shall be prorated (at Closing or as soon thereafter as is practicable) between Seller and Purchaser in the manner indicated:

(a)     Sales taxes and state, county and local transfer taxes or other Taxes relating to this transaction or the instruments of transfer contemplated herein shall be paid by Seller.

(b)     All Taxes with respect to the Acquired Assets which are due and payable and/or levied due and payable prior to Closing, shall be paid by Seller prior to Closing.

2.3     **Allocation of Purchase Price**.  Prior to the Closing, Purchaser and Seller shall agree as to the allocation of the Purchase Price pursuant to Section 1060 of the Code and the treasury regulations promulgated thereunder.  Purchaser and Seller agree to reflect such allocation on IRS Form 8594: Asset Acquisition Statement under Section 1060, including any required

amendments or supplements thereto ("**Form 8594**"), in the form attached hereto as Exhibit B. Form 8594 shall be prepared jointly by Purchaser and Seller and shall be signed by the Parties on the Closing Date. The Parties hereto further agree that: (a) the agreed upon allocation of Purchase Price shall be used in filing all required forms under Section 1060 of the Code and all Tax Returns; and (b) they will not take any position inconsistent with such allocation upon any examination of any such Tax Return, in any refund claim or in any tax litigation.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser on the date hereof and as of the Closing Date, as follows:

3.1     **Organization and Good Standing**. Seller is a Nebraska corporation, duly organized, validly existing and in good standing under the laws of the State of Nebraska, with full corporate power and authority to conduct its Business as it is presently being conducted, and to own, lease and operate its assets and properties. Seller is duly qualified or licensed to do business as a corporation in good standing in every jurisdiction in which its ownership of property or conduct of its business requires such qualification or licensing and the failure to so qualify would have a Material Adverse Effect. Seller is duly qualified to do business as foreign corporations in the states which are identified on Schedule 3.1.

3.2     **Authorization**. Seller has all necessary power and authority and has taken all action necessary (or if any such consents, approvals, or other actions are required, the same will be accomplished prior to the Closing) to execute and deliver this Agreement and all other documents, instruments and agreements to be executed, delivered and performed by Seller pursuant hereto (collectively, the "**Seller Related Agreements**"), to consummate the transactions contemplated by this Agreement and the Seller Related Agreements, and to perform Seller's obligations hereunder and thereunder.

3.3     **Binding Effect**. This Agreement and the Seller Related Agreements have been duly executed by Seller and constitute the legal, valid and binding obligations of Seller, are duly enforceable against Seller according to their respective terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability from time to time in effect relating to the rights and remedies of creditors and general principles of equity.

3.4     **Noncontravention**. The execution and delivery of this Agreement and the Seller Related Agreements, the consummation of the transactions contemplated hereby and thereby, and compliance with the provisions hereof and thereof, do not and will not conflict with or result in any violation, default (with or without notice or lapse of time, or both), or result in the creation of any lien, security interest, charge or encumbrance upon any of the Acquired Assets, under any provisions of:  (a) the Articles of Incorporation or the Bylaws of Seller; (b) any loan or credit agreement, note, bond, mortgage, indenture, lease or other agreement, instrument, permit, concession, franchise or license applicable to Seller; or (c) any judgment, order, decree, statute, law, ordinance, rule or regulation binding upon Seller or any of the Acquired Assets.

7

3.5     **Financial Statements**.  Seller has delivered to Purchaser the following financial statements for the Business (collectively, the "**Financial Statements**"): (i) compiled balance sheets and statements of income, changes in cash flow as of and for the fiscal years ended December 31, 2010, December 31, 2011, and December 31, 2012, for the Business; and (ii) internally prepared balance sheets and statements of income, changes in the member's equity, and cash flow (the "**Most Recent Financial Statements**") as of and for the eight (8) months ended August 31, 2013 (the "**Most Recent Fiscal Month End**"), for the Business. The Financial Statements (including the notes thereto) have been prepared in accordance with GAAP throughout the periods covered thereby, present fairly the financial condition of the Business as of such dates and the results of operations of the Business for such periods, are correct and complete in all material respects, and are consistent with the books and records of the Business (which books and records are correct and complete in all material respects); provided, however, that the Most Recent Financial Statements are subject to normal year-end adjustments (which will not be material individually or in the aggregate) and lack footnotes and other presentation items. True and accurate copies of the Financial Statements are attached as Schedule 3.5.

3.6     **Inventories**.  To Seller's Knowledge, the Inventory does not include items that are obsolete or damaged.  The Inventory is in good and merchantable condition, is suitable and usable for the purposes for which it is intended and is in a condition such that it can be sold in the Ordinary Course of Business consistent with past practice.  The Inventory is valued on the books and records of Seller at the lower of cost or net realizable value.

3.7     **Qualifying Accounts Receivable**.  None of the Qualifying Accounts Receivable existing on the Closing Date is owed by any shareholder, officer, director, employee or any subsidiary or affiliate of Seller, other than as set forth on Schedule 1.2(c).  Each of the Qualifying Accounts Receivable is owed to Seller by current or former customers of Seller, constitutes a valid claim arising from *bona fide* transactions in the Ordinary Course of business.  A complete list of Qualifying Accounts Receivable existing as of August 31, 2013 is set forth on Schedule 1.2(c).

3.8     **Trade Accounts Payable**.  The trade accounts payable of Seller relating to the Business which are set forth on Schedule 1.4(i) hereto and the list of trade accounts payable for which Seller has not received an invoice ("**Pre-Invoice Payables**") which list has been separately delivered to Purchaser constitute all of the Business' trade accounts payable and the amount set forth in said Schedule 1.4 for the trade accounts payable which are listed on Schedule 1.4(i) as of August 31, 2013 is true and correct in all material respects.  None of the payees of the trade accounts payable of Seller set forth on Schedule 1.4(i) are Affiliates of Seller.

3.9     **No Material Change in Net Working Capital**.  For the three month period ending August 30, 2013, Seller's Net Working Capital averaged $5,110,504 ("**Seller's Recent Average NWC**").

3.10     **Sales, Use and Employment Taxes**.  To Seller's Knowledge, Seller has properly filed all required returns or reports for sales and use taxes relating to Seller's Business ("**Sales Tax Returns**"), and Seller has paid all taxes due with respect thereto.  To Seller's Knowledge, Seller does not have any sales tax or use tax liabilities other than those reflected on the aforesaid Sales Tax Returns with respect to the periods covered by the Sales Tax Returns.  No audit of any

Sales Tax Return of Seller is in progress or pending, and no waiver of any statute of limitations has been given and is in effect with respect to the assessment of any taxes against Seller or any of Seller's assets or properties.

3.11    **Absence of Certain Changes or Events**.  Since December 31, 2012, except as contemplated by this Agreement or disclosed on Schedule 3.11, Seller has conducted the Business in the Ordinary Course of Business and there has not been:

(a)    Any change in the Business, or any event, occurrence or circumstance that could reasonably be expected to cause a Material Adverse Effect, other than Seller's cessation of the commercial division of the Business;

(b)    Any event that could reasonably be expected to prevent or materially delay the performance of Seller's obligations pursuant to this Agreement and the consummation of the transaction contemplated by this Agreement;

(c)    Any change by Seller in its accounting methods, principles or practices;

(d)    Any damage, destruction or other casualty loss (whether or not covered by insurance), condemnation or other taking affecting the Acquired Assets;

(e)    Any incurrence of any material Liability (absolute or contingent), except for current Liabilities incurred in the Ordinary Course of Business consistent with past practice;

(f)    Any purchases of Inventory other than in the Ordinary Course of Business consistent with past practice and any material change in the nature, level and condition of the Inventory;

(g)    Any write-downs or write-ups (or failures to write down or write up in accordance with GAAP) of the value of any Inventory other than in the Ordinary Course of Business consistent with past practice and in accordance with GAAP;

(h)    Any failure to maintain the Acquired Assets in accordance with historical maintenance practices of Seller; or

(i)    Any adverse change in Seller's relations with its customers, clients and suppliers that could reasonably be expected to cause a Material Adverse Effect.

3.12    **Title**.  Seller has good and marketable title to, or a valid license or leasehold interest in, all of the Acquired Assets, free and clear of any and all Liens, except Liens to be released at the time of Closing.

3.13    **Intellectual Property**.  Except as set forth on Schedule 3.13:

(a)    No claim or demand has been made, nor is there any proceeding that is pending, or to the Knowledge of Seller, threatened, nor is there a reasonable basis therefor, which (i) challenges the rights of Seller in respect of any Identified Intellectual

9

Property, or (ii) asserts that Seller is infringing or otherwise in conflict with, or is required to pay any royalty, license fee, charge or other amount with regard to, any Identified Intellectual Property.

(b)     There are no restrictions or limitations pursuant to any orders, decisions, injunctions, judgments, awards or decrees of any governmental authority on Seller's right to use any of the Names, any of the Domain Names or any other Identified Intellectual Property related thereto in the conduct of the Business as presently carried on by Seller.

3.14   **Computer Software**.  All of the proprietary computer software other than commercial off the shelf or "shrinkwrap" software which is presently used in the conduct of Seller's Business (the "**Proprietary Software**") is listed on Schedule 3.14.

3.15   **Licenses and Permits**.  All material licenses, permits and other governmental authorizations which Seller holds in connection with the conduct of the Business are listed on Schedule 3.15.

3.16   **Real Property**.  Schedule 3.16 hereto correctly identifies all Real Property currently owned, leased or otherwise currently occupied, but not owned, by Seller and used in the Business (the "**Seller Real Property**").  Seller has delivered to Purchaser true, correct and complete copies of all applicable real estate leases (including subleases and prime leases) or other occupancy arrangements, including any amendments thereto, with respect to the Seller Real Property (collectively referred to as the "**Leases**" and individually as a "**Lease**").

3.17   **Environmental Matters**.  Except as set forth on Schedule 3.17 hereto, to Seller's Knowledge:

(a)     Seller has at all times complied and is in material compliance with all Environmental Laws.  There are no investigations of the business, operations, or owned, operated or leased property of Seller (including, to Seller's Knowledge, previously owned, operated or leased property of Seller ) which are pending or, to Seller's Knowledge, threatened which could lead to the imposition of any Liability or Lien under Environmental Law.

(b)     Seller has not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, manufactured, distributed, exposed any person to, or released any substance, including without limitation any hazardous substance, except for hazardous substances consisting of cleaning solutions and other maintenance materials and products which are used in de minimis amounts and are used only incidental to and as reasonably necessary for the operation and maintenance of the Assets, or owned or operated any property or facility which is or has been contaminated by any such substance so as to give rise to any current or future Liabilities pursuant to any Environmental Law.

(c)     There is not located at any of the Seller Real Properties any (i) underground storage tanks, (ii) asbestos-containing material, (iii) equipment containing polychlorinated biphenyls, (4) groundwater monitoring wells, drinking water wells, or production water wells, or (5) landfills, surface impoundments, or disposal areas.

(d)     Seller has provided to Purchaser all environmentally related audits, studies, reports, analyses, and results of investigations in Seller's possession or control that have been performed with respect to the Seller Real Property.

3.18   **Employees and Labor**.

(a)     With respect to the Business:

(i)     there is no collective bargaining agreement or relationship with any labor organization, no labor organization or group of employees has filed any representation petition or made any written or oral demand for recognition, and, to the Seller's Knowledge, no union organizing or decertification efforts are underway or threatened and no other question concerning representation exists;

(ii)     no labor strike, work stoppage, slowdown, or other material labor dispute has occurred, and none is underway or, to the Seller's Knowledge, threatened;

(iii)     there is no workmen's compensation liability, experience or matter outside the Ordinary Course of the Business; and

(iv)     there is no employment-related charge, complaint, grievance, investigation, inquiry or obligation of any kind relating to the Business, pending or, to the Seller's Knowledge, threatened, in any forum, relating to an alleged violation or breach by the Seller (or its or their managers, directors or officers) of any Law or contract.

(b)     Except as set forth in Schedule 3.18, (i) there are no employment contracts or severance agreements with any employees of Seller relating to the Business, and (ii) there are no written personnel policies, rules, or procedures applicable to employees of Seller relating to the Business.  True and complete copies of all such documents have been provided to Purchaser prior to the date of this Agreement.

(c)     Seller has not implemented any plant closing or layoff of employees implicating the WARN Act.

3.19   **Benefit Plans**.

(a)     Schedule 3.19 lists each Benefit Plan that Seller maintains, to which Seller contributes or has any obligation to contribute, or with respect to which Seller has any Liability.

(i)     To Seller's Knowledge, each such Benefit Plan (and each related trust, insurance contract, or fund) has been maintained, funded and administered in accordance with the terms of such Benefit Plan and the terms of any applicable collective bargaining agreement and complies in form and in operation in all respects with the applicable requirements of ERISA, the Code, and other applicable Law.  There have been no Prohibited Transactions with respect to any such Bene-

11

fit Plan or any Benefit Plan maintained by an ERISA Affiliate. No action, suit, proceeding, hearing, or investigation with respect to the administration or the investment of the assets of any such Benefit Plan (other than routine claims for benefits) is pending or, to the Knowledge of Seller, threatened.

