IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CRABAR/GBF, INC.,

> Plaintiff and
> counterclaim
> defendant,

vs.

MARK WRIGHT and WRIGHT
PRINTING CO.,

> Defendants and
> counterclaimants,

and

MARDRA SIKORA, JAMIE
FREDRICKSON, and ALEXANDRA
KOHLHAAS,

> Defendants.

8:16-CV-537

MEMORANDUM AND ORDER

This matter is before the Court on a host of motions, most pertinently the plaintiff's motion for partial summary judgment (filing 378) as to liability on some (but not all) of its claims, and the defendants' cross-motion for summary judgment (filing 382) as to the entirety of the plaintiff's complaint. The Court will deny the plaintiff's motion, and will for the most part deny the defendants' motion as well. This case will proceed to trial.

## I. BACKGROUND

Defendant Mark Wright and his eponymous printing company, defendant Wright Printing Co., were before 2013 in the business of custom-

printed folders, including multimedia folders and pocket folders, described as "a low cost, quick-turn around presentation folder manufacturer able to produce and ship many standard folders within 24 hours of the approved order." Filing 385 at 2-3.[1] Wright's folder business was located at an industrial facility Wright owned on I Street in southwest Omaha, that was leased by Wright Printing from another business entity. Filing 381 at 4.

In 2013, Wright sold the folder business to plaintiff Crabar/GBF, Inc. Filing 385 at 3. The sale included products distributed under several trade names: "Folder Express," which provided "custom-printed presentation, multimedia, pocket, and other folders, report covers, and related products for use by businesses and other commercial end-users"; "Progress Music Publications," which made promotional music folders and wall calendars for music stores that sold and rented instruments to school band and orchestra members; and "Progress Publications," which made school folders and planners for educational institutions. Filing 381 at 6.

The "Asset and Purchase Agreement" (the "Agreement") that consummated the sale contains several provisions about which the parties now disagree. *See* filing 302 at 62-104. In pertinent part, § 1.1 of the Agreement provided that the plaintiff was buying "all right and title to and interest in the Acquired Assets," separately defined to include:

---

[1] Pursuant to NECivR 56.1, a party moving for summary judgment must include in its brief a statement of material facts about which the movant contends there is no dispute, and the party opposing summary judgment must include in its brief a concise response to that statement of facts, noting any disagreement. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response. NECivR 56.1(b)(1).

All data, records, files, manuals, and other documentation related to the Acquired Assets and the operation of the Business, whether in electronic form or otherwise, including: (j) any and all customer lists, customer and prospect databases, customer sales information, information regarding customer printing requirements, job files, jackets, artwork, base negatives, job logs and other similar information regarding printing work performed for customers of the Business; (ii) all client, customer and supplier lists, telephone numbers and electronic mail addresses with respect to past, present or prospective clients, customers and suppliers of the Business. . . .

Filing 302 at 63-64. The acquired assets also included Wright Printing's "Intellectual Property" and "[a]ll goodwill incident to the Business, including the value of the Names associated with the Business which are transferred to Purchaser hereunder and the value of good customer relations. . . ." Filing 302 at 64-66. The "intellectual property" included Wright Printing's trademarks and "unpatented inventions, discoveries, specifications, data, processes, formulae, trade secrets, proprietary technical information or know-how, industrial models, confidential and technical information, manufacturing, engineering and technical drawings, product specifications and confidential business information." Filing 302 at 65. But the sale didn't include Wright Printing's "assets and properties which are used in the Affiliate Business and which are not located at the Omaha Facility," which referred to a separate printing and packaging operation of Wright Printing that wasn't part of the sale. Filing 302 at 63, 66.

As part of the sale, in § 5.1(c) of the Agreement, Wright Printing agreed that "[f]rom and after the closing date" the plaintiff would have all of Wright

Printing's "Intellectual Property currently used in the Business" and that Wright Printing would not use any of the intellectual property except in performance of the Agreement. And in § 5.1(e), Wright Printing agreed that from and after the closing date, Wright Printing would not use any of its "Confidential Information" except in operating the "Affiliate Business." Filing 302 at 77. "Confidential Information" includes trade secrets and "information regarding the business of Seller, its manufacturing processes, methods of operation, products, financial data, sources of supply and customers." Filing 302 at 78.

Section 7.1 of the Agreement also contained 2-year non-compete, non-solicitation, and non-disclosure provisions applicable to Mark Wright and Wright Printing. Filing 302 at 84-86. And § 8.5 of the Agreement provided that "[t]he representations, warranties, covenants and agreements of the Parties shall survive the Closing for a period of two (2) years." Filing 302 at 91.

The Agreement closed on September 30, 2013. Filing 385 at 3. The plaintiff does not deny that after closing, it made changes to production and its sales declined (although the parties sharply dispute the cause of some or all of that decline). Filing 385 at 4. For production, the plaintiff continued to use the I Street facility, leased from Wright. Filing 385 at 4. The plaintiff leased the facility for a one-year term starting on the closing date, subject to a one-year extension that the plaintiff exercised, extending the lease through September 30, 2015. Filing 385 at 4.

In the meantime, at least according to the plaintiff, Wright Printing was preparing to reenter the folder business. Wright's daughter, defendant Mardra Sikora—who was employed by Wright Printing—purchased the domain name "pocketfoldersfast.com" in 2014 and told Wright, in January 2015, that she had it. Filing 381 at 8; *see* filing 401-3 at 25-26. Among other things, Wright and

Sikora kept customer lists for Folder Express and Progress Publications, including sales information. Filing 381 at 13-14. Wright also retained financial information that had been included in the sale to the plaintiff. Filing 381 at 14, 17. And Wright Printing either retained or reacquired steel-cut die information that would allow it to duplicate the folder products it had previously made that were now being made by the plaintiff. Filing 381 at 16-17.

When the plaintiff purchased the folder business it retained some of Wright Printing's employees, including defendants Alexandra Kohlhaas (who worked as a graphic artist, then a prepress manager) and Jamie Frederickson (who worked as a prepress manager). Filing 381 at 18; filing 385 at 3. Kohlhaas returned to Wright Printing in May 2016, and Fredrickson returned in "early 2016." Filing 381 at 18. When she left, Kohlhaas kept a hard drive from the plaintiff including die templates, which she then transferred to Wright Printing. Filing 381 at 19. Fredrickson helped her do it. Filing 381 at 19.

As the September 30, 2015 expiration date for the I Street facility lease was approaching, the plaintiff and Wright were unable to agree on an extension. Filing 385 at 4. Eventually, Wright agreed to extend the lease only until December 31, 2015. Filing 385. In exchange, the plaintiff and Wright Printing entered into the "Release and Waiver Agreement" (the "Release"), effective June 25, 2015, which also contains several disputed provisions. Filing 385 at 5; see filing 302 at 107-14. In relevant part, the Release provides that the "representations and warranties" referred to in § 8.5 of the Agreement were terminated immediately. Filing 302 at 107-08. And "all indemnification and other obligations of performance" of Wright Printing under the Agreement were immediately terminated, as were the plaintiff's "rights to seek any recourse or remedy in relation thereto." Filing 302 at 108. That said, the Release did preserve the restrictive covenants found in § 7.1. Filing 302 at 108.

In December 2015, the plaintiff moved its folder business to a facility in Kansas. Filing 385 at 5. In 2016, Wright Printing—relying at least in part on information the plaintiff argues was confidential—relaunched its folder business, offering a range of products similar or identical to the plaintiff's products. *See* filing 381 at 7-13. Wright Printing's "Pocket Folders Fast" is, the plaintiff says, analogous to the plaintiff's "Folder Express," and Wright Printing's "Bandfolder Press" is analogous to the plaintiff's "Progress Music." *See* filing 381 at 7.

The plaintiff's operative complaint, as relevant, asserts several theories of recovery against the defendants:

(a) Breach of the Agreement, against Wright Printing.

(b) Violation of the Nebraska Trade Secrets Act, against all defendants.

(c) Tortious interference with business relationships, against all defendants.

(d) Federal trademark infringement in violation of the Lanham Act, against Wright Printing.

(e) Federal unfair competition in violation of the Lanham Act, against Wright Printing.

(f) State common-law unfair competition, against Wright Printing.

(g) Violation of the Nebraska Uniform Deceptive Trade Practices Act, against Wright Printing.

(h) Fraud, against Wright and Wright Printing.

(i) Breach of the non-disparagement clause of the Release, against Wright and Wright Printing.

(j) Violation of the federal Defend Trade Secrets Act of 2016, against all defendants.

(k) Breach of contract, against defendants Kohlhaas and Fredrickson.

Filing 302 at 32-53.[2]

---

[2] The complaint preserves other claims previously dismissed by the Court. Filing 302; *see* filing 253. They need not be listed here.

## II. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

Rule 56 also allows the Court to grant summary judgment as to some issues but not as to others. *See* Fed. R. Civ. P. 56(a). Upon doing so, the Court

may "enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute," and thereby treat such a fact "as established in the case." Fed. R. Civ. P. 56(g).

