IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CRABAR/GBF, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>MARK WRIGHT, WRIGHT PRINTING CO., MARDRA SIKORA, JAMIE FREDRICKSON, and ALEXANDRA KOHLHAAS,<br><br>Defendants. | 8:16-CV-537<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the parties' post-trial motions. The defendants—Mark Wright, Wright Printing Company, Mardra Sikora, Jamie Fredrickson, and Alexandra Kohlhaas—jointly move for a renewed judgment as a matter of law (filing 536), and for a new trial or to alter or amend the judgment (filing 538). The plaintiff has moved for attorney's fees (filing 513).

## I. BACKGROUND

In 2013, Wright Printing sold its custom-printed folder business to Crabar/GBF, Inc., pursuant to an Asset Purchase and Sale Agreement (APA). Filing 302 at 62. Crabar purchased the trade names "Folder Express," "Progress Music Publications, and "Progress Publications," as well as the related "customer lists, customer and prospect databases, customer sales information, information regarding customer printing requirements, job files, jackets, artwork, base negatives, job logs and other similar information regarding printing work performed for customers." Filing 302 at 63-64. Several employees of Wright Printing became employees of Crabar, including two of the defendants, Fredrickson and Kohlhaas.

Three years later, Wright Printing began selling custom-printed folders under new trade names, "Pocket Folders Fast" and "Bandfolder Press." In doing so, Wright Printing used some of the customer and product information it sold to Crabar as part of the APA. So Crabar sued Mark Wright, Wright Printing, and some Wright Printing employees. At trial, Crabar presented evidence that the defendants breached the APA, misappropriated Crabar's trade secrets, interfered with Crabar's business relationships and expectancies, and breached confidentiality agreements.[1]

Crabar sought recovery of lost profits as damages for the alleged harm caused by the defendants' various wrongful actions. Crabar's retained expert, certified public accountant Ronald A. Bero, Jr., provided three "categories" of lost profits. These categories were formulated to allow the jury to determine appropriate damages based on which theories of liability the jury found Crabar proved. The types of lost profits embodied by the categories included, (1) customers who had purchased from Crabar and later purchased from Wright Printing, and (2) customers who purchased certain types of folders sold by Crabar and later sold by Wright Printing. Category 1 included certain types of folders purchased by certain customers; Category 2 included other types of purchases by the customers in Category 1; and Category 3 provided purchases by other customers of certain types of folders.

After nearly two weeks of trial in Omaha, Nebraska, where both parties presented their best evidence and arguments to their empaneled peers, a jury

---

[1] During the trial, Crabar voluntarily dismissed its claims for trademark infringement, unfair competition, violation of the Nebraska Deceptive Trade Practices Act, and misappropriation of trade secrets under Nebraska law. *See* filing 492. Several other claims were dismissed by the Court at various stages of the litigation, including fraud, violation of the Computer Fraud and Abuse Act, and breach of the implied covenant of good faith and fair dealing.

returned a verdict in favor of Crabar on all its claims. Filing 505; filing 507. Pursuant to that verdict, the Court entered judgment in favor of Crabar and against Mark Wright in the amount of $2,750,000; Wright Printing in the amount of $1,000,000; Sikora in the amount of $1,250,000; Fredrickson in the amount of $7,000; and Kohlhaas in the amount of $3,500. Filing 512.

The defendants now argue that much of the jury verdict cannot stand as a matter of law. Filing 537. Alternatively, the defendants argue they are entitled to either a new trial or an amended judgment based on the great weight of the evidence. Filing 539. Specifically, the defendants argue, as to Crabar's claims:

(a)   Crabar failed to prove recoverable damages under the APA, and Mark Wright was not a party to the APA;

(b)   Crabar failed to prove the existence of some trade secrets, the jury returned an inconsistent verdict as to Fredrickson and Kohlhaas on the trade secrets claim, and Crabar failed to prove the defendants willfully and maliciously misappropriated trade secrets;

(c)   Crabar failed to prove that it had a valid business expectancy with which the defendants tortiously interfered, and the defendants did not unjustifiably or actively interfere with those relationships;

(d)   Crabar failed to prove that Fredrickson or Kohlhaas breached a confidentiality agreement.

And, as to the damages awarded, the defendants argue:

(a)   The Court erroneously allowed the jury to consider the testimony of Crabar's expert, and Crabar failed to causally connect Bero's testimony to any of its claims;

(b)   The jury awarded multiple recoveries for a single injury;

(c)   The jury returned an inconsistent verdict for actions of the defendants within the scope of their employment with Wright Printing;

(d)   The jury awarded unconstitutionally excessive punitive damages; and

(e)   The damages were not warranted by the great weight of the evidence.

*See* filing 537; filing 539. Crabar argues the jury's verdict is sound, and moves for attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D). Filing 513.

## II. STANDARD OF REVIEW

### 1. RULE 50

When considering a motion for judgment as a matter of law, a court must determine whether or not the evidence was sufficient to create an issue of fact for the jury. *Lane v. Chowning*, 610 F.2d 1385, 1388 (8th Cir. 1979). The Court will grant a motion for judgment as a matter of law when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party. *Ehrhardt v. Penn. Mut. Life Ins. Co.*, 21 F.3d 266, 269 (8th Cir. 1994). In considering the motion, the Court views the record in the light most favorable to the prevailing party. *Wash Solutions, Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 892 (8th Cir. 2005). The Court must also assume that all conflicts in the evidence were resolved in favor of the prevailing party, and the Court must assume as proved all facts that the prevailing party's evidence tended to prove. *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003). The motion should be denied unless the Court concludes that no reasonable juror could have returned a verdict for the nonmoving party. *Billingsley v. City of Omaha*, 277 F.3d 990, 995 (8th Cir. 2002).

### 2. RULE 59

A motion for new trial is governed by Federal Rule of Civil Procedure 59. The standard for granting a new trial is whether the verdict is against the great weight of the evidence. *Butler v. French*, 83 F.3d 942, 944 (8th Cir. 1996). In evaluating a motion for a new trial pursuant to Rule 59(a), the key question is whether a new trial should have been granted to avoid a miscarriage of

justice. *McKnight By & Through Ludwig v. Johnson Controls, Inc.*, 36 F.3d 1396, 1400 (8th Cir. 1994).

Rule 59(e) permits a court to alter or amend a judgment, but the rule may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008). A district court has broad discretion in determining whether to grant or deny a motion to alter or amend judgment pursuant to Fed. R. Civ. P. 59(e). *United States v. Metro. St. Louis Sewer Dist.*, 440 F.3d 930, 934 (8th Cir. 2006). Rule 59(e) motions serve the limited function of correcting manifest errors of law or fact or to present newly discovered evidence. *Id.* A new trial based on an inconsistent verdict is warranted only if there is no principled basis upon which to reconcile the jury's inconsistent findings. *SEC v. Quan,* 817 F.3d 583, 586 (8th Cir. 2016).

## III. DISCUSSION

### 1. CRABAR'S CLAIMS

The defendants proffer several theories they believe justify setting aside the jury verdict. Many are premised on assertions that the jury misunderstood or failed to follow the Court's instructions, and on the defendants' speculation about how the jury came to its verdict. But juries "are presumed to follow the court's instructions." *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009); *see also Borchardt v. State Farm Fire and Cas. Co.,* 931 F.3d 781, 786 (8th Cir. 2019) ("We assume the jury followed the court's instructions, weighed the evidence and credibility of the witnesses, and carefully reached the verdict that it did"). If the jury is properly instructed on the law, the verdict must remain immune from questioning or speculation by the district court that the jury misunderstood the instructions. *Craig Outdoor Advertising, Inc. v. Viacom*

*Outdoor, Inc.*, 528 F.3d 1001, 1023 (8th Cir. 2008) (quoting *Gander v. FMC Corp.,* 892 F.2d 1373, 1379 (8th Cir. 1990)).