(ii)     Sellers have delivered to Purchaser correct and complete copies of the plan documents and summary plan descriptions, the most recent determination letter received from the Internal Revenue Service, the most recent annual report (Form 5500, with all applicable attachments), and all related trust agreements, insurance contracts, and other funding arrangements that implement each such Benefit Plan.

(b)     Neither Seller nor any ERISA Affiliate contributes to, has any obligation to contribute to, or has any Liability under or with respect to any Employee Pension Benefit Plan that is a "defined benefit plan" (as defined in ERISA §3(35)). No asset of Seller or any of its Subsidiaries is subject to any Lien under ERISA or the Code.

(c)     Neither Seller nor any ERISA Affiliate contributes to, has any obligation to contribute to, or has any Liability (including withdrawal liability as defined in ERISA §4201) under or with respect to any Multiemployer Plan.

(d)     Seller does not maintain, contribute to or have an obligation to contribute to, or have any Liability with respect to, any Employee Welfare Benefit Plan or other arrangement providing health or life insurance or other welfare-type benefits for current or future retired or terminated managers, directors, officers or employees (or any spouse or other dependent thereof) of Seller or of any other Person other than in accordance with COBRA.

(e)     The consummation of the transactions contemplated by this Agreement will not accelerate the time of the payment or vesting of, or increase the amount of, or result in the forfeiture of compensation or benefits under, any Benefit Plan.

(f)     Schedule 3.19 lists each agreement, contract, plan, or other arrangement - whether or not written and whether or not a Benefit Plan (collectively a "Plan") - to which Seller is a party that is a "nonqualified deferred compensation plan" subject to Code §409A.  To Seller's Knowledge, each Plan complies in all material respects with the requirements of Code §409A(a)(2), (3), and (4) and any Internal Revenue Service guidance issued thereunder and no amounts under any such Plan is or has been subject to the interest and additional tax set forth under Code §409A(a)(1)(B). Seller has no actual or potential obligation to reimburse or otherwise "gross-up" any Person for the interest or additional tax set forth under Code §409A(a)(1)(B).

3.20   **Litigation**. To Seller's Knowledge, there is no claim, action or proceeding, at law or in equity involving Seller, or involving any of the Acquired Assets which could result in an attachment of an Lien on an Acquired Asset.

3.21   **No Successor Liabilities**. To Seller's Knowledge, Seller does not have any Liability which could be asserted against Purchaser or any of the Acquired Assets (a "**Successor**

12

**Liability**"). To Seller's Knowledge, there is no known reasonable basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against Seller giving rise to any Successor Liability.

3.22 **Brokers and Finders**. Except as set forth on Schedule 3.22 hereto, Seller has not engaged or authorized any broker, investment banker or third party to act on Seller's behalf, either directly or indirectly, as a broker, finder or advisor in connection with the transactions contemplated hereby.

3.23 **Full Disclosure**. To Seller's Knowledge, neither this Agreement (including the Schedules and Exhibits hereto) nor any document, certificate or instrument furnished in connection therewith contains, with respect to Seller, any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not misleading.

3.24 **"AS IS" Disclaimer**. THE PARTIES ACKNOWLEDGE AND AGREE THAT EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 3, SELLER DOES NOT MAKE AND HAS NOT MADE ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, WRITTEN OR ORAL, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, AS TO ANY FACT OR MATTER WITH RESPECT TO THE ACQUIRED ASSETS OR THE BUSINESS, INCLUDING WITHOUT LIMITATION IN REGARD TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONDITION OR DESIGN OR ARISING BY STATUTE OR OTHERWISE IN LAW, FROM A COURSE OF DEALING OR USAGE OF TRADE OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, ASSURANCE, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT OR FUTURE, OF, AS TO, OR CONCERNING (A) THE NATURE, CONDITION OF THE ACQUIRED ASSETS, AND (B) THE COMPLIANCE OF THE BUSINESS WITH ANY LAWS, ORDINANCES OR REGULATIONS OF ANY GOVERNMENT OR OTHER BODY. SELLER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, ASSURANCE, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT OR FUTURE, OF, AS TO, OR CONCERNING: (1) THE SUITABILITY OF THE ACQUIRED ASSETS FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY ELECT TO CONDUCT IN RELATION THERETO, AND (2) THE POST-CLOSING ECONOMIC PERFORMANCE OF THE ACQUIRED ASSETS AND BUSINESS, INCLUDING WITHOUT LIMITATION, POST-CLOSING REVENUES, OPERATING EXPENSES, CAPITAL EXPENSES, NET INCOME OR NET LOSS. SELLER FURTHER DISCLAIMS ANY WARRANTY, ASSURANCE, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, REGARDING PROJECTIONS, BUDGETS OR OTHER FORWARD LOOKING FINANCIAL DATA, REPORTS, OR SUMMARIES. PURCHASER ACKNOWLEDGES AND AGREES THAT IT IS NOT RELYING ON ANY STATEMENT OR REPRESENTATION MADE BY OR ON BEHALF OF SELLER EXCEPT AS SPECIFICALLY SET FORTH IN THIS SECTION. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, PURCHASER IS ACCEPTING THE ACQUIRED ASSETS ON AN "AS IS WHERE IS, WITH ALL FAULTS" BASIS.

## ARTICLE 4

### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller on the date hereof and as of the Closing Date as follows:

4.1     **Organization and Good Standing**.  Purchaser is a Delaware corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware.

4.2     **Authorization**.  Purchaser has all necessary power and authority and has taken all action necessary to execute and deliver this Agreement and the instruments, documents and agreements to be executed and delivered by Purchaser pursuant hereto and thereto (the "**Purchaser Related Agreements**"), to consummate the transactions contemplated by this Agreement and the Purchaser Related Agreements, and to perform Purchaser's obligations hereunder and thereunder

4.3     **Binding Effect**.  This Agreement and each of the Purchaser Related Agreements have been duly executed by Purchaser and constitutes the legal, valid and binding obligations of Purchaser, enforceable against Purchaser according to their terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability from time to time in effect relating to the rights and remedies of creditors and general principles of equity.

4.4     **Noncontravention**.  The execution and delivery of this Agreement and the Purchaser Related Agreements, the consummation of the transactions contemplated hereby and thereby, and compliance with the provisions hereof and thereof, do not and will not conflict with or result in any violation, default (with or without notice or lapse of time, or both), give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of any benefit under, or result in the creation of any lien, security interest, charge or encumbrance upon any of the Acquired Assets, under any provisions of:  (a) the Articles of Organization or the Operating Agreement of Purchaser; (b) any loan or credit agreement, note, bond, mortgage, indenture, lease or other agreement, instrument, permit, concession, franchise or license applicable to Purchaser; or (c) any judgment, order, decree, statute, law, ordinance, rule or regulation binding upon Purchaser or any of the Acquired Assets.

4.5     **Governmental Consents**.  No filing or registration with, or authorization, consent or approval of, any Governmental Authority is required by or with respect to Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Related Agreements by Purchaser, or is necessary for the consummation of any of the transactions contemplated by this Agreement or the Purchaser Related Agreements.

4.6     **Brokers and Finders**.  Purchaser has not engaged or authorized any broker, investment banker or third party to act on behalf of Purchaser, either directly or indirectly, as a broker, finder or advisor in connection with the transactions contemplated hereby.

14

## ARTICLE 5

### COVENANTS

5.1 **Covenants of Seller**. Seller hereby covenants and agrees with Purchaser as follows:

(a) **Consents of Third Parties**. Following the Closing, both Purchaser and Seller shall use commercially reasonable efforts to obtain or cause to be obtained all consents required to be obtained in order to consummate the transactions contemplated by this Agreement or which would be required for Purchaser to operate the Acquired Assets in the conduct of Purchaser's business. To the extent that any consent cannot be obtained, this Agreement shall not constitute an assignment thereof or an attempted assignment thereof and the Acquired Assets shall not include such asset, contract, agreement or lease, unless and until such consent of such issuer, landlord, lessor or other party or parties has been duly obtained or such assignment has otherwise become lawful. To the extent that the consents are not obtained, then after the Closing Date and until the impracticalities of assignment are resolved, (i) Seller shall use commercially reasonable efforts to provide or cause to be provided to Purchaser the benefits of any such Acquired Asset, and (ii) Purchaser shall use commercially reasonable efforts to perform the obligations of Seller arising under such Acquired Asset.

(b) **Collection of Qualifying Accounts Receivable**. In the event that Seller shall receive payment for any of the Qualifying Accounts Receivable on or after the Closing Date, and such payment shall become collected funds in Seller's account, then Seller shall hold such payments for Purchaser and shall remit the amount of such payments to Purchaser within ten (10) business days of the receipt of such payments.

(c) **Trade Names**. From and after the Closing Date, Purchaser shall have all of Seller's rights to and interests in the Names, the Domain Names, any derivations thereof and all other Intellectual Property currently used in the Business, and neither Seller, nor any affiliate of Seller, shall use the Names, the Domain Names, any derivations thereof, or any other Intellectual Property, for any purpose whatsoever, except in the performance of its obligations hereunder or under any of the Seller Related Agreements and/or for and on behalf of Purchaser or any affiliate of Purchaser.

(d) **Publicity**. Seller shall not, without the prior written consent of Purchaser, issue any press release or other public announcement regarding the transactions contemplated by this Agreement unless required by law.

(e) **Confidentiality**. From and after the Closing Date, without the prior written consent of Purchaser, Seller shall not, except on behalf of Purchaser and except on Seller's behalf in the operation of the Affiliate Business, use any of the Confidential Information of Seller for Seller's own purposes or for the benefit of any other person, firm, corporation, partnership, organization or any other entity or disclose any Confidential Information to any person, firm, corporation, partnership or other entity unless (i) subject to the provisions of this Section 5.1(e), Seller is compelled to disclose any such Confidential

15

Information by judicial or administrative process or, in the opinion of its counsel, by other requirements of law, (ii) such Confidential Information is available to the public through no fault of Seller, (iii) such Confidential Information becomes available to Seller from a third party who is under no confidential or fiduciary obligation to either Purchaser or Seller with respect to such Confidential Information, or (iv) such Confidential Information is used by Seller in the operation of Seller's Affiliate Business and maintained by Seller as Confidential Information subject to the restrictions on disclosure which Seller applies to Seller's own Confidential Information. As used herein, the term "**Confidential Information**" shall mean (i) all trade secrets as defined under applicable statute or common law, and (ii) other confidential information of or about Seller, including, without limitation, any such information regarding the business of Seller, its manufacturing processes, methods of operation, products, financial data, sources of supply and customers. In the event that Seller receives a request to disclose all or any part of the information contained in the Confidential Information under the terms of a subpoena or order issued by a governmental agency or court of competent jurisdiction, Seller shall (i) immediately notify Purchaser of the existence, terms and circumstances surrounding such a request, (ii) consult with Purchaser on the advisability of taking legally available steps to resist or narrow request, and (iii) if disclosure of such information is required, exercise Seller's commercially reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the disclosed information which Purchaser so designates.

(f)     **Conduct of Business in Ordinary Course**. From the date of this Agreement to the Closing Date, Seller will continue to operate the Business in the Ordinary Course of Business, and Seller will take no actions which would, in the aggregate, have a negative material impact on Seller's Net Working Capital.

(g)     **Sales Tax Returns and Tax Payments**. Prior to and after the Closing Date, Seller shall file, when due, all Sales Tax Returns relating to the conduct of the Business prior to the Closing Date, and Seller shall pay, when due, all sales and use taxes which are due and owing by Seller. Seller shall pay any sales tax

(h)     **Net Working Capital**. As of September 30, 2013 and as of the Closing Date, Seller's Net Working Capital shall not be less than 95% of Seller's Recent Average NWC.

(i)     **Due Diligence**. Following execution of this Agreement, Purchaser shall have access to Seller's Real Property for purposes of conducting due diligence, with such access to be after commercially reasonable prior notice to Seller. Purchaser shall not conduct any physical testing of Seller's Real Property without Seller's prior consent.

(j)     **Changes to Schedules Prior to Closing**. If any event occurs or condition changes prior to the Closing that to Seller's Knowledge causes any of its representations or warranties in this Agreement to be inaccurate in any material respect, Seller shall notify Purchaser thereof in writing. Should any such fact or condition require any change in the Schedules if the Schedules were dated the date of the occurrence or discovery of any such fact or condition, Seller will promptly deliver to Purchaser a supplement to the

16

Schedules specifying such change. In addition, Seller shall have the right, and shall promptly deliver to Purchaser, any updated or supplement to any Schedule in the event Seller determines the existence of inaccuracies or omissions in the Schedules prior to Closing. With regard to any supplement provided to the Schedules, Purchaser shall provide objection to any changes thereto within forty-eight (48) hours from Seller's delivery, or the supplement to such Schedules shall be deemed accepted by Purchaser. In the event both parties are unable to agree upon any change in terms to this Agreement required by the change or supplement to a Schedule, then either party shall have the right to terminate this Agreement on written notice to the other Party.