### 1. MOTION TO EXCLUDE TESTIMONY

As noted at the start, the parties' cross-motions for summary judgment present the primary issues. But underlying many of the issues presented is the opinion testimony of Ronald A. Bero, Jr., proffered by the plaintiff to prove its damages. *See* filing 376-2. Bero, a certified public accountant with qualifications in business valuation and financial forensics, sought to estimate the plaintiff's lost profits, future lost profits, and Wright Printing's profits for purposes of disgorgement remedies. Filing 376-2 at 3-4. The defendants have moved to exclude Bero's testimony pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Filing 389.

The objective of the *Daubert* inquiry is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 722 (8th Cir. 2015). This is a flexible, case-specific inquiry: the Court must decide whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case. *Id.* at 723. In exercising its gatekeeping function, the Court must make a preliminary assessment of whether the reasoning or methodology underlying the proposed expert testimony is valid and of whether that reasoning or methodology properly can be applied to the facts in issue, focusing specifically on the methodology and not the conclusions. *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1000-01 (8th Cir. 2019). Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to

the facts of the case. *Id*. at 1001. But "cases are legion that under *Daubert*, liberal admission is prevalent and courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Id*. (cleaned up).

Bero began by opining as to the plaintiff's lost profits through January 2021. Filing 376-2 at 24. Bero categorized lost profits based on cross-referencing the plaintiff's historical customer lists, part numbers of some of the plaintiff's products and their Wright Printing analogues (derived from a Wright Printing list of corresponding products), and Bandfolder products (because the plaintiff had been selling to 96 percent of music stores before Wright Printing reentered that business to compete). *See* filing 376-2 at 20-21, 24-26. Bero assessed profits lost by the plaintiff to Wright Printing by adding Wright Printing's sales in these categories:

(1)   Analogous products and Bandfolder products to plaintiff's former customers,
(2)   Other products to plaintiff's former customers, and
(3)   Analogous products and Bandfolder products to new customers.

Filing 376-2 at 24-26.

Next, Bero projected the plaintiff's lost profits in each of those categories after January 2021, using different methods because Wright Printing's sales information after that time was unavailable to him. Filing 376-2 at 26. Finally, Bero quantified Wright Printing's sales in each category. Filing 376-2 at 28.

The defendants attack Bero's opinion on two primary fronts. First, the defendants claim that Bero's analysis is unreliable because he didn't account for other explanations for the plaintiff's lost sales, such as the plaintiff's allegedly poor service, and general trends in the industry. *See* filing 394 at 22-35. And the defendants argue that Bero's opinion is unreliable because it doesn't account for the difference between lawful and unlawful competitive behavior by Wright Printing. Filing 394 at 35-39.

But those arguments, in the Court's view, go to the weight of Bero's testimony and not its admissibility. It is important to understand that Bero's opinions aren't premised on the plaintiff's sales over time—rather, they're premised on Wright Printing's sales.[3] And as a general rule, deficiencies in an expert's factual basis go to weight and not admissibility. *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 786 (8th Cir. 2021), *cert. denied sub nom. 3M Co. v. Amador*, 142 S. Ct. 2731 (2022).

Loosely described, Bero's first category assumes that any of the plaintiff's former customers purchasing any Bandfolder products from Wright Printing would instead be purchasing those products from the plaintiff, because of the plaintiff's dominance of the market for those products before Wright Printing entered it. Bero's first category also assumes that any of the plaintiff's former customers purchasing one of the Wright Printing products that duplicates one of the plaintiff's products would, instead, have purchased the identical product from the plaintiff. Bero's second category assumes that any of the plaintiff's former customers now purchasing from Wright Printing

---

[3] That fact is what distinguishes this case from *Zimmer, Inc. v. Stryker Corp.*, No. 3:14-CV-152, 2018 WL 276324, at *1 (N.D. Ind. Jan. 3, 2018) and other similar cases relied upon by the plaintiff. *See* filing 394 at 23-25. In that case, the proffered expert opinion calculated lost profits using two methods: one based on the performance of the plaintiff business before and after the defendants' allegedly unlawful acts, and one based on projected growth of the plaintiff's business using national growth rates. *See Zimmer*, 2018 WL 276324, at *2. But that opinion, the district court held, was flawed because it didn't account for other non-actionable causes for the plaintiff's lost business. *See id.* at *3-6. Here, however, Bero is at least beginning with purchases actually made from Wright Printing, and attempting to quantify how many came at the plaintiff's expense. There is a question of causation in there, to be sure, but it's not a blanket assumption that just because the plaintiff lost sales, it must be the defendants' fault. In other words, it's not merely inferring causation from correlation.

would still be one of the plaintiff's customers. And Bero's third category assumes that any customer purchasing a Bandfolder product or Wright Printing duplicate of one of the plaintiff's products would, instead, be purchasing that product from the plaintiff.

There is certainly plenty of room for the defendants to challenge those assumptions, for the reasons the defendants have explained. But redress for such weaknesses lies in cross-examination and contrary evidence rather than exclusion. *Bair Hugger*, 9 F.4th at 787. Bero's reasoning is clear and transparent—should the jury be persuaded by the defendants' evidence that some or all of Wright Printing's customers would still be purchasing from Wright Printing for reasons other than unfair competition, or that they would be purchasing from someone other than the plaintiff, then Bero's breakdown of the relevant categories would allow the jury to deny damages accordingly.

In other words, the defendants are free to argue, and to demonstrate, that other reasons account for the plaintiff's lost sales. Bero's failure to include those in his determination doesn't preclude the jury from including them. Nor is the Court persuaded that failing to account for "printing industry revenue trends" is a fatal flaw, given that the basis for Bero's math is Wright Printing's sales, which are presumably subject to the same trends—again, leaving room for the defendants to argue that some or all of Wright Printing's success at the plaintiff's expense is explained by Wright Printing simply being better at the folder business than the plaintiff.

The Court is also not convinced that Bero was required to distinguish between lawful and unlawful competitive behavior—in essence, to decide for himself which aspects of Wright Printing's conduct are actionable and which are not, and parse out damages accordingly. The plaintiff's theory of the case, as the Court understands it, is that *everything* Wright Printing did was

infected by unlawful competitive behavior. The plaintiff may, or may not, be able to prove that. But it was not Bero's job to, in effect, evaluate the merits of the plaintiff's legal theories.[4] Bero could not, as the defendants' argue, "align [the plaintiff's] alleged damages with defendants' alleged wrongdoing," filing 394 at 38, because whether and what the defendants did wrong is to be determined at trial, not by an expert witness.

Accordingly, the Court will deny the defendants' motion to exclude Bero's testimony (filing 389).

## 2. THE PLAINTIFF'S CLAIMS

As noted above, the plaintiff's operative complaint, as relevant, asserts several theories of recovery against the defendants:

(a)   Breach of the Agreement, against Wright Printing.
(b)   Violation of the Nebraska Trade Secrets Act, against all defendants.
(c)   Tortious interference with business relationships, against all defendants.
(d)   Federal trademark infringement in violation of the Lanham Act, against Wright Printing.
(e)   Federal unfair competition in violation of the Lanham Act, against Wright Printing.

---

[4] That distinguishes this case from, for instance, *Sloan Valve Co. v. Zurn Indus., Inc.*, 33 F. Supp. 3d 984 (N.D. Ill. 2014), relied upon by the defendants. Filing 394 at 35-37. In that case, the district court held that a damages expert should have limited his opinion to sales specifically attributable to a patent-protected feature of a product, not the entire product. *Id.* at 995. That's well and good when the parties agree that at least some of the products or services were lawfully provided. But here, the plaintiff is attacking all of the sales represented in each of Bero's categories—Bero is allowed to assume, for purposes of forming *his* opinions, that the plaintiff will be able to prove up its claims. And again, should the plaintiff fail to do so, Bero's opinions are formed in a way that would make them helpful to the jury by permitting the jurors to assess the strength of the evidence in each category.

(f)   State common-law unfair competition, against Wright Printing.

(g)   Violation of the Nebraska Uniform Deceptive Trade Practices Act, against Wright Printing.

(h)   Fraud, against Wright and Wright Printing.

(i)   Breach of the non-disparagement clause of the Release, against Wright and Wright Printing.

(j)   Violation of the federal Defend Trade Secrets Act of 2016, against all defendants.

(k)   Breach of contract, against defendants Kohlhaas and Fredrickson.

Filing 302 at 32-53. The parties' cross-motions for summary judgment touch on all of those claims in one way or another.

### (a) Breach of the Agreement

The plaintiff's claim for breach of the Agreement rests on four provisions:

- § 1.1 – "Purchase and Sale of Assets"
- § 5.1(c) – "Trade Names"
- § 5.1(e) – "Confidentiality"
- § 7.1(d) – "Non-Disclosure"

Filing 302 at 32-33, 63, 77-78, 85-86. The plaintiff's claims under §§ 5.1(c) and (e) are, it concedes, contingent upon the success of its fraud claim regarding the Release. *See* filing 381 at 26 n.1. For reasons that will be explained below, the Court finds the fraud claim to be viable and that the plaintiff's claims under §§ 5.1(c) and (e) are at least *potentially* viable despite the Release.