(a) Breach of Contract

*Article 8.6 Exculpatory Clause*

First, the defendants argue that a clause in the APA precludes the exact damages sought by Crabar and awarded by the jury. The defendants therefore seek the Court's judgment as a matter of law on the breach of contract claim. Filing 537 at 11. Prior to trial, the defendants proposed adding the following language to the end of Jury Instruction #11:

> However, under Article 8.6 of the APA, Crabar is not entitled to recover damages from lost business opportunities, lost profits, incidental, special, consequential, punitive exemplary or indirect damages, or interference with business operations.

Filing 529 at 7-8; filing 476 at 11. This language mirrors the referenced clause in the APA. *See* filing 302 at 91. At the formal jury instruction conference, the Court elected not to include this proposal, despite the exculpatory language in the APA. *See* filing 529 at 12.

Exculpatory clauses like the one in the APA are enforceable under Delaware law, with limited exceptions. *See Donegal Mut. Ins. Co. v. Tri-Plex Sec. Alarm Sys.,* 622 A.2d 1086, 1090 (Del. Super. Ct. 1992) (collecting cases). But the defendants did nothing to draw the Court's attention to this matter other than a note in their proposed jury instructions, filing 476 at 11, and an objection to Crabar's proposed instructions, filing 482 at 6. The defendants provided no law or explanation with their proposed instruction, and they filed both documents only a few days before the start of trial.

- 6 -

As noted in the Court's Rule 50(a) determination, this type of limitation on damages is substantial. *See* filing 528 at 7. Yet, in over six years of litigation, no *Daubert* motions, motions in limine, motions for summary judgment, motions to dismiss, objections, or any other filing in support of or in opposition to a remedy sought by either party included any reference to this contract provision. *See* filing 71; filing 76; filing 90; filing 135; filing 137; filing 171; filing 227; filing 229; filing 240; filing 241; filing 248; filing 253; filing 385; filing 394; filing 396; filing 404; filing 416; filing 426; filing 431; filing 432; filing 440; filing 443; filing 441; filing 456; filing 473; filing 474. The proposed instruction, included in the defendants' *second* set of proposed jury instructions, was the first time, filed six days prior to trial, that the defendants *ever* referenced the exculpatory clause. And again, the Court had no briefing, law, or explanation as to why the clause should be enforced.

Crabar asserts that the defendants waived the protection of the exculpatory clause by not including it in the final pretrial conference order. Filing 549 at 3; *see* filing 438. The Court agrees. "[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim." *Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 831 (8th Cir. 2019) (quoting *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002)).

Federal Rule of Civil Procedure 16 *requires* that counsel assist "the court in identifying the factual issues worthy of trial. If counsel fail to identify an issue for the court, the right to have the issue tried is waived." Fed. R. Civ. P. 16(c) committee notes on 1983 amendment. By not raising the issue of what types of damages could be recovered by the plaintiff during the final pretrial conference, the defendants waived the asserted protections of the exculpatory

- 7 -

clause. The defendants argue that Rule 16 and the proposition in *Klingenberg* are limited to affirmative defenses, or other issues which must be pled. But Rule 16 is broader; it includes any factual issue, and it includes theories of damages. *Id.; see also* Rule 16(c) committee notes on 1983 amendment.

Principles of basic fairness indicate this Court should not permit the defendants to rely on Article 8.6, a provision buried in a nearly-fifty-page contract. *See Restored Images Consulting, LLC v. Dr. Vinyl & Assoc., Ltd.*, No. 4:14-cv-527, 2016 WL 3064142, at *15 (W.D. Mo. May 31, 2016). The defendants abandoned their protection under this contract provision when they "offhandedly cited" the provision in their proposed jury instructions and never mentioned that provision in any other filing prior to trial. *Id.* For these reasons, the defendants' motion on Crabar's $500,000 contract claim against Wright Printing is denied.[2]

### Verdict Against Mark Wright for Breach of Contract

The defendants additionally argue that Mark Wright was not a party to the APA and including him on the verdict form for Crabar's breach of contract claim was plain error. The Court agrees.

Generally, a party may assign an error in an instruction actually given by properly objecting to it. Fed. R. Civ. P. 51(d)(1)(A). It is the attorney's job in a civil case "to ascertain how the jury is to be instructed and to state any objections before the jury retires." *Phillips v. Parke, Davis & Co.*, 869 F.2d 407, 409 (8th Cir. 1989). In this case, the defendants made no objection to including Mark Wright on Instruction #11, which means they waived any objection,

---

[2] For reasons explained below, the $1 million contract claim against Mark Wright will be set aside, but the amount assessed against Wright Printing is left.

unless the Court's submission of that instruction constituted "plain error." *Niemiec v. Union Pac. R.R. Co.*, 449 F.3d 854, 857-58 (8th Cir. 2006).

The Court included Wright in the jury instructions and verdict form based on the language of the contract provision at issue. *See* filing 302 at 84 ("[N]either Seller, *nor Mark Wright* . . . shall, either directly or indirectly . . . in any way . . . at any time use . . . any Confidential Information" (emphasis added)). But Crabar never asserted, in its operative complaint or in the final pretrial conference order, a claim for breach of the APA against Wright. *See* filing 302 at 32; filing 438 at 4. Crabar argues that the inclusion of Wright was not plain error because it was supported by evidence at trial, and "there is nothing manifestly unfair about holding a wrongdoer accountable for his willful and malicious misconduct." Filing 553 at 17.

To constitute plain error, (1) there must be an "error," which is a "deviation from a legal rule," (2) the error must be "plain," which "is synonymous with 'clear' or, equivalently, 'obvious,'" (3) the party claiming plain error must demonstrate that the alleged error likely altered the outcome, and (4) the error "was sufficiently fundamental to threaten the fairness or integrity or public reputation of the judicial proceeding." *Wilson v. Brinker Int'l, Inc.*, 382 F.3d 765, 771 (8th Cir. 2004).

The Court may not add a party to a plaintiff's claim at the jury instruction stage of trial, regardless of the "willful and malicious misconduct" alleged of a party. The inclusion of Wright for the breach of contract claim was a plain error, which obviously affected the outcome because otherwise there would be *no* judgment against Wright as to that claim. Allowing Crabar to reap $1 million from Mark Wright due to the Court's plain error would threaten the integrity of the proceedings, and would undermine the ideals of fair notice and basic justice. The judgment will be amended and the breach of contract verdict and damages as to Mark Wright will be set aside.

(b) Trade Secrets

*Existence of a Trade Secret*

The defendants argue, under both Rule 50(b) and Rule 59, that Crabar did not present sufficient evidence establishing the existence of some of the alleged trade secrets. Filing 537 at 12; filing 539 at 5. They argue this entitles them to judgment as a matter of law. Filing 537 at 12. Alternatively, the defendants argue that some matters could not legally be trade secrets and were erroneously submitted to the jury without a special verdict form, and so a new trial is warranted. Filing 539 at 6.

The jury was instructed that Crabar alleged "customer lists, customer information, sales data and product cost modeling data, the Folder Express die inquiry spreadsheet, die template files, and die boards" were trade secrets misappropriated by each of the defendants. Filing 503 at 17. It appears the defendants' only umbrage is with including the die inquiry spreadsheet, die template files, and die boards in the jury instructions. *See* filing 539 at 6; filing 537 at 12.