(k)    **Changes to Schedules After the Closing**. Following the Closing, Seller and Purchaser shall jointly update the following Schedules to this Agreement: 1.2(c), 1.2(j), and 1.4.

5.2    **Covenants of Purchaser**.

(a)    **Confidentiality**. If the parties hereto do not consummate the transactions contemplated by this Agreement, Purchaser shall return to Seller all copies of any documents that Seller provided to Purchaser in connection with the transactions contemplated hereby. Additionally, if the parties hereto do not consummate the transactions contemplated by this Agreement, Purchaser shall not, without the prior written consent of Seller, use any of the Confidential Information of Seller or disclose any Confidential Information to any person, firm, corporation, partnership or other entity unless (a) subject to the provisions of this Section 5.2, Purchaser is compelled to disclose any such Confidential Information by judicial or administrative process or, in the opinion of its counsel, by other requirements of law, (b) such Confidential Information is available to the public through no fault of Purchaser, or (c) such Confidential Information becomes available to Purchaser from a third party who is under no confidential or fiduciary obligation to either Purchaser or Seller with respect to such Confidential Information. In the event that Purchaser receives a request to disclose all or any part of the information contained in the Confidential Information under the terms of a subpoena or order issued by a governmental agency or court of competent jurisdiction, Purchaser shall (i) immediately notify Seller of the existence, terms and circumstances surrounding such a request, (ii) consult with Seller on the advisability of taking legally available steps to resist or narrow request, and (iii) if disclosure of such information is required, exercise Purchaser's commercially reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the disclosed information which Seller so designates.

(b)    **Publicity**. Purchaser shall not issue any press release or other public announcement regarding the transactions contemplated by this Agreement unless, in Purchaser's commercially reasonable judgment, that press release or disclosure is required by law and, with respect to publications that are not required SEC filings, Purchaser obtains Seller's consent to such publication, which consent will not be unreasonably withheld, conditioned or delayed.

17

(c)     **Post Closing Access for Seller**.  Following the Closing Date, Purchaser shall cooperate with Seller in providing access to the business records of Seller and books and records of Seller which are included in the Acquired Assets to permit Seller to: (i) close Seller's financial reporting period ending September 30, 2013; (ii) respond to any inquiries from state or federal tax authorities regarding the Business; and (iii) for any other reasonable basis relating to Seller's operation of the Business, including any claims asserted by any party relating to such period.

5.3     **Employees Matters**.

(a)     Effective as of the end of business on the Closing Date, Seller shall terminate all of the employees of the Business ("**Seller's Employees**").  Purchaser shall offer employment to substantially all of Seller's Employees, with the exception of not more than ten (10) persons not to be retained, who will be selected by Purchaser in the exercise of Purchaser's sole discretion.  Nothing contained in this provision shall be deemed to constitute a contract of employment to any party.

(b)     Purchaser will send to Seller not less than two days prior to the signing of this Agreement a list of Seller's Employees to whom Purchaser will make offers of employment and a list of Seller's Employees to whom Purchaser will not make offers of employment. Employees hired will be rehired at their then current wage/salary level prior to the Closing Date. Employees will be offered Purchaser's health care plan and the opportunity to participate in Purchaser's 401K program with a to-be-determined match. Other employment policies will initially match those of Purchaser's policies, but may be supplemented later.  Vacations, holidays and sick pay will initially be identical to Purchaser's policies in this area.

(c)     Purchaser shall discharge Purchaser's liability for the Assumed Payroll Liabilities which are identified on Schedule 1.4 by making a direct payment to Seller, which shall be responsible for making to Seller's employees any and all payments due to Seller's employees. Seller shall pay in full all Retained Payroll Liabilities, including (i) all reimbursable business expenses, wages, bonuses, commissions and other compensation (including all sick pay, holiday and vacation pay which is properly accruable in accordance with FASB 43) earned by Seller's Employees during any period prior to the Closing Date, whether or not payable by such date, other than the Assumed Payroll Liabilities, (ii) any and all payments, expenses, liabilities and costs paid or required to be paid in respect of the termination of employment of Seller's Employees on or prior to the Closing Date, (iii) all workers' compensation claims made by Seller's Employees based on occurrences on or prior to the Closing Date, and (iv) all liabilities arising from the employment of Seller's Employees prior to the Closing Date, it being understood and agreed that Seller shall not be entitled to reimbursement for any portion of prepaid benefits, including, without limitation, medical insurance, with respect to the month in which the Closing occurs.

(d)     Seller, or any affiliate of Seller, shall be solely responsible for providing "qualifying beneficiaries" who terminated their employment with Seller or an affiliate of Seller, or who otherwise have a "qualifying event" on or before the Closing Date, the

18

election or continuation, as the case may be, of the group health continuation coverage required by COBRA. "Qualifying beneficiaries" and "qualifying event" shall have the meanings ascribed to those terms in COBRA. Neither Seller, nor any affiliate of Seller, shall amend, modify or terminate any of its Benefit Plans if the effect of such action would prevent Seller, or any such affiliate of Seller, from providing the continuation coverage referred to in this Section 5.3(d). For purposes of this Section 5.3, "affiliate" shall mean any affiliated entity to the extent such affiliate is described in Internal Revenue Code Section 414(b), (c), (m) or (o) and corresponding Treasury Regulations. From and after Closing, Purchaser shall provide COBRA coverage to any employee hired by Purchaser.

5.4    **Benefit Plans**. Seller shall be responsible for paying, or causing to be paid, directly to Seller's current and former employees (and the spouse, dependents and beneficiaries of any such employee) or on their behalf all benefits to which they are entitled under its Benefit Plans with respect to benefits accruing on or prior to the Closing Date, and Purchaser shall assume no liability therefor. Purchaser shall not be liable for any claim for insurance, reimbursement, other benefits, or any liability (contingent or otherwise) with respect to any Benefit Plan of Seller or any of its ERISA affiliates.

5.5    **Assumption of Customer Orders and Assigned Contracts**. Purchaser shall assume the existing orders from customers which were made in the Ordinary Course of Business ("**Customer Orders**"). Except for the Customer Orders and the Assigned Contracts, Purchaser shall assume none of the contracts to which Seller is a party.

## ARTICLE 6

### CONDITIONS PRECEDENT

6.1    **Conditions to Obligations of Purchaser**. The obligations of Purchaser to proceed with the Closing are subject to the satisfaction on or before the Closing Date of each of the following conditions, any one or more of which may be waived, in writing, by Purchaser:

(a)    **Accuracy of Representations and Warranties**. Each of the representations and warranties of Seller contained in this Agreement or in any Seller Related Agreement shall be true, complete and correct in all material respects (other than representations and warranties subject to "materiality" or "Material Adverse Effect" qualifiers, which shall be true, complete and correct as stated) both when made and on and as of the Closing as if made at and as of the Closing (other than representations and warranties which address matters only as of a certain date which shall have been true, complete and correct as of such certain date).

(b)    **No Material Adverse Effect**. Since August 31, 2013, there shall not have occurred any Material Adverse Effect or any of the events or conditions described in Section 3.11 with respect to Seller.

(c)    **Satisfactory Due Diligence**. The results of Purchaser's due diligence investigation shall have been satisfactory.

19

(d) **Purchaser's Lease**. Purchaser shall have negotiated with the Facility Owner, on terms satisfactory to Purchaser, an Industrial Building Lease for the Omaha Facility (the **"Purchaser's Lease"**), and contemporaneously with the Closing, Purchaser and the Facility Owner shall have executed the Purchaser's Lease. Purchaser's Lease will have a term of one (1) year from the Closing Date and will provide for rent of $4.15 per square foot on a triple net basis, with one (1) option to extend the term for one (1) year, at rent of $4.30 per square foot on a triple net basis.

(e) **Consents and Releases**. At the Closing, Seller shall provide, at Seller's expense, all consents and releases of liens, and any other encumbrances upon the Acquired Assets as Purchaser shall reasonably deem necessary. Seller shall exercise reasonable efforts to obtain any required third party consents or approvals.

(f) **Additional Deliveries**. In addition to any other instruments, agreements or documents expressly provided for herein to be delivered by Seller to Purchaser at Closing, Seller shall have delivered to Purchaser, at the Closing, the following:

(i) a Certificate of Good Standing of Seller, dated within fifteen (15) days of the Closing Date, from the State of Nebraska;

(ii) executed Bill of Sale in the form of Exhibit C attached hereto conveying, transferring and assigning good and marketable title to all of the Acquired Assets (**"Bill of Sale"**);

(iii) executed assignments (with consents, if obtained prior to the Closing) of all Assigned Contracts and any other applicable agreements, assigning to Purchaser all of Seller's right, title and interest therein and thereto, with any required consent endorsed thereon;

(iv) executed trademark assignments for any trademarks or trade names included in the Intellectual Property with respect to any federally registered trademarks or trade names, in a form suitable for filing with the United States Patent and Trademark Office, assigning Seller's interest in any trademarks or trade names held by Seller to Purchaser;

(v) executed assignments in the form of Exhibit D attached hereto assigning Seller's interest in all items of the Identified Intellectual Property other than the trademarks and trade names assigned above to Purchaser;

(vi) an executed certificate of Seller confirming the accuracy of Seller's representations and warranties as of the Closing Date;

(vii) an executed counterpart of the Escrow Agreement;

(viii) an executed counterpart of Form 8594;

(ix) a certified copy of the resolutions of Seller authorizing and approving the execution of this Agreement and all other agreements and documents

20

executed in connection with this transaction and the consummation of the transactions contemplated thereby;

(x)     a termination of the Confidentiality Agreement previously signed by Seller and Ennis, Inc., dated May 10, 2013; and

(xi)    such other documents, instruments and agreements as are reasonably necessary or desirable by Purchaser in order to consummate the transactions contemplated hereunder.

6.2     **Conditions to Obligations of Seller**. The obligations of Seller to proceed with the Closing are subject to the satisfaction on or before the Closing Date of each of the following conditions, any one or more of which may be waived, in writing, by Seller, subject, however, to the understanding of Seller and Purchaser that the Purchase Price is to be paid by Purchaser on the Closing Date:

(a)     **Purchase Price**. On the Closing Date, Purchaser shall pay the Purchase Price to Seller, minus the Escrow Amount and shall deposit the Escrow Amount with the Escrow Agent, all in accordance with Section 2.1.

(b)     **Board of Directors Approval**. Purchaser shall have delivered to Seller certified copies of the resolutions duly adopted by the board of directors of Purchaser authorizing the execution and delivery of this Agreement and the Purchaser Related Agreements and the consummation of the transactions contemplated hereunder and thereunder.

(c)     **Closing Documents**. At the Closing, Purchaser shall deliver to Seller executed copies of the following documents:

(i)     assumptions of all Assigned Contracts in the form of a counterpart to Seller's assignments identified in Section 6.1(c)(iii);

(ii)    an executed certificate of Purchaser confirming the accuracy of Purchaser's representations and warranties as of the Closing Date;

(iii)   an executed counterpart of the Escrow Agreement;

(iv)    a Certificate of Good Standing of Purchaser, dated within fifteen (15) days of the Closing Date, from the State of Delaware;

(v)     executed assumption of the Assumed Liabilities and Customer Orders in form reasonably acceptable to Seller;

(vi)    a termination of the Confidentiality Agreement made by Seller and Ennis, Inc. dated May 10, 2013;

(vii)   executed counterpart of the Purchaser's Lease;

21

(viii)   such other documents, instruments and agreements as are reasonably necessary or desirable by Seller in order to consummate the transactions contemplated hereunder; and

(ix)   an executed counterpart of Form 8594; .

(d)   **Accuracy of Representations and Warranties**.  Each of the representations and warranties of Purchaser contained in this Agreement or in any Purchaser Related Agreement shall be true, complete and correct in all material respects (other than representations and warranties subject to "materiality" or "Material Adverse Effect" qualifiers, which shall be true, complete and correct as stated) both when made and on and as of the Closing as if made at and as of the Closing (other than representations and warranties which address matters only as of a certain date which shall have been true, complete and correct as of such certain date).

## ARTICLE 7

### ADDITIONAL COVENANTS

7.1   **Restrictive Covenants Applicable to Seller and Affiliates**.   Except in connection with services performed for or on behalf of Purchaser or any of its affiliates, neither Seller, nor Mark Wright or any entity directly or indirectly controlling, controlled by or under common control with Seller (either Mark Wright or any such entity, a "**Seller Affiliate**"), shall, either directly or indirectly, on such Seller's own account or as an independent contractor, employee, consultant, agent, partner, joint venturer, member, owner, officer, director or stockholder of any other person, firm, corporation, partnership, limited liability company, association or other entity, or in any other capacity, in any way:

(a)   **Non-Competition**.  For two (2) years from and after the Closing Date (the "**Restricted Period**") conduct, engage in, or aid or assist anyone in the conduct of a business which is directly competitive with the Business as conducted during the twelve (12) month month period immediately precedng the Closing Date, within the continental United States of America (collectively, the "**Territory**"); provided, however, that the conduct of business which is competitive with the Business through an Internet based marketing site being developed by Seller under the working name "Boxes In A Click" shall not be deemed to be a violation of this restrictive covenant.