### (i) Survival Clause

Wright Printing's primary argument with respect to the breach of contract claims is (or at least, was) that the plaintiff's claims are time-barred by § 8.5 of the Agreement, which says that the "representations, warranties, covenants and agreements of the Parties shall survive the Closing for a period of two (2) years." Filing 302 at 91. In its summary judgment brief, Wright

Printing initially argued that § 8.5 operated not only as a limitation on the obligations of the contract, but a limitation on the remedy—essentially, that § 8.5 established a 2-year limitations period on any suit under the contract, commencing at closing. Filing 385 at 25-26. In response, the plaintiff pointed out that in the case relied upon by the defendant, *GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. 5571-CS, 2011 WL 2682898, at *1 (Del. Ch. July 11, 2011), the contract at issue "made plain" that certain representations "*as well as the contractually provided remedies for their breach,* would terminate." The plaintiff further argues that § 8.5 is far more constrained, applying only to representations, warranties, covenants, or agreements arising before closing.

Section 8.5 is a masterpiece of unfortunate drafting, but understanding why requires examining some Delaware caselaw. Contrary to the plaintiff's argument, survival clauses such as § 8.5 may be read in Delaware to impose a limitation on remedies, even in the absence of express language to that effect. As the *GRT* court explained, "the most persuasive authorities conclude that [a] survival clause with a discrete survival period has the effect of granting the non-representing and warranting party a limited period of time in which to file a post-closing lawsuit." *Id.* at *15. But they are permitted to do so because, in the absence of a survival clause, the representations and warranties may not be actionable at all. *See id.*

In that context, § 8.5 would make perfect sense *if* it simply provided for the parties' representations and warranties to survive for a period after closing. But it doesn't: it provides that the "representations, warranties, *covenants and agreements*" of the parties would survive the closing. Filing 302 at 91 (emphasis added). The defendants urge the Court to apply § 8.5 broadly: to read that section as indiscriminately terminating every obligation under the Agreement after two years from closing.

But that isn't consistent with the rest of the Agreement. For one thing, it would render the separate two-year terms found in Article 7 wholly nugatory. The defendants' reading—that § 8.5 applies to everything *and* that it's a "statute of limitations"—would also mean the limitations period for any breach was running from closing even before any breach occurred—meaning that a breach near the end of that period could leave the offended party with literally days or hours to sue.

Nor, the Court notes, does the plain language of § 8.5 actually purport to *terminate* anything: it provides for *survival* for at least two years, but says nothing about termination after two years. And that distinguishes § 8.5 from the sort of provision at issue in *GRT*, in which the court explained:

> a survival clause . . . that expressly states that the covered representations and warranties will survive for a discrete period of time, but will thereafter "terminate," makes plain the contracting parties' intent that the non-representing and warranting party will have a period of time, i.e., the survival period, to file a claim for a breach of the surviving representations and warranties, but will thereafter, when the surviving representations and warranties terminate, be precluded from filing such a claim.

*Id.* at *15.

Rather, the more consistent reading of § 8.5—although admittedly still an unsatisfying reading—is the one offered by the plaintiff: that the "representations, warranties, covenants and agreements" perpetuated by § 8.5 for two years after closing are those representations, warranties, covenants and agreements which were in effect *before* closing and might otherwise have

been extinguished. As the plaintiff notes, for a provision to "survive" the closing, it must have been "alive" *before* the closing. But the provisions that weren't alive at the time of closing—that is, provisions that took effect "from and after the closing date," such as those found in Article 5 and Article 7—are delimited by their own time limits, expressly contained in those sections.

And that's also reasonable when the subjects of those specific covenants are considered. The restrictive covenants in §§ 7.1(a)-(c), relating to competition and solicitation, are limited to two years, while § 7.1(d) relating to confidential information is not. Nor are §§ 5.1(c) and (e), which also relate to intellectual property and confidentiality. In other words, the plaintiff's reading of § 8.5 leaves no limitation period on provisions relating to ownership of what was sold and disclosure of confidential information—obligations that a reasonable person might well expect to be perpetual. And finally, the plaintiff's reading has the effect of setting a limitations period on the parties' remedies that makes sense—two years from the closing for breaches that would, by their nature, have to occur before or at the time of closing, but longer for breaches that, by their nature, couldn't have occurred until on or after the closing date.

### (ii) Confidential Information

Wright Printing also argues that the plaintiff's claims fail because the information allegedly misappropriated and misused by the defendants wasn't "confidential information" subject to the limitations of the Agreement. Filing 385 at 26. For reasons that will be explained below, the Court finds genuine issues of material fact that preclude judgment on that issue. So, Wright Printing's motion for summary judgment as to the plaintiff's claim for breach of the Agreement will be denied.

*(iii) Purchase and Sale of Assets Clause*

For its part, the plaintiff insists that *it* is entitled to summary judgment as to liability on its claim for breach of the Agreement, because it says Wright Printing breached § 1.1 as a matter of law. Filing 381 at 22. The plaintiff's argument goes like this: Wright Printing agreed to sell "all right and title to and interest in" its intellectual property to the plaintiff, but it actually kept (or reacquired) and used some, so that was a breach of contract. Filing 381 at 22. The Court is not persuaded—certainly not persuaded enough to warrant summary judgment for the plaintiff.

The plaintiff cites no authority for its construction of § 1.1, nor is the Court aware of any. The plaintiff doesn't claim it didn't receive its *own* copies of all that information, or that any defendant did anything to prevent the plaintiff's possession or use of the property. It's something of a stretch to construe an otherwise anodyne transfer of ownership into some sort of an implicit non-competition/infringement/confidentiality clause, despite express provisions to that effect being found elsewhere in the contract. And it's certainly a stretch to try and read the "Purchase and Sale of Assets" provision as imposing obligations *beyond* those found elsewhere in the Agreement. Rather, the plaintiff's remedies are found in those other provisions.[5] The

---

[5] Similarly, the plaintiff suggests at length—primarily relying on *Levitt Corp. v. Levitt*, 593 F.2d 463 (2d Cir. 1979)—that § 1.1 of the Agreement is in play because Wright Printing's entry into the market is clawing back the goodwill it said it sold. Filing 381 at 37-42. But again, the Court is not persuaded that § 1.1 can be spun into a perpetual non-competition clause—particularly where the contract contains a non-perpetual non-competition clause. Rather, the Court's reads *Levitt* and the other cases cited by the plaintiff for the unremarkable proposition that the goodwill acquired in the sale of a business is a property interest that may be protected against conduct such as mark infringement, unfair competition, or interference with contractual relationships.

plaintiff's motion for summary judgment on its claim for breach of the Agreement will also be denied.

### (b) Nebraska Trade Secrets Act

To prevail under the Nebraska Trade Secrets Act, Neb. Rev. Stat. § 87-501 *et seq*., the plaintiff must prove, among other things, the existence of a trade secret and the defendant's misappropriation of it. *Infogroup, Inc. v. DatabaseLLC*, 95 F. Supp. 3d 1170, 1172 (D. Neb. 2015); *see* §§ 87-502 to 504; *Richdale Dev. Co. v. McNeil Co., Inc.,* 508 N.W.2d 853, 859 (Neb. 1993). And the plaintiff will need to prove damages. *See* § 87-504. The defendants challenge all three elements.

### (i) Trade Secrets

To begin with, a "trade secret" is defined as information that "[d]erives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." § 87-502(4)(a). That definition is narrow: "if an alleged trade secret is *ascertainable at all* by any means that are not 'improper,' the would-be secret is peremptorily excluded from coverage under the Act." *Infogroup*, 95 F. Supp. 3d at 1182 (quoting *First Express Servs. Grp., Inc. v. Easter,* 840 N.W.2d 465, 474 (Neb. 2013)).

So, for instance, in *Easter*, the Nebraska Supreme Court held that a customer list wasn't a "trade secret" because the customers' identities and contact information were ascertainable from public sources, and the other information on the list—such as crop insurance pricing—was available from other sources. 840 N.W.2d at 475-76. But in *Home Pride Foods, Inc. v. Johnson*, the same court held that a customer list *was* a trade secret because it included information on who had previously placed orders and what they had ordered,

conferring a competitive advantage on the possessor of the list. 634 N.W.2d 774, 781 (Neb. 2001). And, the court asked: Why did the defendant pay for the list if the information on it was readily available? *Id*.

The plaintiff has identified three categories of information it claims were trade secrets:

    a.  Customer Lists and Sales Information
    b.  Cost-Modeling Information
    c.  Die Files

Filing 399 at 24-42. The defendants claim that none of those are "trade secrets" within the meaning of § 87-502(4)(a).

### a. Customer Lists and Sales Information

This is perhaps the easiest category to deal with, because the Nebraska caselaw specifically addresses customer lists. The defendants argue that they generated a list of potential customers from other sources, such as purchased sales leads, industry conventions, and independent online research. Filing 385 at 31-32. And the defendants argue that none of the old customer records identified by the plaintiff contain useful contact information. Filing 414 at 29. But the plaintiff's evidence suggests that historical sales data retained from before the folder business was sold was incorporated into Wright Printing's list of targeted customers. *E.g.* filing 401-3 at 11-15, 60-62; filing 401-2 at 69.

The defendants argue that none of that information provided a competitive advantage, *see* filing 414 at 32, but that begs the question posed in *Home Pride Foods*, 634 N.W.2d at 781: If the information wasn't useful, why did Wright Printing use it? Whether information sought to be protected by the Trade Secrets Act rises to the level of a trade secret is a question of fact—and here, there is at least a genuine issue of material fact as to whether the

customer information at issue here included "trade secrets" as explained in *Home Pride Foods*. *See id.* at 780-81.