As has been stated by this Court in prior rulings, whether or not certain information was a trade secret is a question of fact for a jury to determine. The evidence Crabar produced to survive summary judgment on this issue was provided during the trial. *See* filing 445 at 21. The jury was properly instructed on what to consider in determining whether the folder information was a trade secret, and whether that information was misused by the defendants in any way.

Again, the defendants wish to argue that because folder sizes "are ascertainable by simply observing the folders," that information cannot be a trade secret. Filing 537 at 14. But the defendants misstate the alleged trade secret. The alleged trade secret was the *compilation* of information regarding folder sizes, die files, die boards, the most popular folder types, and the types

- 10 -

of folders certain customers preferred. 18 U.S.C. § 1839(3) (the definition of trade secret includes "all forms and types of financial [and] business . . . information, including . . . compilations"). Whether a compilation of certain industry information is a trade secret is a question for the trier of fact to determine. *See Wellogix, Inc. v. Accenture, LLP,* 716 F.3d 867, 874 (5th Cir. 2013).

Crabar's evidence supported that the defendants used documents which represented time and effort spent systemically compiling information otherwise found only disparately in the public domain, and included information not readily available except by re-creation. *See* filing 445 at 21-22. The defendants (according to their own testimony) *could have* gone to different websites and compiled the information again. Evidence adduced at trial indicated they did not do that, and instead they used the Folder Express, Progress Music Publications, and Progress Publications compilations of folder information which were sold to, and then misappropriated from, Crabar. Filing 540 at 45.

Even using those compilations "as a reference" made it easier for the defendants to reenter the custom-printed folder business. *See* filing 540 at 43. The jury could have found that such information was a trade secret. Kohlhaas testified that, with certain information from a customer, she could easily create a die template in ten or fifteen minutes. Filing 537 at 19. But instead, she used Crabar's templates because it was "accessible easily" and was the quickest way for Wright Printing to reenter the folder business. Filing 540 at 43, 45. And the folder information was valuable because it could be combined with the customer list, and Wright Printing could determine exactly what types of folders Crabar's customers used and preferred.

And while the defendants argue that the economic advantage earned was minimal, the jury did not have to believe the defendants' testimony about how

- 11 -

easy it was to create folder templates. The jury determined, based on sufficient evidence, that the defendants gained a meaningful economic and competitive advantage by using the information they sold to Crabar. The defendants did not prove, as a matter of law or contrary to the great weight of the evidence, that they could ever have found the precise folder dimensions and templates that they sold to Crabar.

The parties offered competing evidence regarding whether Crabar truly kept certain information "secret," or what Wright Printing did with the folder information before selling it to Crabar. *See* filing 537 at 13. But that doesn't entitle the defendants to victory. Rather, it was the jury's job to determine whether Crabar took "reasonable measures to keep such information secret." Filing 503 at 18. The jury, evidenced by its verdict, believed Crabar over the defendants.

Now, the defendants request a new trial because they failed to request a special verdict form. When neither party requests a verdict form, and the jury's general verdict is supported by sufficient evidence, no new trial is warranted. *See Masters v. UHS of Del., Inc.,* 631 F.3d 464, 475 (8th Cir. 2011); *West v. Media Gen. Op., Inc.,* 250 F. Supp. 2d 923, 937 (E.D. Tenn. 2002) (collecting cases); Fed. R. Civ. P. 49. Each of the trade secrets in the instructions was supported by evidence. Which pieces of information the jury considered trade secrets is not ascertainable from the verdict form, but Crabar's evidence sufficiently supports that any of that information *could* have been a trade secret. The defendants' motions on this issue are therefore denied.

### *Fredrickson and Kohlhaas*

The defendants additionally argue that the verdicts against Fredrickson and Kohlhaas for misappropriation of trade secrets "were applied improperly and inconsistently." Filing 539 at 22. When the jury initially delivered its

verdict, it awarded exemplary damages without awarding compensatory damages, contrary to 18 U.S.C. § 1836(b)(3)(C), based on the Court's error in Instruction #12. *See* filing 503 at 19. To remedy this error, upon consultation with counsel, the Court re-instructed the jury, provided a corrective verdict form, and directed the jury to deliberate once more. The jury returned with a verdict which complied with the instructions (and the law). Filing 507.

According to the defendants, the jury improperly intended "to determine a specific dollar amount and then back-in that amount into a verdict form to support" the award against Fredrickson and Kohlhaas. The defendants' two points of evidence include, first, the corrective verdict form reflected the same total dollar amount assessed against these defendants as in the initial verdict form, and second, the jury asked the Court whether it decides "on a total amount" and then apportions fault. Filing 539 at 24. The defendants also baldly argue the jury's verdict is inconsistent, presumably because the original verdict, awarding exemplary damages without awarding compensatory damages, was inconsistent with the jury instructions. *See* filing 539 at 22-24.

In any event, the defendants waived their claim of inconsistency by failing to object before the jury was discharged. *McDonald Apiary, LLC v. Starrh Bees, Inc.,* No. 8:14-cv-351, 2017 WL 1232413, at *4 (D. Neb. Apr. 3, 2017) (citing *Williams v. KETV Television, Inc.,* 26 F.3d 1439, 1443 (8th Cir. 1994)). The defendants' speculation as to how the jury came to its verdict does not support amending the judgment. *Craig Outdoor Advertising,* 528 F.3d at 1023. After asking how to apportion damages, and after returning an inconsistent verdict, the jury was instructed on the law, and it is assumed to have followed the new instructions. The jury awarded damages based on the evidence at trial supporting harm to Crabar caused by Fredrickson and Kohlhaas misappropriating trade secrets, and the Court will not speculate as to how the jury arrived at its verdict. *Id.*

*Evidence of Maliciousness*

Under Rule 50(b), the defendants argue no evidence supports the jury's finding that the defendants acted willfully and maliciously when they misappropriated Crabar's trade secrets. Filing 537 at 32. The defendants did not raise this issue in their Rule 50 motion. *See* filing 521; filing 528. The defendants also did not object to including punitive damages in the jury instructions and verdict form. *See* filing 443; filing 529 at 16. Because the defendants did not raise this issue earlier, they cannot now "renew" the request for judgment as a matter of law on punitive damages under Rule 50(b). *See Olsen as Tr. for Xurex, Inc. v. Di Mase,* 24 F.4th 1197, 1202 (8th Cir. 2022); Fed. R. Civ. P. 50(b). But the defendants' arguments also fail on the merits.

"Juries have considerable flexibility in determining the level of punitive damages." *Trickey v. Kaman Indus. Techs. Corp.,* 705 F.3d 788, 802 (8th Cir. 2013). The Defend Trade Secrets Act allows exemplary damages for trade secrets which are "willfully and maliciously appropriated." 18 U.S.C. § 1836(b)(3)(C). The jury was instructed as to what circumstances would warrant an award of punitive damages. Filing 504 at 5 ("[C]onduct is 'willful' if the wrongdoer either knew or showed reckless disregard for whether its conduct was prohibited by law. To act 'maliciously' means to intentionally injure another without just cause.").

The evidence of maliciousness included evidence that the defendants knowingly used shortcuts to restart a business that had been sold for $15 million. Some of the defendants, while employed by Crabar, assisted Wright Printing in restarting its competing business by lying to Crabar employees and taking a hard drive with Crabar's confidential information on it. The defendants knew that Crabar was selling certain types of folders to certain customers. Several witnesses admitted to having used the confidential information in restarting the Wright Printing folder business, and further

- 14 -

admitted to *knowing* such behavior was wrong, or at least "sneaky." *See* filing 540 at 46. Through Crabar's competent direct and cross-examination, the defendants admitted to inconsistencies throughout the litigation process, and were repeatedly impeached based on changing narratives and stories about how the competing pocket folder business formed.