(b)   **Non-Solicitation of Customers**.  During the Restricted Period, terminate, solicit, divert, take away or accept orders from, or attempt to solicit, divert, take away or accept orders from, any person, firm, corporation, partnership, limited liability company, association or other entity, wherever located, for whom Seller performed any services or to whom Seller sold any products within the eighteen (18) month period immediately preceding the date hereofprovided, however, that the conduct of business which solicits former customers of the Business through an Internet based marketing site being developed by Seller under the working name "Boxes In A Click" shall not be deemed to be a violation of this restrictive covenant.

22

(c)     **Non-Solicitation of Employees or Independent Contractors**.  During the Restricted Period, solicit, hire for employment or engage, or attempt to solicit, hire for employment or engage, any person who was an employee, independent contractor or consultant who was employed or engaged by Seller with respect to the Business within the twelve (12) month period immediately preceding the Closing Date; *provided, however,* that Seller and any Seller Affiliate may solicit, hire or engage such independent contractors or consultants to render services with respect to matters that are in no way related to or competitive with the Business; and *further provided* that Seller and any Seller Affiliate may, at any time, solicit, hire or engage any person who was an employee of Seller and who is not hired by Purchaser on the Closing Date, or any person who is terminated as an employee by Purchaser subsequent to the Closing Date.

(d)     **Non-Disclosure**.  At any time use, for the benefit of Seller or for any other person, firm, corporation, partnership, association or other entity, or divulge or disclose in any manner to any person, firm, corporation, partnership, association or other entity, the identity of the customers of Seller or Purchaser (from and after the Closing) or any of their respective affiliates any Confidential Information.  Notwithstanding anything to the contrary contained in this Agreement, the restrictions on the disclosure and use of the Confidential Information shall not apply to:

(i)     information or techniques which are or become available to the public other than through disclosure (whether deliberate or inadvertent) by any party in violation of any restrictive covenant or fiduciary duty to which such party is bound;

(ii)    disclosure of Confidential Information in judicial or administrative proceedings or other requirement of law to the extent Seller or a Seller Affiliate is legally compelled to disclose such information in the opinion of Seller's counsel, *provided* that Seller shall have used Seller's reasonable efforts, at Purchaser's sole expense, to obtain an appropriate protective order or other assurance of confidential treatment for the information required to be so disclosed;

(iii)   Confidential Information that is or becomes available to Seller or a Seller Affiliate from a third party who is under no confidential or fiduciary obligation to Purchaser or any affiliate of Purchaser with respect to such Confidential Information;

(iv)    the use, but not disclosure to third parties, of Confidential Information in the operation of the Affiliate Business; notwithstanding anything to the contrary contained herein, the restrictions on disclosure of Confidential Information shall not be interpreted to preclude the use in the operation of the Affiliate Business of any methods of operation, financial data, sources of supply, know how, pricing information, records, books, agreements, techniques, forms, procedures, systems, methods or processes, new product or service ideas or research, financial information or other trade secrets or confidential or proprietary information used in or relating to any Affiliate Business, even if such information

23

or material was also used by or in the possession of Seller with respect to the Business; or

(v)  the disclosure of Confidential Information in connection with submitting proof or evidence in any legal or administrative proceeding to enforce Seller's rights and remedies under this Agreement, the Lease or under any of the documents contemplated hereby or thereby.

7.2  **Restrictive Covenants Applicable to Purchaser and Affiliates**.  Neither Purchaser nor or any entity directly or indirectly controlling, controlled by or under common control with Purchaser (a "**Purchaser Affiliate**"), shall, either directly or indirectly, on such person's own account or as an independent contractor, employee, consultant, agent, partner, joint venturer, member, owner, officer, director or stockholder of any other person, firm, corporation, partnership, limited liability company, association or other entity, or in any other capacity, in any way:

(a)  **Non-Solicitation of Employees or Independent Contractors**.  During the Restricted Period, solicit, hire for employment or engage, or attempt to solicit, hire for employment or engage, any person who is an employee, independent contractor or consultant employed or engaged by Purchaser with respect to the Business during the Restricted Period; *provided, however,* that Purchaser and any Purchaser Affiliate may solicit, hire or engage such independent contractors or consultants to render services with respect to matters that are in no way related to or competitive with the Affiliate Business; and *further provided* that Purchaser and any Purchaser Affiliate may, at any time, solicit, hire or engage any person who is terminated as an employee by Seller subsequent to the Closing Date.

7.3  **Remedies for Seller's Breach**.  Seller (on its own behalf and on behalf of any Seller Affiliate) hereby agrees that the periods of time, geographical scope and other limitations provided for in Section 7.1 above are necessary to protect Purchaser and its successors and assigns in the use and employment of the goodwill respecting the Business. Seller further agrees that damages cannot adequately compensate Purchaser in the event of Seller's breach (or the breach by any Seller Affiliate) of any of the covenants contained in Section 7.1 above. Accordingly, Seller agrees (on its own behalf and on behalf of any such Seller Affiliate) that in the event of a breach of any of such covenants by Seller (or by any Seller Affiliate), Purchaser shall be entitled to obtain injunctive relief against Seller or such Seller Affiliate, without bond but upon due notice, in addition to such other relief as may appertain at law or in equity. Obtainment of any such injunction by Purchaser shall not be deemed an election of remedies or a waiver of any right to assert any other remedies Purchaser may have at law or in equity. The existence of any claim or cause of action of Seller against Purchaser, of whatever nature, shall not constitute a defense to the enforcement of these restrictive covenants. To the extent any of such restrictive covenants are deemed unenforceable by virtue of their scope, in terms of geographical area or length of time or otherwise, but may be made enforceable by limitations thereon, Seller agrees that the same shall be enforceable to the fullest extent permissible under the laws and public policies of the jurisdiction in which enforcement is sought. The parties hereto hereby authorize any court of competent jurisdiction to modify or reduce the scope of the restrictive covenants to the extent necessary to make such restrictive covenants enforceable.

24

7.4     **Remedies for Purchaser's Breach**.  Purchaser (on its own behalf and on behalf of any Purchaser Affiliate) hereby agrees that the periods of time, geographical scope and other limitations provided for in Section 7.1 above are necessary to protect Seller and its successors and assigns.  Purchaser further agrees that damages cannot adequately compensate Seller in the event of Purchaser's breach (or the breach by any Purchaser Affiliate) of any of the covenants contained in Section 7.2 above.  Accordingly, Purchaser agrees (on its own behalf and on behalf of any such Purchaser Affiliate) that in the event of a breach of any of such covenants by Purchaser (or by any Purchaser Affiliate), Seller shall be entitled to obtain injunctive relief against Purchaser or such Purchaser Affiliate, without bond but upon due notice, in addition to such other relief as may appertain at law or in equity.  Obtainment of any such injunction by Seller shall not be deemed an election of remedies or a waiver of any right to assert any other remedies Seller may have at law or in equity.  The existence of any claim or cause of action of Purchaser against Seller, of whatever nature, shall not constitute a defense to the enforcement of these restrictive covenants.     To the extent any of such restrictive covenants are deemed unenforceable by virtue of their scope, in terms of geographical area or length of time or otherwise, but may be made enforceable by limitations thereon, Purchaser agrees that the same shall be enforceable to the fullest extent permissible under the laws and public policies of the jurisdiction in which enforcement is sought.  The parties hereto hereby authorize any court of competent jurisdiction to modify or reduce the scope of the restrictive covenants to the extent necessary to make such restrictive covenants enforceable.

## ARTICLE 8

### INDEMNIFICATION AND SURVIVAL

8.1     **Indemnification of Purchaser**.  Subject to the limitations of the Indemnity Cap and the Indemnity Deductible, Seller shall indemnify, defend, and hold Purchaser, its parent corporation, Ennis, Inc., a Texas corporation, and their respective affiliates and each of their respective managers, members, directors, officers, shareholders, agents, employees, successors and assigns harmless from and against any and all Damages suffered, sustained or incurred by Purchaser or such other parties to the extent such Damages arise with respect to, arising from or in connection with, or alleged to result from, arise out of or in connection with:

(a)     a breach of any representation or warranty made by Seller and contained in this Agreement, any Related Agreement or any other document delivered by Seller to Purchaser hereunder or thereunder and not waived by Purchaser in writing;

(b)     a breach or nonperformance of any covenant, restriction or agreement made by or applicable to Seller or any Seller Affiliate and contained in this Agreement, any Related Agreement or other document delivered by Seller to Purchaser hereunder or thereunder and not waived by Purchaser in writing;

(c)     the operation of the Business prior to the Closing Date;

(d)     any Liability of Seller for which Purchaser becomes liable or which becomes a Lien on an Acquired Asset which was not correctly recorded on the Financial Statements or which was not disclosed by Seller, to Purchaser's Knowledge;

25

(e)     any Claim of any kind whatsoever, whether instituted or commenced prior to or after the Closing Date, and to the extent such Claim relates to, arises from or is in connection with the Retained Liabilities;

(f)     any Claim for Environmental Liability or Employment Liability against a Purchaser Indemnified Party to the extent such Claim pertains to the operation of the Business, the use of any of the Acquired Assets or the operation of a Leased Facility by Seller prior to the Closing Date;

(g)     any Claim for failure to file a Sales Tax Return related to the Business and any Claim for unpaid sales or excise Taxes due for operation of the Business prior to Closing;

(h)     the amount by which, as of September 30, 2013 and as of the Closing Date, Seller's Net Working Capital shall be less than 95% of Seller's Recent Average NWC.

8.2     **Indemnification of Seller**.  Subject to the limitations of the Indemnity Cap and the Indemnity Deductible, Purchaser shall indemnify, defend, and hold Seller, Mark Wright, Seller's affiliates and each of their respective managers, members, directors, officers, shareholders, agents, employees, successors and assigns harmless from and against any and all Damages suffered, sustained or incurred by Seller or such other parties to the extent such Damages arise with respect to, arising from or in connection with, or alleged to result from, arise out of or in connection with:

(a)     a breach of any representation or warranty made by Purchaser contained in this Agreement, any Purchaser Related Agreement or in any certificate or other document delivered by Purchaser hereunder or thereunder and not waived by Seller in writing; or

(b)     a breach or nonperformance of any covenant, restriction or agreement made by or applicable to Purchaser and contained in this Agreement, any Purchaser Related Agreement or in any certificate or other document delivered by Purchaser hereunder or thereunder and not waived by Seller in writing;

(c)     Purchaser's operations using the Assets or conducting the Business on or after the Closing Date;

(d)     any failure by Purchaser to pay or perform when due any of the Assumed Liabilities, any obligation under the Assigned Contracts or obligations related to the Customer Orders;

(e)     any Claim for failure to file a Sales Tax Return related to the Business which is due as a result of Purchaser's operation of the Business after the Closing, and any Claim for unpaid sales or excise Taxes due for operation of the Business after the Closing; or

(f)     any Claim for Environmental Liability or Employment Liability against a Seller Indemnified Party to the extent such Claim pertains to the use of the Acquired As-

sets, the operation of the Business or any of the Leased Facilities by Purchaser in the operation of Purchaser's business after the Closing Date.

8.3     **Indemnity Cap and Indemnity Deductible**.

(a)     The maximum aggregate liability for Seller for payment of Damages under this Article 8 shall be the Escrow Amount (the "**Indemnity Cap**"), with the exception of any liability for Seller which is based on Seller's fraud. The maximum aggregate liability for Purchaser for payment of Damages under this Article 8 shall be the amount of the Indemnity Cap, with the exception of any liability for Purchaser which is based on Purchaser's fraud.

(b)     The Liability of Seller for indemnifiable Damages pursuant to this Article 8 shall not be payable unless and until the aggregate amount of Damages suffered or incurred by Purchaser exceeds Fifty Thousand Dollars ($50,000.00) (the "**Basket Amount**"); thereafter, Seller shall be responsible for the payment of Damages in excess of the Basket Amount subject to the limitations set forth in this Section 8.3; provided, that any Damages arising from a breach of the representations and warranties or indemnification obligations contained in the following sections shall not be subject to, or limited by the Basket Amount: Section 8.1(c), (d), (e), (g) and (h), and Sections 3.1, 3.2, 3.10, 3.12 and 3.22.

(c)     The Liability of Purchaser for indemnifiable Damages pursuant to this Article X shall not be payable unless and until the aggregate amount of Damages suffered or incurred by Seller exceeds the Basket Amount; thereafter, Purchaser shall be responsible for the payment of Damages in excess of the Basket Amount subject to the limitations set forth in this Section 8.3; provided, that any Damages arising from a breach of the representations and warranties or indemnification obligations contained in the following sections shall not be subject to, or limited by the Basket Amount: Section 8.2(c), (d) and (e), and Sections 4.1, 4.2 and 4.6.

8.4     **Procedure for Indemnification**.