### b. Cost-Modeling Information

The plaintiff describes this category as information "compiled through considerable effort over time" that's "used to determine pricing strategies for folder products." Filing 399 at 39. The defendants, however, describe this category more dismissively as "the types of costs involved in the printing process – paper, ink, glue, shipping costs, equipment and labor - information which is well-known in the printing industry. . . ." Filing 385 at 35.

But the plaintiff's evidence suggests that Wright Printing at least may have used that cost-modeling information when re-establishing its folder business. *See* filing 401-2 at 51; *see also* filing 401-3 at 44, 52-57. Again, that begs the question: If that information was widely available from other sources, why did Wright Printing use the information it had sold to the plaintiff?

At least arguably, that was because—based on the Court's examination of the evidence—it collected data very specific to customers, folder types, and customized orders. *See* filing 401-1 at 7 (exhibits S(49) & S(50)); *see* filing 401-3 at 44-47. It doesn't take much of a leap to conclude that while these models may be derived from some information available to the public at large, other data is proprietary, and as a whole it's been collected in such a way that provides added value, particularly to a competitor looking to duplicate the products that were modeled. There is, at least, a triable issue of fact as to whether the plaintiff's characterization of that information is more accurate.

### c. Die Files

Finally, the plaintiff contends that its die files—that is, the design files used to manufacture dies for folder production—are trade secrets. Filing 399

at 42. The defendants argue that such information is widely available and free to the public. Filing 385 at 33. In fact, the defendants argue, the plaintiff provides that information to its customers, and provided it to a contractor to which it outsourced some production, all without insisting on confidentiality. Filing 385 at 33-34. The plaintiff doesn't really deny that—rather, the plaintiff's argument is that the collection of die files either retained or reacquired by the defendants are akin to a compilation of data, except instead of customer information, time and effort has been expended to collect information carrying particular characteristics and meeting particular needs. *Cf. Home Pride Foods*, 634 N.W.2d at 782.

That argument is supported by Kohlhaas' testimony: she said that she copied the plaintiff's templates to Wright Printing as "the quickest way to get our operations up and moving" because the alternative was "[d]oing it by hand." Filing 401-5 at 10; *see* filing 401-5 at 30-31. True, she also said that the same information could be found in the public domain "through Web sites on downloads for templates, through customer sent-in samples, and mail-in samples." Filing 401-5 at 32. But copying the information directly was the "quick easy way"—and, importantly, Kohlhaas also said that once the information in the public domain was gathered, someone would *still* have to "create the design, the blueprint for the die" from the information that had been gathered. Filing 401-5 at 32.

In other words, there is at least some evidence in the record to support the plaintiff's argument that the die files that may have been used by Wright Printing represented the time and effort spent systemically compiling information otherwise found only disparately in the public domain, and

included information not readily available except by re-creation.[6] That is enough, the Court finds, to create a triable issue of fact as to whether some of the die files are trade secrets.

### (ii) Misappropriation

The defendants also argue that the plaintiff can't prove any trade secret was misappropriated. "Misappropriation" under the Trade Secrets Act is, as relevant, either "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," § 87-502(2)(a), or

> [d]isclosure or use of a trade secret of another . . . by a person who . . . [a]t the time of the disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was . . . [d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

§ 87-502(2)(b)(ii)(C). The defendants argue that Wright Printing was only obliged by the Agreement to deliver its trade secrets to the plaintiff—not to destroy its own copies of that information. Filing 385 at 36-37.

Perhaps that's true of some information—there is a fair argument that the Agreement only obliged Wright Printing not to *use* that information, as opposed to merely possessing it—but, as described above, there's also evidence

---

[6] There is, to be fair, also evidence that Wright Printing didn't use the die files at all. *See* filing 383-16 at 4. But the plaintiff isn't required to take the defendants' word for that. Obtaining the information, under the circumstances, allows for an inference that it was obtained because it was useful, which in turn allows for an inference that it was used despite the defendants' denials.

that the defendants obtained information from other sources, including the plaintiff itself after the folder business was sold. That could well be misappropriation within the meaning of the Trade Secrets Act. And the Court's task at this point is to determine whether or not the plaintiff's *claims* move forward—not to evaluate each and every piece of evidence proffered by the plaintiff and decide whether or not it proves what the plaintiff claims. It suffices to conclude that at least some of the information upon which the plaintiff relies could, to a reasonable trier of fact, be seen as a trade secret and have been misappropriated.

### (iii) Damages

Finally, the defendants argue that the plaintiff can't show it was damaged by any misappropriation of trade secrets, generally repeating its arguments with respect to Bero's opinion testimony. For the reasons explained above, the Court finds that there is at least a factual issue as to whether the plaintiff was damaged by the defendants' conduct—including the extent to which Wright Printing might have captured business from the plaintiff, and the extent to which that competitive success might be attributable to Wright Printing's use of the plaintiff's customer lists, price-modeling, and die files. The Court will deny the defendants' motion for summary judgment as to the plaintiff's Nebraska Trade Secrets Act claim.

### (c) Tortious Interference with Business Relationships

This claim arrives in a different procedural posture than the others, because the Court already dismissed it. Filing 253 at 31-33. Under Nebraska law, to succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship

or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. *Dick v. Koski Pro. Grp., P.C.*, 950 N.W.2d 321, 377 (Neb. 2020). And this Court has said that this may require proof of a potential relationship with a particular party, or at least a class of parties. *Infogroup*, 95 F. Supp. 3d at 1196.

So, at an earlier stage of this case, the Court held that the plaintiff's claim for tortious interference with a business expectancy was insufficiently pled, because the plaintiff was unable to identify any customer relationships that had been influenced by the defendants. Filing 253 at 32-33. Now, with the benefit of discovery and Bero's opinions, the plaintiff asks the Court to reconsider that decision. Filing 372.

The defendants argue that it's too late: The plaintiff, they contend, "essentially seeks to amend its complaint in order to assert additional allegations relating to business relationships and interference" shortly before trial. Filing 396 at 1-3. And because discovery has closed, they say, that would prejudice them. Filing 396 at 6-7.

The Court is not persuaded. It's difficult to see why the plaintiff's motion should be treated as a motion to amend its complaint—at least, not the sort of motion the defendants want to make it into—when its tortious interference complaint is right there in its operative pleading where it's always been. Filing 302 at 34-35. Rather, the law is clear that pursuant to Fed. R. Civ. P. 54(b), the Court has the inherent power to reconsider and modify an interlocutory order any time before the entry of judgment. *K.C.1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1017 (8th Cir. 2007); *see Dietz v. Bouldin*, 579 U.S. 40, 46-47 (2016).

The standard to be applied in considering a motion to reconsider under Rule 54(b) is not clear, but it is typically held to be less exacting than would be

a motion under Fed. R. Civ. P. 59(e), which is in turn less exacting than the standards enunciated in Fed. R. Civ. P. 60(b). *Jones v. Casey's Gen. Stores*, 551 F. Supp. 2d 848, 854 (S.D. Iowa 2008). The Court has "considerable discretion" in deciding whether to grant such an order. *Wells' Dairy, Inc. v. Travelers Indem. Co. of Illinois*, 336 F. Supp. 2d 906, 909 (N.D. Iowa 2004). But some of the same considerations are pertinent: whether the Court's findings of fact or conclusions of law were clearly or manifestly erroneous, and whether the motion rests on facts or legal arguments that could have been raised in the original motion but were not. *See Jones*, 551 F. Supp. 2d at 854-55.[7]

Here, the plaintiff has appropriately premised its motion on evidence found after the Court's original decision was made. *See* filing 373 at 5-6. And while the defendants think it's too late, it's difficult for the Court to see how the defendants are prejudiced: The plaintiff's tortious interference claim is *factually* coextensive with nearly every other claim it's made. All of the plaintiff's claims rest on the same factual theory—that the defendants unlawfully took the plaintiff's intellectual property and used it to unfairly compete against the plaintiff and take business that would otherwise have gone to the plaintiff. Tortious interference with those business relationships is, if anything, the legally purest form for the plaintiff's argument. But it is quite clear from the Court's examination of the record that the defendants require no additional discovery to meet what is simply a different theory of recovery for the same allegations that the plaintiff has made throughout.

---

[7] The defendants insist that motions to reconsider are "disfavored." Filing 396 at 2 n.1 (citing *Outdoor Cent., Inc. v. GreatLodge.com, Inc.*, 643 F.3d 1115, 1119 (8th Cir. 2011)). It's hard to see how the defendants got that proposition from *Outdoor Cent.*, which only says that certifying interlocutory orders as final judgments is disfavored under some circumstances, and which didn't involve a motion to reconsider at all. *See* 643 F.3d at 1118-19.

Finally, the defendants also argue that the plaintiff's claim is still legally insufficient, because its damages still rest on speculation. Filing 396 at 7-10. But for the reasons explained above with respect to Bero's testimony, the Court finds a factual basis in the record for a reasonable juror (particularly if they credit Bero's testimony) to conclude that business was diverted from the plaintiff to Wright Printing as a result of Wright Printing's unjustified conduct. The Court will grant the plaintiff's motion to reinstate its claim for tortious interference with a business expectancy.[8]

### (d) Lanham Act Trademark Infringement

The plaintiff claims that Wright Printing is infringing its registered trademarks—"Folder Express," "Think Fast," and "Sculptured Pockets"—in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq*. To prevail on a claim of mark infringement under § 1114(1), plaintiffs must establish that they own a valid, protectable mark and that there is a likelihood of confusion between their mark and the defendant's mark. *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir. 2009).