The defendants cite to *NCMIC Fin. Corp. v. Artino*, 638 F.Supp.2d 1042, 1081 (S.D. Iowa 2009), where a court determined that maliciousness was not present when the defendant's conduct seemed to "arise from a sincere difference of opinion on questions of law and fact." The defendants testified and now argue that they did not know the folder information was a trade secret, so they cannot be said to have maliciously misappropriated it. But the defendants needed only to know "or show reckless disregard for whether [the] conduct was prohibited by law," and did not need to know that certain information was a trade secret. Filing 503 at 20. The jury could have found that the defendants misrepresented facts and attempted to escape liability for their actions. They knew Crabar owned the information determined to be a trade secret, and they used shortcuts in order to take back information sold as part of a multimillion-dollar transaction. The evidence supports the jury's finding that the defendants, clearly and convincingly, acted willfully and maliciously when they took information sold to Crabar to compete against it.

### (c) Tortious Interference

The defendants claim that Crabar failed to present sufficient evidence on some of the elements of its claim for tortious interference with a business relationships or expectancies claim. Filing 537 at 21. To succeed on a claim for tortious interference, a plaintiff must prove: (1) the existence of a valid business relationship or expectancy, (2) the defendant knew of the relationship or expectancy, (3) the defendant unjustifiably and intentionally interfered with

that relationship, (4) the interference caused the harm sustained, and (5) damages. *Dick v. Koski Prof. Grp., P.C.*, 950 N.W.2d 321, 374 (Neb. 2020). A person who improperly obtains information about another's business is liable to the other for harm caused by the use of the information. *See Summit Restoration, Inc. v. Keller*, 953 N.W.2d 816, 826 (Neb. App. 2020); Restatement of Torts § 759.

### *Valid Business Expectancy*

The defendants argue that Crabar did not present sufficient evidence showing the existence of a valid business expectancy. Filing 537 at 22. Although Nebraska law is not fully developed on this point, it is true that proving a business expectancy "valid" will generally require proof that there was a reasonable likelihood or probability of a business relationship. *See, e.g., Infogroup, Inc. v. DatabaseLLC*, 95 F.Supp.3d 1170, 1196 (D. Neb. 2015) (collecting cases). A plaintiff must show proof of a potential relationship with a particular party or class of parties. *Id*. A "past relationship with customers alone is insufficient to create a reasonable expectancy," but evidence of retained customers over time clears that bar. *Koski Prof. Grp.,* 950 N.W.2d at 374.

Crabar presented proof of its ongoing relationships with several high-volume customers. *See* filing 530 at 36, 43. Year after year, the "highest dollar volume customers" stayed with Crabar, including after Crabar's disruptive move to Kansas, until Wright Printing re-entered the folder market. Filing 530 at 36, 43. The defendants argue that the evidence showed there is a 25 percent attrition rate in the folder business. Filing 537 at 23. Further, the defendants argue that Crabar's customers worked on a per-contract basis, and customers had no obligation to return to Crabar for future folder orders. But Bero testified that there was not a pure 25 percent attrition rate across all customers; rather,

Crabar retained its biggest customers after the move, until Wright Printing re-entered the market. Filing 530 at 36, 43.

The jury was instructed that Crabar "must prove that there was a reasonable likelihood or probability of a business relationship." Filing 503 at 21. Crabar identified, through Bero and through its customer list, a class of customers likely to purchase from Crabar in successive years. The jury had the tools to evaluate the information provided, and it awarded damages based on the evidence it found credible. The jury's finding that Crabar had a reasonable likelihood or probability of returning customers is supported by sufficient evidence.

### *Unjustified or Active Interference*

Additionally, the defendants argue that they did not provide any untruthful information to Crabar's customers, nor did Wright or Sikora personally contact any of Crabar's customers, and so there was no unjustified or active interference with Crabar's business relationships. In their Rule 50(a) oral motion, the defendants argued that there was no interference because the defendants merely sent a mailer out to different customers, "and that's just competition." Filing 521 at 11. The defendants have not renewed this argument and instead present different justifications for judgment as a matter of law on this element of the plaintiff's tortious interference claim. The alternative justifications are waived because a "post-trial motion for judgment may not advance additional grounds that were not raised in the pre-verdict motion." *Olsen,* 24 F.4th at 1202 (quoting *Klingenberg,* 936 F.3d at 834). For the sake of completeness, however, the Court also notes that the defendants' arguments lack any conceivable merit.

The defendants argue that they did not unjustifiably interfere with Crabar's business relationships because they did not lie to any of the customers

solicited from Crabar's customer list. One way in which interference can be unjustified is when a tortfeasor lies to another business's customer, and under Nebraska law, an actor "does not incur liability for interfering with a business relationship by giving truthful information to another." *Thompson v. Johnson*, 910 N.W.2d 800, 829 (Neb. 2018) (quoting *Recio v. Evers*, 771 N.W.2d 121, 133 (Neb. 2009)).

But the alleged unjustified interference in *this* case was in using misappropriated confidential information. This is a legally sufficient standard by which to judge a party's interference with a valid business relationship or expectancy. *See Summit Restoration*, 953 N.W.2d at 826-27. The jury was properly instructed on the factors to consider in determining whether an interference with a business relationship was proper. Evidence at the trial supports the jury's finding that the defendants wrongfully interfered with Crabar's business expectancies.

The defendants additionally argue that there was no evidence that Mark Wright and Mardra Sikora "actively" interfered with Crabar's customers. Filing 537 at 25-26. The defendants argue that Wright and Sikora did not personally contact any Crabar customers, and they only prepared lists for other employees to call. That misstates the law (and the defendants cite only to out-of-district laws to support their assertions). The alleged tortious interference involves the creation of the list. There is no requirement under Nebraska law that an individual must have been the only responsible party. *See Summit Restoration*, 953 N.W.2d at 826; *Koski Prof. Grp.*, 950 N.W.2d at 377. Wright and Sikora directed employees to make the phone calls, and so they face the natural and probable consequences of those actions.

Crabar claimed that Sikora and Wright used "Crabar's customer lists, customer information, sales data and product cost modeling data, a die inquiry spreadsheet, die template files, and die boards" to interfere with Crabar's

business relationships and expectancies. Filing 503 at 21. Sikora testified that she used Crabar's list to target customers. Filing 548 at 232-33. And Wright testified that he used the same list to create a spreadsheet of potential customers. *See* filing 548 at 210. While Wright testified that he did not actually use that list, the jury could make reasonable inferences to answer questions. Why would Wright create the list but not use it? Wright and Sikora both knew they should not have used Crabar's list in creating their customer information. Sikora even testified that she did not see the harm in using the list because she assumed the customer information would be available to her *eventually*, but that wasn't actually the case. Filing 548 at 232. The jury determined that Wright Printing gained an unfair competitive advantage by using Crabar's information.

Sufficient evidence supports the jury's finding that Wright and Sikora actively and unjustifiably interfered with Crabar's business expectancies. The defendants' motion on these issues is denied.

### (d) Confidentiality Agreements

Kohlhaas and Fredrickson argue that they legally cannot have breached the confidentiality agreements because, first, the agreements "did not survive termination of employment," and second, the contracts were between the defendants and Crabar's parent company, Ennis, who is not a party to this case. Filing 537 at 37.