(a)     The party or parties which are entitled to be indemnified under this Article 8 (individually or collectively the "**Indemnified Party**") shall promptly give written notice to the indemnifying party after obtaining actual knowledge of any claim as to which recovery may be sought against the indemnifying party because of the indemnity in this Article 8. If such notice is given after the expiration of the Indemnity Claim Window, then the indemnifying party shall have no obligation under this Article 8 to assume the responsibility for indemnification for such claim. If such indemnity shall arise from the claim of a third party, the Indemnified Party shall permit the indemnifying party to assume the defense of any such claim and any litigation resulting from such claim with counsel reasonably acceptable to the Indemnified Party. Notwithstanding the foregoing, the right to indemnification hereunder shall not be affected by any failure of an Indemnified Party to give such notice or delay by the Indemnified Party in giving such notice unless, and then only to the extent that, the rights and remedies of the indemnifying party shall have been prejudiced as a result of the failure to give, or delay in giving, such no-

27

tice. Failure by an indemnifying party to notify an Indemnified Party of its election to defend any such claim or action by a third party within twenty-one (21) days after notice thereof shall have been given to the indemnifying party shall be deemed a waiver by the indemnifying party of its right to defend such claim or action. If the indemnifying party elects to assume the defense of any such claim, the Indemnified Party shall have no further right to indemnification hereunder with respect to claims consisting of its legal fees and expenses, so long as the indemnifying party is continuing to defend such claim in good faith. With respect to any claim by a third party, upon the written request of the indemnifying party, the Indemnified Party shall make available to the indemnifying party all relevant information in the possession of the Indemnified Party that may be material to such claim.

(b)     If the indemnifying party assumes the defense of such claim or litigation resulting therefrom, the obligations of the indemnifying party hereunder as to such claim shall include taking all steps reasonably necessary in the defense or settlement of such claim or litigation and holding the Indemnified Party harmless from and against any and all damages caused by or arising out of any settlement approved by the indemnifying party or any judgment in connection with such claim or litigation. The indemnifying party shall not, in the defense of such claim or any litigation resulting therefrom, consent to entry of any judgment (other than a judgment of dismissal on the merits without costs) except with the written consent of the Indemnified Party, which shall not be unreasonably withheld or delayed, or enter into any settlement (except with the written consent of the Indemnified Party, not to be unreasonably withheld or delayed) which does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party of a release from all liability in respect of such claim or litigation. If the Indemnified Party elects to reject a settlement or compromise proposed by the indemnifying party, where the claim or cause of action can be resolved solely by the payment of monetary damages, the indemnifying party shall have no further obligation to defend the claim and the indemnifying party's indemnification liability to the Indemnified Party with respect to such claim shall be no more than the highest bona fide offer by the indemnifying party to settle or compromise any claim where the claimant states in writing that such offer of settlement or compromise is unconditionally acceptable to it but the settlement or compromise is prevented from occurring by any action or a withholding of consent or approval on the part of the Indemnified Party.

(c)     If the indemnifying party shall not assume the defense of any such claim by a third party or litigation resulting therefrom after receipt of notice from such Indemnified Party, the Indemnified Party may defend against such claim or litigation in such manner as it deems appropriate; provided, however, that the Indemnified Party shall not agree to any settlement of such claim or litigation without the prior written consent of the indemnifying party, not to be unreasonably withheld or delayed.

(d)     The indemnifying party shall promptly reimburse the Indemnified Party for the amount of any judgment rendered with respect to any claim by a third party in such litigation and for all damages incurred by the Indemnified Party in connection with the defense against such claim or litigation, whether or not resulting from, arising out of, or incurred with respect to, the act of a third party.

28

8.5 **Survival of Representations and Warranties**. The representations, warranties, covenants and agreements of the Parties shall survive the Closing for a period of two (2) years. No party shall be entitled to recover Damages or to receive indemnification for breach of representation or warranty to the extent such Party had actual knowledge that of the inaccuracy of the representation and warranty as of the Closing Date.

8.6 **Lost Profits and Special Damages**. Notwithstanding any other provision of this Agreement to the contrary, no party hereto shall be required to indemnify, hold harmless or otherwise protect Purchaser Indemnified Party or Seller Indemnified Party, as the case may be, for damage to reputation, lost business opportunities, lost profits, mental or emotional distress, incidental, special, consequential, punitive exemplary or indirect damages, interference with business operations or diminution of the value of property, except to the extent such claims are recovered by a third party.

8.7 **Exclusive Remedy for Breach of Representation or Warranty**. The sole and exclusive remedy with respect to any and all claims arising under this Agreement for breach of representation and warranty shall be pursuant to the indemnification provisions set forth in this Article 8. In furtherance of the foregoing, the parties on behalf of themselves and their respective Seller Indemnified Parties and Purchaser Indemnified Parties hereby waive any and all other rights, claims and causes of action they may have against any other party or its officers, directors, employees, agents, and affiliates relating to any misrepresentation or breach of any representation or warranty under this Agreement.

## ARTICLE 9

### DEFINITIONS

9.1 **Definitions**. Terms defined in this Agreement shall have the meanings assigned to them in the text where the term is defined or in Schedule A.

9.2 **Rules of Interpretation**. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a) Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(b) Dollars. Any reference in this Agreement to $ shall mean U.S. dollars.

(c) Exhibits/Schedules. The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

29

(d)  Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(e)  Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(f)  Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(g)  Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(h)  Commercially Reasonable Efforts. For purposes of this Agreement, the term "commercially reasonable efforts" shall not be deemed to require a person to undertake extraordinary or unreasonable measures to achieve a result, including the payment of amounts which would be materially in excess of what would customarily be expected to accomplish that result.

## ARTICLE 10

### MISCELLANEOUS

10.1  **Written Agreement to Govern.** This Agreement, together with all Exhibits, Schedules and other documents, instruments and agreements delivered pursuant hereto and thereto, sets forth the entire understanding of the parties hereto and supersedes all prior oral or written agreements among the parties hereto relating to the subject matter contained herein and therein, and all prior and contemporaneous discussions among the parties hereto are merged herein and therein. No party hereto shall be bound by any definition, condition, representation, warranty, covenant or provision other than as expressly stated in this Agreement or the Exhibits and other documents, instruments and agreements delivered pursuant hereto or thereto, or as hereafter set forth in a written instrument executed by such party or by a duly authorized representative of such party.

10.2  **Severability.** If any court of competent jurisdiction at any time deems any of the covenants set forth in this Agreement not fully enforceable, the other provisions of this Agreement will nevertheless stand and to the full extent consistent with law continue in full force and effect, and it is the intention and desire of the parties that the court treat any provisions of this Agreement which are not fully enforceable as having been modified to the extent deemed necessary by the court to render them reasonable and enforceable and that the court enforce them to such extent.

10.3 **Notice**. Any notice, consent, waiver and other communications required or permitted pursuant to the provisions of this Agreement must be in writing and will be deemed to have been properly given (a) when delivered by hand; (b) three (3) days after sent by certified mail, postage prepaid, return receipt requested; or (c) one (1) day after deposit with a nationally recognized overnight delivery service, to the addresses and telecopier numbers listed below unless another address or telecopier number is provided in writing by either party.

**If to Purchaser:**

Crabar/GBF, Inc.
2441 Presidential Pkwy.
Midlothian, TX 76065
Attn.: Michael D. Magill, Vice President

**with a copy to:**

Kenneth Hartmann, Esq.
2580 Foxfield Drive
Suite 104
St. Charles, IL 60174

**If to Seller:**

Wright Printing Co.
11616 I Street
Omaha, NE 68137
Attn.: Mark Wright

**with a copy to:**

Gary Gotsdiner, Esq.
McGill, Gotsdiner, Workman & Lepp, P.C., L.L.O.
11404 W Dodge Road, Suite 500
Omaha, Nebraska 68154-2584

10.4 **Law to Govern**. The validity construction and enforceability of this Agreement shall be governed in all respects by the laws of the State of Delaware, without regard to its conflict of laws rules.

10.5 **Binding Effect**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and assigns.

10.6 **Assignment**. This Agreement may not be assigned or transferred by any party without the prior written consent of the non-assigning party.

10.7 **Further Assurances**. At any time on or after the Closing Date, the parties hereto shall each perform such acts, execute and deliver such instruments, assignments, endorsements

31

and other documents and do all such other things consistent with the terms of this Agreement as may be reasonably necessary or desirable to accomplish the transactions contemplated hereunder or otherwise carryout the purposes hereof.

10.8 **No Third Party Beneficiaries**. Except as otherwise expressly provided in this Agreement, this Agreement is intended for the sole and exclusive benefit of the parties hereto, and no other person shall have any right to rely hereon or derive any benefit herefrom absent the express written consent of the party to be charged therewith.

10.9 **Modification; Waiver**. This Agreement may not be amended or modified unless such amendment or modification is reduced to writing and signed by the parties. No term or condition of this Agreement will be deemed to have been waived, except by the written instrument of the party charged with such waiver. No such written waiver will be deemed to be a continuing waiver unless specifically stated therein, and each such waiver will operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

10.10 **Counterparts; Facsimile**. This Agreement may be executed in counterparts, and each of which shall constitute an original instrument, but all such together shall constitute one and the same agreement. Signature by facsimile is hereby authorized.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first written above.

PURCHASER:

**CRABAR/GBF, INC.,** a Delaware corporation

By: _____

Name: Michael D. Magill

Its: Vice President

SELLER:

**WRIGHT PRINTING CO.,** a Nebraska corporation

By: _____

Name: Mark Wright

Its: President

33

## SCHEDULE A

### LIST OF DEFINED TERMS

"Accounts Receivable" means: (i) all trade accounts receivable and other rights to payment from customers of Seller and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of Seller; (ii) all other accounts or notes receivable of Seller and the full benefit of all security for such accounts or notes; and (iii) any Claim, remedy or other right related to any of the foregoing.

"Acquired Assets" is defined in Section 1.2 of the Agreement.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person provided that, for purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Affiliate Business" is defined in the Recitals of the Agreement.

"Assets" means properties, rights, interests and assets of every kind, real, personal or mixed, tangible and intangible, used or usable by Seller in the Business and located at the Omaha Facility.

"Assigned Contracts" is defined in Section 1.2(g) of the Agreement.

"Assumed Liabilities" is defined in Section 1.4 of the Agreement.

"Assumed Payroll Liabilities" is defined in Section 1.4 of the Agreement.

"Basket Amount" is defined in Section 8.3 of the Agreement.

"Benefit Plans" means all employee benefit plans as defined in Section 3(3) of ERISA and all other employee benefit arrangements, obligations, customs, or practices (including but not limited to a payroll practice), whether or not legally enforceable, to provide benefits, other than salary, as compensation for services rendered, to current or former directors, employees or agents of Seller or an ERISA Affiliate, including, without limitation, employment agreements, severance agreements, executive compensation arrangements, incentive programs or arrangements, sick leave, vacation pay, severance pay policies, plant closing benefits, salary continuation for disability, consulting or other compensation arrangements, workers' compensation, deferred compensation, bonus, stock option or purchase, hospitalization, medical insurance, life insurance, tuition reimbursement or scholarship programs, any plans providing benefits or payments in the event of a change of control, change in ownership, or sale of a substantial portion (including all or substantially all) of the assets of any business of Seller, other than Multiemployer Plans, maintained by Seller or an ERISA Affiliate or to which Seller or an ERISA Affiliate has contributed or is or was obligated to make payments, in each case with respect to any current or former employees, directors or agents of Seller or an ERISA Affiliate in the six-year period before the date of this Agreement.

"Bill of Sale" is defined in <u>Section 6.1(c)</u> of the Agreement.

"Business" is defined in the first Recital clause of the Agreement.

"Claim" shall mean claim, suit, action or cause of action, investigation or proceeding.

"Closing" is defined in <u>Section 1.6</u> of the Agreement.

"Closing Date" is defined in <u>Section 1.6</u> of the Agreement.

"Code" means the Internal Revenue Code of 1986, as it may be amended from time to time, and any successor thereto. Any reference herein to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of future law.

"Confidential Information" is defined in <u>Section 5.1(c)</u> of the Agreement.

"Customer Orders" is defined in <u>Section 5.5</u> of the Agreement.

"Damages" shall mean any and all costs, expenses, losses, direct or indirect damages, fines, penalties or liabilities (including, without limitation, interest which may be imposed by a court in connection therewith), income taxes with respect to any indemnification payments hereunder, court costs, litigation expenses, reasonable attorneys' and paralegals' fees, arbitrators' fees, costs of investigation and proof of facts and other costs of litigation or arbitration, whether or not such litigation or arbitration is commenced and accounting fees.

"Domain Names" is defined in <u>Section 1.2(g)</u> of the Agreement.

"Employee Pension Benefit Plans" is defined in Section 3(2) of ERISA, subject to Title IV of ERISA or Section 412 of the Code.

"Employee Welfare Benefit Plan" has the meaning set forth in ERISA §3(1).

"Employment Liability" shall mean any Liability in respect of salary, payroll, Benefit Plans, severance payments and other compensation and all taxes and withholdings related thereto.

"Environmental Law" means any statute, regulation, rule, code, common law, Order or judgment of any applicable federal, state, local or foreign jurisdiction relating to pollution, hazardous substances, hazardous wastes, petroleum or otherwise relating to protection of the environment, natural resources or human health, including, by way of example and not by way of limitation, the Clean Air Act, the Clean Water Act, the Resource Conservation Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Toxic Substances Control Act, and the Emergency Planning and Community Right-to-Know Act, all as currently amended.