### (i) Valid or Protectable Mark

In support of its motion for summary judgment, Wright Printing argues that the plaintiff doesn't have an exclusive right to use Wright Printing's trademark: "Pocket Folders Fast." Filing 385 at 20. Wright Printing argues at length that its mark, "Pocket Folders Fast," comprises generic or descriptive terms that have no secondary meaning. Filing 285 at 21-22.

---

[8] The Court notes that nothing in the defendants' brief asked the Court to distinguish among them when evaluating the plaintiff's claim. So, it hasn't. But that doesn't mean there will be enough evidence to submit this claim to the jury as to *each* of the named defendants.

Wright Printing's argument that *its own mark* is weak is an interesting strategy—but, as the plaintiff points out, it's off target. The question isn't whether Wright Printing has a protectable mark—rather, it's whether the plaintiff has protectable marks. In other words, what's at issue is the strength of the plaintiff's marks, not Wright Printing's mark. And Wright Printing made no arguments on that point. *See* filing 385 at 20-22.

At least, not in its opening brief. In response, the plaintiff pointed out how Wright Printing had missed the point. Filing 399 at 9-14 (citing *Home Builders Ass'n of Greater St. Louis v. L&L Exhibition Mgmt., Inc.*, 226 F.3d 944, 950 (8th Cir. 2000)). *Home Builders Ass'n* speaks directly to Wright Printing's argument: In that case, the Eighth Circuit rejected the defendant's argument that its own trade names had no secondary meaning—instead, the Court of Appeals explained, it was the plaintiff's marks that needed secondary meaning, and the plaintiff "need not prove secondary meaning in the words [the defendant] used to create the public confusion." 225 F.3d at 950.

In its *reply* brief, Wright Printing spoke to that point, arguing that the plaintiff failed to present evidence of its own marks' secondary meaning. *See* filing 414 at 14. But Wright Printing's argument came too late, and the Court will not reward it. A reply brief may not raise new grounds for relief. NECivR 7.1(c)(2). And it's well-understood that on a motion for summary judgment, it's the movant's initial burden to show—that is, to point out to the Court—an absence of evidence to support a nonmoving party's case; only then does the nonmoving party have an affirmative burden to designate specific facts creating a triable controversy. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Rusness v. Becker Cnty., Minn.*, 31 F.4th 606, 614 (8th Cir. 2022). Here, Wright Printing didn't initially raise that issue, so the plaintiff wasn't obliged to present evidence in response to it.

*(ii) Likelihood of Confusion*

Wright Printing's brief also contained a single paragraph questioning whether the plaintiff can show a likelihood of confusion. Filing 385 at 22. Wright Printing cites an unpublished District of Maryland case for the proposition that the Court "must focus exclusively on the confusing similarity of the common *non-generic* portions of the marks." Filing 385 at 22 (citing *Me. Ave. Seafood, Inc. v. Crab House, Inc.*, No. 8:97-cv-640, 1998 U.S. Dist. LEXIS 23144 (D. Md. Mar. 30, 1998)).

The Court isn't persuaded that *Crab House* is on point: in that case, the alleged infringer was using a *wholly* generic phrase to describe its business. In order to get close, Wright Printing would have to concede that its mark, "Pocket Folders Fast," is wholly generic and unprotectable. *See Crab House*, 1998 U.S. Dist. LEXIS 23144, at *17; *see generally* 4 McCarthy on Trademarks and Unfair Competition § 23:49 (5th ed. Supp. 2022). The Court doesn't read Wright Printing's argument as going that far. And Wright Printing's focus on assessing words in isolation is contrary to the fundamental rule that the commercial impression of a trademark is derived from it as a whole, not from its elements separated and considered in detail, so it should be considered in its entirety. *Est. of P.D. Beckwith, Inc., v. Comm'r of Pats.*, 252 U.S. 538, 545-46 (1920).

Rather, the Court considers the following factors when evaluating likelihood of confusion:

> 1) the strength of the plaintiff's mark; 2) the similarity between the plaintiff's and defendant's marks; 3) the degree to which the allegedly infringing product competes with the plaintiff's goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of

care reasonably expected of potential customers; and 6) evidence
of actual confusion.

*A.I.G. Agency, Inc. v. Am. Int'l Grp., Inc.*, 33 F.4th 1031, 1035 (8th Cir. 2022).
Wright Printing's opening brief didn't mention any of those factors, *see* filing
385 at 20-22, and again the Court is disinclined to permit this late shot.

In any event, the Court finds that the plaintiff's evidence is sufficient to
establish a triable issue of fact as to likelihood of confusion. In Wright
Printing's favor, the plaintiff's marks—"Folder Express," "Think Fast," and
"Sculptured Pockets"—can be charitably described as having varying strength,
but at least some are arguably descriptive or suggestive.[9] *See generally Am.*
*Dairy Queen Corp. v. W.B. Mason Co.*, 543 F. Supp. 3d 695, 713 (D. Minn.
2021). Nor is the similarity of the competing marks particularly strong. *See id*.
But when services are closely related, less similarity in the trademarks is
necessary to support a finding of infringement. *Kuper Indus., LLC v. Reid*, 89
F. Supp. 3d 1005, 1012 (D. Neb. 2015) (citing *SquirtCo. v. Seven–Up Co.*, 628
F.2d 1086, 1091 (8th Cir. 1980)). Here, the core of the plaintiff's case is that
the parties are providing identical products. And Wright Printing's intent to
confuse the public is a question for the jury—Wright Printing certainly
intended to *compete* directly with the plaintiff.

Where the plaintiff goes into the most depth—and where the parties
engage the most—is on evidence of actual confusion. The plaintiff provides a
number of examples in which customers seem to be confused about the
relationship between the parties' respective folder businesses. *See* filing 399 at
19-21. Wright Printing points out, correctly, that inquiries from customers can

---

[9] Not to tell the plaintiff how to try its case, but "Think Fast" should perhaps not be the focus
of its argument.

actually indicate a distinction in the mind of the consumer, rather than confusion. *See Duluth News-Trib., a Div. of Nw. Publications, Inc. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996). But at least some of the evidence pointed to by the plaintiff suggests that the customer *assumed* Wright Printing's new folder business was the same as the plaintiff's—because, for instance, they asked about prior orders that hadn't been placed with Wright Printing's new folder business. *See* filing 401-7 at 25; filing 401-8 at 13; filing 401-16 at 2. That's more suggestive of actual confusion. *See Champions Golf Club, Inc. v. Sunrise Land Corp.*, 846 F. Supp. 742, 752 (W.D. Ark. 1994).

On balance, the Court finds that whether the plaintiff has shown a likelihood of confusion is a question for the jury.

### (e) Lanham Act Unfair Competition

Similarly, § 1125(a)(1), which offers protection to marks regardless of federal registration, prohibits the use of a mark in connection with goods or services in a manner likely to cause confusion as to the source or sponsorship of the goods or services. § 1125(a)(1); *see also Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005). And even a generic mark may support an unfair competition claim if it's acquired secondary meaning. *Home Builders Ass'n*, 226 F.3d at 950.

Wright Printing argues conclusorily that the plaintiff "has not shown that the marks at issue have acquired secondary meaning, that 'Pocket Folders Fast' is associated with Plaintiff, or that [Wright Printing]'s mark is visually and aurally the same as [the plaintiff]'s marks. Without such a showing, [the plaintiff] cannot establish consumer confusion. . . ." Filing 385 at 24. But again, Wright Printing's focus on its own trademark is the flaw in its argument. And all of the facts and circumstances should be taken together in determining the absence or existence of unfair competition. *Sargent & Co. v. Welco Feed Mfg.*

*Co.*, 195 F.2d 929, 935 (8th Cir. 1952). For the reasons discussed above, the plaintiff's evidence—considered in the context of Wright Printing's operation of a folder business selling identical products to the plaintiff's from the same building it had previously leased to the plaintiff—is sufficient to overcome summary judgment on its unfair competition claim.

### (f) Common Law Unfair Competition

On these facts, the plaintiff's common-law unfair competition claim is coextensive with its Lanham Act unfair competition claim. *See Dahms v. Jacobs*, 272 N.W.2d 43, 44 (Neb. 1978); *Pers. Fin. Co. of Lincoln v. Pers. Loan Serv.*, 275 N.W. 324, 326 (Neb. 1937); *see also John Markel Ford, Inc. v. Auto-Owners Ins. Co.*, 543 N.W.2d 173, 178 (Neb. 1996). And, in fact, the parties treat the claims that way. *See* filing 385 at 22-24; filing 399 at 11-16. Accordingly, the Court reaches the same conclusion.