Two versions of a confidentiality agreement were placed into evidence. Both agreements included express language indicating that the obligation to protect confidential information survived the termination of employment. *See* filing 380-10 at 1; filing 302 at 121. But the alleged breaches, taking confidential information and providing it to Wright Printing, at least started *during* the defendants' employment with Crabar. *See* filing 540 at 33. The

defendants testified as much. It's difficult to see how the jury could have found anything else.

The argument that Crabar was not a party to the agreement is similarly unconvincing. The jury was instructed that as part of Crabar's claim against Kohlhaas and Fredrickson, it must find that "Crabar and the defendant entered into a contract." Filing 503 at 24. Testimony adduced at trial indicated that Kohlhaas and Fredrickson understood who their agreements were with, and this evidence supports the jury's verdict. *See* filing 521 at 10. The jury had a reasonable basis for determining that Crabar was a party to the contract, regardless of the business name at the top of the piece of paper.

The defendants also appear to argue that the confidentiality agreement was not a contract at all. *See* filing 537 at 38. A provision in one of the agreements states that the confidentiality agreement "is not a contract of employment and . . . does not alter my status as an at-will employee of Ennis, Inc." Filing 537 at 38; filing 380-10 at 2. The defendants do not raise concerns about lacking consideration, but instead argue that the confidentiality agreement failed "to create a mutual understanding of post-employment contractual obligations." Filing 537 at 38.

 In order to recover in an action for breach of contract, the plaintiff must prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty. *Henriksen v. Gleason,* 643 N.W.2d 652, 658 (Neb. 2002). "[T]he burden of proving the existence of an employment contract and all the facts essential to the cause of action is upon the person who asserts the contract." *Blinn v. Beatrice Cmty. Hosp. & Health Ctr., Inc.,* 708 N.W.2d 235, 245 (Neb. 2006).

Crabar presented sufficient evidence showing the existence of a binding agreement. Crabar further elicited testimony from Kohlhaas that she breached that agreement when she utilized confidential information to unfairly compete

against Crabar. Filing 540 at 32. There was also testimony from Fredrickson that she provided Crabar's confidential information to Wright Printing, Wright, and Sikora, in violation of the agreement. Kohlhaas and Fredrickson also testified that they understood that they were not to use proprietary information other than for Crabar's company purposes. The terms of the contract were clear and both parties understood them. The evidence supports Crabar's breach of contract claim and the jury's verdict against Fredrickson and Kohlhaas.

## 2. DAMAGES

Having determined that Crabar presented sufficient evidence supporting the verdicts against the defendants, the Court turns to the defendants' various arguments about the damages awarded. In evaluating each of the defendants' contentions, the Court will consider whether the amount of damages awarded is supported by the evidence. This includes consideration of the weight which a reasonable juror could have afforded to different aspects of any expert testimony.

"The general rule is that uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty as to the amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss." *Pribil v. Koinzan*, 665 N.W.2d 567, 572 (Neb. 2003). The evidence must allow the jury to "estimate actual damages with a reasonable degree of certainty and exactness," without speculation or conjecture. *Id.*

### (a) Expert Testimony

The defendants argue that Bero's testimony was unreliable and speculative based on Bero's categories of damages (filing 539 at 18), and that Crabar failed to causally connect Bero's connections to the defendants'

- 21 -

wrongdoing (filing 537 at 27). This, according to the defendants, entitles them to judgment as a matter of law, or a new trial. Without Bero, the defendants say, Crabar "failed to present any proof of reliable damages," and Bero's opinion was improperly submitted to the jury. Filing 539 at 22.

*"Category 1" and "Category 2" Damages*

The defendants argue that Bero's calculations are unreliable in part because Crabar, during closing arguments, indicated that it was no longer seeking the lost profits represented by Category 2. According to the defendants, by "abandoning" Category 2 damages, Crabar necessarily abandoned Category 1 damages. The defendants argue this is evidence that even Crabar believed that Bero's opinion was unreliable.

The defendants' cross-examination of Bero revealed that the customers in Categories 1 and 2 were not customers who appeared on the customer list sold to Crabar as part of the APA. Rather, "Crabar's customers" in Bero's categories included *any* customer who purchased from Crabar and later purchased from Wright Printing. According to the defendants, the jury was left with thousands of customers and thousands of pages of sales data and was "neither equipped nor provided the foundation to perform" any calculation of damages for the alleged misappropriation of the customer list. Filing 539 at 19.

The defendants misrepresent Bero's categories of damages. One reason this Court allowed Bero to testify is because the categories appropriately separated customers and types of sales in order to allow a jury to determine the appropriate measure of lost profits based on the jury's factual findings of liability. *See* filing 445 at 11-12. None of the sales in any particular category were included in any other category. Bero's categories provided a basis for damages depending on the jury's finding of liability. If a jury determined that

Wright did *not* unlawfully sell to certain customers, but folder information *was* unlawfully used, Bero's categories allowed an of award *both* Category 1 and Category 3 damages. So, abandoning Category 2 damages did not, by itself, equate to abandoning Category 1 damages, if the jury determined that the defendants misappropriated the folder information.

Crabar was not required to prove its damages with mathematical certainty if it provided a factual basis for computing a probable loss. *Pribil*, 665 N.W.2d at 572. The evidence adduced through Bero provided such a basis. While the "certain customers" categories (Categories 1 and 2) are overinclusive in assessing damages associated with the defendants' use of Crabar's customer list, the jury had the underlying data for Bero's various categories, including lists of purchases by Wright Printing's customers and the customer list alleged to have been a trade secret. *See* filing 502 at 3 (plaintiff's exhibits 335, 336, and 337). The jury therefore had the foundation and equipment to "estimate actual damages with a reasonable degree of certainty and exactness." *Pribil*, 665 N.W.2d at 572.

The defendants argue that "the only reasonable inference" for Crabar abandoning Category 2 lost profits "is that Crabar felt it could no longer credibly ask for recovery" of those damages. Filing 539 at 20. However, there is another reasonable inference that does not involve Crabar discrediting its expert: This was a strategic trial decision intended to maximize any potential award by simplifying the damages requested. Counsel's closing argument is not evidence. Crabar was allowed to frame the evidence to assist the jury in its deliberations. The defendants had the same opportunity. The jury had all the information, and could assess the defendants' arguments regarding any overlap in Category 1 and Category 2 damages.

- 23 -

*Causation*

The defendants also argue that Bero's testimony is the only evidence of any damage for all of Crabar's claims, and Crabar failed to connect the lost profits calculations with any of the defendants' wrongful conduct. Filing 537 at 27. The defendants primarily argue that Bero's calculations were overinclusive because they included *every* sale by Wright Printing (to certain customers and of certain folders) as a wrongfully acquired sale. Filing 537 at 28. Really, the defendants' arguments go to the weight the jury afforded both Bero's testimony and Crabar's evidence. The defendants argue that because of alleged gaps in Crabar's evidence, the jury's verdict is speculative and cannot stand.

The defendants cite to this Court's determination in *Infogroup, Inc. v. DatabaseUSA.com LLC* that a jury's award may not be entirely speculative. No. 8:14-cv-49, 2018 WL 6624217, at *20 (D. Neb. Dec. 18, 2018). In that case, the jury awarded $4 million as damages for false advertising, but the plaintiff failed to put on any evidence "allowing a reasonable inference as to the amount of business diverted to [the defendant] that [was] attributable to false advertising." *Id.* That case is inapposite here. The *Infogroup* plaintiff sought relief under the Lanham Act, 15 U.S.C. § 1117(a), which requires "a heightened level of proof of injury in order to recover money damages." *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1335 (8th Cir. 1997).