"Environmental Liability" shall mean any Liability based upon, arising out of or relating to any Environmental Law, including all penalties and other sanctions, all removal, remediation and cleanup costs, investigatory costs, governmental response costs, natural resource damages, property damages, personal injury damages and all other costs and damages relating to alleged or actual violations of Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business the employees of which, together with the employees of Seller, are treated as employed by a single employer under Section 414(b), (c), (m) or (o) of the Code.

2

"Escrow Agent" is defined in <u>Section 2.1(b)</u> of the Agreement.

"Escrow Agreement" is defined in <u>Section 2.1(b)</u> of the Agreement.

"Escrow Amount" is defined in <u>Section 2.1(b)</u> of the Agreement.

"Excluded Assets" is defined in <u>Section 1.3</u> of the Agreement.

"Facility Owner" means 11616 I Street, LLC.

"Financial Statements" is defined in <u>Section 3.5</u> of the Agreement.

"Form 8594" is defined in Section   of the Agreement.

"GAAP" means generally accepted accounting principles applied on a consistent basis in effect on the date hereof as set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States.

Governmental Authorities" means all agencies, authorities, bodies, boards, commissions, courts, instrumentalities, legislatures and offices of any nature whatsoever of any government, quasi-governmental unit or political subdivision, whether foreign, federal, state, county, district, municipality, city or otherwise.

"Hazardous Material" means any substance, material or waste that is regulated, classified, or otherwise characterized under or pursuant to any Environmental Law as "hazardous," "toxic," "pollutant," "contaminant," "radioactive," or words of similar meaning or effect, including without limitation, petroleum and its by-products, asbestos, polychlorinated biphenyls, radon, mold, urea formaldehyde insulation.

"Identified Intellectual Property" is defined in <u>Section 1.2</u> of the Agreement.

"Indemnity Cap" is defined in <u>Section 8.3</u> of the Agreement.

"Indemnified Parties" is defined in <u>Section 8.4</u> of the Agreement.

"Intangible Property" is defined in <u>Section 1.2(g)</u> of the Agreement.

"Intellectual Property" is defined in <u>Section 1.2</u> of the Agreement.

"Inventory" is defined in <u>Section 1.2(b)</u> of the Agreement.

"Knowledge" means the actual knowledge of a particular fact or other matter being possessed as of the pertinent date, without any obligation of additional inquiry.

"Laws" means any Federal, state, foreign or local statute, law, ordinance, regulation, rule, code, order entered by a court of competent jurisdiction applicable to a Party or that Party's property, and any other requirement or rule of law.

"Lease" is defined in <u>Section 3.16</u> of the Agreement.

"Liabilities" shall mean any and all claims, debts, liabilities, obligations and commitments of any nature whatsoever, whether known or unknown, asserted or unasserted, fixed, absolute or contingent, primary or secondary, matured or unmatured, accrued or unaccrued, liquidated or unliquidated or due or to become due, whenever or however arising and whether or not the same

would be required by GAAP to be reflected as a liability in financial statements or disclosed in the notes thereto.

"Lien" means any mortgage, lien (including mechanics, warehousemen, laborers and landlords liens), claim, pledge, charge, community property interest, condition, equitable interest, security interest, preemptive right, right of first refusal or similar restriction or right, option, judgment, title defect or encumbrance of any kind.

"Machinery and Equipment" is defined in Section 1.2(a) of the Agreement.

"Material Adverse Effect" means, with respect to Seller, any change in or effect on the Business that, individually or in the aggregate (taking into account all other such changes or effects), is, or is reasonably likely to be, materially adverse to the Business, Assets, Liabilities, financial condition, results of operations or prospects of Seller, taken as a whole

"Most Recent Financial Statement" is defined in Section 3.5 of the Agreement.

"Most Recent Fiscal Month End" is defined in Section 3.5 of the Agreement.

"Multiemployer Plan" means any multiemployer plan as defined in Section 3(37) of ERISA or a plan subject to Section 413(b) and (c) of the Code, to which Seller or an ERISA Affiliate has contributed or is or was obligated to make payments, in each case with respect to any current or former employees of Seller or an ERISA Affiliate before the Closing Date.

"Names" is defined in Section 1.2(g) of the Agreement.

"Net Working Capital" means, for any Person, that Person's current assets (other than cash, cash equivalents or Excluded Assets) minus current liabilities, as set forth in Schedule 3.9.

"Omaha Facility" is defined in the third Recital clause of the Agreement.

"Ordinary Course of Business" means the ordinary and usual course of day to day operations of the business as conducted prior to the Closing.

"Parties" means Seller and Purchaser.

"Person" means an individual, corporation, partnership, limited partnership, limited liability company, limited liability partnership, syndicate, person (including a "person" as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, together with the rules and regulations promulgated thereunder), trust, association, entity or government or political subdivision, agency or instrumentality of a government.

"Proprietary Software" is defined in Section 3.14 of the Agreement

"Purchase Price" is defined in Section 2.1 of the Agreement.

"Purchaser" is Crabar/GBF, Inc., a Delaware corporation.

"Purchaser's Knowledge" means the Knowledge of Mr. Michael D. Magill and Mr. Rick Travis.

"Purchaser's Lease" is defined in Section 6.1(d) of the Agreement.

"Qualifying Accounts Receivable" is defined in Section 1.2(c) of the Agreement.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching into the indoor or outdoor environment, or into or out of any

4

property.

"Retained Liabilities" is defined in <u>Section 1.5</u> of the Agreement.

"Retained Payroll Liabilities" is defined in <u>Section 1.5</u> of the Agreement.

"Sales Tax Returns" is defined in <u>Section 3.10</u> of the Agreement.

"Seller" is Wright Printing Co., a Nebraska corporation.

"Seller Affiliate" is defined in <u>Section 7.1</u> of the Agreement.

"Seller's Employees" is defined in <u>Section 5.3</u> of the Agreement.

"Seller's Knowledge" means the Knowledge of Mr. Mark Wright and Mr. Tom Nicholson.

"Seller's Recent Average NWC" is defined in <u>Section 3.9</u> of the Agreement.

"Seller Related Agreements" is defined in <u>Section 3.2</u> of the Agreement

"Successor Liability" is defined in <u>Section 3.21</u> of the Agreement.

"Subsidiary," with respect to Seller, any corporation, partnership, limited partnership, limited liability company, limited liability partnership, joint venture or other legal entity of which Seller (either alone or through or together with any other subsidiary) owns, directly or indirectly, a majority of the stock or other equity interests.

"Taxes" means: (i) any and all taxes, fees, levies, duties, tariffs, imposts and other charges of any kind, imposed by any Governmental Authority or taxing authority, including taxes or other charges on, measured by, or with respect to income, franchise, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation or net worth; taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value-added or gains taxes; license, registration and documentation fees; and customers' duties, tariffs and similar charges; (ii) any Liability for the payment of any amounts of the type described in (i) as a result of being a member of an affiliated, combined, consolidated or unitary group for any Taxable period; (iii) any Liability for the payment of amounts of the type described in (i) or (ii) as a result of being a transferee of, or a successor in interest to, any Person or as a result of an express or implied obligation to indemnify any Person; and (iv) any and all interest, penalties, additions to tax and additional amounts imposed in connection with or with respect to any amounts described in (i), (ii) or (iii).

"Territory" is defined in <u>Section 7.1</u> of the Agreement.

5

**EXHIBIT D**

TO THAT CERTAIN ASSET PURCHASE AND SALE AGREEMENT
DATED AS OF SEPTEMBER 23, 2013

<u>TRADEMARK ASSIGNMENT</u>

## TRADEMARK ASSIGNMENT

THIS TRADEMARK ASSIGNMENT ("Assignment"), is made and entered into is entered into as of September 30, 2013 (the "Effective Date"), by and among WRIGHT PRINTING CO., a Nebraska corporation ("Assignor"), in favor of CRABAR/GBF, INC., a Delaware corporation ("Assignee").

WHEREAS, Assignor is the owner of and has adopted, used and is using the trademark or trademarks which are identified on Schedule A (the "Marks"); and

WHEREAS, Assignee desires to acquire all of Assignor's right, title and interest in and to the Marks, including any applications and/or registrations thereon, together with the goodwill of the business in connection with which the Marks are used and which is symbolized by the Marks, along with the right to recover for damages and profits for past infringement thereof.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby sell, grant, assign, transfer, convey and deliver to Assignee all of its right, title and interest it may possess in and to the Marks. Assignor also authorizes Assignee, in the case of any Marks hereby assigned which have been registered with the United States Patent and Trademark Office, to file electronic assignments of those registered Marks with the USPTO in the Electronic Trademark Assignment System.

IN WITNESS WHEREOF, the Assignor and the Assignee have caused this Assignment to be executed on the date and year first above written.

ASSIGNOR:

WRIGHT PRINTING CO., a Nebraska corporation

By: _Mark Wright_
Name: Mark Wright
Title: President

ASSIGNEE:

CRABAR/GBF, INC., a Delaware corporation

By: _____
Name: Michael D. Magill
Title: Vice President

## TRADEMARK ASSIGNMENT

THIS TRADEMARK ASSIGNMENT ("Assignment"), is made and entered into is entered into as of September 30, 2013 (the "Effective Date"), by and among **WRIGHT PRINTING CO.**, a Nebraska corporation ("Assignor"), in favor of **CRABAR/GBF, INC.**, a Delaware corporation ("Assignee").

WHEREAS, Assignor is the owner of and has adopted, used and is using the trademark or trademarks which are identified on Schedule A (the "Marks"); and

WHEREAS, Assignee desires to acquire all of Assignor's right, title and interest in and to the Marks, including any applications and/or registrations thereon, together with the goodwill of the business in connection with which the Marks are used and which is symbolized by the Marks, along with the right to recover for damages and profits for past infringement thereof.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby sell, grant, assign, transfer, convey and deliver to Assignee all of its right, title and interest it may possess in and to the Marks. Assignor also authorizes Assignee, in the case of any Marks hereby assigned which have been registered with the United States Patent and Trademark Office, to file electronic assignments of those registered Marks with the USPTO in the Electronic Trademark Assignment System.

IN WITNESS WHEREOF, the Assignor and the Assignee have caused this Assignment to be executed on the date and year first above written.

ASSIGNOR:

WRIGHT PRINTING CO., a Nebraska corporation

By: _____
Name: Mark Wright
Title: President

ASSIGNEE:

CRABAR/GBF, INC., a Delaware corporation

By: Michael D. Magill
Name: Michael D. Magill
Title: Vice President

SCHEDULE A

| Word Mark | Type of Mark | Serial Number | Registration No. | Registration Date |
|-----------|--------------|---------------|------------------|-------------------|
| Folder Express | Word Mark | 75470175 | 2247736 | May 25, 1999 |
| Think Fast | Service Mark | 76308086 | 2582110 | June 18, 2002 |
| Sculptured Pockets | Trade Mark | 77395742 | 3614618 | May 5, 2009 |



**MCGILL, GOTSDINER,**
**WORKMAN & LEPP, P.C., L.L.O.**

ATTORNEYS AT LAW

11404 West Dodge Road, Suite 500
Omaha, Nebraska 68154-2584
P (402) 492-9200
F (402) 492-9222

mgwl.com

GARY M. GOTSDINER
ATTORNEY
garygotsdiner@mgwl.com

August 14, 2013

### PERSONAL AND CONFIDENTIAL

**VIA CERTIFIED MAIL**

President
POCKET FOLDER EXPRESS
3455 Peachtree Industrial Blvd, Suite 305-235
Duluth, GA 30096

> RE:  Folder Express
> Our File No.: 4804-0136

Dear Sir:

Our firm represents Wright Printing Co. which owns and utilizes the federally registered mark *Folder Express* in connection with its business of marketing custom folders to various customers. Recently our client became aware that your business is operating in Duluth, Georgia under the name Pocket Folders Express.

It appears that your business is engaged in business directly competitive with that of our client and that similar customers are serviced by each party. Given the strong similarity in your business name and our client's mark, and the same industry and customers who will come in contact with these products, the likelihood of confusion in this case is clear. As a result your company's operation under the name Pocket Folders Express, and use of the domain name pocketfoldersexpress.com constitute an infringement of our client's mark, and may additionally constitute unfair competition under applicable state law.

Your adoption of the name Pocket Folder Express, appears to have been substantially after our client's registration of its mark in 1999. You were therefore on constructive notice of its existence, if not actual notice. As the owner of the federally registered mark *Folder Express*, our client is entitled not only to injunctive relief, but is also permitted to seek monetary relief in the form of the recovery of damages and your company's profits, the cost of the legal action, and potentially the recovery of treble damages.

Consequently, demand is hereby made upon you to immediately cease and desist any and all future use of the name Pocket Folders Express or the domain name pocketfoldersexpress.com,

#530502_1.DOCX



LEGUS
MEMBER INTERNATIONAL
**EXHIBIT**
**3**



POCKET FOLDERS EXPRESS
August 14, 2013
Page 2

and confirm the same to the undersigned in writing within ten (10) days of the date of this letter. In the event you fail to comply with these demands, we will advise Wright Printing of all legal avenues available to it to protect its interests.