### (g) Nebraska Uniform Deceptive Trade Practices Act

In relevant part, under the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301 *et seq.*, a person engages in a deceptive trade practice when, in the course of business, they pass off goods or services as those of another; cause a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; or cause likelihood of confusion or misunderstanding as to affiliation, connection, or association with another. *See* § 87-302(a)(1)-(3); *Denali Real Est., LLC v. Denali Custom Builders, Inc.*, 926 N.W.2d 610, 626 (Neb. 2019); *Prime Home Care, LLC v. Pathways to Compassion, LLC*, 809 N.W.2d 751, 764 (Neb. 2012); *Stenberg v. Consumer's Choice Foods, Inc.*, 755 N.W.2d 583, 591-92 (Neb. 2008); *Reinbrecht v. Walgreen Co.*, 742 N.W.2d 243, 247 (Neb. Ct. App. 2007).

Having found sufficient evidence to proceed to trial on whether there is a likelihood of confusion between Wright Printing's folder business and the plaintiff's, the Court will also deny summary judgment on this claim.

### (h) Fraud

Although presented as a single claim for relief, the plaintiff actually presents two very different fraud claims: one for fraudulently inducing the Agreement, and one for fraudulently inducing the Release. Filing 302 at 39-44. Fraud requires (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).[10]

---

[10] The Agreement provided that "The validity construction and enforceability of this Agreement shall be governed in all respects by the laws of the State of Delaware, without regard to its conflict of laws rules." Filing 302 at 93. That language—particularly the word "enforceability"—is broad enough to bring tort claims for fraudulent inducement of the agreement within the scope of the choice-of-law clause. *See Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 687 (8th Cir. 2001) (holding that under Nebraska choice-of-law principles, a choice of law provision that a contract would be "governed by and construed" in accordance with foreign law was not broad enough to apply to tort claims because it was not a "broad" clause "which choose[s] a particular state's law to govern, construe and enforce all rights and duties of the parties arising from or relating in any way to the subject matter of the applicable contract[.]") And neither party contends otherwise. *See* filing 399 at 53-58.

*(i) The Agreement*

The plaintiff alleges that it was fraudulently induced into entering into the agreement by, among other things, false representations that Wright Printing and Wright intended to get out of the folder business altogether. Filing 302 at 39. The plaintiff also lists a number of contract provisions that it characterizes as "falsely representing" Wright Printing's performance of, and intent to perform, the Agreement. Filing 302 at 39. And the plaintiff alleges that Wright Printing and Wright "concealed" much of the same alleged lack of performance. Filing 302 at 40. The defendants separate the plaintiff's allegations into two categories—alleged fraudulent representations made outside the Agreement, and those allegedly made in the Agreement—and argues that they should be treated differently. The Court agrees.

a. Extra-Contractual Misrepresentations – Reliance Clause

First, the defendants argue that the plaintiff's claims of extra-contractual misrepresentations are barred by the Agreement's reliance clause. Filing 385 at 7-9. And under Delaware law, they're correct. In § 3.24 of the Agreement, the parties acknowledged and agreed that

> Except as expressly set forth in this Article 3, [Wright Printing] does not make and has not made any representations or warranties whatsoever, written or oral, express or implied, at law or in equity, as to any fact or matter with respect to the acquired assets or the business, including without limitation in regard to :merchantability, fitness for a particular purpose, condition or design or arising by statute or otherwise in law, from a course of dealing or usage of trade or otherwise.

Filing 302 at 75 (letter case modified). Further, the plaintiff expressly acknowledged and agreed that it was "not relying on any statement or representation made by or on behalf of [Wright Printing] except as specifically set forth in this section." Filing 302 at 75 (letter case modified). And

> a party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a "but we did rely on those other representations" fraudulent inducement claim. The policy basis for this line of cases is, in my view, quite strong. If there is a public policy interest in truthfulness, then that interest applies with more force, not less, to contractual representations of fact. Contractually binding, written representations of fact ought to be the most reliable of representations, and a law intolerant of fraud should abhor parties that make such representations knowing they are false.

> To fail to enforce non-reliance clauses is not to promote a public policy against lying. Rather, it is to excuse a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made—to enable it to prove that another party lied orally or in a writing outside the contract's four corners. For the plaintiff in such a situation to prove its fraudulent inducement claim, it proves itself not only a liar, but a liar in the most inexcusable of commercial circumstances: in a freely negotiated written contract. Put colloquially, this is necessarily a "Double Liar" scenario. To

allow the buyer to prevail on its claim is to sanction its own fraudulent conduct.

*Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1057-58 (Del. Ch. 2006); *see RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 117 (Del. 2012).[11]

In response, the plaintiff insists that its claim isn't barred because it alleged fraudulent *concealment*. But what was concealed? The plaintiff says "Wright fraudulently concealed material information—he retained proprietary information that was supposed to be included in the sale to [the plaintiff,] with the intention of using it to start a competing business." Filing 399 at 53.

There are two parts to that, each with its own problems. First, retaining propriety information *prior to closing* wasn't a secret—Wright Printing was still operating the business. And retaining that information after closing may (or may not) have been a breach of the Agreement, but it couldn't have induced the Agreement. Wright couldn't have fraudulently concealed doing something that Wright Printing still had the right to do and that everyone obviously knew Wright Printing was still doing.

So that leaves Wright's alleged intent to eventually use the information to start a competing business. But that's just recasting Wright's alleged misrepresentations as omissions.

> Because a party in an arms' length contractual setting begins the process without any affirmative duty to speak, any claim of fraud in an arms' length setting necessarily depends on

---

[11] Nebraska law is the same—in fact, the Nebraska Supreme Court expressly adopted the reasoning of *Abry*. *Nathan v. McDermott*, 945 N.W.2d 92, 113 (Neb. 2020).

some form of representation. A fraud claim in that setting cannot start from an omission. For arms' length counterparties, therefore, contractual provisions that identify the representations on which a party exclusively relied define the universe of information that is in play for purposes of a fraud claim. A party may use external sources of information to plead that a contractually identified fact was false or misleading, but a party cannot point to extra-contractual information and escape the contractual limitation by arguing that the extra-contractual information was incomplete.

There is also a powerful practical rationale underlying this approach. Every misrepresentation, to some extent, involves an omission of the truth. Consequently, any misrepresentation can be re-framed for pleading purposes as an omission. If a plaintiff could escape a [reliance clause] by re-framing an extra-contractual misrepresentation as an omission, then the clause would be rendered nugatory. When parties identify a universe of contractually operative representations in a written agreement, they remain in that universe. A party that is later disappointed with the written agreement cannot escape through a wormhole into an alternative universe of extra-contractual omissions.

*Prairie Cap. III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 52-53 (Del. Ch. 2015) (cleaned up); *see Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 61 F. Supp. 3d 391, 400 (D. Del. 2014). Moreover, under Delaware law, concealment requires *active* concealment—that is, more than mere silence. *Air Prod. & Chems., Inc. v. Wiesemann*, 237 F. Supp. 3d 192, 216 (D. Del. 2017). The plaintiff has pointed to no affirmative acts that Wright or Wright Printing took to prevent any facts from being discovered. *See id*.

b. Contractual Misrepresentations – Bootstrapping

That leaves the plaintiff to base its fraud claim on representations made in the Agreement. The defendants argue that the plaintiff is attempting to improperly bootstrap a breach of contract claim into a fraud claim. Filing 385 at 10. Again, the Court agrees.

> Delaware courts will find that improper bootstrapping has occurred when the plaintiff simply adds the words "fraudulently induced" or alleges that the contracting parties never intended to perform as a means to plead fraud in cases where the parties are bound by contract. The bootstrapping is deemed improper because the plaintiff has simply tacked on conclusory allegations that the defendant made the contract knowing it would not or could not deliver on its promises.

*Pilot Air Freight, LLC v. Manna Freight Sys., Inc.*, No. CV 2019-0992-JRS, 2020 WL 5588671, at *25 (Del. Ch. Sept. 18, 2020).

But there are exceptions. In particular, a fraud claim alleged contemporaneously with a breach of contract claim may survive, so long as the claim is based on conduct that is separate and distinct from the conduct constituting breach. *ITW Glob. Invs. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.*, No. N14C-10-236, 2015 WL 3970908, at *6 (Del. Super. Ct. June 24, 2015). And allegations that are focused on inducement to contract are separate and distinct conduct. *Id.*

The plaintiff is focused on that exception. Filing 399 at 56-57. But the plaintiff can't sustain that claim based solely on contractual representations (and remember, as explained above, the reliance clause bars its use of extra-contractual representations). *See id.* at *9. As explained in *ITW Global*, the

exception for fraudulent inducement is appropriate when the plaintiffs allege fraud based on "the inducement to contract because of alleged fraudulent conduct occurring *prior* to entering the contract." *Id*. at *6. The plaintiff's own argument demonstrates the problem:

> [Wright Printing] and Wright separately and distinctly induced Crabar to enter into the [Agreement] (and later the Release) by fraudulently concealing these true intentions. In reliance upon Wright's representation that he was exiting the folder business and [Wright Printing]'s representation in the [Agreement] that it was selling all of its rights, title, and interest in the Acquired Assets including customer lists and customer data—when in fact the confidential and proprietary data and the spreadsheets were copied and stored on computer devices owned by Wright, [Wright Printing], or Sikora—[the plaintiff] was fraudulently induced to enter into the APA.

Filing 399 at 57. Wright's alleged representation that he was exiting the folder business is extra-contractual and barred by the reliance clause. And the alleged misrepresentation found in the "Purchase and Sale of Assets" provision of the Agreement was only effective when the Agreement was actually reached. To the extent it can possibly be characterized as a pre-contract representation that induced the contract, it's simply a representation to perform that was allegedly false—precisely the sort of subjective intent not to perform that the anti-bootstrapping rule precludes.