The jury's verdict in this case is not speculative. It was based on expert testimony and on figures provided to the jury. In *Infogroup*, the only basis for the jury to award damages on the Lanham Act claim was argument made by counsel in closing, which was not a proper basis, unlike an expert opinion. The causation element can be met by the jury using its common sense and drawing reasonable inferences about the natural consequences of a party's actions. *See* filing 503 at 26 ("A proximate cause is a cause that produces a result in a natural and continuous sequence, and without which the result would not have

occurred."). The jury had a proper basis on which it determined damages attributable to the defendants' wrongdoing.

The defendants also cite to cases where an expert's testimony was based on projected or expected sales. But Bero's calculations were rooted in Wright Printing's actual sales, and were not speculative in the same way as those cases. *Cf. Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1368 (7th Cir. 1996). Bero could assume, in making his calculations, that Crabar could prove its claims. Crabar had to prove that Wright Printing acted wrongfully, and that wrongful conduct caused Crabar some type of damage. Bero's opinion was not lacking, and his reasoning was clear and transparent. His testimony was properly considered by the jury.

### (b) Single Recovery

The defendants request an amended judgment or a new trial on the basis that the jury impermissibly awarded damages more than once for the same injury. Filing 539 at 9. According to the defendants, the jury ignored Instruction #17 (filing 503 at 28) and awarded different amounts on Crabar's separate claims despite all of Crabar's claims stemming from the same alleged course of conduct. Relatedly, Bero failed to separate out in his analysis which lost profits were caused by which alleged tortious acts. So, according to the defendants, the jury verdict is speculative and duplicative, justifying an amended judgment.

While all of Crabar's claims arose from the same set of facts, a plaintiff is able to prosecute "consistent remedies, even to final adjudication, so long as the plaintiff receives but one satisfaction." *Penn. Nat. Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 951 (8th Cir. 2004). The Court must prevent making a plaintiff "more than whole." *Vowers & Sons, Inc. v. Strasheim*, 576 N.W.2d 817, 825 (Neb. 1998). Based on the instructions and the jury's verdict,

the jury found that different parts of the defendants' acts led to different lost profits. The jury awarded approximately $3.75 million in compensatory damages, less than the $8 million suggested by Crabar's counsel in closing. Bero's opinion provided a basis for $5.19 million in lost profits up to January 2021, and a basis for additional lost profits in perpetuity up to $17.74 million. *See* filing 376-2 at 24-25. The jury had the supporting documentation for Bero's calculations, and had sufficient evidence upon which to base any damages award for separate tortious conduct.

The jury is presumed to have followed the jury instructions, and there is no evidence beyond the defendants' speculation that the jury did anything else. *See de Vries,* 968 N.W.2d at 85; *CSX Transp., Inc.,* 556 U.S. at 841; *Borchardt,* 931 F.3d at 786. Sufficient evidence supports the jury's verdict that Crabar suffered some injury through Wright Printing's breach of contract, separate injuries from each of the defendants' willful and malicious misappropriation of Crabar's trade secrets, separate injuries from Wright and Sikora's tortious interference by using Crabar's confidential business information, and separate injuries from the breaches of the confidentiality agreements signed by Kohlhaas and Fredrickson.[3]

Only the defendants' speculation supports the argument that the jury disregarded the jury instructions and awarded multiple awards for a single injury. The Court will not entertain such speculation. *Craig Outdoor Advertising,* 528 F.3d at 1023.

---

[3] Notably, success on a tortious interference claim based on misappropriated confidential information does not require that the information be a trade secret. *See Summit Restoration,* 953 N.W.2d at 826; *Koski Prof. Grp.,* 950 N.W.2d at 377; Restatement of Torts § 759 cmt b. The evidence supports the jury's finding that some information, which was not a trade secret, led to a harm that could be compensated by a tortious interference claim but not a misappropriation of trade secrets claim.

(c) Vicarious Liability

According to the defendants, the jury failed to follow Instruction #8, and this alleged error warrants a new trial on damages. Filing 539 at 13-15. The defendants argue that the damages attributable to Wright Printing should align with the damages attributable to the individual defendants because the jury could not have found that any of the individual defendants acted outside the scope of their employment. The Court reads this as arguing that the jury verdict is inconsistent.[4] *See* Quan, 817 F.3d at 586. So, the defendants request a new trial on the basis that the judgment amount against Wright Printing for the trade secret and tortious interference claims is inconsistent with the judgments against the individual defendants.

The jury found Wright Printing to be responsible for $250,000 in damages for misappropriation of trade secrets and $250,000 in damages for tortious interference. Filing 505 at 2-3. But the jury also awarded damages for injuries caused by the individual defendants on those same claims, in amounts which exceeded the financial culpability of Wright Printing. The jury indicated on the verdict form that these were separate injuries and had not been accounted for in any other damages award. *See* filing 505; filing 507. Yet the defendants argue that "*[a]ll* of the conduct giving rise to liability for [Crabar's] claims was engaged in by the individual defendants while acting as employees and agents" for Wright Printing, apparently indicating an inconsistent verdict. Filing 539 at 14.

The jury was instructed that Wright Printing could only act through its employees working within the scope of their employment. The jury was further instructed that if any of the named defendants were liable to Crabar within

---

[4] As explained above, the defendants waived any inconsistent verdict argument by not raising it at the time the verdict was read. *McDonald Apiary,* 2017 WL 1232413, at *4.

the scope of their employment, Wright Printing would *also* be liable. Filing 503 at 11. And the jury was instructed to reduce any award if the "injured party had already been compensated for some or all of the injur[y] being redressed" by an award on a different claim. Filing 503 at 28. The verdict form reflected this instruction several times. *See* filing 505.

So, if the jury found that the named defendants acted within the scope of their employment, the jury would have found a total amount which fairly and reasonably compensated Crabar for its injuries caused by Wright Printing. Then, it would have found a total amount for injuries caused by each individual defendants, and that amount would be reduced by the amount that was accounted for in the award against Wright Printing for acts by the defendants in the scope of their employment.

The jury did not do this. Instead, it provided an amount to compensate Crabar for injuries caused by Wright Printing, and a separate amount for injuries caused by the individual defendants. The jury explicitly indicated that the award should not be reduced to prevent Crabar from recovering more than once for the same injury. The Court assumes the jury followed the instructions. The jury's verdict indicates that the individual defendants were acting outside the scope of their employment in committing at least some tortious acts, and that Wright Printing acted through other employees in causing separate harms to Crabar.

The Court will not second-guess the jury's verdict. While the jury may have benefited from counsel explaining the relationships between the individual defendants and Wright Printing in closing arguments, the jury was properly instructed on the law, and its verdict can be reconciled on a principled basis. No new trial is warranted. *Quan*, 817 F.3d at 586.

(d) Unconstitutionally Excessive Punitive Damage

The defendants argue that, based on the limited evidence of maliciousness, the punitive damages award for misappropriation of trade secrets is unconstitutionally excessive.[5] Filing 537 at 33. The jury found that Wright, Sikora, Fredrickson, and Kohlhaas willfully and maliciously misappropriated Crabar's trade secrets. It awarded punitive damages, and this award reached the statutory cap, two times the award for compensatory damages, against Wright, Fredrickson, and Kohlhaas. *See* 18 U.S.C. § 1836(b)(3)(C); filing 505; filing 507.