Nothing contained herein is to be construed as a waiver of any rights, remedies or recourse available in relation to this matter. You are advised to govern yourself accordingly.

Very truly yours,

Gary M. Gotsdiner
FOR THE FIRM

cc:   Doug Boysen (via email)
      Mark Wright (via email)

#S30502_1.DOCX

## RELEASE AND WAIVER AGREEMENT

THIS RELEASE AND WAIVER AGREEMENT (the "**Agreement**") is made and entered into effective this 25th day of June, 2015, by and between **WRIGHT PRINTING CO.**, a Nebraska corporation ("**Seller**"), and **CRABAR/GBF, INC.**, a Delaware corporation ("**Purchaser**").

WHEREAS, Purchaser and Seller entered into that certain Asset Purchase and Sale Agreement dated September 23, 2013 (the "**Purchase Agreement**") relating to the sale of substantially all assets of the Wright Printing division of Seller;

WHEREAS, in connection with the Purchase Agreement, Seller made certain representations and warranties, and provided certain indemnifications or other obligations, which survived the Closing thereunder;

WHEREAS, the parties additionally entered into that certain Escrow Agreement with Bank of America, National Association, dated September 30, 2013 (the "**Escrow Agreement**") funding the escrow as of Closing under the Purchase Agreement (which escrow contained approximately $1,125,783.00 as of April 30, 2015), and subsequent thereto, Purchaser asserted a claim on or about September 16, 2014 for $54,618.03 based upon the terms of the Purchase Agreement (the "**Pending Claim**");

WHEREAS, Purchaser (as assignee) and 11616 "I" Street, LLC ("**Landlord**") are parties to that certain Lease Agreement dated May 1, 1998, as amended, which is scheduled to terminate on September 30, 2014, but which Purchaser and Landlord have agreed to extend pursuant to that certain Fourth Amendment to Lease Agreement dated concurrent herewith (collectively with all amendments, including the Fourth Amendment, the "**Lease Agreement**") subject to certain conditions, including execution of this Agreement and release of funds from the escrow account under the Escrow Agreement, all as more fully set forth herein.

NOW THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      **Recitals.** The foregoing recitals are incorporated herein as a substantive, contractual part of this Agreement.

2.      **Amendment to Purchase Agreement.** Purchaser and Seller hereby agree to amend, and by this Agreement do hereby amend the Purchase Agreement as follows:

        a.      Section 8.5 of the Purchase Agreement is hereby amended to reflect that Seller's representations and warranties, and the right of the Purchaser

#633632_6.DOCX


EXHIBIT
4

to assert any claims for indemnification with respect thereto shall (and hereby do) unconditionally terminate as of the date hereof.

b.     Section 8.5 of the Purchase Agreement is hereby amended to reflect that Purchaser's representations and warranties, and the right of the Seller to assert any claims for indemnification with respect thereto shall (and hereby do) unconditionally terminate as of the date hereof.

c.     In addition, except as otherwise provided in this Agreement, all indemnification and other obligations of performance for which Seller is otherwise responsible under the Purchase Agreement from and after the date hereof, and Purchaser's rights to seek any recourse or remedy in relation thereto are hereby immediately terminated and cancelled by the parties and of no further force and effect.

d.     In addition, except as otherwise provided in this Agreement, all indemnification and other obligations of performance for which Purchaser is otherwise responsible under the Purchase Agreement from and after the date hereof, and Seller's rights to seek any recourse or remedy in relation thereto are hereby immediately terminated and cancelled by the parties and of no further force and effect.

e.     Notwithstanding the foregoing amendment, it is expressly agreed that the foregoing amendment shall not limit or otherwise amend the terms of the Restrictive Covenants Applicable to Seller and Affiliates under Section 7.1 of the Purchase Agreement or the Restrictive Covenants Applicable to Purchaser and Affiliates under Section 7.2 of the Purchase Agreement or the related remedies permitted for breach thereof as set forth under Sections 7.3 and 7.4 of the Purchase Agreement (the "**Continuing Obligations**").

3.     **Existing Claim.**  Purchaser represents to Seller that, except for the Pending Claim, Purchaser has not made and shall make no other claim for any damages against Seller under the Purchase Agreement.   The parties agree that concurrent herewith they shall deliver to the Escrow Agent joint termination instructions for termination of the Escrow Agreement and release of all funds under the escrow account thereof to provide payment to Purchaser of **$20,000.00** (less any unpaid escrow fees due from Purchaser) and the balance of the escrow account, estimated at approximately **$1,105,783.00** to be released to Seller (less any unpaid escrow fees due from Seller).  Upon payment to Purchaser of the above amount, the Pending Claim shall be deemed fully satisfied.

4.     **Waiver of Claims Against Seller Releasees.**  Purchaser for itself and on behalf of Ennis, Inc., and their respective affiliates and each of their respective present and former managers, directors, members, shareholders, officers, agents, employees, successors and assigns (the "**Purchaser Releasors**"), hereby waives any and all Claims (as defined in the Purchase Agreement) against Seller and the Seller Releasees

#633632_6.DOCX

(as defined below) which any of the Purchaser Releasors may have against any of the Seller Releasees under the Purchase Agreement.

5.      **Waiver of Claims Against Purchaser Releasees.**  Seller, for itself and its affiliates, and their respective present and former managers, directors, members, shareholders, officers, agents, employees, successors and assigns (the "**Seller Releasors**"), hereby waives any and all Claims against Purchaser and the Purchaser Releasees (as defined below) which any of the Seller Releasors may have against any of the Purchaser Releasees under the Purchase Agreement.

6.      **Release by Purchaser.**  Purchaser, for itself and for the Purchaser Releasors, hereby fully and finally releases and forever discharges Seller, its shareholders, directors, officers, affiliates, and successors and assigns (collectively, the "**Seller Releasees**"), of and from any and all manner of actions, causes of action, claims for relief, in law or in equity, suits, debts, torts, frauds, statutory relief and claims, anticipatory or actual breaches of contract, breaches of fiduciary duties, agreements, distributions, promises, liabilities, claims, demands, of any nature whatsoever, known or unknown, fixed or contingent, including but not limited to any alleged violations of any contract, express or implied, any covenant of good faith and fair dealing, express or implied, or any tort, common law or otherwise, based on the Purchase Agreement and rights, obligations, covenants and indemnities arising thereunder, which any Purchaser Releasor now has, owns or holds, or claims to have, own or hold (collectively, the "**Purchaser Claims**"), against the Seller Releasees or any of them or may hereafter acquire against the Seller Releasees or any of them; provided that such release shall not limit or restrict Purchaser's (i) rights to enforce this Agreement, (ii) right to enforce the Continuing Obligations, (iii) right to receive funds from escrow account as contemplated under Section 3 above, or (iv) right to enforce rights under the Lease Agreement.  Each of the Seller Releasees herein are hereby declared to be intended third-party beneficiaries hereunder, and shall have standing to enforce the rights and obligations set forth in this Section 4.

7.      **Release by Seller.**  Seller for itself and the Seller Releasors, hereby fully and finally releases and forever discharges Purchaser, its shareholders, directors, officers, affiliates, and successors and assigns (collectively, the "**Purchaser Releasees**"), of and from any and all manner of actions, causes of action, claims for relief, in law or in equity, suits, debts, torts, frauds, statutory relief and claims, anticipatory or actual breaches of contract, breaches of fiduciary duties, agreements, distributions, promises, liabilities, claims, demands, of any nature whatsoever, known or unknown, fixed or contingent, including but not limited to any alleged violations of any contract, express or implied, any covenant of good faith and fair dealing, express or implied, or any tort, common law or otherwise, based on the Purchase Agreement and rights, obligations, covenants and indemnities arising thereunder, which any Seller Releasor now has, owns or holds, or claims to have, own or hold (collectively, the "**Seller Claims**"), against the Purchaser Releasees or any of them or may hereafter acquire against the Purchaser Releasees or any of them; provided that such release shall not limit or restrict Seller's (i) rights to enforce this Agreement, (ii) right to enforce the Continuing Obligations, (iii) right to receive funds from escrow account as

contemplated under Section 3 above, or (iv) right to enforce rights under the Lease Agreement. Each of the Purchaser Releasees herein are hereby declared to be intended third-party beneficiaries hereunder, and shall have standing to enforce the rights and obligations set forth in this Section 5.

8.    **Mutual Indemnification and Defense.**    Purchaser shall indemnify, defend, and hold the Purchaser Releasees harmless from any expenses, damages or losses arising out of, relating to or in any way caused by any breach by Purchaser of the terms of this Agreement, including, without limitation, any representation, warranty, covenant or obligation contained herein or therein. Seller shall indemnify, defend, and hold Seller Releasees harmless from any expenses, damages or losses arising out of, relating to or in any way caused by any breach by Seller of the terms of this Agreement or any agreement contemplated by this Agreement, including, without limitation, any representation, warranty, covenant or obligation contained herein or therein.

9.    **Mutual Non-Disparagement.**    Seller, Purchaser and Mark Wright, who executes a Joinder to this Agreement to confirm his consent to the terms of this Section, hereby agree to the following terms (the "**Non-Disparagement Covenant**"):

a.    Each of Seller and Mark Wright agrees that, during the period commencing on the date of this Agreement and continuing for a period of two (2) years (the "Relevant Period"), neither Mark Wright, nor any of the officers of Seller or Affiliates (as defined in the Purchase Agreement) will, and Mark Wright will cause each of such persons not to, directly or indirectly, in any capacity or manner, make, express, transmit speak, write, verbalize or otherwise communicate in any way (or cause, further, assist, solicit, encourage, support or participate in any of the foregoing), any remark, comment, message, information, declaration, communication or other statement of any kind, whether verbal, in writing, electronically transferred or otherwise, that might reasonably be construed to be derogatory or critical of, or negative toward, the Purchaser or any of its directors, officers, Affiliates, subsidiaries, employees, agents or representatives (collectively, the "Purchaser Representatives"), or to malign, harm, disparage, defame or damage the reputation or good name of the Purchaser, its business or any of the Purchaser Representatives; provided the restriction with regard to officers of Seller or Affiliates shall only apply as long as Mark Wright holds a majority of the equity interest in such entities.

b.    Purchaser agrees that, during the period commencing on the date of this Agreement and continuing for the Relevant Period, neither it nor any of its Affiliates will, and it will cause each of its Affiliates not to, directly or indirectly, in any capacity or manner, make, express, transmit speak, write, verbalize or otherwise communicate in any way (or cause, further, assist, solicit, encourage, support or participate in any of the foregoing), any remark, comment, message, information, declaration, communication or other statement of any kind, whether verbal, in writing, electronically transferred or otherwise, that might reasonably be construed to be derogatory or critical of, or negative toward, Mr. Mark Wright or the Seller or any of Seller's directors, officers, Affiliates, subsidiaries, employees,

- 4 -

agents or representatives (collectively, the "Seller Representatives"), or to malign, harm, disparage, defame or damage the reputation or good name of Mr. Wright, the Seller, its business or any of the Seller Representatives.

10.   **Further Actions.**  Each of the parties hereto and their respective counsel shall promptly take such actions and execute, acknowledge, deliver and cause to be fully delivered  all such additional agreements, documents and instruments as may be reasonably necessary or appropriate to consummate or implement the settlement contemplated by this Agreement.

11.   **Miscellaneous.**

A.   All capitalized terms not otherwise defined herein shall have the meanings assigned under the Purchase Agreement.

B.   This Agreement may not be amended or modified except in writing and signed by all parties hereto.

C.   This Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns.

D.   This Agreement may be executed in one or more counterparts, each of which when so executed, shall be deemed to be an original and all of which counterparts of this Agreement, taken together, shall constitute but one and the same instrument.  Facsimile and other electronic signatures and initials on this Agreement shall be binding and enforceable.

*[Remainder of page intentionally left blank.]*

#633632_6.DOCX

- 5 -

**IN WITNESS WHEREOF**, the parties have executed this Release and Waiver Agreement effective as of the date first written above.

**SELLER:**                                          **PURCHASER:**

**WRIGHT PRINTING CO.**                              **CRABAR/GBF, INC.**

By: _Mark P Wright_                                  By: _____
Name:  Mark Wright                                   Name:  Michael D. Magill
Title:    President                                  Title:    Vice President

**IN WITNESS WHEREOF**, the parties have executed this Release and Waiver Agreement effective as of the date first written above.

SELLER:

WRIGHT PRINTING CO.

By: _____
Name:  Mark Wright
Title:   President

PURCHASER:

CRABAR/GBF, INC.

By: _____
Name:  Michael D. Magill
Title:   Vice President

#833632_6.DOCX

- 6 -

**JOINDER**

**THIS JOINDER IS ATTACHED TO AND MADE A PART OF THAT RELEASE AND WAIVER AGREEMENT DATED AS OF JUNE 25 2015 MADE BY WRIGHT PRINTING CO., A NEBRASKA CORPORATION, AND CRABAR/GBF, INC., A DELAWARE CORPORATION. TERMS DEFINED IN THE RELEASE AND WAIVER AGREEMENT ARE USED WITH THE SAME MEANINGS IN THIS JOINDER.**

Mark Wright hereby executes this Joinder to confirm his agreement with the Non-Disparagement Covenant provisions of the Agreement.