In sum, the Court agrees that the plaintiff's claim of fraudulent inducement as to the Agreement is barred by the reliance clause of the Agreement and the anti-bootstrapping rule. The plaintiff also asked the Court

for summary judgment in its favor as to its claim for fraudulent inducement of the Agreement. Filing 381 at 26. Obviously, that will be denied.

### (ii) The Release

The Court reaches a different conclusion as to the Release, however. As explained above, the elements of fraud include a false representation made by the defendant and the plaintiff's action or inaction in justifiable reliance upon the representation. *Stephenson*, 462 A.2d at 1074. The plaintiff alleges that Wright's alleged statements about his intent to get out of the folder business, along with later statements indicating a desire to "slow down" and get out of the landlord business, fraudulently induced the plaintiff to enter into the Release. Filing 302 at 43-44. The defendants question the evidence of both misrepresentation and reliance.

### a. Misrepresentation

The defendants argue that Wright didn't actually represent during the Release negotiations that he intended to retire from the folder business. Filing 385. They point to the critical emails, in which Michael Magill (the plaintiff's vice-president who was attempting to negotiate a lease extension) tried to persuade Wright that a long-term lease extension would be better than terminating the lease and selling the property, but Wright responded,

> I appreciate the good advice. I have tried to look at this from a lot of angles. The reality is I think it is time for me to close out and slow down. The realtors tell me they will not have a problem selling it because the demand here is high. . . . I am going to take this opportunity to get this off my plate and go for the sale.

Filing 88-10. And a few days later, Wright wrote that despite some economic advantage to the plaintiff's proposed lease extension, "again my mission is not to be a landlord." Filing 88-12. And, the defendants note, in Magill's deposition he said he interpreted Wright's statements as indicating that Wright no longer wanted to be a landlord. *See* filing 383-4 at 40-41. That, the defendants say, doesn't indicate Wright was saying he wanted to retire altogether.

The plaintiff argues, however, that Wright's statements when negotiating the release should be read along with his earlier statements, which the plaintiff alleges reassured the plaintiff that Wright was getting out of the folder business altogether. Filing 399 at 48. The defendants argue that Wright's 2013 statements can't support a claim for 2015 fraudulent inducement, but it's not clear why—it's not as if they have an expiration date. And a duty to disclose information may arise where it's necessary to make other statements not misleading. *See Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 154 (Del. Ch. 2004).

To be fair, the defendants are probably right that Wright couldn't have made statements in 2013 *intending* for them to be relied upon in 2015—and intent to induce the plaintiff to act is an element of the tort. *See Stephenson*, 462 A.2d at 1074. But the fairer way to describe the plaintiff's argument is that when Wright spoke in 2015, he knew that the plaintiff already believed him to have left the folder business behind for good—and because of that, he would have known that saying he wanted to sell the building and "slow down" might lull the plaintiff into agreeing to release the escrow and restrictive covenants of the Agreement, without suspecting that Wright Printing would instead move back into the building and start making folders. That may or may not be persuasive—but whether it's persuasive will be determined at trial.

b. Reliance

The defendants' other argument is that the plaintiff's decision to enter into the Release wasn't made in reliance on anything Wright said—rather, it was made because the plaintiff desperately needed additional time to move and didn't have any choice. Filing 385 at 15. Essentially, the defendants argue that Wright had the plaintiff over a barrel, so nothing he said mattered.

Perhaps. The plaintiff's response to that isn't particularly compelling. *See* filing 399 at 47-49. And there is evidence in the record clearly establishing how important a lease extension was for the plaintiff. *See* filing 383-4 at 37-39. But Magill also testified that the course of negotiations raised concerns, for him, about whether Wright really intended to sell the property. Filing 383-4 at 46. Whether the plaintiff would have made the same decision, had Wright not falsely reaffirmed his intent to sell the property outright, will be determined at trial.[12] The Court will deny the defendants' motion for summary judgment with respect to fraudulent inducement of the Release.

_____

[12] The Court notes that the plaintiff's alleged damages resulting from fraud include "lost revenue and profits due to the disruption of the business it purchased from [Wright Printing], the $1.1 million in released escrow funds, and the extensive costs of having to relocate its business from Omaha to Columbus, Kansas." Filing 302 at 44. It's hard to see how those are recoverable based on a fraudulent inducement of the Release, though: Had the Release not been signed, the business would have had to move earlier and been even more disrupted. And the escrow fund was only security against some other breach of the Agreement, not something to which the plaintiff was independently entitled. The plaintiff can argue otherwise, but it seems to the Court that the plaintiff's claim for fraudulent inducement of the Release is limited to a rescission remedy. The parties are encouraged to consider that issue as it relates to election of remedies, and whether the plaintiff's fraud claim is for the jury or the Court to decide. *See*, *e.g.*, *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 463 (Del. 1999) (describing options available for a fraudulently induced release); *see also Simler v. Conner*, 372 U.S. 221, 222 (1963) (characterization of state-created claim as legal or

(i) Breach of the Non-Disparagement Clause of the Release

The complaint contains a claim for breach of the non-disparagement provision of the Release, *see* filing 302 at 110-11, but the plaintiff has abandoned that claim, *see* filing 399 at 60-61. Accordingly, the Court will grant the defendants' motion for summary judgment on that claim.

(j) Federal Defend Trade Secrets Act

In addition to a Nebraska Trade Secrets Act claim, the plaintiff alleges a claim pursuant to the federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.* Under the federal law, as with the Nebraska statute, the plaintiff must show the existence of a protectable trade secret and misappropriation of that trade secret. *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1016 (8th Cir. 2020). The Defend Trade Secrets act uses "a similar definition of trade secrets," *see Farmers Edge Inc. v. Farmobile, LLC*, 970 F.3d 1027, 1033 (8th Cir. 2020), although the federal definition is broader, *see* § 1839(3)(B); *see also W. Point Auto & Truck Ctr., Inc. v. Klitz*, 492 F. Supp. 3d 936, 945 (D. Neb. 2020).

The defendants' argument with respect to the plaintiff's Defend Trade Secrets Act claim is coextensive with their Nebraska Trade Secrets Act argument. *See* filing 385 at 29-38. Accordingly, the Court reaches the same conclusion—if anything, the plaintiff's case under the federal statute is stronger because under federal law, information can be a trade secret if it is not "*readily* ascertainable through proper means." *Compare* § 1839(3)(B) (emphasis supplied), *with* § 87-502(4)(a); *see Infogroup*, 95 F. Supp. 3d at 1182.

---

equitable for purposes of whether a right to jury trial is indicated must be made by recourse to federal law); *Phillips v. Kaplus*, 764 F.2d 807, 812 (11th Cir. 1985) ("federal law is clear that an action for rescission is equitable, triable by the court without a jury").

(k) Breach of Confidentiality Agreements

Finally, the plaintiff claims that Kohlhaas and Fredrickson violated confidentiality agreements arising out of their employment with the plaintiff. Filing 302 at 51-53. These claims are a bit of a moving target.

In its operative complaint, the plaintiff points to Kohlhaas' February 10, 2015 execution of a an "Acknowledgement of Information Security And Confidentiality Agreement" (filing 302 at 116), in which she allegedly agreed to abide by a separate "Security Policy" (filing 302 at 117-20) and "Confidentiality Agreement" (filing 302 at 121). Fredrickson was alleged to have signed the same acknowledgement, of the same policies, on September 27, 2013. Filing 302 at 122.

The security policy obliged employees to "take all necessary steps to prevent unauthorized access to" confidential information, including trade secrets. *E.g.* filing 302 at 1. And the "Confidentiality Agreement" required the employee to agree that trade secrets were protected from disclosure and that trade secrets "or other confidential or proprietary information" belonging to the plaintiff wouldn't be disclosed or used "during or after termination" of the employee's employment. Filing 302 at 121. The employee was also required to return information after termination of employment. Filing 302 at 121.

But in support of its motion for summary judgment, the plaintiff provided a different "Confidentiality Agreement." Filing 380-10. That agreement provided that the employee would not, either during employment or thereafter, use or disclose "any confidential information acquired in the course of [] employment activities" without the consent of the employee's immediate supervisor. Filing 380-10. But it doesn't define "confidential information." Filing 380-10.

The defendants pointed out the discrepancy, filing 404 at 19-21, and the plaintiff admitted that it attached the wrong confidentiality agreement to the complaint, filing 409 at 19. The correct confidentiality agreement, the plaintiff says, is filing 380-10. Filing 409 at 19-20. The plaintiff also, now, points to the "Code of Conduct and Ethics Acknowledgement" Kohlhaas and Fredrickson signed, which *does* define trade secrets and prohibits employees from disclosing trade secrets or proprietary information. Filing 410-1 at 24, 35.

The defendants' argument for summary judgment is three-fold. First, they argue that the security policy didn't apply to employees after leaving their employment. Filing 385 at 38-39. There is some force to that argument—the security policy applies expressly to "employees, contractors, consultants, temporaries, and other workers at [the plaintiff], including all personnel affiliated with third parties." Filing 380-9 at 1. The plaintiff complains that the defendants "cite no legal authority for the proposition that a security policy like the one at issue must explicitly state it outlasts employment," but neither does the plaintiff cite any authority for the proposition that a survival clause should be read into it—particularly when many of its provisions simply wouldn't make sense for a non-employee. Rather, while the plaintiff insists it "makes no sense for [the plaintiff] to take active measures to protect unauthorized access to its confidential information, only to permit such access immediately upon an employee's termination," filing 399 at 59, that's presumably why other, expressly post-termination agreements were used.