Excessive punitive damages may implicate a defendant's Fourteenth Amendment due process rights. *Trickey,* 705 F.3d at 802. Constitutional jurisprudence dictates "that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty." *BMW of N. Am. v. Gore,* 517 U.S. 559, 574 (1996). A punitive damages award is grossly excessive if it shocks the conscience of the court or demonstrates passion or prejudice on the part of the trier of fact. *Trickey,* 705 F.3d at 802. Generally, due process concerns arise when a statute authorizing punitive damages is vague as to how to calculate such damages, or if there is no statutory cap on the amount that can be awarded. *See id.* (reducing punitive damages awarded under the Missouri Human Rights Act, which at that time provided that a court "may award to the plaintiff actual and punitive damages" without any cap); *Gore,* 517 U.S. at 565 (remanding a case to recalculate

---

[5] This argument appears in the defendants' Rule 50(b) motion. They did not make this argument in their Rule 50(a) motion, so the argument would be waived. *See Olsen,* 24 F.4th at 1202. But these arguments would have been premature in a Rule 50(a) motion, so the Court will construe this as a Rule 59 motion. *Nassar v. Jackson,* 779 F.3d 547, 552 (8th Cir. 2015); Fed. R. Civ. P. 50(b).

punitive damages awarded under an Alabama statute which provided no limitation or mechanism for calculating damages).

To determine whether an award of punitive damages shocks the judicial conscience or is motivated by passion or prejudice, courts consider three guideposts:

> (1) the degree of reprehensibility of the defendant's misconduct;
>
> (2) the disparity between the actual or potential harm suffered and the punitive damages award (often stated as a ratio between the amount of the compensatory damages award and the punitive damages award); and
>
> (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Trickey,* 705 F.3d at 802; *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 418 (2003).

Five factors help evaluate the first guidepost, the degree of reprehensibility. Those factors are: whether the harm was physical or economic; whether the conduct impacted the health or safety of others; if the target of the conduct had financial vulnerability; if the conduct was repeated; and whether the harm was the result of intentional malice, trickery, or deceit. *Id.* (quoting *Campbell,* 538 U.S. at 419). Here, the jury explicitly found that at least some of Crabar's harm was the result of intentional malice. While the evidence is "scant" as to the other four factors, this is not fatal to an award of punitive damages. *See id.*

As to the second guidepost, the defendants argue that the large compensatory damage award necessitates a smaller ratio. "When

compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Campbell*, 538 U.S. at 425.

In *Conseco Fin. Serv. Corp. v. N. Am. Mortgage Co.,* 381 F.3d 811 (8th Cir. 2004), the Eighth Circuit found that a punitive damages award of $18 million was excessive compared to a $3.5 million compensatory award. Again facing statutory silence on any cap or mechanism to calculate punitive damages, the court determined that a two-to-one ratio reflected the conduct of the defendant and comported with due process, based on the large compensatory award. *Id.* at 825-26. That the Eighth Circuit *reduced* an award to a two-to-one ratio is instructive here.

Finally, the third guidepost does not provide any reprieve to the defendants in avoiding the punitive damage awards. The civil penalty was explicitly authorized by statute to apply in cases exactly like these. The jury's award was not excessive and did not infringe on the defendants' Fourteenth Amendment due process rights.

It's tough to argue that a jury award within statutory guidelines should shock the judicial conscience. And the Court is certain that, regardless of some passion that may have stirred counsel during the two-week trial . . . neither the topic of the trial (pocket folders) nor the evidence adduced stirred the passion or prejudice of either the jury or this judge. The defendants' due process rights were not violated where the statute plainly outlined an outer bound for punitive damages, and where the statute made clear that willfulness and maliciousness are prerequisites to such an award. Sufficient evidence supports the jury's verdict. The defendants' motions on these issues are denied.

(e) Damages Not Warranted by Great Weight of Evidence

The defendants argue for a new trial because the "compensatory award of $3.75 million in lost profits was excessively disproportionate to the evidence of damages." Filing 539 at 15. As described above, Bero provided a sufficient basis for which the jury could calculate lost profits caused by the defendants.

The defendants also argue that Bero's failure to account for "head start" damages taints Crabar's award. But the jury was instructed to only award damages "for the time period that the trade secrets would have been unavailable to the defendants had the defendants not obtained the information improperly." Filing 503 at 19. This encompasses the "head start" theory proffered by the defendants. Crabar's expert was under no obligation to calculate a reduction in damages because, arguably, there was no way that Wright Printing could ever have legally obtained the information it sold to Crabar.

The jury had Bero's schedules, including year-by-year sales by Wright Printing to Crabar's customers or of Crabar's products, and could have determined a point after which the defendants could have lawfully obtained the information. The defendants made their arguments to the jury on that issue. Bero was not obliged to account for other reasons that Crabar may have lost customers – those alleged deficiencies, as this Court has explained, go to weight and not admissibility. Filing 445 at 10. The jury was apparently unpersuaded by the defendants' alternate explanations for what caused Crabar to lose sales.

Whether the defendants would have been able to replicate Crabar's trade secrets within minutes, months, or years, or at all, was a question of *fact*, properly posed to the jury. The jury deliberated, followed the instructions, and came back with its verdict. The jury did not have to believe that the defendants could have recreated the trade secrets through proper means. As indicated

above, Bero's opinion provided a basis for $5.19 million in lost profits up to January 2021, and a basis for additional lost profits in perpetuity up to $17.74 million. The jury (appropriately) awarded far less than those figures, and the damages award is not excessive.

Finally, the defendants argue that Crabar was required to provide some evidence that the defendants continued to use the trade secrets and caused damages. Filing 539 at 18 (citing *Infogroup*, 2018 WL 6624217, at *19). But the defendants conflate copyright law with the trade secrets statute. Copyright infringement requires active infringement, but misappropriation of trade secrets carries no such requirement. *Compare Infogroup*, 2018 WL 6624217, at *18, *with* 18 U.S.C. § 1836(b)(3)(B) *and, e.g., FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir. 1984) ("A trade secret once lost is, of course, lost forever.").

To recover lost profits, Crabar had to show that but for the defendants' tortious conduct, customers would have continued purchasing folders from Crabar. It does not matter how many times the defendants used the confidential information. The defendants assume that, at some point, they would have lawfully been able to contact Crabar's customers or recreate its folder inventory. But this was a fact question posed to the jury.

Sufficient evidence supports the jury's verdict. Mardra Sikora testified that there were customers she *assumed* she would have found on publicly available and purchasable lists, but this did not end up being true and some customers came only from Crabar's list. Crabar's list was integrated into the defendants' call lists, and it doesn't matter that the defendants didn't refer to that list over and over again because all the information was "baked in" to their processes for selling. The jury's finding that Crabar's customers would have remained Crabar's customers but for the defendants' actions is supported by

- 33 -

sufficient evidence, and no new trial is warranted. The same is true for the alleged misuse of the folder information.

Much of this case rested on how trustworthy and reliable the jury found Mark Wright, his company, and his employees. Crabar's theory of the case was that it was duped by the defendants, and, as a result, the defendants gained an unfair competitive advantage. The defendants argued that Crabar was bad at making folders and its damages were self-inflicted, unrelated to the defendants' reentry into the custom-printed folder market. The defendants presented evidence and argument that Crabar failed to produce custom-printed folders as quickly as customers had come to expect, and the defendants were simply better at that business. But Crabar presented evidence that the defendants lied, took shortcuts, and misused confidential information in a manner which unlawfully harmed Crabar and its business.