**MARK WRIGHT**

#833632_6.DOCX

May 15, 2017

Paul Shotkoski
Fraser Stryker PC LLO
409 S. 17th Street, #500
Omaha, NE 68102

Re: Civil Action No. 8:16-cv-00537
      Crabar/GBF, Inc. vs. Mark Wright and Wright Printing Co.

Dear Paul,

This letter is in response to a subpoena to produce documents, electronically stored information, or objects pertaining to Crabar/GBF, Inc. or Mark Wright, Mardra Sikora, and Wright Printing Co. which was served by Fraser Stryker PC LLO on May 10, 2017.

To the best of my ability I have submitted all original documents, communications, and any property relating to Civil Action No. 8:16-cv-00537 through the end of my employment with Crabar/GBF, Inc. on May 27, 2016.

The external drive was in my possession at home while I was working remotely from Council Bluffs, Iowa starting November 20, 2015. It was used to assist Crabar/GBF, Inc. in an efficient manner. After my leave it was intended to be wiped clean and used to store personal data.

Sincerely,

*Alexandra Kohlhaas*

Alexandra A. Kohlhaas

**EXHIBIT**

**5**

TPR 001182

# Acknowledgment of Information Security

# And

# Confidentiality Agreement

This form is used to acknowledge receipt of and compliance with the company's Information Security Policy and Confidentiality Agreement.

## Procedure

Complete the following steps:

1. Read the Information Security Policy.

2. Read the Confidentiality Agreement.

3. Initial the spaces provided below, Sign and date.

4. Return to the Corporate Human Resources Director.

## Initial

By initialing below, I agree to the following terms:

(i)   I have read a copy of the Information Security Policy and the Confidentiality Agreements and understand and agree to the same.

*Alexandra Kohlhaas*

**Employee Signature**

*Alexandra Kohlhaas*

**Employee Name**

*Prepress Specialist*

**Employee Title**

*Feb. 10, 2015*

**Date**

*Prepress*

**Department/Location**

**EXHIBIT**

**6**

# Security Policy

### *1.0      Overview*

Information Technology's intentions for publishing a Security Policy are not to impose restrictions that are contrary to Ennis' established culture of openness, trust and integrity.  IT is committed to protecting Ennis' employees, partners and the company from illegal or damaging actions by individuals, either knowingly or unknowingly. Internet/Intranet/Extranet-related systems, including but not limited to computer equipment, software, operating systems, storage media, network accounts providing electronic mail, WWW browsing, and FTP, are the property of Ennis. These systems are to be used for business purposes in serving the interests of the company, and of our clients and customers in the course of normal operations. Effective security is a team effort involving the participation and support of every Ennis employee and affiliate who deals with information and/or information systems. It is the responsibility of every computer user to know these guidelines, and to conduct their activities accordingly.

### *2.0      Purpose*

The purpose of this policy is to outline the acceptable use of computer equipment at Ennis in regards to security.  These rules are in place to protect the employee and Ennis. Inappropriate use exposes Ennis to risks including virus attacks, compromise of network systems and services, and legal issues.

### *3.0      Scope*

This policy applies to employees, contractors, consultants, temporaries, and other workers at Ennis, including all personnel affiliated with third parties. This policy applies to all equipment that is owned or leased by Ennis.

### 4.0 Policy

This policy is inclusive of the following policies or procedures and should be considered in whole:

- Network & Application Authorization Procedure (CP_00_1)
- Physical Security Policy
- Password Policy
- Anti-Virus Policy
- Dial-in Policy
- VPN Policy
- Licensing Policy

#### 4.1 General Use and Ownership

**1.** While Ennis' network administration desires to provide a reasonable level of privacy, users should be aware that the data they create on the corporate systems remains the property of Ennis. Because of the need to protect Ennis' network, management cannot guarantee the confidentiality of information stored on any network device belonging to Ennis.

**2.** Employees are responsible for exercising good judgment regarding the reasonableness of personal use. Individual departments are responsible for creating guidelines concerning personal use of Internet/Intranet/Extranet systems. In the absence of such policies, employees should be guided by departmental policies on personal use, and if there is any uncertainty, employees should consult their supervisor or manager.

**3.** Any information that is considered sensitive or vulnerable should be encrypted if possible. Sensitive information will not be sent or received electronically outside the Ennis network unless encrypted.



EXHIBIT

7

**4.** For security and network maintenance purposes, authorized individuals within Ennis may monitor equipment, systems and network traffic at any time.

**5.** Ennis reserves the right to audit networks and systems on a periodic basis to ensure compliance with this policy.

### 4.2 Security and Proprietary Information

**1.** The user interface for information contained on Internet/Intranet/Extranet-  related systems should be classified as either confidential or not confidential. Examples of confidential information include but are not limited to: company private, corporate strategies, competitor sensitive, trade secrets, specifications, customer lists, and research data. Employees should take all necessary steps to prevent unauthorized access to this information.

**2.** Keep passwords secure and do not share accounts. Authorized users are responsible for the security of their passwords and accounts. Refer to the Password Policy for details.

**3.** Because information contained on portable computers is especially vulnerable, special care should be exercised. Protect laptops in accordance with the security tips outlined in the Physical Security Policy.

**4.** Postings by employees from an Ennis email address to newsgroups should contain a disclaimer stating that the opinions expressed are strictly their own and not necessarily those of Ennis, unless posting is in the course of business duties.

**5.** All hosts used by the employee that are connected to the Ennis Internet/Intranet/Extranet, whether owned by the employee or Ennis, shall be continually executing approved virus-scanning software with a current virus database. Unless overridden by departmental or group policy.

**6.** Employees must use extreme caution when opening e-mail attachments received from unknown senders, which may contain viruses, e-mail bombs, or Trojan horse code.

### 4.3. Unacceptable Use

The following activities are, in general, prohibited. Employees may be exempted from these restrictions during the course of their legitimate job responsibilities (e.g., systems administration staff may have a need to disable the network access of a host if that host is disrupting production services).  Under no circumstances is an employee of Ennis authorized to engage in any activity that is illegal under local, state, federal or international law while utilizing Ennis-owned resources.

The lists below are by no means exhaustive, but attempt to provide a framework for activities which fall into the category of unacceptable use.

### 4.4 System and Network Activities

The following activities are strictly prohibited, with no exceptions:

**1.** Violations of the rights of any person or company protected by copyright, trade secret, patent or other intellectual property, or similar laws or regulations, including, but not limited to, the installation or distribution of "pirated" or other software products that are not appropriately licensed for use by Ennis.

**2.** Unauthorized copying of copyrighted material including, but not limited to, digitization and distribution of photographs from magazines, books or other copyrighted sources, copyrighted music, and the installation of any copyrighted software for which Ennis or the end user does not have an active license is strictly prohibited

**3.** Exporting software, technical information, encryption software or technology, in violation of international or regional export control laws, is illegal. The appropriate management should be consulted prior to export of any material that is in question.

**4.** Introduction of malicious programs into the network or server (e.g., viruses, worms, Trojan horses, e-mail bombs, etc.).

**5.** Revealing your account password to others or allowing use of your account by others. This includes family and other household members when work is being done at home.

**6.** Using an Ennis' computing asset to actively engage in procuring or transmitting material that is in violation of sexual harassment or hostile workplace laws in the user's local jurisdiction.

**7.** Making fraudulent offers of products, items, or services originating from any Ennis account.

**8.** Making statements about warranty, expressly or implied, unless it is a part of normal job duties.

**9.** Effecting security breaches or disruptions of network communication. Security breaches include, but are not limited to, accessing data of which the employee is not an intended recipient or logging into a server or account that the employee is not expressly authorized to access, unless these duties are within the scope of regular duties. For purposes of this section, "disruption" includes, but is not limited to, network sniffing, pinged floods, packet spoofing, denial of service, and forged routing information for malicious purposes.

**10.** Port scanning or security scanning is expressly prohibited unless prior notification to IT is made.

**11.** Executing any form of network monitoring which will intercept data not intended for the employee's host, unless this activity is a part of the employee's normal job/duty.

**12.** Circumventing user authentication or security of any host, network or account.

**13.** Interfering with or denying service to any user other than the employee's host (for example, denial of service attack).

**14.** Using any program/script/command, or sending messages of any kind, with the intent to interfere with, or disable, a user's terminal session, via any means, locally or via the Internet/Intranet/Extranet.

**15.** Providing information about, or lists of, Ennis employees to parties outside Ennis.

**16.** Use of wireless network devices without prior notification and approval by IT.

**17.** Access to Ennis' internal network by any means other than those provided by IT (i.e. PC RAS, VPN devices).

**18.** Any activity that is contrary to state of federal law, including distributing or obtaining copyrighted software or other information without proper authorization from the copyright holder.

**19.** Copying copyrighted software to an Ennis' computer without proper licensing.

### 4.5 Email and Communications Activities

**1.** Sending unsolicited email messages, including the sending of "junk mail" or other advertising material to individuals who did not specifically request such material (email spam).

**2.** Any form of harassment via email, telephone or paging, whether through language, frequency, or size of messages.

**3.** Unauthorized use, or forging, of email header information.

**4.** Solicitation of email for any other email address, other than that of the poster's account, with the intent to harass or to collect replies.

**5.** Creating or forwarding "chain letters", "Ponzi" or other "pyramid" schemes of any type.

**6.** Use of unsolicited email originating from within Ennis' networks of other Internet/Intranet/Extranet service providers on behalf of, or to advertise, any service hosted by Ennis or connected via Ennis' network.

**7.** Posting the same or similar non-business-related messages to large numbers of Usenet newsgroups (newsgroup spam).

*5.0*     **Enforcement**

Any employee found to have violated this policy may be subject to disciplinary action, up to and including termination of employment.

## Confidentiality Agreement

In consideration for my employment or continued employment by Ennis, Inc. and/or its subsidiaries (the Company), I acknowledge and agree to the following:

1.  I acknowledge that the Company operates in a competitive business environment.

2.  I acknowledge that I owe the Company a duty of loyalty and will not violate this duty.

3.  I acknowledge that the Company, in order to maintain a competitive advantage against its competitors, creates information and material for its use that is not known or readily ascertainable by independent investigation; this information is generally described as Trade Secrets.    Further, I understand and agree that the Trade Secrets have substantial, but undetermined, value and they result from the Company's substantial work, efforts, costs and expense in development and maintenance; unauthorized disclosure would cause the Company irreparable harm and damages.

4.  Trade Secrets include, but are not limited to, confidential and proprietary information such as product development techniques, plans or information, customer lists and relationships, pricing policies, material , labor and burden rate information contained in the ERP system,  employment records and policies, operational methods, marketing plans and strategies, business acquisition plans, new personnel acquisition plans, manufacturing methods, technical processes, designs and design projects, inventions and research programs, specific computer software or processing systems, object and source codes, user manuals, systems documentation, and any other information disclosed, either orally or in writing, to me while in the employ of the Company that is not known or readily ascertainable by independent investigation In addition, Trade Secrets include any formula, pattern, device or compilation, whether created using public information or not, which is used by the Company and presents an opportunity to obtain an advantage over its competitors and such formula, pattern, device, or compilation is not known or readily ascertainable by independent investigation.

5.  As part of my employment with the Company, it will expose me to its Trade Secrets for the sole and limited purpose of performing my job duties and otherwise furthering the Company's business.

6.  I agree that any information and documentation developed by me in the course and scope of my employment with the Company shall become and remain the property of the Company and such information shall be protected from disclosure pursuant to this Agreement.

7.  I agree that I will not directly or indirectly for any person, corporation or entity during or after termination of my employment, without authorization of the Company, disclose to, or make use of the Company's Trade Secrets or other confidential or proprietary information.

8.  I agree that upon termination of my employment, for any reason, I shall immediately return all documentation and information and other property belonging to the Company or its customers.

9.  This Agreement embodies the entire agreement and understanding between us.  This Agreement is binding upon and inures to the benefit of us.  It supersedes any and all prior Confidential Information Agreements whether written or oral or understandings between us.

**Employee**

_____
Signature

_____
Name (Printed)

_____
Date

EXHIBIT

**8**

# Acknowledgment of Information Security

# And

# Confidentiality Agreement

This form is used to acknowledge receipt of and compliance with the company's Information Security Policy and Confidentiality Agreement.

## Procedure

Complete the following steps:

1.  Read the Information Security Policy.

2.  Read the Confidentiality Agreement.

3.  Initial the spaces provided below, Sign and date.

4.  Return to the Corporate Human Resources Director.

## Initial

By initialing below, I agree to the following terms:

   (i)    I have read a copy of the Information Security Policy and the Confidentiality Agreements and understand and agree to the same.

*Jamie Fredrickson*

**Employee Signature**

*Jamie Fredrickson*

**Employee Name**

*Prepress Manager*

**Employee Title**

*9-27-13*

**Date**

*Prepress, Omaha, NE - 2033 601*

**Department/Location**



EXHIBIT
9