But the defendants' argument runs into tougher sledding on those other agreements. The defendants say that Fredrickson didn't breach the confidentiality agreement (presumably, the correct one) because the plaintiff can't prove Fredrickson disclosed a trade secret or that it was damaged. Filing 385 at 39-41. Similarly, the defendants say that Kohlhaas didn't disclose any

trade secrets. In other words, the defendants are rehashing the same trade secrets and damages arguments that the Court already found to present genuine issues of material fact, and the Court will deny the defendants' motion for summary judgment on these claims for the same reasons.

The plaintiff seeks summary judgment in its favor on these claims, filing 381 at 35, but for the same reasons, the Court finds that whether the information Kohlhaas and Fredrickson allegedly transferred *did* include trade secrets—and whether it actually caused the plaintiff damage—are questions for the jury. In addition, the Court is sympathetic to the defendants' argument that given the plaintiff's lack of clarity on what agreements Kohlhaas and Fredrickson actually acknowledged, there are at this point still genuine issues of material fact as to what the terms of their employment and post-employment covenants actually were. The Court will deny the plaintiff's motion for summary judgment on these claims.

### 3. PLAINTIFF'S MOTION IN LIMINE

The plaintiff's motion in limine (filing 418) asks the Court to prohibit the defendants from calling 28 witnesses identified in the defendants' supplemental Fed. R. Civ. P. 26(a) disclosure (filing 420-3). The plaintiffs argue that the supplemental Rule 26 disclosure was made after the close of discovery, and allowing the defendants to put on these witnesses would constitute unfair surprise and would be prejudicial to the plaintiffs. The Court agrees.

Rule 26(a)(1)(A) requires parties to disclose names, addresses, and telephone numbers of individuals who are "likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses, unless the use would solely be for impeachment." Rule 26(a)(1)(A)(i). This disclosure must be supplemented "in a timely manner" if a party learns that the disclosure is incomplete or incorrect, i.e., if the party finds additional

witnesses that it would like to call to testify at trial. *See* Rule 26(e). A party is not allowed to use untimely disclosed witnesses at trial unless the failure to timely disclose "was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1); *see Trost v. Trek Bicycle Corp.,* 162 F.3d 1004, 1008 (8th Cir. 1998).

All depositions in this case were due on May 6, 2022, and the deadline for filing dispositive motions was May 20, 2022. Filing 366. Defendants submitted their initial Rule 26(a) disclosures on March 15, 2017 (filing 420-2 at 5), and did not amend their disclosure per Rule 26(e) until July 19, 2022 (filing 420-3 at 10; filing 417). The defendants cite Rule 26(e)(1)(A) and argue they had no obligation to amend their initial disclosure because the contested witnesses were already known to the other parties through other discovery processes. Filing 426 at 1. The defendants point to various emails, lease records, Facebook messages, Excel spreadsheets, Google reviews, depositions, affidavits, other correspondence, responses to interrogatories, and other documents produced or created throughout discovery which reference the contested witnesses. These references throughout the voluminous discovery record amounted to, according to the defendants, a sufficient disclosure that the defendants may call these individuals as witnesses.

This Court is not persuaded that transient and discrete references to a person are enough to amount to a disclosure that a party will call that person to testify at trial. The defendants appear to argue that if an individual is identified as someone likely to have discoverable information at any point throughout discovery, that is enough of a disclosure that the party may use that person to support its claims at trial. *See* filing 426. But Rule 26(a)(1)(A) requires a party to disclose individuals who are "likely to have discoverable information," *and* who the party "may use to support its claims or defenses" at trial. Many different people are referenced in emails or depositions, and those

people may be relevant to a lawsuit, but simply being relevant to a case does not mean that a party is likely to use that person as a witness. The plaintiffs had no way to prepare for the "witnesses" that appeared intermittently throughout the course of discovery because the defendants never disclosed their intention to use these witnesses to support their case.

The defendants also appear to claim that because documents referencing some of the contested witnesses—namely Gena Hange, Holly Vallandingham, Tom Kehoe, James Hartley, Neil Harvey, Martin James, Patrick Ryan, Steve Huie, and Robert Stor—were used as support for various motions, that also amounted to a disclosure that the defendants intended to use the referenced persons as support for their claim or defenses. But even that use is not enough to evade Rule 26(a) or (e) disclosure requirements. The plaintiffs had no way of knowing which individuals incidentally referenced in discovery documents would be potentially called as a witness at trial, even if such references were appended to the defendants' motion for summary judgment.

The defendants' supplemental Rule 26 disclosure was clearly untimely under Rule 26(e), and so the Court will exclude the untimely disclosed witnesses unless the defendant can show the failure to timely disclose was either harmless or substantially justified. Rule 37(c)(1). The defendants have provided no justification, let alone a substantial justification, for their failure to comply with Rule 26(a) or (e). In fact, the references to the contested witnesses cited by the defendants only undercut their argument. The defendants knew about them, and could have—at any point from their identification to May 26, 2022—supplemented their disclosures.

The defendants identify three witnesses—Debbie Moore, Jim Moore, and Robert Kakareka—"whose identities were only recently made known." Filing 426 at 6. But in support of this assertion, the defendants cite to a January 7,

2022, expert report which identified them. Filing 426 at 12. The defendants argue that the plaintiff "has put them at issue in this lawsuit," but that does not mean the defendants can call them as witnesses without following the disclosure rules in Rule 26(a) and (e). The defendants' six-month delay in supplementing their disclosure, after purportedly discovering these witnesses, is not substantially justified.

Further, the untimely disclosure of these witnesses is not harmless. The sheer amount of untimely disclosed witnesses constitutes a significant burden on the plaintiff to prepare cross-examination or rebuttal witnesses. *See Wegener v. Johnson*, 527 F.3d 687, 693 (8th Cir. 2008). The plaintiff is likely to be unfairly prejudiced if the Court allows these 28 witnesses to testify, even if the witnesses are under the plaintiff's control and have been identified somewhere in the course of discovery. *See Troknya v. Cleveland Chiropractic Clinic*, 280 F.3d 1200, 1205 (8th Cir. 2002).

This Court has wide discretion in creating a remedy for a party's failure to comply with Rule 26(a) and (e), and it will consider the reasons for noncompliance, the surprise and prejudice to the opposing party, the extent to which the testimony would disrupt the order and efficiency of trial, and the importance of the testimony. *Wegener*, 527 F.3d at 692. On balance, these factors point to excluding all witnesses. Particularly of note is that most of the contested witnesses referenced would provide only cumulative and redundant testimony, so there is not significant importance to their appearance at trial. The reasons for noncompliance and the surprise and prejudice to the opposing party have been addressed above, and point to excluding the witnesses. And the trial will be significantly more efficient by excluding redundant witnesses.

The Court will make an exception for certain witnesses if, *and only if*, the defendants can show both that there is a material need for the witness and

that the content of any testimony would not be unfairly prejudicial to the plaintiff. For example, a foundational witness to authenticate *timely and properly disclosed* documents may be allowed, assuming that such testimony would comply with the Federal Rules of Evidence. But for the Court to make such an exception, the defendants should identify those witnesses ahead of trial or well in advance of their proposed testimony, after consulting with the plaintiff's counsel to see if the witness's appearance is opposed—the Court does not intend to bring trial to a halt to determine whether the next proposed witness will be permitted to take the stand.[13]

### III. CONCLUSION

To summarize: The defendants' motion to exclude Bero's testimony will be denied. The defendants' motion for summary judgment will be granted in part—the plaintiff's fraud claim as to the Agreement, and the plaintiff's breach of contract claim as to the non-disparagement clause of the Release, are dismissed. In all other respects, the defendants' motion for summary judgment will be denied. The plaintiff's motion for summary judgment will be denied in its entirety. The plaintiff's motion to reinstate will be granted, and the plaintiff may pursue its tortious interference claim at trial. The plaintiff's motion in limine will be granted.

---

[13] Counsel are encouraged to be reasonable on this point—if you know (given what's been explained above) how the Court is likely to rule, perhaps spare everyone the trouble of making the Court do it. This has been a very hard-fought case, and the Court doesn't expect anything other than a hard-fought trial—but this is also a 10-day trial with the Christmas holiday looming at the finish line, so we should all be looking for ways we can cooperate to get this case to the jury effectively and efficiently. And that is what the Court expects.

IT IS ORDERED:

1.      The plaintiff's motion to reinstate (filing 372) is granted.

2.      The plaintiff's motion for partial summary judgment (filing 378) is denied.

3.      The defendants' motion for summary judgment (filing 382) is granted in part and denied in part, as set forth above.

4.      The defendants' motion to exclude (filing 389) is denied.

5.      The plaintiff's motion in limine (filing 418) is granted.

6.      The defendants' motion in limine (filing 431) will be taken up at the beginning of trial.

Dated this 5th day of December, 2022.

BY THE COURT:

John M. Gerrard
United States District Judge