At the end of nearly two weeks of trial, the jury determined that the defendants caused Crabar's lost profits and lost business by misappropriating trade secrets and confidential information, breaching contracts, and tortiously interfering with Crabar's customer relationships. The jury determined that the manner in which Wright Printing reentered the folder business was deceitful and unlawful, and even malicious.[6] The cause of Crabar's injuries was a question of fact, and the jury believed Crabar's version of events. The jury had the tools to determine the appropriate measure of damages for the defendants' misconduct and harm caused to Crabar. The verdict, and the damages awards, are supported by sufficient evidence.

---

[6] According to the jury, collecting $15 million for a sale of a company, and then restarting that company with the information sold as part of that sale, violates a deep-held philosophy of justice: no take-backsies.

- 34 -

3. ATTORNEY'S FEES

Crabar asks the Court to award it reasonable attorney's fees allowable under the Defend Trade Secrets Act. Filing 513. A court may "award reasonable attorney's fees to the prevailing party" if a "trade secret was willfully and maliciously misappropriated." 18 U.S.C. § 1836(b)(3)(D); *see also Phillips Med. Sys. v. Buan*, No. 19-cv-2648, 2023 WL 143200, at *10 (N.D. Ill. Jan. 10, 2023); *Advanced Control Tech. v. Iversen*, No. 19-cv-1608, 2021 WL 5087248, at *1 (D. Minn. June 2, 2021). Crabar requests an award of $2,411,644.93, plus an additional $61,619.50 in attorney's fees incurred between April 12, 2023, and the end of June 2023, for a total of $2,473,264.43. Filing 569 at 2.

The defendants ask this Court to reduce that amount to either $0, $334,462.07, or $1,001,383.45, based on a number of theories. Filing 535 at 26. The defendants argue that Crabar is not entitled to attorney's fees for claims on which the defendants were successful. Notably, the jury found in Crabar's favor on every claim for which it was instructed—which means that the defendants are protesting the award of any fees attributable to claims which the Court dismissed or which Crabar voluntarily dismissed. Filing 535 at 7-8. The defendants also argue that a reduction of Crabar's proposed fee award is warranted based on unreasonable Chicago attorney rates, over-lawyering, excessive billing, block-billing, and duplicative efforts. Filing 535 at 15.[7] And,

---

[7] Additionally, the defendants argue that the evidence of maliciousness on the part of the defendants was not as reprehensible as other cases of misappropriation of trade secrets, so this Court should, in its discretion, opt not to award attorney's fees. Filing 535 at 9. Considering a jury found, by clear and convincing evidence, that the defendants willfully and maliciously misappropriated Crabar's trade secrets, this argument is not well-taken.

the defendants oppose the award of $61,619.50 for post-trial lawyering because the supplement does not sufficiently support an award of those fees. Filing 573.

The Court bears the responsibility of scrutinizing attorney's fees requests, and the burden rests with counsel to establish a factual basis to support the award. *Johnston v. Comerica Mortg. Corp.,* 83 F.3d 241, 246 (8th Cir. 1996). In cases such as this, the Court uses the "lodestar" approach. *Id.* Under this methodology, the hours expended by an attorney are multiplied by a reasonable hourly rate of compensation so as to produce a fee amount which can be adjusted, up or down, to reflect the individualized characteristics of a given action. *Id.*

The standards to be considered in calculating attorney's fees under a "lodestar" approach are (1) the number of hours spent in various legal activities by the individual attorneys, (2) the reasonable hourly rate for the individual attorneys, (3) the contingent nature of success, and (4) the quality of the attorneys' work. *Jorstad v. IDS Realty Trust,* 643 F.2d 1305, 1312-13 (8th Cir. 1981). The "reasonable hourly rate" for purposes of a lodestar analysis is the "hourly amount to which attorneys of like skill in the area would typically be entitled for a given type of work on the basis of an hourly rate of compensation." *Id.* at 1313. The starting point is multiplying attorneys' hours and typical hourly rates; only after such a calculation do other, less objective factors come into the equation.

The Court has carefully considered the hours spent on the case by Crabar's attorneys, and their hourly rates. *See* filing 516-2; filing 516-3; filing 516-4; filing 516-5; filing 516-7; filing 569-1. Crabar's requested amount includes a 15 percent reduction of the Chicago-based attorneys' billable rate to reflect the lower prevailing cost in Omaha. The defendants argue a larger reduction is necessary.

Crabar was successful on all the claims which went to the jury. However, many of the dismissed claims were not dismissed until halfway through trial, or shortly before. So, Crabar incurred attorney fees for claims that it was not successful in litigating. But, all of Crabar's claims, even those which were dismissed (voluntarily or otherwise), centered around a single fact pattern. It is impossible to sort out one claim from another in assessing the billable hours. Crabar's attorneys strategically dropped certain claims to maximize its success. And a $5 million[8] verdict indicates it was successful. Notably, because only the trade secrets claim merits an award of attorney's fees, only the defendants found liable for willfully and maliciously appropriating trade secrets will be liable for the fees. *See* 18 U.S.C. § 1836(b)(3)(D).

Crabar provided sufficient evidence of the hours spent litigating this case. NECivR 54.4 requires attorneys to "file affidavits or other evidence in support of claimed hourly rates and hours." Patrick Cooper's affidavit sufficiently identifies the work performed and the hourly rates of the plaintiff's attorneys involved in preparing the post-trial briefing, particularly when combined with the evidence available in filing 516-5. *See* filing 569-1. The Court is not convinced by the defendants' objections to the supplemental attorney's fees request.

In sum, the Court has considered the challenging nature of this litigation, and the extensive preparation and care reflected in the briefings and evidence submitted over the course of the litigation by Crabar's capable counsel. But with that said, the Court also notes that this lawsuit was "over the top" contentious (by both sides' counsel) from beginning to end . . . from the pleadings stage through discovery, to the two-week trial, and all the way

---

[8] After this Order, closer to $4 million.

through post-trial motions. And *both sides* are to pay some price for this level of over-lawyering in a case of this nature.

As a result, considered under the lodestar approach, the Court will be reducing by 25 percent Crabar's requested attorney's fees, and will enter its award accordingly. Additionally, the Court is allocating fee liability, in its discretion, based on factors such as the relative culpability of the parties, the proportion of time spent litigating against each defendant, and the Court's considerable supervision during the entire course of litigation. *See Koster v. Perales*, 903 F.2d 131, 139 (2d Cir. 1990) (collecting cases), *abrogated on other grounds by N.Y. State Fed. of Taxi Drivers, Inc. v. Westchester Cnty. Taxi and Limousine Comm'n*, 272 F.3d 154 (2d Cir. 2001). The Court has considered that Wright and Sikora are primarily responsible for both the inception of this lawsuit and many of the hours spent preparing this case for trial, particularly compared with the minimal control Fredrickson and Kohlhaas had over the lawyers and time spent in this matter.

Crabar's fee award will total $1,854,948.32, apportioned as follows:

- Mark Wright and Mardra Sikora, jointly and severally, in the amount of $1,852,448.32,
- Jamie Fredrickson in the amount of $1,500, and
- Alexandra Kohlhaas in the amount of $1,000.

IT IS ORDERED:

1. The defendants' motion for judgment as a matter of law (renewed) (filing 536) is denied.

2. The defendants' motion for a new trial or to *alter or amend the judgment* (filing 538) is granted in part as to $1,000,000

in breach of contract damages against Mark Wright, and is otherwise denied.

3.     The plaintiff's motion for attorney's fees (filing 513) is granted in part, as set forth in this Order.

4.     Attorney's fees are awarded in the amount of $1,854,948.32, payable as apportioned in this Order.

5.     A separate, amended judgment will be entered.

Dated this 19th day of September, 2023.

BY THE COURT:

John M. Gerrard
Senior United States District Judge